Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
P: 626-795-4700
F: 626-795-4790

Charles Andrewscavage, *pro hac vice*
candrewscavage@scopelitis.com
Jared S. Kramer, *pro hac vice*
jskramer@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
P: 312-255-7200
F: 312-422-1224

James H. Hanson, *pro hac vice*
jhanson@scopelitis.com
Andrew J. Ireland, *pro hac vice*
aireland@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-637-1777
F: 317-687-2414

Attorneys for Defendants,
CRST EXPEDITED, INC. and CRST INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No. 2:21-cv-07766-ODW-PD<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO FOR DECERTIFICATION**<br><br>Date: September 9, 2024<br>Time: 1:30 p.m.<br>Noticed: Hon. Otis D. Wright II<br>Courtroom: 5D<br><br>Action Filed: August 9, 2021<br>Removed: September 29, 2021<br>Trial Date: November 19, 2024 |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. Class Certification and the Court's Order on Reconsideration. ........ 2

B. CRST'S Load-Based Compensation. ........ 3

C. Drivers Have Different Understandings Over Whether Compensation Was Based On Actual Miles Driven Versus Computer-Estimated Miles. ........ 4

D. Class Members' Logging Practices Varied Widely and Often Contradicted the Assumptions Huckaby's Proposed Experts Relied on To Calculate Classwide Damages. ........ 5

III. ARGUMENT ........ 6

A. Individual Issues Predominate Huckaby's Minimum Wage Claim. ........ 6

1. Drivers' individualized understanding of the job they were paid to perform. ........ 9

2. Drivers' individualized understanding of whether their pay varied based on the number of miles they personally drove. ........ 10

3. Drivers' individualized understanding of how wage statements reflected driver pay. ........ 11

4. Drivers' individualized understanding over whether successful pick-up and drop-off was a predicate to receiving payment. ........ 12

B. Individual Issues Predominate Huckaby's Contractual Wage Claim. ........ 14

C. Any Trial on CRST's Alleged Failure to Pay for Nondriving Tasks Would be Unmanageable. ........ 16

IV. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

## Cases

*Ayala v. U.S. Xpress Enters., Inc.*,
851 F. App'x 53 (9th Cir. 2021) .......... 9

*Bernstein v. Virgin Am., Inc.*,
2018 WL 3349135 (N.D. Cal. July 9, 2018) .......... 27

*Bouissey v. Swift Transportation Co.*,
2024 WL 649246 (C.D. Cal. Jan. 30, 2024) .......... 17

*Brewster v. City ofLos Angeles*,
2023 WL 5505867 (C.D. Cal. July 17, 2023) .......... 10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 22

*DiGiacinto v. Ameriko-Omserv Corp.*,
59 Cal. App. 4th 629 (1997) .......... 19, 20

*Dore v. Arnold Worldwide, Inc.*,
39 Cal.4th 384 (2006) .......... 12

*Employers Ins. of Wausau v. Granite State Ins. Co.*,
330 F.3d 1214 (9th Cir. 2003) .......... 11

*Heffelfinger v. Elec. Data Sys. Corp.*,
2013 WL 12201050 (C.D. Cal. Feb. 26, 2013) .......... 7, 10, 22

*Jimenez-Sanchez v. Dark Horse Express, Inc.*,
243 Cal. Rptr. 3d 691 (Ct. App. 2019) .......... 10, 17

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017) .......... 26

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) .......... 6, 7

*Marlo*,
639 F.3d .......... 7

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006) .......... 12

*Monaco v. Bear Stearns Companies, Inc.*,
2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) .......... 17

*Oman v. Delta Airlines, Inc.*,
9 Cal. 5th 762 (Cal. 2020) .......... 2, 8, 9, 18

*Owino v. CoreCivic, Inc.*,
60 F.4th 437 (9th Cir. 2022) .......... 23

*RMR Equip. Rental*,
65 Cal. App. .......... 12

*RMR Equip. Rental, Inc. v. Residential Fund 1347, LLC*,
65 Cal. App. 5th 383 (2021) .......... 1

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) .......... 17

*Salazar v. Driver Provider Phoenix LLC*,
2023 WL 8715626 (D. Ariz. Dec. 18, 2023) .......... 16, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 26

*Valentino v. Carter–Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) .......... 21

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 8, 21

*Zinser v. Accufix Research Institute, Inc.*,
253 F.3d 1180 (9th Cir. 2001) .......... 21

**Statutes**

Cal. Lab. Code § 226.2(a)(4) .......... 19

California Labor Code § 226.2 .......... 6, 7, 19

**Rules**

Cal. R. Ct. 8.1125 .......... 8

Fed. R. Civ. P. 23 .......... 6, 16, 20

Fed. R. Evid. 702 .......... 19

## I. INTRODUCTION

When it certified the Amended Piece-Rate Class, the Court recognized "[t]he most significant aspect of Huckaby's case is the question of whether CRST's Piece-Rate Pay Plan violates California law by failing to compensate drivers for non-driving tasks," along with the "question of whether CRST's failure to compensate its drivers for actual miles driven violates California law." ECF No. 60 at 10. To assert both questions should be answered in the affirmative, Huckaby's wage claims presume that, because CRST calculates its drivers' compensation using a formula with a mileage-rate, the payment for each load only compensates drives for each actual mile they drive and not time performing any other, non-driving activities.

As explained in CRST's concurrently filed motion for summary judgement, the undisputed evidence that is common to the class shows that for over 30 years, CRST compensated drivers on a per-load basis—using a split of an estimate of the number of miles associated with each load—in exchange for the completion of all tasks necessary to complete each load's safe delivery. The written documents Huckaby relied on as the so-called "wage agreements" forming the basis for his claim merely set forth the per-mile rate that would be used as a component of the *formula* used to calculate the amount each driver is paid for the delivery of the load. *Nothing* in either document, or any other evidence common to the class, instructs that CRST's load-based pay *only* compensates time spent driving or that the amount would be calculated based on the actual number of miles driven. For those reasons, summary judgment is appropriate on Huckaby and the Class's claims.

But, if the Court denies summary judgment because a material dispute of fact renders CRST's pay plan ambiguous, then, at trial, the jury will be required to consider extrinsic evidence that bears on drivers' reasonable expectations regarding how CRST calculated their pay, and what that pay compensated them for. *See RMR Equip. Rental, Inc. v. Residential Fund 1347, LLC*, 65 Cal. App. 5th 383, 392–93 (2021); *Oman v. Delta Airlines, Inc.*, 9 Cal. 5th 762, 782 (Cal. 2020). Testimony from the seven class members

deposed since the Court's class certification order diverged on a number of key issues bearing on those expectations, including: (a) the tasks they were hired to perform; (b) whether they knew their pay did not depend on the actual number of miles they drove a truck and if they did, when they learned of that fact; (c) whether they understood their wage statements reflected the amounts paid for each load they hauled regardless of how many miles they actually drove; and (d) whether successful pick-up and drop-off of a load was a predicate to receiving payment. The individualized nature of testimony on each of these issues will predominate a trial of Huckaby's wage claims and requires decertification.

Huckaby's claims should also be decertified for an additional reason: despite promising that any damages associated with the alleged failure to pay for nondriving tasks could be calculated on a class-wide basis, and that doing so "will be a straightforward process" (ECF No. 52-1 at 6), class-wide discovery demonstrates the opposite is true. Far from relying on the empirical analysis of payroll and log data, or even "questionnaires from class members" Huckaby promised, the damages model proffered by Huckaby relies on unfounded, inadmissible assumptions, which are contradicted by class members' testimony and establish that trial of Huckaby's claims would be unmanageable. The Court should decertify the Amended Piece Rate Class and order Huckaby's claims to proceed on an individual basis.

## II. BACKGROUND

### A. Class Certification and the Court's Order on Reconsideration.

On October 3, 2022, the Court granted in part and denied in part Huckaby's motion for class certification. *See* ECF No. 60. In its order, the Court certified an "Amended Piece-Rate Class" that it defined as "[a]ll current and former employees that had a residential address in California and performed work as a truck driver for CRST . . . who were compensated by a piece-rate from August 9, 2017, through the date of final disposition of this action, excluding the participants in the settlement in *Montoya v. CRST Expedited, Inc.*, Case No. 16-cv-10095-PBS (D. Mass.)." *Id.* at 18. Huckaby's

certified claims include his "first cause of action for failure to pay minimum wages, second cause of action for failure to pay statutory/contractual wages, and ninth cause of action for violation of California's Unfair Competition Law." *Id*. The Court denied certification of all other classes and issues. *Id*.

On April 10, 2023, the Court granted CRST's Motion for Reconsideration, in part, concluding membership in the Amended Piece-Rate Class should not extend "through the date of final disposition of this action" and therefore narrowed the class period to end on April 10, 2023. ECF No. 86 at 7–8. But the Court denied CRST's request to reconsider its decision that Huckaby had satisfied Rule 23(b)(3)'s predominance and superiority requirements, holding Huckaby satisfied his burden of showing "damages are capable of measurement on a class-wide basis." *Id*. at 6.

**B. CRST'S Load-Based Compensation.**

As detailed in its summary judgment motion, CRST compensates team drivers for safely delivering loads using a simple pay formula: half the computer-estimated miles dispatched for a load multiplied by a driver's mileage rate (which is based on experience). *See* Defendant's Memorandum in Support of Motion for Summary Judgment (MSJ Br.) at 4–8; Statement of Uncontroverted Facts (SUF) ¶ 20, 23, 25–27; *see also Brueck Tr*. at 19:20-20:16; *Aldana Tr*. at 10:15-19.[1] Under its compensation structure, team members know what they will be paid for the delivery of the load before they even begin driving because CRST dispatches the paid mileage with the rest of the load information; using the pay formula, each driver can then calculate their pay for the delivery. *Brueck Tr*. at 20:6-9; *Rainwater Tr*. at 85:12-22, 92:20-93:10, 53:14-19; *McGlothen Tr*. at 48:10-22, 50:24-51:3, 52:13-20, 72:2-8; *Aldana Tr*. at 47:1-8, 68:17-

---

[1] Unless otherwise noted, all record citations are made to the exhibits to the contemporaneously filed Declaration of Charles Andrewscavage in Support of CRST's Motion for Decertification (*Andrewscavage Decl*.). Citations are formatted as follows: excerpts of deposition transcripts, "*Deponent's Surname Tr*. at Page:Line"; excerpts of deposition exhibits, "*Deponent's Surname Tr*., Ex. __); other exhibits, "Ex. __."

69:15. CRST designs a driver's load-pay to compensate for all the tasks directly related to safely completing the delivery of the load (which includes all "on duty time," not just time spent actually driving). *Brueck Tr.* at 19:20- 20:16; *Rainwater Tr.* at 32:21-33:8.

As further explained in Section III(A)(1)-(4), class members' understanding of what their compensation covered varies widely. Some class members understood they were hired to and paid for completing all the tasks necessary to safely deliver each load. *See Andree Tr.* at 52:16-53:19, 75:28-76:9; *Aldana Tr.* at 31:8-32:9. Others, however, testified they were only paid to actually drive a truck (*i.e.*, not safe delivery or the myriad other tasks necessary for operating a commercial motor vehicle). *Rainwater Tr.* 30:24-33:8, 100:24-103:18.

**C. Drivers Have Different Understandings Over Whether Compensation Was Based On Actual Miles Driven Versus Computer-Estimated Miles.**

Several drivers knew that their pay formula used a split of their computer-estimated miles. In 2004, during his second month with CRST, Edward Rainwater's driver manager told him that CRST calculated his pay using a split of the computer-estimated miles for a load—not a split of the actual number of miles driven by him or his truck. *Rainwater Tr.* at 84:22-85:11. For the 20 years that followed, Rainwater understood his pay would never vary based on the number of miles that he or his co-driver actually drove for each load. *Id.* at 84:12-85:11.

Like Rainwater, Eduardo Aldana testified that he understood the "paid miles were not the actual miles run on the load" and that CRST was not paying him for actual miles driven. *Aldana Tr.* at 57:1-8. During his first month of employment at CRST, he raised the issue with his driver manager, who told him the miles were estimated "zip code to zip code." *Id.* at 67:18-68:22. And he continued to deliver loads for eight months after that. *Id.* at 69:2-15. Another driver, Johnnie McGlothen, had the same understanding. *McGlothen Tr.* at 48:10-22.

Yet other drivers, including Jeffrey Higginson and Huckaby, believed that CRST compensated them based on the number of miles the truck actually drove. *Higginson Tr.*

at 73:12-23; *Huckaby Tr.* at 91:4-93:19; *Akins Tr.* at 92:21-25, 104:21-105:13.

**D. Class Members' Logging Practices Varied Widely and Often Contradicted the Assumptions Huckaby's Proposed Experts Relied on To Calculate Classwide Damages.**

As part of expert discovery that followed class certification, Huckaby disclosed the reports of two proposed experts, Dr. Steve Viscelli and Sean Chasworth. *See Andrewscavage Decl.*, Ex. L - June 18, 2024 Report of Dr. Steve Viscelli (*Viscelli Report*); *id.*, Ex. M - June 18, 2024 Report of Sean Chasworth (*Chasworth Report*).[2] Dr. Viscelli's reports—which Chasworth relied on to calculate estimates of classwide damages—proffer various opinions about the frequency and duration of various non-driving tasks for which Huckaby seeks to recover, and about whether class members uniformly recorded time spent performing those tasks as on-duty or off-duty, which Chasworth relied on to calculate damages. *See generally Viscelli Report*; *Chasworth Report*.

Dr. Viscelli opines that "Driver logs are not a record of driver activities," and accordingly, "[t]here is a substantial amount of work time required of drivers" that is not necessarily logged as 'on-duty' on the driver logs." *Viscelli Report* at 10. But as described in Section III(C), class member testimony about their logging practices varied widely, and Dr. Viscelli's opinion is inconsistent with testimony of drivers who testified they logged all time spent performing the various nondriving work Huckaby seeks recovery for as on duty. *See, e.g.*, *Higginson Tr.* at 44:2-18 (on-duty time is "All time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and...responsibility for performing work, that is not actually driving"), 44:19-45:14 (all time waiting at a customer facility), 45:15-12 (pre- and post-trip inspections); 51:23-24 (fueling), 53:9-25 (attending to truck during

[2] Dr. Viscelli and Chasworth's June 18, 2024 reports supplemented their previous reports in light of additional, class-wide data CRST produced over the course of class discovery.

breakdowns), 54:1-17 (waiting to load or unload trailer), 54:23-56:3 (scaling). Class member testimony also differed on the amount of time it took to complete various nondriving tasks and cannot be reconciled with the uniform estimates Huckaby's experts applied to allow them to calculate damages on a classwide basis. *See infra* Section III(C).

## III. ARGUMENT

A court's order granting class certification may be altered at any time before entry of final judgment. Fed. R. Civ. P. 23(c). The standard of review for decertification "is the same as a motion for class certification: whether the Rule 23 requirements are met." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 479 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011). As the proponent of certification, Huckaby continues to bear the burden of satisfying that standard. *See Marlo*, 639 F.3d at 947.

When evaluating whether to decertify a class, the Court must "perform[] its role as gatekeeper, or manager, of the class action." *Heffelfinger v. Elec. Data Sys. Corp.*, 2013 WL 12201050, at *7 (C.D. Cal. Feb. 26, 2013). For that reason, a motion to decertify "should not be denied simply because it is based on facts or law previously considered." *Id.* Rather, the Court "may consider its previous substantive rulings in the context of the history of the case and may consider the nature and range of proof necessary to establish the class wide allegations." *Marlo*, 251 F.R.D. at 479–80.

In short, the Court must again engage in the same "rigorous analysis" Rule 23 requires. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Here, the discovery conducted since the Court granted class certification shows that, if this case proceeds to trial, Rule 23's exacting standards will no longer be met.

### A. Individual Issues Predominate Huckaby's Minimum Wage Claim.

California Labor Code § 226.2 requires an employer that pays by the piece to provide separate compensation for "other nonproductive time . . . that is not directly related to the activity being compensated on a piece-rate basis." Huckaby's wage claims assert that, because CRST calculates its drivers' compensation using a formula with a mileage-rate, the payment for each load only compensates time driving and not time

performing any other, non-driving activities—even if those activities are directly related to and required to safely deliver a load.

Ultimately, Huckaby's claim turns on the scope of the "piece" (*i.e.*, the activity) for which CRST compensated its drivers. Under California law, this question "is a matter determined primarily by contract," which "[c]onsistent with contract interpretation principles[,] . . . should be determined based on the mutual intention of the parties as it existed at the time of contracting." *Oman*, 9 Cal. 5th at 781. The Ninth Circuit has recognized that "section 226.2 permits an employer and its employees to define the scope of its piece-rate compensation system"; it has also rejected the assertion that the scope of the piece "must be defined by reference to the pay formula alone." *Ayala v. U.S. Xpress Enters., Inc.*, 851 F. App'x 53, 54 (9th Cir. 2021). Meaning, the pay *formula* that an employer uses for its piece rate compensation structure (*i.e.*, the equation and variables used to calculate pay) does not dictate what *piece* the employer is compensating. *See Oman*, 9 Cal. 5th at 789 ("The minimum wage laws exist to ensure that workers receive adequate and fair pay, not to dictate to employers and employees what pay formulas they may, or may not, agree to adopt as a means to that end."). Thus, a compensation structure can comply with California law "even if particular components of those [pay plans] fail to attribute to each and every compensable hour a specific amount equal to or greater than the minimum wage." *Id*.

As explained in CRST's concurrently-filed motion for summary judgment, CRST promised to pay drivers for the successful delivery of each load, and that load-based pay was intended to compensate drivers for all tasks necessary to complete safe delivery of each load. *See* MSJ Br. at 4–8; SUF ¶¶ 20–23.[3] The undisputed evidence establishes that,

[3] If the Court finds there is a genuine dispute over the tasks that CRST's load-based pay compensates, then by virtue of that holding, individual inquiries will be required to adjudicate each class member's claims. In *Brewster v. City of Los Angeles*, this Court held that "legal analysis in a summary judgment order that renders 'commonality issues . . . no longer present,' is a valid predicate for reconsideration of an earlier order denying certification." 2023 WL 5505867, at *9 (C.D. Cal. July 17, 2023). It must also be true

for over 30 years, CRST has paid its drivers by the load using computer-estimated miles. SUF ¶¶ 25–26. Huckaby, likewise, admitted CRST paid him to deliver each load and that to get paid he had to complete the delivery of the load. *Id.* ¶ 38. He also conceded that the various non-driving tasks he performed were necessary to complete safe delivery of a load. *Id.* ¶ 39. Meanwhile, there is no evidence, let alone any evidence common to the class, that CRST ever promised Huckaby or any other driver that it would pay for those non-driving tasks separately from the load pay. *Cf. Jimenez-Sanchez v. Dark Horse Express, Inc.*, 243 Cal. Rptr. 3d 691, 702 (Ct. App. 2019) (affirming denial of class certification in driver case because “Plaintiffs presented no evidence that defendant’s employment agreement with any of the drivers provided that the activity being compensated on a piece-rate basis was only driving, or excluded the listed items.”), *review denied* (June 12, 2019) (ordered de-published).[4]

Huckaby’s own evidence underscores this conclusion. The only common evidence he could present at trial—“written wage information, which reflects CRST’s pay scale on a per mile basis,” ECF No. 60 at 10—is *silent* on the scope of the piece for which CRST paid drivers. Specifically, Huckaby characterizes two documents as CRST’s “wage agreements”: (1) CRST’s “Expedited Pay Scale” and (2) its “Entry Classification/Wage Verification” form. *See* ECF No. 41-1 at 10; ECF No. 41-7 at 54, 56. Both documents state the driver’s load-based compensation, *i.e.*, the amount that will be paid for the delivery of the load, will be calculated using a per-mile rate which CRST labels “Split Mile Pay”—a fact he curiously papers over. *Id.* Yet *nothing* in either

---

that the legal analysis in a future summary judgment order that undermine the Court’s prior rulings as to commonality and predominance should predicate reconsideration. *See also Heffelfinger*, 2013 WL 12201050, at *16.

[4] The prohibition against the citation of depublished decisions does not apply to federal courts in the Ninth Circuit. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003). Further, “[a] Supreme Court order to depublish is not an expression of the court’s opinion of the correctness of the result of the decision or of any law stated in the opinion.” Cal. R. Ct. 8.1125(d).

document suggests that CRST's load-based pay *only* compensates time spent driving. Nor is there in anything in either document that suggests a promise by CRST to separately compensate for non-driving tasks.

The want of evidence favoring Huckaby's claims entitles CRST to summary judgment. But if the Court disagrees and this case proceeds to trial, then the jury will be required to consider extrinsic evidence—in particular, testimony from individual drivers—concerning the understanding of CRST's compensation policy. At minimum, the trial would need to address each driver's understanding of (a) the tasks they were hired to perform and, in turn, what they could have reasonably expected their pay to compensate; (b) the specific inputs in their pay formula, including whether the amount they were paid was based on the actual number of miles they drove a truck or the computer-estimated miles dispatched with each load (which is impossible given that the co-drivers are paid on a split of the miles associated with the load and not the actual miles); (c) their wage statements, including whether they reflected payments for each load they hauled regardless of how many miles they actually drove; and (d) whether successful pick-up and drop-off of a load was a predicate to receiving payment. Well-settled principles of contractual interpretation dictate that Huckaby cannot avoid introduction of this evidence. *See, e.g.*, *RMR Equip. Rental*, 65 Cal. App. at 392–93; *Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th 384, 391 (2006); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989–90 (9th Cir. 2006). Yet, as detailed below, class members' testimony diverges on all of these issues.

**1. Drivers' individualized understanding of the job they were paid to perform.**

Huckaby cannot ignore the reality that each driver's expectations about the tasks they were hired to perform bear directly on their objective understanding of what CRST's pay compensated them for. While some class members believed they were only hired to drive, others understood from the job description CRST provided to them at the time they applied that their job was to safely deliver loads and to perform each of the

tasks required to do so. *Compare Akins Tr.* at 18:4-24:21 (only hired to drive), *with Garcia Tr.* at 22:9-32:9; *id.*, Ex. 1; *Higginson Tr.* at 17:19-29:22; *id.*, Ex. 1; *Rainwater Tr.* at 20:3-33:8; *Aldana Tr.* at 36:6-15; *McGlothen Tr.* at 33:5-20; *Linson Tr.* at 32:18-33:11, 52:4-15, 54:8-19, 156:17-157:19; *Huckaby Tr.* at 33:10-36:2, 42:2-7, 49:10-16, 62:25-63:11.

Garcia, for example, testified he understood that was the job CRST's pay would compensate him for. *Garcia Tr.* at 30:9-32:9. Cary Andree similarly testified he understood CRST's pay compensated him for "all of the tasks related to delivering" each load. *Andree Tr.* at 40:7-12, 75:28-76:9. Rainwater, however, testified CRST has only paid him to drive for over 20 years—despite understanding he was hired to perform all of the nondriving tasks necessary to safely deliver loads when he applied for the job in 2004. *Rainwater Tr.* 30:24-33:8, 100:24-103:18. He came to that understanding because *his* "primary focus" was on driving; as he explained, "the reason I focus on that is, I drive night shift," even though he conceded all of the other tasks that are necessary to complete delivery of a load were part of his job as a driver. *Id.* at 31:20-33:8; 98:6-100:9.[5]

**2. Drivers' individualized understanding of whether their pay varied based on the number of miles they personally drove.**

The undisputed evidence also establishes that CRST paid drivers to deliver loads according to a *split* mileage pay system, which did not vary depending on the number of miles actually driven. *See* MSJ Br. at 15; SUF ¶¶ 25, 27. Indeed, the purported "wage agreements" Huckaby relies on as the common glue for his class claims references that "split mile pay." ECF No. 41-7 at 54, 56. And drivers received the estimated number of miles associated with each load *before* they even picked up the load. SUF ¶ 36. Drivers

---

[5] In his 21 years at CRST, he never complained to anyone other than one other driver about not being paid for anything other than driving, despite admitting that in other instances, when there were certain tasks he didn't receive pay for, he brought that to his driver manager's attention. *Rainwater Tr.* at 103:10-104:15; 106:4-107:17; *id.*, Ex. 8.

therefore could—and some admitted they did—determine their total load pay for a given delivery before they drove a single mile of each delivery. *Aldana Tr.* at 56:17-57:4, 58:17-59:2; *Rainwater Tr.* at 95:6-11, 116:6-117:24.

Unsurprisingly, several drivers—including Huckaby—also testified they understood their pay did not vary based on the number of miles they personally drove; they knew they were paid the same amount regardless of whether they drove more or less than their co-driver. *See Huckaby Tr.* at 91:11-93:19; *Garcia Tr.* at 107:3-13; *Rainwater Tr.* at ¶ 95:6-96:18; *Aldana Tr.* at 53:25-54:55:12. At least one driver, Anthony Akins, did not know. *Akins Tr.* at 117:2-14.

While several drivers understood their pay to be based on a split of the actual miles driven, other drivers' understanding about their pay was even more attenuated from the number of miles actually driven. They understood the "paid miles" used to calculate their pay was merely a computer-generated estimate of the miles associated with each load, which CRST provided with their dispatch instructions, and frequently differed from the total number of miles they and their co-driver would travel to complete delivery of the load. *Aldana Tr.* at 54:25-55:12, 57:1-59:2, 68:17-69:15; *Andree Tr.* at 21:7-9; 52:16-53:19, 61:23-28, 72:21-73:2, 73:3-15; *Rainwater Tr.* at 53:14-19. As Rainwater explained, "that's industry standard." *Id.* at 117:7-13. One driver testified he understood he would be paid for delivery of a load *even if he personally did not drive a single mile*. *McGlothen Tr.* at 60:17-61:11.

**3. Drivers' individualized understanding of how wage statements reflected driver pay.**

Huckaby also cannot dispute that CRST's wage statements reflect separate payment amounts for each load delivered during the corresponding pay period. *See* MSJ Br. at 12; SUF ¶¶ 24, 37, 45. Despite that, testimony about how drivers understood their pay to be reflected on their paychecks varied.

Rainwater, for example, reviewed his wage statements each week to confirm they reflected pay for every load he hauled. *Rainwater Tr.* at 118:22-119:1. When he noticed

a load did not appear, he told his driver manager and payroll corrected it. *Id.* at 119:2-23. Aldana similarly understood his wage statements reflected pay for the completed loads he submitted. *Aldana Tr.* at 78:12-19. He also understood the number of miles listed associated with those loads on the pay statements were an estimate, which equaled the number of miles provided to him in dispatch instructions before he hauled the load. *Id.* at 80:2-81:15. But others, like Higginson, believed that the number of miles listed for each load on his wage statements were the actual miles driven by the truck, though he understood his pay did not depend on the number of miles he personally drove. *Higginson Tr.* at 79:2-16; 82:8-18. And still others testified that they never reviewed their wage statements at all. *Linson Tr.* at 98:7-18, 121:19-122:24; *McGlothen Tr.* at 54:2-25; *id.*, Ex. 4.

**4. Drivers' individualized understanding over whether successful pick-up and drop-off was a predicate to receiving payment.**

Finally, Huckaby's theory that CRST only paid drivers to drive also cannot be reconciled with testimony that drivers' receipt of payment depended on the successful pick-up and drop-off of a trailer and/or freight; not driving a particular number of miles. MSJ Br. at 8; SUF ¶¶ 29, 46.

Several class members, including Huckaby, understood this. *Huckaby Tr.* at 31:20-32:2; *McGlothen Tr.* at 59:14-24. Others agreed but with the added explanation that some deliveries included two segments, each completed by a different truck. *See, e.g.*, *Aldana Tr.* at 45:23-46:19. In those instances, CRST paid them upon successful completion of the pick-up and drop-off for their truck's segment. *Id.* As McGlothen explained, he understood CRST would pay him for delivery of a load even if he did not drive a single mile. *McGlothen Tr.* at 60:17-61:1. Another driver testified drivers would have been paid regardless of whether they completed the delivery (though they may have been fired or suspended for doing so). *Linson Tr.* at 114:20-115:13; 158:25-159:9.

Similarly, some drivers testified they needed to submit paperwork reflecting successful delivery of the load in order to get paid, while others testified they did not.

Aldana testified he needed to submit paperwork, but that paperwork needed to include the number of miles actually driven. *Aldana Tr.* at 34:14-18. But others stated they never provided the number of miles actually driven when submitting their load paperwork. *See, e.g., Garcia Tr.* at 115:17-22.

* * *

The divergent testimony on each of these several issues shows the inherently individualized nature of the extrinsic evidence bearing on Huckaby's claims. Courts do not permit cases to proceed to trial on a classwide basis when the jury will be required to hear testimony from each class member. For example, in *Salazar v. Driver Provider Phoenix LLC*, 2023 WL 8715626, at *4 (D. Ariz. Dec. 18, 2023), the court denied certification because the case "require[d] individual analysis of each Driver's reasonable expectation and individual analysis of what implied contract existed between each Driver and Driver Provider." Because "[t]he determination of liability cannot be adjudicated by representation, and it would entail factual mini trials for each class member," the Court should decertify the class. *Bouissey v. Swift Transportation Co.*, 2024 WL 649246, at *8 (C.D. Cal. Jan. 30, 2024) (granting decertification); *see also Dark Horse Express*, 243 Cal. Rptr. 3d at 702 (affirming denial of certification where drivers testified they were paid by the load and understood they were not paid separately for non-driving tasks); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176–77 (11th Cir. 2010) ("Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements."); *Monaco v. Bear Stearns Companies, Inc.*, 2012 WL 10006987, at *8 (C.D. Cal. Dec. 10, 2012) ("Because extrinsic and parol evidence is needed to determine the intent of each of the putative Subclass members in entering into the loan agreements, class-wide resolution of this issue is not appropriate.").

**B. Individual Issues Predominate Huckaby's Contractual Wage Claim.**

Under CRST's compensation system, drivers were paid to deliver loads and their pay was calculated by multiplying drivers' mileage rate by a split of the computerized estimation of the miles between two points (the pick-up and delivery sites). *See* MSJ Br. at 4–8; SUF ¶¶ 20, 23, 25–27. If the Court finds it does not have sufficient undisputed evidence to make that determination and must look to extrinsic evidence, however, then the Court must decertify the class.

Despite his promise to do so, Huckaby has not identified a single document in which CRST promised to pay drivers for the actual miles they drove. So, if this case goes to trial, the jury must consider the available extrinsic evidence, including both *what* class members understood about whether they were being paid for the actual miles they drove and *why* or *how* they came to that understanding. *Oman*, 9 Cal. 5th at 782. That evidence is highly individualized.

The discovery to date bears that out. Some class members testified that they understood CRST was paying them using computer estimated miles for the entirety of the class period. *See, e.g.*, *Rainwater Tr.* at 84:22-85:11. Like Rainwater, Aldana testified that he understood the "paid miles were not the actual miles run on the load" and that CRST was not paying him for actual miles driven. *Aldana Tr.* at 57:1-8. As he learned during his first month with CRST, upon raising the issue with his driver manager, the miles were actually estimated "zip code to zip code." *Id.* at 67:18-68:22, 69:2-15. McGlothen too had the same understanding. *McGlothen Tr.* at 48:10-22. But other drivers, like Higginson, believed that CRST was compensating him for actual miles he and his co-driver drove in the truck on an actual trip. *Higginson Tr.* at 73:12-23, 74:10-75:9; 82:13-18.

Because class members have a different understanding of how CRST was compensating them during the class period, each class member will need to testify to their own experience at trial in order to resolve whether CRST and that class member had agreed that CRST would pay them for actual miles or estimated miles. *Salazar*, 2023

WL 8715626, at *4.

Notably, no matter what they understood when they joined CRST, class members were at-will employees. In California, "an at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." *DiGiacinto v. Ameriko-Omserv Corp.*, 59 Cal. App. 4th 629, 637 (1997). Therefore, no matter if an individual initially believed that their contractual agreement with CRST was to be paid for actual miles driven, if they later were put on notice that they were instead paid by a split of the estimated miles and opted to continue to perform services for CRST, then they would have "accepted the changed term and conditions" and cannot have a claim after that date. *Id.*

The only way CRST could pursue this defense is by having drivers testify as to *what* dispatchers told them about their future compensation and *when*. Again, as the testimony above demonstrates, class members' experiences on this point varied. *Aldana Tr.* 67:22-69:15; *Rainwater Tr.* at 84:12-85:11, 101:11-25; *McGlothen Tr.* at 74:3-79:22. Other drivers, like Higginson and Huckaby, testified that they always understood that CRST paid them for actual miles driven and that CRST never informed them differently. *Higginson Tr.* at 73:12-23; *Huckaby Tr.* at 101:19-24. And yet others, like Mr. Linson, understood that he was not getting paid for actual miles driven despite knowing his actual miles driven was more than the paid mileage provided to him before he hauled each load. *Linson Tr.* at 160:2-25.

What individual class members knew about how they were compensated for their at-will employment and when they knew it matters to CRST's modification defense. *See DiGiacinto*, 59 Cal. App. 4th at 637. Because class members had differing experiences on this point, the Court should find that Huckaby cannot satisfy the predominance requirement and decertify the class.

**C. Any Trial on CRST's Alleged Failure to Pay for Nondriving Tasks Would be Unmanageable.**

To maintain this case as a class action, Huckaby has the burden of establishing not only that common issues predominate each claim, but also that a class action can provide a common answer and remains the superior method to fairly and efficiently adjudicate his claims. Fed. R. Civ. P. 23(b)(3). The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). A class action is not superior where "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). To satisfy superiority, Huckaby must show "a suitable and realistic plan for trial of the class claims." *Id.* at 1189. A trial plan does not establish manageability if a party's claims require individual analysis of each employee's claims or if the plan involves procedural tools that deprive a defendant of its right to assert its defenses as to each class member. *Dukes*, 564 U.S. at 367. If a district court certifies a class, but "subsequently . . . becomes convinced that the litigation cannot be managed, the option of decertification is available." *Heffelfinger*, 2013 WL 12201050, at *9.

Consistent with these principles, the Supreme Court has made clear a plaintiff must offer a damages model that ties liability to a damages calculation susceptible of measurement across the entire class. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). The Supreme Court also rejected the notion that any methodology will do. Rather, at the certification stage, a court must examine plaintiffs' proposed method of proving damages on a classwide basis and determine whether the methodology is just and reasonable. *Id.* If a plaintiff fails to show that damages are capable of being fairly measured on a class-wide basis, Rule 23's requirements are not met.

In initially permitting this case to proceed as a class action, the Court relied on Huckaby's representations that he would be able to prove damages on a class-wide basis

using "representative evidence and CRST's corporate records, timekeeping, and pay data." ECF No. 86 at 6. According to Huckaby, "[w]ith the existence of . . . extensive daily activity and payroll data, a damage analysis will be a straightforward process." ECF No. 52-1 at 6. Huckaby's counsel promised more specifically, "quantifying the time spent performing [nondriving] tasks can be proven through representative evidence such as: questionnaires from class members, data from DOT inspections, CRST's driver log database, CRST's GPS database, employee and corporate testimony, video recordings, expert studies, and more." *Id.* at 7. Huckaby has also contended driver logs in particular would be used to "provide[] information about the drivers at any given time, including the location of their truck and the drivers' activities such as driving, stopping, on-duty/non-driving time, and sleeper berth time." ECF No. 66 at 11. The Court also observed that, at the time, Huckaby did "not need to present a fully formed damages model 'when discovery [is] not yet complete and pertinent records may [be] still within [CRST's] control.'" *Id.* (quoting *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 447 (9th Cir. 2022)).

Discovery taken since class certification establishes Huckaby cannot make good on these promises. During that time, CRST produced hundreds of gigabytes of data, consisting of hours-of-service log data, GPS data, payroll data, DOT inspection data, messaging data, emails sent to and from class members, and details about the trips completed pertaining to the entire class during the class period. *See Andrewscavage Decl.*, ¶ 15; *id.*, Ex. K - Rebuttal Report of Dr. Chen Song (*Song Report*) at ¶ 15. Despite promising he could quantify the time spent performing non-driving tasks using that data, along with "questionnaires from class members," "expert studies," and other "representative evidence," Huckaby has done no such thing. Instead, Huckaby's damages calculations rely on opinions of one of Huckaby's proposed experts, Dr. Viscelli, about the frequency and duration of nondriving tasks. Those opinions are not based on any empirical analysis of data, time-studies, verified survey responses, or statistical analysis of any kind. Instead, they are based on his unspecified "experience

studying and observing these issues in the field," (*Viscelli Report* at 19, 20, 26), along with cherry-picked, anecdotal testimony from certain class members, which conflicts with testimony of other class members Dr. Viscelli omitted from his report.

By way of example, Dr. Viscelli concluded 22.5 minutes is a "modest and reasonable" estimate of how long it takes all class members to complete pre- and post-trip inspections. *Viscelli Report* at 26. But some class members testified that the amount of time spent on pre-trip inspections varied between approximately 10 and 35 minutes depending on factors such as the weather. *Aldana Tr.* at 85:14-21; *Akins Tr.* at 43:8-23; *Rainwater Tr.* at 70:7-14; *Huckaby Tr.* at 51:3-52:10. On the other hand, Antonio Acosta-Garcia testified that pre-trip inspections took 15 minutes, and the time never varied. *Garcia Tr.* at 77:7-78:1. For some, post-trip inspections took between 10-30 minutes. *Akins Tr.* at 46:9-18. Others did not complete post-trip inspections at all. *Rainwater Tr.* at 74:11-21.

Class member testimony similarly varied with respect to time spent scaling. Dr. Viscelli estimated, based on unspecified "professional research and observations" that "routine scalings would take 20-30 minutes, and "more time-consuming ones to take longer." *Viscelli Report* at 20. But Huckaby testified that the amount of time spent scaling the truck at weigh stations "[s]houldn't be longer than five minutes." *Huckaby Tr.* at 88:5-15. Other class members testified it took them between 15 minutes to an hour. *Garcia Tr.* at 85:1-7; *Akins Tr.* at 88:4-15.[6]

Critically, the thrust of Dr. Viscelli's report is that driver logs—the only timekeeping records that exist—cannot be used to accurately estimate the amount of time class members spend performing compensable work. *See Viscelli Report* at 10

---

[6] Dr. Viscelli speculates class members provided lower estimates of the amount of time they spent scaling because they were responding to questions such as "about how long did it take to scale a load on average." *Viscelli Report* at 20. But aside from speculation, he provides no evidence for his conclusion that in answering those questions, drivers limited their estimates in the way he assumes.

(“Driver logs are not a record of driver activities.”), 11 (“Dr. Song incorrectly assumes that drivers would record all work they did for CRST in these logs accurately.”). To calculate alleged unpaid wages associated with several tasks, such as fueling, Huckaby’s other proposed expert, Sean Chasworth, simply adopted many of Dr. Viscelli’s unsupported opinions about their duration and daily frequency, then multiplied them by a “weighted average hourly rate”[7] or “weighted average minimum wage rate,” and assumed (contrary to the log data) each class member worked 5 days per week during each week for which they received a paycheck. *Song Report* at 12-19. For other tasks, Chasworth relied on the frequency of pay codes indicating when certain events occurred, but still adopted Dr. Viscelli’s various assumptions about their duration. *See, e.g.*, *Chasworth Report*, ¶¶ 25 (fueling), 31 (scaling), 32 (pre- and post-trip inspections).

Those assumptions lack any foundation based on an analysis of data, which Huckaby promised would permeate his class-wide damages model. Nor is there any evidentiary basis for the admissibility of Dr. Viscelli’s speculative assumptions as “representative evidence.”[8] Dr. Viscelli has not, for example, conducted any type of time and motion study, or other analysis of data that would render his opinions about the duration and frequency of various nondriving tasks admissible. *Cf. Tyson Foods, Inc. v.*

---

[7] The weighted average hourly rate Chasworth calculated equals the total amount of “sick pay” included in the payroll data CRST produced, divided by the total number of hours associated with that pay. Chasworth Report at ¶ 15. To calculate that amount, he used data from only a small sample of the class (88 drivers). *Song Report* at ¶ 14, *Rebuttal Opinion I*. Regardless, there is no legal basis for using an average hourly rate to calculate damages for Huckaby’s claim alleging failure to separately pay for non-driving tasks. Even if the nondriving tasks were not “directly related to the activity being compensated on a piece-rate basis,” California Labor Code § 226.2 only requires that employers pay for time spent performing those tasks “at an hourly rate that is no less than the applicable minimum wage.” Cal. Lab. Code § 226.2(a)(4).

[8] Expert discovery has not yet closed in this case. Following the expert discovery cutoff date, CRST intends to file a motion in limine seeking exclusion of Dr. Viscelli and Chasworth’s testimony under Federal Rule of Evidence 702.

*Bouaphakeo*, 577 U.S. 442, 455 (2016). What is more speculative, these assumptions are based on Dr. Viscelli's rejection of Huckaby's own representation that driver log data could be used to accurately quantify when and for how long drivers performed the myriad tasks for which he seeks recovery—a representation the Court relied on when it certified the class. ECF No. 86 at 6.

Though "[u]ncertainty regarding class members' damages does not prevent certification," Huckaby was obligated to provide "a valid method . . . for calculating those damages" to support maintenance of this case as a class action. *See Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017). Where plaintiffs fail to do so after conducting class discovery, courts recognize Rule 23's efficiency goals can no longer be met by allowing the plaintiff to pursue his claims on behalf of class. *See, e.g.*, *Bernstein v. Virgin Am., Inc.*, 2018 WL 3349135, at *8 (N.D. Cal. July 9, 2018), (decertifying claim alleging failure to pay for completion of "incident reports," noting "Plaintiffs previously proposed the possibility of using surveys, but offer none here. Instead, they offer a handful of declarations from a small group of flight attendants regarding their personal experience. This is not sufficient evidence to prove that incident reports always take at least fifteen minutes." (internal citations omitted)). The Court should do the same here.

## IV. CONCLUSION

For these reasons, CRST respectfully requests that the Court decertify any class claims that survive summary judgment.

Dated: August 6, 2024

Respectfully submitted,

/s/ *Charles Andrewscavage*
Charles Andrewscavage

Attorney for Defendants,
CRST EXPEDITED, INC. and
CRST INTERNATIONAL, INC.

## Certificate of Compliance

The undersigned counsel of record for Defendants certifies that this brief contains 6,989 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 6, 2024

Respectfully submitted,

/s/ *Charles Andrewscavage*
Charles Andrewscavage

Attorney for Defendants,
CRST EXPEDITED, INC. and
CRST INTERNATIONAL, INC.