Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
P: 626-795-4700
F: 626-795-4790

Charles Andrewscavage, *pro hac vice*
candrewscavage@scopelitis.com
Jared S. Kramer, *pro hac vice*
jskramer@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
P: 312-255-7200
F: 312-422-1224

James H. Hanson, *pro hac vice*
jhanson@scopelitis.com
Andrew J. Ireland, *pro hac vice*
aireland@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-637-1777
F: 317-687-2414

Attorneys for Defendants,
CRST EXPEDITED, INC. and CRST INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No. 2:21-cv-07766-ODW-PD<br><br>**DECLARATION OF CHARLES ANDREWSCAVAGE IN SUPPORT OF DEFENDANTS' MOTION FOR CLASS DECERTIFICATION** |

I, Charles Andrewscavage, declare as follows:

1. I am a partner at the law firm of Scopelitis, Garvin, Light, Hanson & Feary, P.C. I represent the Defendants CRST Expedited, Inc. and CRST International, Inc. (collectively, CRST) in the above-captioned matter.

2. A true and correct copy of excerpts of the deposition of Chad Brueck, dated February 15, 2022, and the exhibits thereto, are attached as **Exhibit A**.

3. A true and correct copy of excerpts of the deposition of Eduardo Aldana, dated December 18, 2023, and the exhibits thereto, are attached as **Exhibit B**.

4. A true and correct copy of excerpts of the deposition of Edward Rainwater, dated February 9, 2024, and the exhibits thereto, are attached as **Exhibit C.**

5. A true and correct copy of excerpts of the deposition of Johnnie McGlothen, dated January 11, 2024, and the exhibits thereto, are attached as **Exhibit D**.

6. A true and correct copy of excerpts of the deposition of Cary Andree, dated November 6, 2019, and the exhibits thereto, are attached as **Exhibit E.**

7. A true and correct copy of excerpts of the deposition of Jeffrey Higginson, dated July 23, 2024, and the exhibits thereto, are attached as **Exhibit F.**

8. A true and correct copy of excerpts of the deposition of Keith Huckaby, dated March 7, 2022, and the exhibits thereto, are attached as **Exhibit G**.

9. A true and correct copy of excerpts of the deposition of Anthony Akins, dated January 16, 2024, and the exhibits thereto, are attached as **Exhibit H.**

10. A true and correct copy of excerpts of the deposition of Antonio Acosta Garcia, dated March 21, 2024, and the exhibits thereto, are attached as **Exhibit I**.

11. A true and correct copy of excerpts of the deposition of Vaughn Linson, dated July 10, 2024, and the exhibits thereto, are attached as **Exhibit J**.

12. A true and correct copy of the Expert Rebuttal Report of Dr. Chen Song, dated November 6, 2023, is attached hereto as **Exhibit K**.

13. A true and correct copy of the Expert Report of Dr. Steve Viscelli, dated April 10, 2023, is attached hereto as **Exhibit L**.

14. A true and correct copy of the Expert Report of Dr. Sean Chasworth, dated April 10, 2023, is attached hereto as **Exhibit M**.

15. During discovery, CRST produced thousands of gigabytes of data, consisting of hours of service log data, GPS data, payroll data, DOT inspection data, messaging data, emails sent to and from class members, and details about the trips completed pertaining to the entire class during the class period.

16. Additionally, during discovery, Huckaby disclosed the reports of two proposed experts, Dr. Steve Viscelli and Sean Chasworth. CRST disclosed the rebuttal report of its expert, Dr. Chen Song.

17. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 6, 2024

*/s/ Charles Andrewscavage*
Charles Andrewscavage

# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEITH HUCKABY, INDIVIDUALLY )
AND ON BEHALF OF ALL OTHER )
PERSONS SIMILARLY SITUATED, )
AND ON BEHALF OF THE GENERAL )
PUBLIC, )
)
Plaintiff, )
)
vs. ) No 2:21-cv-07766-ODW-PD
)
CRST EXPEDITED, INC., AN )
IOWA CORPORATION; CRST )
INTERNATIONAL, INC., AN IOWA )
CORPORATION; AND DOES 1 )
THROUGH 30, INCLUSIVE, )
)
Defendants. )
)

DEPOSITION OF CRST EXPEDITED, INC.
BY AND THROUGH CHAD BRUECK
TUESDAY, FEBRUARY 15, 2022
LOS ANGELES, CALIFORNIA

ATKINSON-BAKER, A VERITEXT COMPANY
(800) 288-3376

REPORTED BY: JEANINE CURCIONE
CSR NO. 10223, RPR

FILE NO.: AB 5084431

Deposition of CHAD BRUECK, taken on behalf of Plaintiff, at 9:05 A.M., Tuesday, February 15, 2022 before Jeanine Curcione, C.S.R. No. 10223, RPR, pursuant to notice.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

BERENJI LAW FIRM, APC
BY: DAVID C. HOPPER, ESQ.
8383 Wilshire Boulevard
Suite 708
Beverly Hills, California 90211
Phone: (310)855-3270
e-mail: hopper@employeejustice.law

FOR THE DEFENDANTS:

SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
BY: CHARLES ANDREWSCAVAGE, ESQ.
BY: JARED S. KRAMER, ESQ.
30 West Monroe Street
Suite 1600
Chicago, Illinois 60603
e-mail: candrewscavage@scopelitis.com

ALSO PRESENT:

LISA STEPHERSON

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| CHAD BRUECK | BY MR. HOPPER | 6 |

E X H I B I T S

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 1 | 11 | Deposition Notice |
| Exhibit 2 | 65 | Document Bates Stamped CRST F4-15 |
| Exhibit 3 | 73 | CRST F455-633 |
| Exhibit 4 | 124 | September 2020 Safety and Operations Handbook |
| Exhibit 5 | 125 | 2016 Driver Employee Handbook |
| Exhibit 6 | 129 | Document Bates Stamped CRST F309 -370 |
| Exhibit 7 | 138 | Memo Dated 3/12/21 |
| Exhibit 8 | 143 | Document Bates Stamped CRST_B000164, 360 |
| Exhibit 9 | 148 | Document Bates Stamped CRST F37 |
| Exhibit 10 | 149 | Reserved in Document Production as CRST F453_Native |
| Exhibit 11 | 151 | Reserved in Document Production as CRST F00045_Native |
| Exhibit 12 | 152 | Document Bates Stamped CRST F60-61 |
| Exhibit 13 | 154 | Document Bates Stamped CRST F55 |
| Exhibit 14 | 155 | CRST Expedited Solutions Wage Verification Form |

EXHIBITS (CONTINUED

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 15 | 157 | Document Bates Stamped CRST F248-258 |
| Exhibit 16 | 161 | Bates Stamped CRST F259-270 |
| Exhibit 17 | 162 | Document Bates Stamped CRST F271-282 |
| Exhibit 18 | 163 | Document Bates Stamped CRST F283-293 |
| Exhibit 19 | 210 | Document Bates Stamped CRST F294-304 |
| Exhibit 20 | 210 | Document Bates Stamped CRST F305-308 |
| Exhibit 21 | 210 | Document Bates Stamped CRST F371-374 |
| Exhibit 22 | 211 | Document Bates Stamped CRST F433-436 |
| Exhibit 23 | 164 | Bates Stamped CRST F429-422 |
| Exhibit 24 | 164 | Huckaby Driver Logs CRSTF000205_Native |
| Exhibit 25 | 168 | Document Bates Stamped CRST F957-1085 |
| Exhibit 26 | 180 | Document Bates Stamped CRST F718-79 |
| Exhibit 27 | 194 | Document Bates Stamped CRST F1091-1171 |
| Exhibit 28 | 184 | Bates stamped CRST F799-806. |
| Exhibit 29 | 198 | Document Reserved in Document Production Native File Bates Stamped CRST 000246_native |
| Exhibit 30 | 200 | Document Bates Stamped CRST F000796_Native |

EXHIBITS (CONTINUED)

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 31 | 203 | Document Bates Stamped CRST F000798_Native |
| Exhibit 32 | 204 | Document Bates Stamped CRST F000807_Native |
| Exhibit 33 | 205 | Document Bates Stamped CRST F000808_Native |
| Exhibit 34 | 208 | Document Bates Stamped CRST F000810_Native |

LOS ANGELES, CALIFORNIA;

TUESDAY, FEBRUARY 15, 2022, 9:05 A.M.

CHAD BRUECK,

having been duly affirmed, was

examined and testified as follows:

EXAMINATION

BY MR. HOPPER:

Q. Good morning. Will you please state and spell your name for the record.

A. My name is Chad Brueck. C-h-a-d, B-r-u-e-c-k.

Q. Do you have any middle names?

A. Yeah, my middle name is Michael, M-i-c-h-a-e-l.

Q. Have you gone by any other names before?

A. No.

Q. And my name is David Hopper. I'm counsel for Keith Huckaby and also punitive class members in an action brought against CRST Expedited, Inc. and CRST International, Inc.

Do you understand that you're here today appearing remotely to answer some questions related to that action?

During that time period from August 9 of 2017 to the present, who has been responsible for developing or creating CRST Expedited policies regarding payment of wages to drivers?

A. It's not a single individual I would say first off, and my tenure from August 2017 was vice president of customer service, and then I was at Pegasus for 16 months from March of 2018 to July of 2019. So my predecessor as president of Expedited Solutions was Cameron Holzer who I believe was president of Expedited the entire remainder prior to me assuming the role.

Q. And so would Cameron have had responsibility for developing or creating policies regarding the payment of wages to drivers?

MR. ANDREWSCAVAGE: Objection. Vague and mischaracterizes testimony. Go ahead.

THE WITNESS: What do you mean by policies relating to payment of wages?

Q. BY MR. HOPPER: So how the drivers are paid. It's my understanding they're paid piece rate by the mile; is that correct?

MR. ANDREWSCAVAGE: Objection. Form. Go ahead, Chad.

THE WITNESS: They're paid by the movement.

Q. BY MR. HOPPER: What does that mean?
A. That means that they are assigned a movement that could be a loaded movement or an empty movement and upon completion of that movement they are paid the wage for that movement.
Q. Okay. But that rate is determined based on their miles; correct?
A. Movement amount is calculated by taking the miles of the trip times the wage rate.
Q. Okay. Is there any other form of compensation that the drivers receive other than this -- sorry. Strike that.
What do you call this? It's called a -- you said paid by the movement. Is there a term we can use throughout the deposition that describes that?
A. We can use load pay.
Q. Load pay. Okay. Do the drivers from that time period from August of 2017 to present, do they get any other wages other than load pay?
A. Yes.
Q. What other wages?
A. Some examples of other compensation are detention pay. They also receive load/unload pay. They receive layover pay, breakdown pay.
Q. Okay. And is there anything else before

REPORTER'S CERTIFICATE

I, JEANINE CURCIONE, C.S.R. NO. 10223, RPR, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth and that the witness was requested to read and sign;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings.

I further certify that I am not interested in the event of the action.

Witness my hand this 17th day of February, 2022.



Certified Shorthand
Reporter for the
State of California

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,

Plaintiff,

vs.

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

CASE NO. 2:21-cv-07766-ODW-PD

ZOOM DEPOSITION OF
EDUARDO ALDANA

Taken on behalf of the Defendants, CRST EXPEDITED, INC., dba and kna CRST The Transportation Solution, Inc., at Honolulu, Hawaii, Commencing at 9:30 a.m. Pacific Time, on December 18, 2023, pursuant to notice.

BEFORE:
SHEILA MOORE, RPR, RMR, CMRS, CRR, CSR No. 501

APPEARANCES:

For Plaintiff, KEITH HUCKABY, et al.:

SHADIE L. BERENJI, ESQ.
BERENJI LAW FIRM, APC
8383 Wilshire Boulevard, Suite 708
Beverly Hill, CA 90211
888-900-2573
berenji@employeejustice.law

For the Defendants, CRST EXPEDITED, INC., dba and kna CRST The Transportation Solution, Inc.:

JAMES H. HANSON, ESQ.
ANDREW J. IRELAND, ESQ.
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
317.637.1777
jhanson@scopelitis.com
aireland@scopelitis.com

AND

CHARLES ANDREWSCAVAGE, ESQ.
JARED S. KRAMER, ESQ.
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
312.255.7200
candrewscavage@scopelitis.com
jskramer@scopelitis.com

ALSO PRESENT:

Dan Bruun, Video Specialist

\- - - - -

INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| MR. HANSON | 4 |


INDEX OF MARKED EXHIBITS


| NO. | PAGE |
|---|---|
| Exhibit 1 IntelliApp | 15 |
| Exhibit 2 CRST Entry Classification Wage Verification Form | 52 |
| Exhibit 3 CRST Training Guide | 56 |
| Exhibit 4 Excerpt of PowerPoint | 66 |
| Exhibit 5 Pay Document | 72 |
| Exhibit 6 Wage Statement | 78 |


** ALL EXHIBITS MARKED AFTER THE DEPOSITION **

VIDEO SPECIALIST: Good morning. We are on the record at 9:35 a.m., on December 18th, 2023. This is media unit number one of the video-recorded deposition of Eduardo Aldana in the matter of Keith Huckaby versus CRST Expedited, Inc., et al.

My name is Dan Bruun and I'm the video from Veritext legal solutions. The court reporter is Sheila Moore from Veritext Legal Solutions.

Will counsel please introduce themselves and state their affiliations for the record.

MR. HANSON: This is the James Hanson. I'm the attorney for the CRST, a defendant in the case.

MS. BERENJI: Shadie Berenji, counsel for plaintiffs.

VIDEO SPECIALIST: And would the court reporter please swear in the witness.

EDUARDO ALDANA,

Of lawful age, called for examination, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF EDUARDO ALDANA

BY MR. HANSON:

Q. Mr. Aldana, state your name for the record, please.
A. My need?
Q. Your name?
A. Oh, my name. Eduardo Aldana.
Q. Have you had a deposition taken in the past?
A. No. It would be my first time.
Q. Okay. I'm gonna go over some rules that we need to follow and it will help us speed along as we do this.
First of all, you have to give oral responses to the questions that are asked of you; you can't nod your head or things like that. The court reporter is taking down the words that are being spoken and so you need to give a verbal answer to the questions.
Do you understand that?
A. Yes, I do.
Q. If you don't understand something, ask me to repeat or rephrase the question. If I get an answer from you, I will assume that you've understood the question. Do you understand that rule?
A. Yes.
Q. We'll take some breaks, probably take one or two of them during the course of the deposition, and the only requirement that I have before taking a break

stressful and so I just took some time off and I -- then I went to CRST, like after, and I started doing CRST in January because I took a break and I took a refresher course with CRST. After I got my license I didn't get any experience on the road or anything.

BY MR. HANSON:

Q. Did Warner tell you the reason why you were not gonna get a job there then?

A. No. I remember speaking to the guy, but he just gave me some -- some nonsense and I just -- I wasn't too happy anyways, I didn't want to even -- I didn't really care. They did my a favor. So I just moved on and I wanted to take a break. I wasn't sure if I wanted to keep doing trucking or keep doing what I was doing at the time. I took a break and I decided to give it -- try it again with CRST.

Q. What type of work were you doing at that time?

A. I was working at a restaurant, the food industry.

Q. Okay. Have you been involved in any other type of lawsuits?

A. No. This would be my first time.

Q. Have you given any statements about this case to -- to anyone?

Q. Where were they?
A. At their office. I never physically got to see one of them. They're working their Cedar Rapids office.
Q. That's where the home office is for CRST?
MS. BERENJI: Calls for speculation.
THE WITNESS: Yes.
BY MR. HANSON:
Q. How did you know that it was located in Cedar Rapids?
A. Because that's what they tell you in orientation, that the home base is out of Cedar Rapids.
Q. And all contacts regarding the loads you delivered were with Cedar Rapids, correct?
A. Correct.
MS. BERENJI: Vague and ambiguous, calls for a narrative.
Q. How many different states did you travel in during the time that you worked for CRST?
A. Roughly 35 states.
Q. Was most of your work done outside of California?
A. Yes.
MS. BERENJI: Vague and ambiguous.

Q. Now you get to the receiver of the goods and you're there; how do you notify the receiver that you're there?

A. Most of them have a guardshack, a security guard in the guardshack and they're the ones that take care of you and tell you where to go, at their shipping and receiving office.

Q. And do you have to -- do you have to have the load unloaded while you're there, or do you simply drop the trailer?

A. It varied depending on what the -- depending -- you knew if it was a drop and hook or it was a live unload.

Q. Okay. And that was something that was -- how was that communicated to you as to whether it was a drop and hook or a live unload?

A. With the QualComm, the device in the truck.

Q. Was that when you first received your dispatch on the load?

A. Yes. You knew -- unless they for some reason it got switched up to -- there was times -- even though it might have been originally drop and hook, it could have turned into a live unload later on. But that was later -- sent later back. But most of the -- all the time it was you knew if it was either a drop

had -- I forgot what they called it, but it was a paperwork that CRST would provide you and you would fill it out and you put it in, both your driver information, and the co-driver information, and that would -- there was -- you would put the total miles driven for that particular run, and if there was any dead head miles. Dead head miles was if I had an empty trailer and I was driving two hours to pick up the next delivery, that's dead head miles. You're getting paid for dead head miles within that trip.

So all that paperwork, you filled it out, gave all the miles that you had driven for that particular route, that particular run.

Q. So you claim that you wrote down the mileage that you actually drove during the course of making deliveries?

A. Yes; on the paperwork that the CRST gives you to submit.

Q. When you received your pay for the loads, was the mileage that you wrote down included on the pay statements?

A. I don't recall that.

MS. BERENJI: Objection.

Q. We'll look at some pay statements and we'll look at some dispatch records.

required in order to get the load delivered?
MS. BERENJI: Vague and ambiguous.
THE WITNESS: Can you rephrase that, please?
BY MR. HANSON:
Q. We talked about various tasks, and I may not have the complete list, but we talked about getting the dispatch, doing the trip planning, fueling, driving, completing the paperwork related to the load, waiting to load or unload at a particular location, doing the drop and hook, dealing with the receiver -- or dealing with the shipper, as well as the receiver.
Were all of those things tasks that were required in order to get the load delivered?
A. Yes.
MS. BERENJI: Vague and ambiguous, compound.
Q. You said yes, those were all tasks that you had to complete in order to deliver a load?
A. Yes, they're part of the load.
Q. You knew your work as a truck driver was all governed by the department of transportation's hours of service regulations, correct?
MS. BERENJI: Vague and ambiguous.
THE WITNESS: Yes.

gives us -- I'm not sure how many time, but it would put yourself on duty where -- automatically by itself. But you could put it -- you could put it in yourself, too, or put yourself on duty right away. You could put it in whatever line, option it gave you to fill out if it was either on duty, fueling, or maybe even shower.

I forgot the list of the things that you could do on duty, but automatically once you stop the truck it puts you on duty. It's not on drive mode anymore.

BY MR. HANSON:

Q. It puts you on the on duty/not driving line, correct?

A. Yes.

MS. BERENJI: Lacks foundation.

Q. And that's what your experience was, correct?

A. Yes.

Q. If you didn't deliver the road, would you have been paid?

A. No.

MS. BERENJI: Calls for speculation.

Q. But you only got paid once the load was delivered, correct?

A. Not necessarily. If I could answer something

for that, I could give you an example.

Q. Go ahead.

A. There was times that we didn't necessarily take the whole -- we'd pick up a load, like, from the shipper and we just stage it at a certain yard. So we just got paid for whatever miles driven for that particular. We didn't necessarily take all the -- the runs into the receiving. Sometimes we just stage them at a yard, the yard, or we gave it to another truck. We switch off. We met up with another driver and we switch it off and we just got paid for whatever miles that we drove on that particular whatever -- they -- they told how many miles were given. It might have been 200 miles, for example, and that's what we got paid for.

Q. I'm sorry, go ahead.

A. And whoever has -- whoever has the rest of the run and finishes it off will get the rest of the miles for that particular run.

Q. So that was -- that was a run that included two different trucks on a delivery, correct?

MS. BERENJI: Lacks foundation, vague and ambiguous.

THE WITNESS: Yes.

BY MR. HANSON:

Q. And they would tell you how many miles were gonna be attributed to the portion of the trip that you completed, correct?
A. Correct.
Q. And you got paid based on those miles they told you they were going to attribute to your portion of the delivery of the load, correct?
A. Correct.
Q. Did you ever have two days that were exactly the same in what you did and when you did it?
MS. BERENJI: Objection.
THE WITNESS: Can you repeat or rephrase that? Two days of the same work?
BY MR. HANSON:
Q. In your work as a truck driver, you're delivering loads around the country, correct?
A. Correct.
Q. And did you ever have two days where you did the exact same thing at the exact same time each day?
MS. BERENJI: Vague and ambiguous.
THE WITNESS: I don't recall two days exact. Maybe pretty similar to what -- depending on the run, what it was, if it was a 3,000-mile run you'd probably be doing the same thing for the next two days; your normal pre-trip, your

will be in the OTR driving program with a lead driver, my wage rate will be 35 cents when I am assigned to a tractor. Do you see that?
A. Yes, I see that.
Q. And you were paid 35 cents per mile by the company, correct?
A. Correct.
Q. I'll show you a page statement here in a few minutes, but did you increase above 35 cents during the time you were employed?
A. Yes.
Q. Did you end up getting up to -- what was your highest rate at the company?
A. 40 cents. 40 cents.
Q. Okay, so you were there between 9 and 10 months?
A. Correct.
Q. Seven and eight months, correct?
A. It was from the date March -- it was February 28 to -- I would say so.
Q. All right.
A. Yeah, let's say March, and then I left around December 22nd. That was, like, my last one, something like that.
Q. It says split mileage rate. What is your

understanding of split mileage rate?

A. My understanding of split mileage is that if we have a run that is 1,000 miles, that I would get 500 miles out of that -- out of that run.

Q. Did it matter how many miles you actually drove on that --

A. No.

Q. -- particular load?

A. It was split no matter what. It doesn't matter if I drove 700 miles and he drove 300 miles, it was a split.

Q. And you did even split between the two drivers?

A. Yes, even split.

Q. So that means it would be fair to say that you never got paid for the actual miles that you drove, correct?

A. Sometimes because -- I can give an example if you like.

Q. No, I'm asking you the questions.

A. Oh, okay. No, depending on the run. There was certain runs that I might have driven more, and there are certain ones that he might have driven more. It just based on how it happened to be on our time that we had allowed to drive.

Q. But you split the miles associated with the

load, correct?
A. Correct.
Q. And those miles were what were included in the QualComm message to you with the load when you were first dispatched on it?
A. Yes. Unless they for some reason, maybe once or twice they switched the destination, the delivery point, to another delivery point, that's when they update the miles.
Q. So the -- so that you get the miles associated with the load before you ever run the load, correct?
A. Correct.
Q. I'm gonna open up another exhibit for you to look at. I've lost my screen share.
MR. HANSON: Dan, help me find it, if you would.
VIDEO SPECIALIST: Just one moment here. It's enabled. You have screen share enabled, so I'm not sure.
MR. KRAMER: It looks like you're sharing your screen, you just have a different monitor that's being shared right now. So that you're showing the folders that you have open on the desktop as opposed to the actual document. You might want to --

MR. HANSON: I want to stop sharing, that's what I'm not finding.

MR. KRAMER: I believe it should be -- there you go.

MR. HANSON: There we go. Okay, let me try again.

BY MR. HANSON:

Q. All right, let's try this.

Mr. Aldana, can you see the CRST Training Guide on your screen?

A. Yes.

Q. All right. We'll call that Exhibit 3.

Do you recall seeing this when you were in orientation at CRST?

A. Can you lower it down? Yeah, yeah, it looks familiar. Looks familiar.

Q. Okay. It's got a section on trip planning, and it -- and it says, you know, reviewing the data at the time of dispatch you get the information for the load on your QualComm. And at the bottom of that screenshot it says paid miles 1346 and it gives trailer number and directions to follow. And you know where to pick up the load, the expected time for the pickup, as well as the destination and the appointment time for any stops.

Now, paid miles were not the actual miles run on the load, correct?
A. Yeah, whatever they have for pay, that's what they were paying.
Q. Yeah, that's what you -- what you got paid from the company?
A. Yes.
MS. BERENJI: Okay, I'm just gonna for a second -- sorry, my volume was on mute -- I'm gonna insert an objection that this document, it lacks foundation, the question calls for speculation, the question was compound, and vague and ambiguous.
MR. HANSON: Thank you.
BY MR. HANSON:
Q. Once -- once you get the number of -- it says the number of paid miles is sent to you with your dispatch information, and it says the actual drive miles will be slightly higher, and it gives you the route suggestion, as well as the fuel stops.
Is that information that you received with the dispatch instructions -- or with the dispatch itself?
MS. BERENJI: Lacks foundation, vague and ambiguous.
THE WITNESS: No, it was separate. You

send a special QualComm and you let them know how much fuel you have, and that's -- after you got the route -- after you got the load that was assigned to you, that's whether they base it off where you gonna do your stops for your fueling, based on how much fuel you told them that you had.

Unless you decide -- there's times one of my co-drivers didn't care what they told him to and he just fueled up wherever he wanted to fuel up. That's different.

But the company would tell you where it fuel up, because you have your fuel card and they would not authorize any other fuel station unless you had to call it in for them to open it up.

BY MR. HANSON:

Q. Right. So the first thing you get is the dispatch with the location that the customer -- or the shipper that you're picking it up at, and then you get the address where you're delivering it, correct?

A. So on the QualComm you get all that information; where you're picking it up, and all that, like the information that you see there. It tells you if they have dead head miles, it tells you how many miles you're getting paid for that run, and the

delivery time, if it's an open window or if it's a specific time that you have to be there.

Q. Like on this dispatch information that you see up on the screen, it's got, Shipper Oklahoma Terminal.

Do you know what that means?

A. Yeah, it's their Oklahoma terminal yard. That's like another -- it's like where they have empty trailer, loaded trailer. It's a safe -- I think they call it safe haven place, where it's a place for them to if you had to do -- whatever -- if you had to stop and it's a safe place for them to put the trailers and trucks.

Q. Okay. And that's a CRST location?

A. Yeah.

Q. So that one --

MS. BERENJI: Counsel, with your -- with your share screen we cannot see the entire document. Can you at least tell me what the Bates stamp numbers are for this document?

MR. HANSON: It starts at 33 -- 330914, through 916.

MS. BERENJI: Okay, thank you.

I'm sorry, it goes -- it goes longer than that. I've just a few pages taken out of it. So I'm on 914 right now and I'm going to -- this one

is for trip planning, and part 1 says when you receive a QualComm message from dispatch and you begin planning your trip.

And you did that every time you got a load, correct?

A. Yes.

Q. Paid miles plus ten percent, and it says actual miles are eight to ten -- eight to 12 percent higher than paid miles.

Did you see that?

MS. BERENJI: Let me just insert an objection. Objection, this document lacks foundation, but you can answer.

Q. And you've already said that you used -- you used 55 miles an hour standard for determining whether you could make a delivery, correct? On time?

A. For the most part, yes.

Q. And do you see where it says paid miles are less than the actual miles driven? In that second bullet point.

A. I see it.

Q. Did you ever raise a question with the company as to why paid miles were different than actual miles?

MS. BERENJI: Vague and ambiguous, lacks foundation.

THE WITNESS: Yes.
BY MR. HANSON:
Q. How did you do that?
A. I brought it up to my driver manager saying that the miles that they have that they're actually paying for were usually less, and he told me that it was because they paid zip code to zip code so it didn't matter what -- you were always short, but I guess it saves it. I don't remember seeing that on there. I probably missed it or something. Now I see why there was always like 50 miles short on your trip than what they were actually paying for.
Q. And the driver manager you talked to told you that they were different amounts or different numbers of miles, correct?
MS. BERENJI: Vague and ambiguous.
THE WITNESS: He just said -- he just said it was zip code to zip code. So sometimes it varies. Sometimes it was in your favor that you might get -- which it never happened, it was always -- it was always on the benefit on the company at least during the 50 miles shorter than what the actual run was.
BY MR. HANSON:
Q. When did you first realize that?

A. Right away.

Q. Like when you say right away, you began driving in approximately March of 2018. Was it in March of 2018?

A. I had a trainer. It was more like somewhere in April when I started doing my first run with a co-driver. March was -- March was with my trainer. April was more of -- I was on my own with someone else.

Q. And you continued to work for the company for the next eight -- eight or nine months?

A. Yes, sir.

Q. You knew that the miles were different, the paid miles were different than the actual miles?

A. Yeah, I was aware of it.

Q. Now, the next page on this trip planning instruction again talks about total miles, saying to add ten percent to paid miles.

And did you ever question that?

MS. BERENJI: Objection, lacks foundation, vague and ambiguous.

THE WITNESS: I don't recall seeing that. I don't know. I might have missed that, I don't recall seeing it. Don't forget to add ten percent to. I don't know, I don't know what they

BY MR. HANSON:

Q. All right, this is a two-page document and it's CRST F 39482 and 483. And you see up at the top it's got a statement date of March 22nd of 2018. Do you see that?

A. Oh, yes, I do. March 16, right? Is that what you're saying?

Q. Let me start at the beginning.

CRST F 394482, up at the top has a payroll date of 3/27 of '18, correct?

A. Yes.

Q. When you're paid for CRST you receive two paychecks per week, correct?

A. Correct.

Q. And it was based on the load -- the completed loads that you turned in to the company, correct?

MS. BERENJI: Objection, vague and ambiguous.

THE WITNESS: Correct.

BY MR. HANSON:

Q. And then we've got -- we've got on this particular payroll statement, it's got split miles loaded on the first load, the Averitt Express load from Grand Prairie, Texas, to Mount Valley, Phoenix, Arizona, that load was picked up on the 20th of March

When I asked my driver manager he said we paid zip code to zip code. So sometimes that's how it works.

Q. Yeah.

MR. HANSON: Can you read that question back to him, please?

(Record read.)

THE WITNESS: Correct.

MS. BERENJI: Did you get the objection as well?

(Record read.)

BY MR. HANSON:

Q. And you said correct, right?

A. Yes, I did, I said correct.

Q. Just a couple quick questions for you that I don't think I've covered, is on the pre-trip inspections that you did, how long does it take to do a pre-trip?

A. Minimum at least 15 minutes to cover the whole truck and trailer. It could take up to a half-hour, depending, but I would give myself about 30 minutes to do so.

Q. But you could get it down in 15?

MS. BERENJI: Objection.

THE WITNESS: Sometimes, depending. Not every time. Anything from 15 to 30

minutes I would take. Some people might do it faster, but if -- it's anything from 15 to 30 minutes it can take.
BY MR. HANSON:
Q. Okay. Do you have -- did you note on your logs when you did a pre-trip?
A. Not all the time. Not all the time. Well, you could if you -- you had to put your pre-trip, but I just put myself on duty. But, like, if you would look into my logs you couldn't see that on duty there was 20 minutes involved in the pre-trip.
Q. You identified earlier a variety of tasks that were -- that you had to perform in order to get a load delivered. Do you remember those?
A. Yes.
Q. Could you have delivered the load without performing all of those tasks?
MS. BERENJI: Objection, compound, asked and answered.
THE WITNESS: No.
BY MR. HANSON:
Q. You can answer the question.
A. No, sir.
MR. HANSON: I'd like to take a break and I may be almost done. I just want to check a

CERTIFICATE

I, Sheila Moore, Certified Shorthand Reporter, do Hereby certify:

That the foregoing deposition was taken before me on the date and at the time shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript:

_X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

___ Was NOT made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

___ Was waived.

I further certify that I am not an attorney for any of the parties thereto, nor in any way concerned with the cause.

Dated this 18th day of January, 2024, in Honolulu, Hawaii.

Sheila Moore, CSR No. 501

# Exhibit C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---o0o---

KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,

Plaintiffs,

vs.

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

___________________________/

No. 2:21-cv-07766-ODW-PD

REMOTE VIDEOTAPED DEPOSITION OF EDWARD RAINWATER, JR.

February 9, 2024

Reported by:
ERIN F. ROBINSON, RPR, CRR
CSR NO. 12199

INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MR. KRAMER | 5 |

EXHIBITS


| | | PAGE |
|---|---|---|
| Exhibit 1 | Company Driver Application | 19 |
| Exhibit 2 | Excerpt from CRST Safety and Operations Handbook | 47 |
| Exhibit 3 | Excerpt from CRST's training guide | 81 |
| Exhibit 4 | E-mail sent by Mr. Rainwater, July 14th, 2022 at 8:11 a.m. | 87 |
| Exhibit 7 | CRST's current driver employee handbook | 96 |
| Exhibit 8 | E-mail sent to Ed Rainwater from Scott Nelson August 5th, 2022 | 106 |
| Exhibit 9 | Trip Sheet | 110 |
| Exhibit 10 | Qualcomm Excel spreadsheet | 113 |
| Exhibit 11 | Wage statement dated October 16 of 2018 | 115 |
| Exhibit 12 | Maven Excel spreadsheet | 120 |

REMOTE VIDEOTAPED DEPOSITION OF EDWARD RAINWATER, JR.

BE IT REMEMBERED, that pursuant to Notice, and on the 9th day of February, 2024, commencing at the hour of 9:00 a.m., before me, ERIN F. ROBINSON, a California Certified Shorthand Reporter, EDWARD RAINWATER, JR., appeared remotely via Zoom, from Yuma, Arizona, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

APPEARANCES (All counsel appeared remotely):

For the Plaintiffs:

JOSH KONECKY
Schneider Wallace Cottrell Konecky LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100
jkonecky@schneiderwallace.com

For the Defendants:

JARED KRAMER
CHARLES ANDREWSCAVAGE
Scopelitis, Garvin, Light, Hanson & Feary
30 West Monroe Street, Suite 1600
Chicago, Illinois 60603
(312) 255-7200
jskramer@scopelitis.com

Also Present:

FRANK CLARE, Videographer

P R O C E E D I N G S

Friday, February 9, 2024 - 9:00 a.m.

---oOo---

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:00 a.m. on February 9th, 0 2024.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and Internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit No. 1 of the video recorded deposition of Edward Rainwater, Jr., taken by counsel for defendant in the matter of Keith Huckaby, et al., versus CRST Expedited Incorporated, et al., filed in the United States District Court, Central District of California, Case No. 2:21-CV-07766-ODW-PD.

This deposition is being conducted remotely using virtual technology. My name is Frank Clare representing Veritext. I'm the videographer. The court reporter is Erin

Robinson, also from Veritext.

I am not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at the time of your appearance.

At this time will counsel please identify yourselves and state who you represent beginning with the noticing attorney.

MR. KRAMER: Jared Kramer on behalf of the defendant CRST Expedited, Inc.

MR. KONECKY: Good morning. Josh Konecky on behalf of the plaintiff class.

THE VIDEOGRAPHER: Thank you. The court reporter will administer the oath, and examination may begin.

EDWARD RAINWATER, JR.,

sworn as a witness,

testified as follows:

EXAMINATION

BY MR. KRAMER:

Q. Good morning, Mr. Rainwater. Can you please state and spell your full name for the record?

A. Full name is Edward Lenor Rainwater, Jr.

Spell it? It is Edward, E-d-w-a-r-d. Lenor is L-e-n-o-r. Rainwater, R-a-i-n-w-a-t-e-r, Jr., JR.

Q. Mr. Rainwater, as you just heard, my name is Jared Kramer. I'm one of the attorneys representing CRST Expedited in this lawsuit which, as you may know, has been brought by a former driver for the company, Keith Huckaby.

At the outset, I just want to thank you for your time today. No one that I've met so far enjoys having their deposition taken, so you being here today, albeit virtually, is much appreciated and not taken lightly.

That said, it's very important to both sides that we obtain your accurate and your honest testimony today. So to get us started, I just want to cover a few ground rules for the deposition that's going to help us do that. Okay?

A. Okay.

Q. So first, as you may have deduced, the court reporter is taking down everything that you say and everything that I say as well as your attorney Mr. Konecky.

And in order for her to be able to do that, it's very important that we not talk over each other. Makes sense?

scroll through it so that you can take a look at it.

Now the top of the first page says that it's a Company Driver Application, it as a CRST Van Expedited logo in the upper left-hand corner, and it's dated in the upper right-hand corner October 5th of 2004.

I know it's been a while, but this is a job application that you completed when you applied to be a driver at CRST, right?

A. Yes, it appears to be.

Q. And that's your handwriting on the application?

A. It does appear to be my handwriting, yes.

Q. And is that your signature at the bottom of the last page?

A. It looks like my signature, yes.

Q. Where it's dated October 5th, 2004?

A. Yes, that's correct.

Q. I'm going to stay on the last page of the application for a moment and direct your attention to the top half that you can see on the screen here.

Do you see below that where there's several boxes checked?

A. Yes, I do.
Q. And it looks like you checked the box indicating that you had reviewed the job description that appears above it, right?
A. Yes, those check marks are there, yes. I see them.
Q. And you checked the box indicating that the requirements of the job have been explained to you, right?
A. Yes, I see that, yes.
Q. And also that you understood those requirements, do you see you checked that box as well?
A. Yes, yes, on line 3 there, yes.
Q. And you agreed that you could perform those job requirements either with or without a reasonable accommodation, right?
A. One moment. Yes, I did check that, yes.
Q. Okay. I just want to talk a bit about the job description that appears above those boxes.
So the first sentence of the description says, an over-the-road driver must be able to pick up, transport and deliver products in a safe, professional, courteous and timely manner, driving a semitractor in a contiguous 48 states with up to

a 53-foot trailer.
Do you see that?
A. Yes, that's the first sentence there.
Q. And do you agree with that description of the job, that your job as an over-the-road driver was to pick up, transport and deliver products in a safe, professional, courteous and timely manner?
MR. KONECKY: Objection, overbroad, and compound and vague. You can answer.
THE WITNESS: I agree with the description.
BY MR. KRAMER:
Q. The paragraph below says, the driver is the single direct contact responsible for good public relations with the motoring public and with the existing and prospective clients and customers.
The driver must be able to communicate orally and in writing with others including company representatives, fellow drivers and customers.
The driver must be able to read, write and do basic math to properly complete bills of lading, trip sheets, logs, accident and cargo claims paperwork. The driver must be able to read

and understand maps.
Do you agree that to be a driver for CRST, and to deliver loads you needed to communicate with customers?
A. Yes, yes, communication skills are required, and I agree with that.
Q. And it also requires communicating with your co-driver and team driving environment, right?
A. Yes, while teamed we must communicate with each other and coordinate.
Q. And in order to deliver loads as a driver, you also need to communicate with your dispatcher, your driver manager as CRST calls them, right?
A. Yes, usually through Maven, or at that time it was Qualcomm, text messages.
Q. And in addition to communication, you're required to pick up and accept certain paperwork in order to safely deliver loads, right?
A. Yes, bills of lading, et cetera.
Q. And in addition to bills of lading, you had to pick up and complete, I think, what are called trip sheets or sometimes referred to as bubble sheets, right?
A. Yes, for pay issues, we'd have to take

care of that, for the personnel and payroll.

Q. And you need to submit those -- that paperwork in order to be paid for delivery of the load?

A. That's correct, in the packet also we'd have to have those BOLs, the paperwork as well.

Q. When you say BOL, that's a bill of lading?

A. Bill of lading, yes.

Q. In the event there's an accident, you're going to have to fill out paperwork related to an accident claim, right?

A. That's correct, yes.

Q. And if there's damage to cargo, you might have to fill out paperwork related to the cargo claim, right?

A. Yes, an OS & D, overage shortage and damage form, there's a procedure for that separately.

Q. Depending on the circumstances, you need to complete all that paperwork in order to complete delivery of a load as a driver for CRST, right?

MR. KONECKY: Objection --

THE WITNESS: As the circumstances require, as an example, overage shortage and

damage may not apply.
BY MR. KRAMER:
Q. And as you indicated, by checking those boxes there, all of that was explained to you at the time you applied for the job, right?
MR. KONECKY: Objection as to form.
THE WITNESS: All of the items that we discussed so far on this description, yes.
BY MR. KRAMER:
Q. Okay. So the paragraph below that says the driver must know and understand Department of Transportation rules and regulations pertaining to over-the-road drivers, equipment, and cargo listed in the Federal Motor Carrier Safety Regulations. The driver must understand and comply with company policies and procedures.
So in other words, to deliver loads you needed to understand and follow many DOT rules and regulations, right?
A. That's right.
Q. And as an over-the-road truck driver that includes federal hours of service regulations, right?
A. Yes, that's right.
Q. And to do that, part of what you need to

do is accurately log your time under those hours of service regulations, right?

A. Yes, that's right.

Q. And again, that's something that you need to do in order to deliver loads as an interstate truck driver, correct?

MR. KONECKY: Objection as to form.

BY MR. KRAMER:

Q. You can answer, Mr. Rainwater.

A. It is something that the FMCSA requires us to do.

Q. And CRST requires it as well, right?

A. As part of company policy, yes.

Q. The fourth paragraph of that description there says, the driver must have a basic mechanical knowledge of a tractor trailer. The driver must be able to perform DOT equipment inspections, hook, unhook trailers and enter and exit the tractor and trailer.

The driver must be able to shift manual transmission engines, control the steering wheel, it goes on to list a few other driving-related tasks.

Fair to say that to deliver loads, you need to understand how to use and freight the

tractor trailer, right?
A. That's right.
Q. You need to know how to conduct pre- and post-trip inspections in compliance with federal law, right?
A. That's correct.
Q. You need to know how to drop or unhook and also to hook trailers to the tractor in order to deliver loads, right?
A. That's right.
Q. And also to be able to put fuel in the truck in order to deliver loads, correct?
A. That is correct.
Q. And throughout the course of a route, you may also need to take breaks on occasion, correct?
MR. KONECKY: Objection, vague.
THE WITNESS: Yes.
BY MR. KRAMER:
Q. And would those breaks include 30-minute breaks required under DOT regulations?
A. Yes, that's correct.
Q. Going down to the second-to-last paragraph, the description says drivers on occasion must load and unload trailers handling weights of up to 75 pounds and be able to mount

snow chains on tires. Drivers may be required to use loading or unloading devices such as electric floor jacks and hand dollies.

So you understood at the time you applied that you may need to help load or unload trailers in order to deliver loads, right?

A. Yes, I understood that.

Q. And for loads where you were asked to do that, that was a necessary part of delivering those loads, right? Let me see if I can rephrase it.

In other words, it wouldn't be possible to deliver certain loads without assisting in loading or unloading the freight into the trailer, right?

A. Yes, that is correct.

Q. So we just talked about a number of different aspects of being a driver for CRST that were explained in the application, and I want to just kind of summarize them. Let me know if this is accurate.

So it includes communicating with your driver manager and with customers, right?

A. That's right.

Q. Picking up, filling out and submitting paperwork, right?

A. That's right.

Q. Following DOT regulations and logging your time in accordance with those regulations, right?

A. That's right.

Q. Operating the tractor trailer, so driving, right?

A. That's right.

Q. You had to inspect the truck including doing pre-trip and post-trip inspections, right?

A. That's right.

Q. Dropping and hooking trailers, right?

A. Correct, yes.

Q. Fuelling and taking breaks when needed, right?

A. As required, yes.

Q. And then I think the last one was helping to load or unload on certain loads, right?

A. Caveat, there's a point on that. Loading and unloading is not normally part of a driver's regular duties. I think I can tell you what I think, but it is not part of the regular duties of a driver.

It may be required occasionally. It is not recommended, and this is also something that came out by CRST safety, the reasoning behind that

is the person, the driver may become fatigued, tired, worn out or actually hurt themselves because driving is not the same as loading and unloading physically.

Q. So generally -- sorry, I didn't mean to cut you off.

A. No, go ahead. Go ahead.

Q. Generally speaking, it was no touch freight, right?

A. That is correct, and that's what was brought up in orientation many times. It was mostly, I would say, at least 95 percent no touch freight, and they discouraged the drivers from actively getting involved in freight handling in our orientation.

Q. And when you didn't need to actually load or unload the freight yourself, you would need to sometimes wait while others loaded or unloaded the freight, right?

A. That's correct.

Q. And that's something that you'd need to do in order to complete delivery of the load, right?

A. That is right, yes.

Q. And so all of these activities that we just discussed are various tasks that you needed

to do as a truck driver in order to safely deliver loads, right?

A. Yes, that's right.

MR. KONECKY: I'll object as to form.

BY MR. KRAMER:

Q. I'm sorry, was that a "yes," Mr. Rainwater?

A. Yes, that's right.

Q. And you understood that at the time that you applied for the job, right?

A. Yes, I did.

Q. In other words, you understood that that was the job that you were applying to be paid for, right?

MR. KONECKY: Objection, as to form.

THE WITNESS: I did understand the tasks that were described here in this description as part of my job.

BY MR. KRAMER:

Q. And you understood that you were applying to be paid to do that job, right?

MR. KONECKY: Objection, vague and ambiguous.

THE WITNESS: To include all of these as part of my job as a driver, no.

BY MR. KRAMER:
Q. Can you explain that?
A. My primary focus on day-to-day duties has always been then, even until now, 19 years of driving, has been focused on exclusively driving safely.
The reason I focus on that is, I drive night shift. I have to get my sleep. If I'm out there loading and unloading, I'm not going to be able to sleep very well that night. I'm going to have pulled muscles, aches, pains, et cetera.
So whenever I signed up for this, I knew from my previous work what hard labor was like, I knew that I'd have to focus on driving as my primary focus.
All the things that I do would have to be towards that, driving first. That's a maximum tonnage vehicle on average, it weighs 32 tons. I have to focus on being able to stay awake aware focused on that.
Q. So the focus of your work from your perspective was on driving the tractor trailer. Is that what you're saying?
A. Yes, very much so.
Q. Okay. But as you testified, all those

other tasks are part of being a driver, that was part of your job, right?
A. Yes, that's correct.
Q. And you understood that when you began your work for the company. That's my question.
MR. KONECKY: Objection as to form.
THE WITNESS: Yes, as part of my job, I would do each of these as described.
BY MR. KRAMER:
Q. Okay. Throughout that time, the time that you've been at CRST, you've been what's called an over-the-road driver, right?
A. Yes, that's correct.
Q. Can you describe what an over-the-road driver is, in your words?
A. A driver first. The driver needs to be -- needs to be focused on the safety, safe operation of the vehicle, to that point inspections, paperwork.
And FMCSA regulations must be complied with in order to safely move the cargo, tractor trailer and equipment and additional personnel, co-driver in this case, from one point to another.
Q. And as an over-the-road driver, you deliver loads for CRST's customers across the

country, right?
A. That is correct, 47 of the 48 states.
Q. What was the one state you didn't deliver to?
A. Vermont, because the interstate doesn't go through that state. It's a spur only.
Q. Okay, got it. And you would spend days, sometimes even weeks away from home, right?
A. Usually it would be four weeks to five weeks at a time, yes.
Q. Were you always operating an 18-wheel tractor trailer combination with the exception of when you're -- sorry, I didn't mean to cut you off, just to caveat my question, with the exception of times when maybe you were bobtailing without a trailer attached?
A. Occasionally we would bobtail to or from a location for loads. Initially we would bobtail, this is back in 2008, 2009, 2010, my co-driver and I would bobtail temporarily over to different places to eat on personal business.
Q. And you always hauled 53-foot trailers with a combined gross vehicle weight rating of at least 80,000 pounds?
MR. KONECKY: Overbroad.

Q. And is there any way, looking at your logs, to identify when you were logged off duty but waiting at a customer terminal?

MR. KONECKY: Objection, calls for speculation.

THE WITNESS: Actually, you can based on the logs determine the location. Logs require a description of where you are and what your duty status description is.

If it's on duty, loading, unloading, most of the time I wouldn't worry about logging that. I'd usually go on duty for maintenance issues. That would be the primary thing that I'd log on duty for.

But sitting at a dock, no, I wouldn't log that on duty. I would have that as off duty.

BY MR. KRAMER:

Q. And as you said, that was because, during that time, you would be using that time as your own by eating or watching YouTube or doing anything else that you wanted to at that point?

MR. KONECKY: Objection, compound, misstates the testimony, vague and ambiguous, overbroad.

///

full pressure, air pressure is good, tires are good, lights are good.
Making sure that if I do have a trailer, I'd have to do a quick walk around on the trailer that I'm hooked, which I would have already been hooked to already, before going on home time.
Q. And how long would the pre-trip inspection typically take?
A. It would take up to 30 minutes in some cases, typical for me, been doing it so many years, I could get it done in 15 or less.
Q. So it would vary between 15 and 30 minutes approximately?
A. On average about 20 minutes, yes.
Q. And you logged that time as on duty not driving?
A. I would flag it, yes, I'd have an on-duty for a pre-trip, but I wouldn't log all of that.
Q. Okay. So there's a portion of the pre-trip that you would log as off duty?
A. That's correct.
Q. Which portion?
A. About half of it.
Q. Did the amount that you would log off duty vary?

A. The amount that I'd log off duty would vary, yes.

Q. Were there some times when you would log the entire time spent performing a pre-trip as off duty?

A. No, not as off duty.

Q. Were there times when you logged the entire amount of time spent performing a pre-trip as on duty?

A. There are times, yes, I would log the entire time that I was doing the pre-trip as on duty.

Q. Do you know how other drivers aside from maybe your co-drivers logged their pre-trip inspections?

A. Yes, I have spoken to some of the older long-term drivers there about this.

Q. And to your knowledge, is their experience consistent with yours, or does it vary?

MR. KONECKY: Vague and ambiguous.

THE WITNESS: I can recall conversations where other drivers that have multiple years, six, eight years, have the same viewpoint as I do, and we would not log all of our time on duty.

We would flag it as on duty pre-trip to

satisfy FMCSA rules and regulations. But we would not log anything more than what was absolutely minimum required.

BY MR. KRAMER:

Q. When you say flag it, what do you mean by that?

A. It would show up on the log as an on duty change in status, and when that change of status is put in the comment would show on duty for the pre-trip.

The time would only be about 10, maybe 12 minutes for the most part, although we were actually completing the task in its full entirety, which could take 22 to 29, maybe 30 minutes.

Q. And so you're saying that after logging on duty for 10 or 12 minutes, in the middle of pre-trip you would go into the truck, log off duty, and then complete the rest of the pre-trip while you were off duty?

A. Yes, and the reason for that is because we aren't being paid for that on duty time.

Q. And you didn't flag that you were logging that rest of that off duty time -- withdrawn. Let me try to rephrase that.

The time that you logged off duty, but you

you log at least a few minutes of on duty time when you do your pre-trip, you could log the rest of the time you spend performing your pre-trip as off duty; is that your testimony?

A. Yes, so long as we actually do complete the pre-trip and make sure the vehicle is safe to operate.

Q. And that was based on what a DOT officer told you that time in Arizona?

A. That one time, yes.

Q. Okay. When you're finished driving for the day, did you have to complete a post-trip inspection?

A. The company wants us to, but I rarely do anymore. Initially I did. The company policy is to do so.

However, most of the time the pre-trip is being taken care of at the same time the post-trip is going on, so why waste the time whenever the next co-driver coming on duty is doing the same exact job? No, I don't log a post-trip.

Q. So you would inspect the truck once at the beginning of the day but not again at the end of the day?

A. Not entirely correct. During the break, I

A. Let me think. All of the paperwork which would include the bubble sheet and sending that in using the app for pay purposes, just that would be 15 minutes.

Q. Okay. And would that sometimes vary?

A. And would that what? What was that?

Q. Would the amount of time you spent filling out paperwork vary from load to load?

A. Most of the time, 15 minutes would take care of it. There are exceptions where it would take close to 40 minutes.

An example would be what I call a milk run, expediters on the West Coast, California, Oregon, Washington, there's five stops on that, but they hit the Maven back to back.

So there's a lot of paperwork for each one of those legs, instead of it being one solid job all the way through.

Q. Okay. And about how long would it take you to fuel your truck?

A. To fuel my truck start to finish would be 30 minutes.

Q. Okay. And did that ever vary?

A. Yes.

Q. Would it vary depending on how many people

were waiting in line at a fuel island?
A. Yes, that's accurate.
Q. Just one moment. Did you sometimes have to weight scale loads in order to deliver them?
A. Weighting, no.
Q. Did you sometimes have to go to weigh stations and scale the loads in order to complete delivery of a load?
A. Yes, I would have to go to a CAT scale usually nearby in order to scale certain loads over 27,500 pounds.
Q. And how would you log the time that you spent scaling loads?
A. That would be on duty, and that's a DOT requirement as well.
Q. Okay.
A. That's to make sure the DOT officers know that I scaled the heavy load.
Q. How frequently did you take breaks when you were driving?
A. I take -- I try to take only one break.
Q. And is that just a 30-minute mandated DOT break?
A. That's correct.
Q. And would you log that as off duty?

Q. It would tell you the time of the pickup, correct?
A. Yes, although that's not shown here from what I can see, it's on a different screen that would pop that up on the Qualcomm.
Q. I think here it says pickup May 22nd from 1600 to 1600, which is a little confusing?
A. Oh, there it is, paid time, yes.
Q. And it would also include the paid miles that were associated with the load, right?
A. Yes.
Q. So what are paid miles?
A. Paid miles are household good miles that the company pays you straight line as to curve lines. It is not practical or hub miles.
Q. So it's an estimated number of the miles from if you drive straight line from the origin to the destination, right?
A. That's correct, and the discrepancy is about 5 to 7 percent between hub versus the household good.
Q. And you've known that throughout the time that you've worked at CRST, right?
A. Not throughout the entire time. I got a rude awakening at about month No. 2 whenever I

asked my then dispatcher fleet manager, her name was Kate Bangs, asked her about it and why we were not getting paid our actual miles.

And she told me it was an industry standard that all companies were doing it. I learned since then that not all companies are doing it, but very few are -- I'm sorry, all companies are doing the household good miles, the shortened mileage.

Q. So that was back in 2004?

A. That's correct.

Q. And you can use the paid miles that are listed in the load information provided to over the Qualcomm to determine how much you would be paid for delivery of the load before you accept it, right?

MR. KONECKY: Objection, vague and ambiguous.

THE WITNESS: I use the paid miles as an indicator of how much money I'd be making on that load as a maximum. It's not guaranteed that that's the mileage that I'd be paid.

BY MR. KRAMER:

Q. So there were sometimes where the mileage would end up being different?

to sharing Exhibit 3 on the screen. I'm going to turn to page 4 where it says now that you have your route you can calculate how much time is going to take for you to get there.

The number of paid miles were sent to you in the dispatch information. The routed or drive miles are normally slightly higher and should be used for trip planning purposes.

Calculate the number of drive miles via your Atlas or you can add approximately 5 percent to the paid miles for trip planning purposes.

Do you see that?

A. Yes, I see that.

Q. And you testified before that you understood it was actually the actual or hub miles were actually 5 to 7 percent more than the paid miles; is that right?

A. Yes.

Q. And that's been -- go ahead.

A. There is a tidbit on that, see, whenever I first got in in 2004, I thought that we were going to be paid for all of the miles.

Q. Got it. But since you spoke to your driver manager in, you said your second month back in 2004, this has been your understanding, right?

A. Yeah, I had to give up after a couple months of arguing with them.

Q. Okay. And so this paragraph here is explaining that the number of miles you actually drive will typically be higher than the number of paid miles in the dispatch information, right?

A. Right, our paid would actually be on mileage that would be less than what the dispatch would be. Well, what we would be actually driving.

Q. And it's important, it's important to be able to estimate the number of miles you're actually expecting to drive in order to get a sense of how long it will take you so that you can make sure you have enough hours on your hours of service regulations clocked, right?

MR. KONECKY: Objection, compound, vague.

THE WITNESS: That is one method of doing it, yes. There are other methods.

BY MR. KRAMER:

Q. So for example, okay, was this a process that you followed in order to determine whether you had enough time on your clock?

A. No.

Q. What process do you use?

Rainwater, Jr. We are on the record at 11:22 a.m.
BY MR. KRAMER:
Q. Mr. Rainwater, just another reminder that you're still under oath, okay?
A. Understood.
Q. Throughout the time you've been at CRST, you've received what's called split mileage pay, right?
A. That's right.
Q. And under split mileage pay, you were paid for one half of the paid miles that we spoke about earlier associated with each load you deliver, right?
A. That's right.
Q. And that's true that you were paid for half of the load, half of the miles associated with the load regardless of whether you drove the majority of the miles or your co-driver did, right?
A. That's right.
Q. So, for example, if the paid mileage for a load was 1,000 miles, and you drove 800 of those miles, while your co-driver only drove 200 miles, your pay for the load would still be calculated by multiplying 500 miles by your mileage rate, right?

A. That's right.
Q. So in that example, say just for simplicity sake that your rate was 50 cents per mile, you'd receive $250 for delivering that load, right?
A. That's correct, if my calculations are right.
Q. And that did not depend on the number of miles that you actually drove or that the truck actually drove, right?
A. That's right.
MR. KONECKY: Belated objection as to form.
BY MR. KRAMER:
Q. And you understood that since you spoke with your driver manager your second month in back in 2004, right?
A. Yes, that's correct.
Q. I'm just going to introduce, it's a bit out of order, but I've already labeled it as Exhibit 7, I'm going to share my screen in just a moment.
(Exhibit 7 was marked for identification.)
BY MR. KRAMER:
Q. I'll represent for you, Mr. Rainwater,

A. Yes, I do.

MR. KONECKY: Jared, could you just scroll up, is this the 2023, May 20 --

MR. KRAMER: Correct.

BY MR. KRAMER:

Q. The header of the page says V.3, 5-2023. The first sentence says, so below where it says activity-based compensation, it says for employees paid based on activity, i.e., the designated mileage rate as compensation for completing a trip and delivering a load.

Would you agree that you are one of those employees, you were paid based on a designated mileage rate as compensation for completing a trip and delivering loads?

MR. KONECKY: Objection, calls for speculation. He hasn't seen this document before.

BY MR. KRAMER:

Q. You can answer, Mr. Rainwater.

A. Let me read the question -- read the information.

Q. Sure. And I'm highlighting the language I'm asking you about.

A. Not entirely correct. That's what the company is willing to pay for the work and

compensation for delivering the load, but it doesn't cover the actual work that's being done in completing that trip or delivering the load.

Q. Can you explain what you mean by that? I'm not following.

A. They give CRST will -- and this is industry wide, so it's not just CRST, but they give, as you mentioned before, a specified number of miles for the load in the dispatch whenever it's first given out.

The actual work that we're doing isn't going to be logged. Our pay is actually coming from the cents per mile. It's piece work.

So all the other work that's being done isn't being compensated for because we're only being paid for mileage, not the other work, like you said before, with fuelling, pre-trips, loading, unloading, breakdown pay, all of that isn't covered in the mileage that is given on the dispatch.

Q. What's that understanding based off of?

A. The driver has to complete a large number of tasks in order to finish the load, our job is focused on the driving. That is a pretty big undertaking by itself, as I described earlier.

To say that we are being compensated for all of the work being done for delivering the load in this sentence based only on the mileage rate and the miles given is not correct.
Q. So your understanding --
A. It's focused only on the driving, the actual tires turning because it's cents per mile. It's the pay method, piece work versus hourly or salary. That's where the discrepancy comes in.
Q. You testified earlier that when you applied to work at CRST, you understood that the job required you to drive a truck, right?
A. To drive a truck, yes.
Q. And it also required you to perform all the other tasks that we talked about when we were reviewing that job description, right?
MR. KONECKY: Objection, asked and answered. Overbroad. Vague and ambiguous.
BY MR. KRAMER:
Q. Do you recall you testifying to that?
A. I recall testifying that it took me a couple of months to realize that we're being paid only by the mileage.
Q. Okay, that's not my question. Do you remember that when you applied, you testified that

when you applied to CRST, you understood that to perform the job that you were applying for, you needed to perform all of those other nondriving tasks?

Do you remember that?

A. I would be required to perform all those other tasks, yes, that's correct. Never did mention anything about being paid for all the additional tasks that were being dumped on us which we weren't told about.

Q. So your testimony is, and you understood that when you started out that you were going to be paid -- your pay was calculated based on multiplying the paid mileage by your mileage rate, right?

A. We were going to be paid on that, yes, not knowing that we were going to be 5 percent short later. I only learned about that two months later after I got hired on.

Q. Okay. And so after that point, you understood that your pay would be calculated by using the paid mileage which is estimated number of miles from point to point, right?

A. Yes, I gave up on pushing for the actual miles, what they call hub miles.

Q. And it's multiplied by your mileage rate cents per miles, right?

A. Mileage and the cents per mile, that's correct, my rate.

Q. And you understood that you were going to be paid for the job that you were hired to do; is that fair?

MR. KONECKY: Objection, vague and ambiguous.

THE WITNESS: Well, I assumed that I was going to be paid for the work I did. I didn't know exactly how the pay structure was going to be set up, though.

BY MR. KRAMER:

Q. And you've been performing all these other tasks that we talked about, fuelling, completing inspections, completing paperwork, communicating with your dispatch and the customers.

You have to do all those things to complete the delivery of every load you hauled for the past 20 years, right?

MR. KONECKY: Objection, argumentative, overbroad, asked and answered.

THE WITNESS: I understood that I had to take care of all of those tasks before accepting

the job back in 2004. I had a good idea of what I was getting into, in other words.

BY MR. KRAMER:

Q. So is your testimony that you believe that for the past 20 years your pay, you received pay only for driving, but not for any of those other tasks because your pay was calculated using a per mile rate?

A. Yes, that's correct.

Q. And so for the past 20 years, you felt that you haven't been paid for all those other tasks that you've had to complete in order to deliver each load you've hauled for CRST; is that your testimony?

MR. KONECKY: Asked and answered, argumentative.

THE WITNESS: Let me think. Yes, I would say that.

BY MR. KRAMER:

Q. Did you ever tell someone that you weren't being paid for all this other work?

A. I mentioned it to at least one other individual that I recall, I'm trying to recall the driver's name, but yeah, it was a senior driver, he'd been around for at least 15, I think 20 years

like me, maybe a little longer.
Q. So it was another driver for CRST that you mentioned it to?
A. Yeah, he'd in the million-mile club at least. He's been around for quite a while.
Q. Do you remember what his name is?
A. I can remember Wayne. I'm trying to remember his full name. It's been some months. We don't always meet up out there on the road. I can't remember his full name. I remember one of his names is Wayne, and he's got 20 years plus in the CRST.
Q. And he's the only one, right?
A. That I recall, he's the one I spoke with most, yes.
Q. And in other instances where you realized that you weren't paid correctly, you would bring that to your driver manager's attention, right?
A. No. Why would I?
Q. So you never raised pay issues with your driver manager?
A. I would only ask for more mileage to increase my pay because there's no way I was going to get any more cents per mile. CRST capped that for the longest time.

has got his hands full or her hands full when I know what the answer is going to be? They can't do anything about it, so.

Q. Okay. I'm going to introduce what will be Exhibit 8. This is a one page document it's Bates numbered CRST F123769.

This is an e-mail sent to you Ed Rainwater from Scott Nelson August 5th, 2022. The subject is extra stop pay.

(Exhibit 8 was marked for identification.)

BY MR. KRAMER:

Q. And this is an e-mail that you sent to Mr. Nelson, right?

A. Yes.

Q. And Mr. Nelson, Scott Nelson was your driver manager at this time in August of 2022?

A. Yes, yes, he was.

Q. And it says, hello, Scott, I was looking closer at this pay sheet, and I was under the impression that all of the stops in between the first pickup and the last drop were paid as extra.

There were a total of 5 extra stops on the R & L route on pay number that aren't showing. I didn't catch it until now. Unless things have changed, would you be able to get those 5 extra

stops added to next Friday's pay sheet? Thank you. And it's signed Ed 3925ELRAINWA, that's your driver ID, right?

A. Yes, it is, both of them, actually my old one and my new one.

Q. Okay. And then he responded later that day, about two hours later and said, good afternoon, I will get those added, right?

A. Yes, this goes back to our previous discussion a couple minutes ago about the extraneous costs and incidental pay, this is one of the things I'd bring up, the cents per mile or the mileage itself, I dropped off.

Q. So when there were certain tasks that you felt you needed to be paid for you brought those to your driver manager's attention, right?

A. Right.

MR. KONECKY: Vague and ambiguous, overbroad.

THE WITNESS: For example, city work is another one. Or trailer shuttle would be another one. This falls into incidentals.

BY MR. KRAMER:

Q. But you never thought to raise the fact that you felt you weren't being paid for all of

hauled from LaSalle to Santa Fe Springs, California from October 10th to October 11th, right?
A. Right, this correlates with the previous, that's correct.
Q. And under trip information, the wage statement shows all the loads that you delivered that you're being paid for during this pay period, right?
A. Yes, it does.
Q. And so it lists the load with pay number 77843729, again, that's the load that you hauled between LaSalle, Illinois and Santa Fe Springs, California, right?
A. Right.
Q. And then the miles listed here, that's the paid miles, which is the same number of miles in the dispatch you received and the same number of miles you wrote down on the trip sheet, right?
A. Right.
Q. And, again, you knew that that wasn't the actual number of miles that you drove?
A. Right.
Q. And under taxable compensation below that, it lists the same pay number again, right? That's

the load number that's listed right up here towards the top, and then it has what's called split miles loaded that's 963.5.

So that's just half of the paid miles, right?

A. Yes, that's right.

Q. And again, you always received this split of the paid miles regardless of how many miles you actually drove, right?

A. Yes, that's right.

Q. And that was always true throughout the 20-plus years you've worked at CRST, right?

A. Yes, that's industry standard.

Q. And then to calculate the amount that you were paid for delivering this load you multiply the split miles loaded by the mileage rate which is listed here, two columns over, and at this time it looks like it was 48 cents per mile, right?

A. That's right.

Q. And that should equal $462.48. And that was a formula, that was the way that you have been paid throughout the time you've been at CRST, right?

A. Yes, that's right.

Q. And the substance of the work that you've

had to perform aside from maybe some technological advances with the truck and the ELD, that hasn't changed, right?

A. No, it has not.

Q. Your job has always been to safely deliver loads on behalf of CRST's customers throughout the country, right?

A. Yes.

MR. KONECKY: Objection as to form.

BY MR. KRAMER:

Q. Did the wage statements you received each week accurately reflect all of the pay for all of the loads that you delivered during that pay period?

MR. KONECKY: Objection as to form, calls for speculation, calls for a legal conclusion.

THE WITNESS: I don't know for certain. I can't recall if everything was taken care of in a timely fashion. But all the work that I did was paid for.

BY MR. KRAMER:

Q. Was it your practice to review the wage statements to see if each load that you hauled appeared under the trip information and taxable compensation?

A. Yes.
Q. And if you noticed that a load that you hauled did not appear, was it your practice to bring that to the attention of your driver manager?
A. Yes.
Q. Can you recall instances when that actually happened?
A. When the payroll department had lost one person and switched out a pay stub had a job that was shorted, it was picked up on the next pay cycle.
But I had to call it in. I didn't have to call it in, I wrote it in, and asked about it to see if my DM, my driver manager could ask payroll to get it taken care of, and I gave them that pay number as you see in the top left corner over there, similar to that, that eight-digit pay number for that specific instance. And it was resolved.
Q. Okay. So the pay ended up appearing on your next wage statement?
A. Yes, that's correct.
Q. Okay.
A. It did only happen that one time that I

REPORTER'S CERTIFICATE

I, ERIN F. ROBINSON, a Shorthand Reporter, State of California, do hereby certify:

That EDWARD RAINWATER, JR., in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 22nd day of February 2024.

Erin F. Robinson

ERIN F. ROBINSON, CSR NO. 12199

State of California

REV0056266

**From:** Scott Nelson
**Sent:** Friday, August 5, 2022 1:13 PM
**To:** Ed Rainwater
**Subject:** RE: Extra stop pay.

Good afternoon. I will get those added

-----Original Message-----
From: Ed Rainwater <bobbiebubkis@aim.com>
Sent: Friday, August 5, 2022 11:12 AM
To: Scott Nelson <snelson@CRST.com>
Subject: Extra stop pay.

[EXTERNAL] This message originated outside the company. Verify links and attachments with sender.

Hello Scott. I was looking closer at this pay sheet and I was under the impression that all of the stops in between the first pick up and the last drop were paid as extra.
There were a total of 5 extra stops on the R&L route on pay number 55126814 that aren't showing. I didn't catch it until now. Unless things have changed, would you be able to get those 5 extra stops added to next Fridays pay sheet?
Thank you.
Ed3925 elrainwa





EXHIBIT 8

# Exhibit D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>vs.<br><br>CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No. 2:21-cv-07766-ODW-PD |

VIDEOTAPED DEPOSITION OF JOHNNIE LEE MCGLOTHEN
Hemet, CALIFORNIA
Thursday, January 11, 2024

Reported by:
Gideon Choi (Appearing via videoconference)
CSR No. 13258

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public, | ) Case No. 2:21-cv-07766-ODW-PD |
| Plaintiff, | ) |
| vs. | ) |
| CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive, | ) |
| Defendants. | ) |

Deposition of JOHNNIE LEE MCGLOTHEN, taken on behalf of Defendant, 1201 West Florida Avenue, Hemet, California, beginning at 9:02 a.m. and ending at 11:16 a.m., on Thursday, January 11, 2024, before Gideon Choi, Certified Shorthand Reporter No. 13258.

APPEARANCES

For the Plaintiff, KEITH HUCKABY:

SCHNEIDER WALLACE COTTRELL KONECKY LLP
BY: JOSHUA G. KONECKY, ESQ. (Appearing via videoconference)
2000 Powell Street
Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
E-mail: JKonecky@schneiderwallace.com

For the Defendants, CRST EXPEDITED, INC. d/b/a and k/n/a CRST The Transportation Solution, Inc.:

SCOPELITIS GARVIN LIGHT HANSON & FEARY P.C.
BY: CHARLES ANDREWSCAVAGE, ESQ. (Appearing via videoconference)
30 West Monroe Street
Suite 1600
Chicago, IL 60603
Telephone: (312) 255-7167
E-mail: candrewscavage@scopelitis.com

SCOPELITIS GARVIN LIGHT HANSON & FEARY P.C.
BY: ANDREW IRELAND, ESQ. (Appearing via videoconference)
10 West Market Street
Suite 1400
Indianapolis, IN 46204
Telephone: (317) 637-1777
E-mail: aireland@scopelitis.com

Also Present:

ROBERT CASTILLO (Videographer)

I N D E X

Witness: JOHNNIE LEE MCGLOTHEN


| Examinations | Page |
|---|---|
| By Mr. Andrewscavage | 6, 74 |
| By Mr. Konecky | 72 |


E X H I B I T S


| Defendant's | Description | Page |
|---|---|---|
| Exhibit 1 | Copy of eight-page document, Bates stamped CRSTF396038 through CRSTF396045 | 13 |
| Exhibit 2 | Copy of 19-page document entitled "Qualcomm/Log Training: Hours of Service | 35 |
| Exhibit 3 | Copy of five-page document entitled "Training Guide", Bates stamped CRSTF330914, CRSTF330942 through CRSTF330944, CRSTF330946 | 47 |
| Exhibit 4 | Copy of wage statement, Bates stamped CRSTF396126 | 53 |
| Exhibit 5 | Copy of two-page document entitled "Driver Handbook", Bates stamped CRSTF339551 AND CRSTF339747 | 62 |


INFORMATION REQUESTED

Page Line

None.

QUESTIONS INSTRUCTED NOT TO ANSWER

| Page | Line |
|---|---|
| 11 | 4 |

THE VIDEOGRAPHER: All right. Good morning. We are going on the record at 9:02 a.m. on January 11th, 2024. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Johnnie Lee McGlothen taken by counsel for defendants in the matter of Keith Huckaby et al., versus CRST Expedited, Inc., et al. This is filed in the United States District Court, Central District of California. The case number is 2:21-cv-07766-ODW-PD. The location of this deposition is Zoom videoconference and 1201 West Florida Avenue, Hemet, California 92543.

My name is Robert Castillo representing Veritext. I am the videographer. The court reporter is Gideon Choi from the firm Veritext. I am not authorized to an administer oath. I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. ANDREWSCAVAGE: Good morning. Chip Andrewscavage and Andrew Ireland from Scopelitis, Garvin, Light, Hanson & Feary on behalf of defendant, CRST.

MR. KONECKY: Josh Konecky on behalf of the class.

THE VIDEOGRAPHER: Okay. The court reporter will now swear in the witness.

JOHNNIE LEE MCGLOTHEN,

called as a witness by and on behalf of the Defendant, and having been first duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

THE VIDEOGRAPHER: Counsel, you may proceed.

EXAMINATION

BY MR. ANDREWSCAVAGE:

Q Mr. McGlothen, did I pronounce that right?

A Yes.

Q Okay. Great. Thank you for taking the time today. Can you just please first state your name and your current address for the record?

A Johnnie Lee McGlothen, 761 Courtland Avenue, San Jacinto, California 92583.

Q Thank you, Mr. McGlothen. Have you ever been deposed before?

A Pardon me? I -- pardon me?

Q Sure. Have you ever sat for a deposition like you

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: I'm still not understanding what you're talking about that we talked about earlier.

BY MR. ANDREWSCAVAGE:

Q Sure. We talked about, you know, doing paperwork, picking up the manifest, hooking, dropping a load; right? We talked about getting -- checking the Qualcomm or the Maven for your dispatch, you know, communicating with your dispatcher, pre-trip and post-trip inspections, taking breaks, trip planning; right? You need to do all of that in order to safely deliver a load correct?

MR. KONECKY: Objection. Compound. Vague.

MR. ANDREWSCAVAGE: Gideon, did you get the objection and the answer?

THE COURT REPORTER: I didn't get the answer.

BY MR. ANDREWSCAVAGE:

Q Mr. McGlothen, can you repeat your answer, please?

A You have to do all of that, yes.

Q To safely deliver a load; correct?

A Correct.

Q Mr. McGlothen, at the end of each load, do you need to submit any paperwork to CRST?

A You can -- yes, you do.

Q What do you submit?

A I sign the bill of lading. You do it over the

not.

Q You haven't seen this exact information, but is that what a dispatch would look like on the Qualcomm system before you transitioned to Maven?

A They would tell you where to pick it up at, they tell you where to deliver it at; okay? That's a rough idea.

Q Okay. And for each dispatch that you get, you also get the paid miles? Right here, it says "paid miles"?

A Yes.

Q Okay. What are paid miles?

MR. KONECKY: Objection. Vague and ambiguous.

THE WITNESS: Paid miles is what they're going to pay you for delivering the load.

BY MR. ANDREWSCAVAGE:

Q And those miles are computer-calculated; correct?

A Correct.

MR. KONECKY: Objection. Vague and ambiguous. Calls for speculation.

BY MR. ANDREWSCAVAGE:

Q They're not what we call hub miles, they're not actual driving miles; correct?

A They're not actual driving miles.

Q So do you use the paid miles to trip plan?

A They trip plan for us for, where to go and where to stop. If I use those miles, it would not be delivered to

up and when to drop off. They give us all that information on the Maven.

Q Uh-huh.

A We try to accommodate that information.

Q Okay.

A But it's more miles than what they give us.

Q And you see here, it says you have to sort of calculate the amount of time it's going to take you from the pick-up to drop. It says, "Calculate the number of drive miles via your atlas or you can add approximately 5 percent to the paid miles for trip planning purposes." Does that sound about right?

MR. KONECKY: Objection. Vague.

THE WITNESS: They don't give --

MR. ANDREWSCAVAGE: What, Mr. McGlothen?

THE WITNESS: They don't tell us to add no 5 percent. They don't tell us that.

BY MR. ANDREWSCAVAGE:

Q You understood when you got the dispatch, the paid miles was an estimation of the miles; correct?

MR. KONECKY: Objection. Vague and ambiguous. Overbroad.

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: They show us trip miles. When you send in the accurate miles, they don't pay you for that. They only

pay you the trip miles. If you go 100 miles over, if it takes 100 miles over to get there, they don't pay that. They just pay whatever they put on that paper.

BY MR. ANDREWSCAVAGE:

Q And you knew the amount of miles you were getting paid for at the time you accepted the load; correct?

MR. KONECKY: Objection. Vague and ambiguous. Overbroad.

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: I know what they would tell me.

BY MR. ANDREWSCAVAGE:

Q But you knew that the paid miles they are giving you in the dispatch information we just looked at, right, those are the miles you're getting paid for for the load; correct?

MR. KONECKY: Objection. Compound. Vague and ambiguous. Overbroad.

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: I know what they say that that's what we get paid. I know that's what they say.

BY MR. ANDREWSCAVAGE:

Q Okay. And that's how you are actually paid, correct, based on those paid miles?

MR. KONECKY: Objection. Vague and ambiguous. Overbroad.

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: Yes.
BY MR. ANDREWSCAVAGE:
Q Okay. So at the time you receive each load, you can know what your compensation will be for delivering that load before you ever drive a single mile; correct?
MR. KONECKY: Objection. Calls for speculation. Vague and ambiguous. Overbroad.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: Could you repeat that question again, please?
MR. ANDREWSCAVAGE: Yes.
BY MR. ANDREWSCAVAGE:
Q When you receive a dispatch, you can figure out how much you will be paid for delivering the load before you ever perform any work; correct?
MR. KONECKY: Same objections.
THE WITNESS: Yes.
BY MR. ANDREWSCAVAGE:
Q And do you ever do that?
A Yes.
Q I'll stop sharing.
What is split mileage pay?
A Split milage is if there is 500 miles you have to go, you have a co-driver, he gets 250 and you get 250.
Q And it doesn't matter if he drives 90 percent of the

BY MR. ANDREWSCAVAGE:

Q And, Mr. McGlothen, I will represent to you that this is a wage statement for the work you performed for the pay week of November 7, 2021, to November 13, 2021; do you see that?

A Yeah, I see that.

Q I just want to walk through a couple of things on this wage statement. So, first of all, it's organized by loads; is that correct?

A I'm still not following you. I don't understand the question.

Q Sure. So when you receive your wage statement, right, each load that you deliver during that week is on the wage statement; correct?

A No.

Q What's incorrect about that?

A They don't give us a weekly wage statement.

Q How frequently do you receive a wage statement?

A We don't.

Q Have you ever seen this document before?

A No.

Q Have you ever seen --

A No. No, I have not. We get a printout of all requests from payroll. You have to request it. We don't even get a paycheck stub.

and answered.
MR. ANDREWSCAVAGE: You can answer. You can answer. Mr. McGlothen, you can answer.
We may have lost him. Oh, there we go.
MR. ANDREWSCAVAGE: Mr. McGlothen are you there?
THE WITNESS: I'm here.
MR. ANDREWSCAVAGE: Do you need me to repeat my question?
THE WITNESS: Yes, please.
MR. ANDREWSCAVAGE: Gideon, can you read back my last question, please?
THE COURT REPORTER: "Question: And part of that may be sitting in traffic; is that correct?"
BY MR. ANDREWSCAVAGE:
Q Let me just re-ask it, Mr. McGlothen. In order to get -- well, strike that.
Mr. McGlothen, you're not paid until the load is delivered; correct?
A Correct.
Q And so in order to get paid, you need to deliver the load; correct?
MR. KONECKY: Objection. Vague and ambiguous. Overbroad.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: Correct.
///

BY MR. ANDREWSCAVAGE:
Q And part of getting the load delivered may be sitting in traffic; correct?
A I don't know.
Q And part of getting the load delivered is doing a pre-trip and post-trip inspection; correct?
MR. KONECKY: Objection as to form.
THE WITNESS: Correct.
BY MR. ANDREWSCAVAGE:
Q Part of getting a load delivered is dropping a load; correct?
MR. KONECKY: Objection as to form.
MR. ANDREWSCAVAGE: You can answer. You can answer, Mr. McGlothen.
THE WITNESS: You have to drop it.
BY MR. ANDREWSCAVAGE:
Q And it's true that if the load is short enough, you may get paid for miles associated with the load and never drive a mile; correct?
A I don't understand that.
MR. KONECKY: Calls for speculation.
BY MR. ANDREWSCAVAGE:
Q Sure. Let's go back to the 500 -- let's say a load is 500 miles; right?
A Okay.

Q And you were in the sleeper berth and your teammate is on duty; okay?
A Okay.
Q And say that load is delivered while you're in sleeper berth and you don't drive at all during that load. You still will be compensated for that load; correct?
MR. KONECKY: Objection. Incomplete hypothetical.
MR. ANDREWSCAVAGE: You can answer.
MR. KONECKY: Calls for speculation.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: Yes.
MR. ANDREWSCAVAGE: Okay. Let's take a quick break, guys. I hate to do this, but I think I'm almost done. I just want to check and then come back. I have a few more questions, but I think I'm almost done.
THE VIDEOGRAPHER: Okay. The time is 10:36 a.m., and we are now off the record.
(Recess taken from 10:36 a.m. to 10:46 a.m.)
THE VIDEOGRAPHER: The time is 10:46 a.m. We are now back on the record.
BY MR. ANDREWSCAVAGE:
Q Mr. McGlothen, thank you. You understand you're still under oath?
A Yes.
Q I just have a few more questions.

A By the miles only, yes.
Q And it's true that when you received a load, for the entire time, you would know -- for the entire time you worked at CRST, you would know how much you would be paid for the load before you ever stepped in the truck; correct?
MR. KONECKY: Objection. Overbroad.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: If you are given that load, you would know.
BY MR. ANDREWSCAVAGE:
Q Okay. And during the entire time at the company, there's never been an announcement that we're changing the way we pay drivers, correct, the method by which we pay drivers; correct?
A Not to my knowledge.
Q And you started with the company in 2011; is that correct?
A Yes.
MR. ANDREWSCAVAGE: I have no further questions at this time.
MR. KONECKY: I just have a couple of questions.
THE WITNESS: Okay. All right.

EXAMINATION

BY MR. KONECKY:
Q Thank you, Mr. McGlothen, for your time. When you

FURTHER EXAMINATION

BY MR. ANDREWSCAVAGE:

Q Just one more question or a couple of more questions. Mr. McGlothen, when you received your dispatch, it had paid miles in it; correct?

A Excuse me. I didn't understand that part.

Q You testified earlier that when you received your dispatches on the Qualcomm or on the Maven, it included paid miles; correct?

A Correct.

Q And you understood that you were paid based on those paid miles; correct?

A What they gave us, yes, what they gave us.

Q But you also understood that those paid miles were not the actual miles that you drove; correct?

MR. KONECKY: Objection. Overbroad. Vague and ambiguous.

MR. ANDREWSCAVAGE: You can answer.

THE WITNESS: I brought it to their attention.

BY MR. ANDREWSCAVAGE:

Q Okay. We'll come back to that in a second, but I just want to -- you understood that the paid miles were an estimated mileage? You testified to that earlier; do you recall that?

MR. KONECKY: Objection. Compound.

MR. ANDREWSCAVAGE: You can answer. You can answer.
THE WITNESS: Everything CRST gives you, they said these are the miles and that's only what they'd paid us on. You give them the actual miles -- they said they had been doing this for years. They pay you on what they give you and what they give you only.
BY MR. ANDREWSCAVAGE:
Q So then you knew that you were being paid based on paid miles; correct?
MR. KONECKY: Objection. Vague and ambiguous as to time.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: I was paid on what they gave me.
BY MR. ANDREWSCAVAGE:
Q Okay. And you understood that; correct?
MR. KONECKY: Vague and ambiguous.
THE WITNESS: Not really.
BY MR. ANDREWSCAVAGE:
Q What do you mean "not really"?
A No, not really.
Q What do you mean by that?
A When I gave them the actual miles, the actual miles it takes to get the load from Point A to Point B, they refused to make the compensation, the difference.
Q When did that happen?

A Probably six months into my driving for them.
Q All right. So as of six months after you started, so sometime in 2011; is that correct?
A Right.
Q So sometime in 2011, at that time you knew you were being paid by paid miles, not actual miles; correct?
A I knew I was being paid by what they gave me.
Q Okay. And with that --
A I knew it wasn't the right miles. I knew that.
Q You still --
A I sent the figure to them.
Q So since 2011, you have known that you were being paid based on estimated mileage that CRST provides you; correct?
MR. KONECKY: Objection. Misstates testimony. Asked and answered. Vague and ambiguous.
MR. ANDREWSCAVAGE: You can answer.
THE WITNESS: I was paid what they gave me.
BY MR. ANDREWSCAVAGE:
Q And you've known that since 2011; correct?
A What they gave me is what they paid me on.
Q Okay. And you've known that since the year 2011; is that correct?
A What I was given is what they paid me on, and I thought they was giving me the right miles until I figured

it out, until I figured it out.
Q Okay. And you figured that out in 2011; correct?
A No, because every load was different. Every load had different miles on it. I did not start going from Santa Fe Springs to La Salle in 2011. I was going all over the place -- Florida, Texas, Georgia, New York, New Jersey, Pennsylvania, Wyoming, Colorado, okay, and every mile was different.
Q Mr. McGlothen, that's not -- that's not really --
A With -- go ahead.
Q Go ahead.
A No, you go ahead.
Q I believe you just testified that six months after you started, so sometime in 2011, you talked to someone at CRST and said, "Here's the actual miles I drove. I'm not being paid for those," and they said, "We don't pay for actual miles. We pay for the paid miles"; isn't that right?
A They paid from ZIP code to ZIP code.
Q And you found that out -- okay.
A Okay. They go from ZIP code to ZIP code, and from ZIP code to ZIP code was not the correct miles, and that's what I questioned them on.
Q And that was in 2011; correct?
A No. Like I said, I'm going different places.
Q Mr. McGlothen, I'm not saying that --

A I did not -- let me finish. I did not sit there and figure out every last one of them. That was just one place that I went when I figured out.
Q I understand that, but you were being compensated the same way through your entire time period at CRST? You testified to that; correct?
A I testified that I got paid the miles that CRST provided me with.
Q And in 2011, you found out those miles were not actual miles, they were paid miles, correct, computer estimated miles?
A Let me ask you a question.
Q I would like an answer to my question first, please.
MR. KONECKY: Asked and answered several times.
MR. ANDREWSCAVAGE: Josh, respectfully, it hasn't been answered.
THE WITNESS: I was paid the miles that CRST provided me.
BY MR. ANDREWSCAVAGE:
Q I understand that, Mr. McGlothen. My question is: You knew that that's how you were being compensated --
A No, no --
Q -- in 2011; correct?
A -- no, no, no.
Q Why is that not correct?

A Because it's not.
Q Did you not raise that issue in 2011 that you just testified to? Are you changing your testimony about that?
MR. KONECKY: Objection. Argumentative.
BY MR. ANDREWSCAVAGE:
Q Mr. McGlothen, is it true that in 2011, you asked whether CRST paid for the actual miles driven?
A I have answered your question several, several times. I do not want to get into an argument with you about that question. Like I said, I took them miles that CRST gave me on that particular load; okay? When I questioned them about it, they told me that that's the miles they paid. Now, I didn't get that load no more.
Q Uh-huh.
A The rest of the miles or the loads that I got did not go back to that place. You don't go to the same place every day until you get on to a dedicated route.
Q That conversation happened in 2011; correct?
A That one particular load.
Q Okay. And that was in 2011; correct?
A For that one particular load, yes. For that one particular load.
MR. ANDREWSCAVAGE: I have no further questions.
MR. KONECKY: All right. Thank you, Mr. McGlothen, for your time.

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is and accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS HEREOF, I have my name

Gideon Choi, CSR

Certificate No. 13258

Dated: January 22, 2024

CRST
CRST Expedited, Inc.
1332 Edgewood Road SW Cedar Rapids, IA 52406
1-800-733-9362

| Name: | Pay ID: | Last 4 SSN: |
|---|---|---|
| MCGLOTHEN, JOHNNIE LEE | MCGLMOCA | 7290 |

| Pay Week: | Pay Date: | On Duty Driving: | On Duty Not Driving: | Hourly Rate: | Remaining Sick Time: |
|---|---|---|---|---|---|
| 11/7/2021 - 11/13/2021 | 11/19/2021 | 22h 43m | 4h 52m | 38.48 | 24.00 hours |

## Loads

11/12/2021 - 11/14/2021 LA SALLE, IL - PACOIMA, CA

Order: 10350738
Tractor: 104620
Total Movement Miles: 1931

| Pay Detail | Miles | Rate | Total |
|---|---|---|---|
| Loaded | 965.5 | 53.0 | 511.72 |
| Empty | -- | -- | -- |
| Per Diem | | | 96.55 |
| **Total** | | | **$608.27** |

11/10/2021 - 11/12/2021 SANTA FE SPRINGS, CA - LA SALLE, IL

Order: 10351027
Tractor: 104620
Total Movement Miles: 2034

| Pay Detail | Miles | Rate | Total |
|---|---|---|---|
| Loaded | 1017.0 | 53.0 | 539.01 |
| Empty | -- | -- | -- |
| Per Diem | | | 101.70 |
| **Total** | | | **$640.71** |

11/05/2021 - 11/10/2021 FONTANA, CA - SANTA FE SPRINGS, CA

Order: 10351027
Tractor: 104620
Total Movement Miles: 40

| Pay Detail | Miles | Rate | Total |
|---|---|---|---|
| Loaded | -- | -- | -- |
| Empty | 20.0 | 53.0 | 10.60 |
| Per Diem | | | 2.00 |
| **Total** | | | **$12.60** |

| Current Pay Cycle Totals | |
|---|---|
| Total Movement Miles | 4005 |
| Total Paid Miles | 2002.5 |

## Other Earnings/Deductions

Earnings

| Description | Units | Rate | Amount |
|---|---|---|---|
| **Total** | | | **$0.00** |

Deduction: Taxes

| Description | Amount |
|---|---|
| FEDERAL | 160.02 |
| STATE | 40.99 |
| SOCIAL SECURITY | 65.80 |
| MEDICARE | 15.39 |
| **Total** | **$282.20** |

Deduction: Before Taxes

| Description | Amount |
|---|---|
| **Total** | **$0.00** |

Deduction: After Taxes

| Description | Amount |
|---|---|
| **Total** | **$0.00** |

## Summary

Earnings

| | Order Pay | Other | Per Diem | Gross |
|---|---|---|---|---|
| Current: | 1261.58 | 0.00 | 200.25 | 1061.33 |
| YTD: | 58777.16 | 4371.71 | 0.00 | 52786.62 |

Deductions

| | Taxes | Before Tax | After Tax |
|---|---|---|---|
| Current: | 282.20 | 0.00 | 0.00 |
| YTD: | 15374.25 | 0.00 | 1755.00 |

**Net Pay**

**$979.38**

CRSTF396126

EXHIBIT 4

# Exhibit E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTOPHER DUEKER, on behalf of himself and all persons similarly situated,

Plaintiffs,

vs.

CRST EXPEDITED, INC., and DOES 1 to 50, inclusive,

Defendants.

Case No.: 2:18-CV-08751

DEPOSITION OF

CARY B. ANDREE

NOVEMBER 6, 2019

ATKINSON-BAKER, INC.
(800) 288-3376

REPORTED BY: SONIA BOUGHTON ROGERS, CSR NO. 8153

FILE NO.: AD0B3EA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, on behalf of himself and all persons similarly situated, | |
| Plaintiffs, | |
| vs. | Case No.: 2:18-CV-08751 |
| CRST EXPEDITED, INC., and DOES 1 to 50, inclusive, | |
| Defendants. | |

Deposition of CARY B. ANDREE, taken on behalf of Defendants, at the Law Offices of Corren & Corren, 5345 N. El Dorado, Suite 7, Stockton, California 95207, commencing at 2:51 p.m., Wednesday, November 6, 2019, before Sonia Boughton Rogers, CSR No. 8153.

A P P E A R A N C E S

FOR PLAINTIFFS:

LAW OFFICES OF CORREN & CORREN
BY: ADAM BLAIR CORREN, ESQUIRE
5345 North El Dorado
Suite 7
Stockton, California 95207
209-478-2621 (v)
209-478-3038 (f)
Acorren@correnlaw.com

FOR DEFENDANTS:

LAW OFFICES OF SCOPELITIS, GARVIN,
LIGHT, HANSON & FEARY, P.C.
BY: JAMES H. HANSON, ESQUIRE
10 West Market Street
Suite 1400
Indianapolis, Indiana 46204
317-637-1777 (v)
317-492-9205 (dir)
Jhanson@scopelitis.com

LAW OFFICES OF SCOPELITIS, GARVIN,
LIGHT, HANSON & FEARY, P.C.
BY: JARED KRAMER, ESQUIRE
30 West Monroe Street
Suite 1600
Chicago, Illinois 60603
312-255-7200 (v)
312-255-7194 (dir)
Jskramer@scopelitis.com

ALSO PRESENT:

(none)

EXAMINATION INDEX

CARY B. ANDREE
BY MR. KRAMER 5

EXHIBIT INDEX

| DEFENDANT'S | | MAR |
|---|---|---|
| 1 | CRST Cary Andree over-the-road driver job description and application | 16 |
| 2 | Declaration of Cary Andree in Support of Motion For Class Certification | 63 |
| 3 | January 8, 2018, and December 27, 2017, CRST orientation sign-in sheets | 81 |

STOCKTON, CALIFORNIA NOVEMBER 6, 2019
WEDNESDAY, 2:51 P.M.

CARY B. ANDREE,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. KRAMER:
Q Good afternoon, Mr. Andree.
A How you doing?
Q As I mentioned, my name's Jared Kramer. Along with Mr. Hanson, we represent CRST Expedited in this case.
Can you state your full name and spell it for the record.
A Cary Brent Andree. C-a-r-y; Brent, B-r-e-n-t; Andree, A-n-d-r-e-e.
Q And have you ever been deposed before today, Mr. Andree?
A Excuse me?
Q Have you ever been deposed before today?
A What's that mean?
Q Have you ever testified in a proceeding like this --
A No.
Q -- called a deposition?

shipment in the Qualcomm?
A Sometimes. Not all the time. I had to weigh it sometimes.
Q You'd have to scale it?
(Reporter requests that parties not speak at the same time.)
Q (By Mr. Kramer) Would it include the miles that were associated with the trip in the Qualcomm message?
A Yes.
Q And would it also include the directions from the shipper to the receiver?
A Yes.
Q Okay. You mentioned that when you received the information about the load, it would include the amount of time that you had to deliver it.
Right?
A Correct.
Q And so after you received all that information, did you have to inform dispatch whether or not you were going to accept the load?
A Yes.
Q And before you did that, before you accepted a load, would you do anything to make sure that you could deliver the load within the time frame that they had specified?
A Yes.
Q What types of things would you do in order to do that?

Q Did all of your co-drivers live in California?
A No.
Q Do you remember where some of them lived outside of California?
A Um, Jose Delgado lived in Florida, and Cedric Womack lives in Ohio.
Q Earlier we had spoken about performing several different tasks in order to deliver a load. Right?
A Uh-huh.
Q Between you and your co-driver, did you always have to perform those tasks in order to deliver a load?
A Yes.
Q Before you were working in a dedicated route, can you describe what your typical day was while you were on the road.
A Before a dedicated route?
Q Yes.
A Typically the day would be -- Well, are you asking me -- Am I on a load or before I picked up a load?
Q Well, while you were on a load.
A Typical day would be gotta get your message from the Qualcomm. Tell you where to pick the load up. Go to shipper. Pick the load up. You'd have to do all your pre-tripping before you left the yard.
Anything that was wrong with the trailer, CRST wouldn't let it out of the yard. For instance, they put all -- GPS on all their trailers. A couple times I

load. Were there times that you would go to a restaurant and get something to eat?
A Only -- Only at a truck stop. We couldn't like pull your 50-foot trailer up to Olive Garden or something like that. You -- You had to go someplace that was equipped to handle a truck and trailer.
Q Were there ever times when you parked the truck somewhere safe and you had to go somewhere else to do laundry, for example?
A No.
Q Okay.
A Most truck stops have laundromats.
Q Was there ever a time where you had a friend in the area that you went to go visit?
A No.
Q Okay. Now, you mentioned before that you would receive the number of miles associated with the trip when you received a dispatch about a load.
Is that right?
A Correct.
Q And would that message contain the number of what's called paid miles?
A Correct.
Q And paid miles would not necessarily be actual number of miles that you --
A That's right.
Q -- that you actually drove --
A Sometimes they would be -- Most of the time,

mine, we were 100 or 200 miles short, because they go from zip code to zip code instead of point A to point B.
Q And your payment for that load was based on --
A Cents per mile.
Q And that was based on your picking up, driving, and ultimately delivering the load. Correct?
A Correct.
Q And in order to do that, as we already discussed, you had to perform all those different tasks related to --
A Yeah.
Q I'm sorry. I know my questions are a little long sometimes. But I just want to make sure we have a clean record.
So in order to do that, you had to perform all those different --
A Correct.
Q -- tasks?
Did you and your driver plan how to split up your work shifts throughout the day?
A Yes.
Q And can you tell me how you did that.
A I always wanted to drive my full distance. CRTS's target was for us to drive close to 600 miles a day. They want you to drive 600. Some guys would drive -- would say, I'm not driving that many. I'm just going to drive 500 or 450.

Q -- accurate?
Did you ever think about doing other types of over-the-road driving that didn't involve that?
A I thought about it after I started team driving. Nothing prepares you for -- for that.
Q For having to be in that confined space with another person?
A Right. That you don't know and --
Q Now, you mentioned how you were paid based on a mileage rate. And you were paid either on a Tuesday or a Thursday of each week. Right?
A Correct.
Q And did that just depend on when you had sent in the paperwork for the loads that you had hauled?
A Correct. It -- It depended on if you delivered the load within a certain -- the parameter and if you sent the paperwork in on time. Correct. You're right. Yeah.
Q And so if you sent the paperwork in on time, were you always paid for the loads you hauled on that next payday, whether it was a Tuesday or a Thursday?
A Correct.
Q Did the wage statements that you received each week, did they reflect the amount of money that you were supposed to be paid for those loads?
A Correct.
Q And have you kept any sort of CRST documents or documents from your time as a driver for CRST?

Q And you state that they indicate that the hours worked were based on unaudited log data. Is that correct?
A That's correct.
Q Did anyone from CRST ever explain to you what that's based on?
A No.
Q Did anyone ever explain what unaudited log data is?
A No.
Q Do you know if there were other sources of hours worked reflected in pay statements?
A I don't know.
Q You mentioned earlier that sometimes you would perform the city work --
A Correct.
Q -- correct?
And would that city work be reflected in your pay statements?
A Yes.
Q Did you generally look at your pay statements when you received them?
A You know, just -- I knew what I was getting paid. You could do the math in your head. You're getting 43 cents a mile. You drive 1,000 miles, it's $430. That's pretty simple.
Q And you could actually do that math even before you went to go pick up the load?

A Yeah. I could figure it out right then and there.
Q So did you ever not receive the amount that you --
A No; I did.
Q -- were supposed --
I'm sorry. I just want to make sure I finish the question for the record. Did you ever not receive the amount that you were supposed to be paid in your pay statement?
A Did I ever not receive the amount of money that they said they were going to pay me --
Q Yes.
A -- for that load?
No.
Q Did you ever voice any complaint to CRST about your pay statements?
A Oh, okay. I see what you're saying. Yeah. There were a couple of times my check was not -- All the miles weren't logged in correctly a couple of times. But they fixed it.
Q And do you remember around when that was?
A No.
Q And what was the problem that you had noticed those times?
A There's a couple of times -- You're dealing with electronic logs. And those machines get glitches, and they don't send everything in properly sometimes. Just

Q -- "yes" or "no."
A Yes.
Q Were those pay statements provided to you here or did you bring those in?
A They were provided to me here. But I do have my own. Sorry to cut you off.
Q You still have copies of your own pay --
A I still -- Uh-huh.
Q -- stubs?
Is that a "yes"?
A Yes.
Q And did you review all of the pay stubs from your time as a driver at CRST?
A Yes.
Q How did you determine that it was impossible that the hours you worked accounted for all the work you performed?
A Well, because from here to LaSalle, Illinois, is easily for me -- 10, 11 -- 22 hours there for me and 22 hours back. That's 44 hours. And sometimes my paycheck would only have 29, 22, 18 hours on the bottom of the paycheck stub. I don't know how that -- I don't know how they got all that.
Some would have 56; some would have, you know, more. But they were generally -- I was wondering how come there'd be so small hours, but my check would be right. Didn't seem right.
Q But before you were picking up those loads, it

was your understanding that you were being paid on a mileage rate basis.
Is that right?
A Correct.
Q And that was to perform all of the tasks related to delivering --
A Correct.
Q -- those loads?
A Correct.
Q And there were times when you received 2 paychecks per week; is that right?
A That's correct. Sometimes 3.
Q And you stated that you believe the hours worked figure encompasses only the on-duty and driving time recorded in driver's logs.
Is that right?
A Could you repeat that.
Q In the declaration you state that you believe the hours worked figure encompasses only the on-duty and driving time that you had recorded in your driver's logs.
Is that correct?
A Correct.
Q What caused you to form that belief?
A That's how they trained us. That's what they said, that we correct -- Let me -- That's -- I got paid for half the miles no matter if I drove one mile or all of them. I only got paid for half. So I didn't get

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN JOAQUIN )

I, SONIA BOUGHTON ROGERS, a Certified Shorthand Reporter in and for the State of California, hereby certify:

That on the 6th day of November, 2019, I fully, truly and correctly took down in shorthand writing, to the best of my ability, all of the proceedings had and all of the testimony given in said case and cause;

That I thereafter truly, fully and correctly caused the same to be transcribed by computer-aided transcription, that the foregoing is a full, true and correct transcript of my shorthand notes taken at said time and place therein named.

DATED:___________________________

_______________________________________
Sonia Boughton Rogers, C.S.R. No. 8153

# Exhibit F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

___________________________________

KEITH HUCKABY, individually, and on behalf of all other persons similarly situated and on behalf of the general public,

Plaintiffs,

vs.

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

___________________________________

Case No. 2:21-cv-07766 ODW-PD

REMOTE VIDEO DEPOSITION OF JEFFREY HIGGINSON
Tuesday, July 23, 2024
Volume I

Reported Remotely and Stenographically by:
Gail E. Kennamer, CSR 4583, CCRR
Job No. 6808480
Pages 1 - 89

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

________________________________________________________

KEITH HUCKABY, individually, and on behalf of all other persons similarly situated and on behalf of the general public,

Plaintiffs,

vs.

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

Case No. 2:21-cv-07766 ODW-PD

________________________________________________________

Remote Video Deposition of Jeffrey Higginson, Volume I, taken on behalf of Defendants, beginning at 9:03 a.m. and ending at 11:27 a.m.; Tuesday, July 23, 2024, before Gail E. Kennamer, CSR 4583, CCRR.

REMOTE APPEARANCES:

For Plaintiffs:

SCHNEIDER WALLACE COTTRELL KONECKY
BY: JOSHUA KONECKY, ESQ.
2000 Powell Street, Suite 1400
Emeryville, California 94608
jkonecky@schneiderwallace.com

-and-

BERENJI LAW FIRM, APC
BY: SHAWHIN BERENJI, ESQ.
8383 Wilshire Boulevard, Suite 708
Beverly Hills, California 90211
berenji@employeejustic.law

(Continued on following page.)

REMOTE APPEARANCES (Continued):

For Defendants:

SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
BY: JARED KRAMER, ESQ.
30 West Monroe Street, Suite 1600
Chicago, Illinois 60603
jskramer@scopelitis.com

Also Remotely Present:

Dan Bruun, Videographer
Christina Ochoa, Intern

INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| JEFFREY HIGGINSON | | |
| Volume I | | |
| | BY MR. KRAMER | 8, 86 |
| | BY MR. KONECKY | 85 |

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| Exhibit 1 | Job Description Bates CRSTF425317 (2 pages) | 17 |
| Exhibit 2 | Certification of Knowledge & Understanding Bates CRSTF425372 | 37 |
| Exhibit 3 | Hours of Service, Logbook Training, FMSCR 395 Bates CRSTF000551 (3 pages) | 41 |
| Exhibit 4 | Email dated November 2, 2022 from Natalie Cornejo Bates CRSTF166401 | 57 |
| Exhibit 5 | Attachment to Exhibit 4 email Maven Training for CRST Bates CRSTF166402 (33 pages) | 58 |
| Exhibit 6 | CRST Training Guide excerpts Bates CRSTF330914 (5 pages) | 67 |
| Exhibit 7 | Pay Stub for Jeffrey Higginson Bates CRSTF425184 | 79 |

Tuesday, July 23, 2024

9:03 a.m.

VIDEO OPERATOR: Good morning. We are on the record at 9:03 a.m. on July 23rd, 2024.

This is Media Unit Number 1 of the video-recorded deposition of Jeffrey Higginson in the matter of Keith Huckaby versus CRST Expedited, Inc. et al.

My name is Dan Bruun, and I'm the videographer from the firm Veritext Legal Solutions. The court reporter is Gail Kennamer from the firm Veritext Legal Solutions.

Would counsel please introduce themselves and state their affiliations for the record.

MR. KRAMER: Good morning. Jared Kramer on behalf of the defendant, CRST Expedited, Inc.

MR. KONECKY: Josh Konecky on behalf of plaintiffs in the Class.

MR. BERENJI: Good morning. Shawhin Berenji on behalf of the plaintiffs in the Class.

JEFFREY HIGGINSON,

a witness herein, having been administered an oath, was examined, and testified as follows:

THE REPORTER: Thank you.

Counsel may proceed.

-EXAMINATION-

BY MR. KRAMER:

Q. Good morning, Mr. Higginson.

Can you please state and spell your full name for the record.

A. It's Jeffrey Dean Higginson. J-e-f-f-r-e-y. D-e-a-n. H-i-g-g-i-n-s-o-n.

Q. Mr. Higginson, as I mentioned, my name is Jared Kramer. I'm an attorney that's representing CRST Expedited in this lawsuit which, as you may know, was brought by a former driver for the company named Keith Huckaby.

To get started today, I just want to cover a few ground rules for the deposition.

And so first, as you might know, the court reporter is going to be taking down that everything that you say and everything I say today. In order for her to be able

Q. What caused you to get your CDL and apply for work at CRST?
A. I wanted to try something different than my usual occupation.
Q. What were you doing before that?
A. I was in aerospace.
Q. What were you doing in aerospace?
A. I was a mechanic.
Q. Okay. And how long were you doing that for?
A. Being a mechanic or working for aerospace?
Q. Being a mechanic.
A. I have been a mechanic pretty much all my life.
Q. Did you do other jobs within the aerospace industry?
A. Yes, I did.
Q. What other jobs?
A. I did inspection and calibrations in the metrology department.
MR. KRAMER: Okay. I'm going to share an exhibit on my screen that I'll introduce as Exhibit 1.
(Deposition Exhibit 1 was marked for identification by counsel electronically.)
BY MR. KRAMER:
Q. And so this is a two-page document. For the record, it's Bates numbered CRSTF425317 to 318.

At the top of the page there is a CRST logo, and beneath that it says, "Job description: Class A Driver."

Before I get into the details of the job description, just want to acknowledge, it's fair to say that work as a truck driver is a difficult job; right?

A. Correct.

Q. And it requires you to be able to perform a lot of different tasks; right?

A. Correct.

MR. KONECKY: Object as vague and ambiguous.

BY MR. KRAMER:

Q. So I want to go over some of the tasks that are part of the job and are listed on this document here.

So first I'll direct your attention towards the job summary towards the top of the first page.

Do you see that?

A. Yes, I do.

Q. And it says, "Drive a commercial motor vehicle to pick up and deliver freight in a safe and timely manner."

Is that consistent with your understanding of the job as a truck driver for CRST?

A. That is correct.

Q. And so you understood that you'd be required to drive a commercial truck?

A. Correct.
Q. And that you'd have to pick up and deliver freight on time?
A. My job was to drive a commercial vehicle.
Q. And did you also have to, as part of that, pick up and deliver freight on time?
A. Yes, I did.
Q. And it was your job to do that in a safe manner, to do that safely?
A. Correct.
Q. Do you remember receiving this job description as part of your orientation materials when you started working for CRST?
A. It looks familiar.
Q. I want to move down to where it lists job responsibilities, and there are several bullet points beneath that. Do you see where that is, where my cursor is?
A. Yes, I see it.
Q. Okay.
A. Although it's very small on my screen.
Q. Let me see if I can zoom in a bit so it's easier to see. Is that a bit better?
A. That's much better.
Q. The first bullet says, "Perform all duties in

accordance with the company policies and procedures and in compliance with the federal regulations for safe operation of a Commercial Motor Vehicle (CMV)."

Do you understand when you were hired, that you have to follow company policy and comply with Federal CMV regulations that apply to truck drivers?

A. Correct.

Q. Part of those regulations include the Federal Powers of Service Regulations; right?

A. I'm not familiar with that term.

Q. Are you familiar with the regulations that require to log your time in for different duty statuses?

A. I believe so.

MR. KONECKY: Vague and ambiguous.

And object to the extent it calls for a legal conclusion.

BY MR. KRAMER:

Q. You can answer.

A. I believe so.

Q. And do you understand that as a driver, you needed to complete logs every day; right?

A. That is correct.

Q. The last bullet point in this section says, "Properly maintains compliant records of duty status with established regulations from the FMCSA."

Do you see that?
A. Yes, I do.
Q. And so do you understand generally that you needed to maintain accurate log records under Federal law?
A. Correct.
MR. KONECKY: Objection. Vague.
BY MR. KRAMER:
Q. And you are required to do that in order to work as a truck driver and safely pick up and deliver freight; correct?
A. That would be correct.
Q. The second bullet below where it says, "Job Responsibilities," says, "Conduct a pre-trip and post-trip inspection of equipment as outlines," looks like that might be a typo, "but as outlined by the FMCSA."
Did you understand at the time that you were hired that one of the things you'd have to do is complete pre- and post-trip inspections of the truck?
A. That is correct.
Q. And that's true for every long-haul truck driver no matter where you work; right?
A. I believe so, yes.
Q. Did you learn about pre- and post-trips in truck driving school?
A. Yes, we do. Or I did.

Q. Did you also learn about that in orientation for CRST?
A. Yes, I did.
Q. And the purpose of conducting pre-trip and post-trip inspections is to make sure that the truck is in safe, working condition; right?
A. That is correct.
Q. And so it's something that you need to do in order to make sure that you're picking up and delivering freight in a safe manner to make sure the truck itself is safe; right?
A. Correct.
MR. KONECKY: Objection. Compound.
BY MR. KRAMER:
Q. And the next job responsibility listed, the bullet point is, "Couple, uncouple and all activities associated with the interchanging of equipment, including raising and lowering landing gear."
A. That is correct.
Q. Go ahead.
A. Continue, please.
Q. When -- So in picking up and dropping off freight as a driver, do you sometimes need to couple and uncouple the tractor-trailer?
A. Yes.

Q. And that's -- Go ahead. Didn't mean to cut you off.
A. As necessary.
Q. And that's the process of hooking up and unhooking the trailer from a tractor; right?
A. That is correct.
Q. And to do that, you need to be able to raise and lower the landing gear that's on the tractor itself; right?
A. That is correct.
Q. Do you also sometimes need to slide the tandems on the trailer in order to reapportion the weight that's inside the trailer?
A. That is correct.
Q. Did you learn about that in truck driving school before you started work?
A. Yes, I did.
Q. Do you remember if that was something that was also covered during orientation?
A. Yes, it was.
Q. Is it your understanding that that is something that's always required of long-haul truck drivers in order to safely pick up and deliver freight?
MR. KONECKY: Objection. Overbroad. Compound. Calls for speculation.

BY MR. KRAMER:
Q. You can answer.
A. For hooking up the trailer, yes.
Q. Okay. And same thing with unhooking the trailer?
A. Yes. That's correct.
Q. Below the bullet point we just discussed it says, "Communicates with Operations personnel in a timely manner regarding dispatch instructions, equipment issues, transit delays, and Cargo overages, shortages, and damages."
Sort of a lot covered in that one.
But fair to say you understood that part of the job was to communicate with the dispatcher what CRST calls driver manager?
A. That is correct.
Q. And did you have to communicate with them about all sorts of issues?
A. Yes, I did.
MR. KONECKY: Vague and ambiguous.
BY MR. KRAMER:
Q. Would that include communicating with your driver manager if you encountered any delays?
A. Yes, it would.
Q. Would you have to communicate with them if there

were any issues with the equipment, with the tractor, the trailer, where you experienced a breakdown?

A. Yes, I would.

Q. Would you have to communicate with them about damage to the truck or the freight?

A. Yes, I would.

Q. Did you sometimes communicate with them to discuss instruction -- dispatch instructions that you received about the load that you were assigned to?

A. No, not particular.

Q. Okay. Did you also need to communicate with customers on occasion?

A. I would have to, yes.

Q. So, for example, if you arrived at a customer location, and you were being detained and had to wait for some reason, would you need to communicate with the customer or someone at the customer's location about instructions on where and when to pick up or drop off the freight?

A. No. I did not.

Q. What sort of things would you typically have to communicate with the customer about?

A. Just bill of lading, pick up time with the check-in sheet.

Q. Okay. In order to be able to fill out all the

information, you needed to include in the bill of lading?

A. Yes. Most of that was done by computer through CRST.

Q. And it was done through the electronic logging device or the ELD that was in the truck?

A. Yes, it was.

Q. Okay. And you needed to do that, you needed to communicate with the customer and get that information in order to complete the pickup and delivery of the loads?

A. Through the ELD. Through customers, no.

Q. I'm sorry. Can you say that one more time. I'm not sure I understood.

A. It was only through the ELD and not directly with the customers on that information.

Q. I see.

Okay. So you would communicate -- how would you communicate using the ELD about that information?

A. It was already pre-entered about the bill of lading number.

Q. Okay. And so you would need to just submit the bill of lading paperwork electronically; is that what you are explaining?

A. That is not my job.

Q. So you did not have to submit the completed bills of lading to CRST?

A. I would present the bill of ladings to the terminals where I'd drop or pick up the trailer.
Q. So if you dropped the trailer at a customer, you would present the bill of lading to the customer at that location?
A. Yes. To the terminal. Yes.
Q. Okay. And you needed to do that in order to complete delivery of the load?
MR. KONECKY: Objection as to form.
BY MR. KRAMER:
Q. You can answer.
A. I needed to present that bill of lading to make sure that the paperwork was correct.
Q. Okay. Did you also have to fill out trip sheets?
A. That would be done automatically through the ELD.
Q. Okay. If there was an accident, would you have to fill out paperwork related to an accident claim?
A. No, I would not.
Q. Okay. What about if there was damage to the cargo, would you have to fill out paperwork related to that?
A. No, I would not.
Q. Okay. Is that just something you never

experienced while you were working at CRST?

A. No. It was never filled out on paperwork. I would call dispatch, and they would take care of it.

Q. Okay. So you'd provide them with information, and they would handle the -- whatever paperwork needed to be completed?

A. That is correct.

Q. Okay. While you were delivering loads, do you sometimes need to take breaks?

A. Could you repeat that again?

Q. Sure.

So while you were delivering loads, would you sometimes need to take breaks?

MR. KONECKY: Objection as to form.

BY MR. KRAMER:

Q. You can answer.

A. When I would stop the trucks, and there was time, when the wheels weren't rolling, I'd have to put on-duty status.

Q. And are you familiar with 30-minute DOT breaks?

A. Yes.

Q. And those are breaks that are required for you to take every -- within every eight hours of driving; right?

A. That is correct.

Q. And those are required by Federal law; right?
A. That is correct.
Q. I'm going to go down to the last bullet -- last bullet point that is on the first page of Exhibit 1 where it says, "While performing the duties of this position, the employee must occasionally load, unload and secure cargo and related duties. Activities expected to be performed as a regular part of the job for a significant portion of an average day: Standing, sitting, bending, reaching, stooping, kneeling, seating, handling, pushing, pulling and lifting."
You understand on occasion you might have to load or unload trailers in order to pick up and deliver loads?
A. My job was to pick up a trailer and deliver. It was no-touch freight.
Q. Okay. So there were never any instances where you had to actually assist with loading or unloading?
A. That is correct.
Q. And you understand that you'd sometimes have to wait for the trailer to be loaded or unloaded at the pickup and dropoff points?
A. That is correct.
Q. Or did you -- Okay.
So it wasn't all drop-and-hook freight?
A. No. It was all drop and hook.

automatically go to driving status.

Q. I want to move down to Paragraph 4 on the exhibit where it says, "On Duty (Line 4)."

In the description next to that, it says, "All time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and...responsibility for performing work, that is not actually driving, is On-Duty time."

Is that description consistent with your understanding of the meaning of on-duty time under the hours of service regulations?

MR. KONECKY: Objection. Calls for a legal conclusion. Compound. Vague and ambiguous. Calls for speculation.

BY MR. KRAMER:

Q. You can answer.

A. I'm reading the sentence.

Yes, I would say it's on-duty time.

Q. That first bullet point under Paragraph 4 says that on-duty time includes quote, "All time at plant, terminal, facility, or other property of a motor carrier or shipper, or on any public property, waiting to be dispatched, unless the driver has been relieved from duty by the motor carrier."

So did you log time spent at a customer's facility as

on duty, not driving?

MR. KONECKY: Objection. Overbroad.

BY MR. KRAMER:

Q. You can answer.

A. We would log in as arrived at the shipper.

Q. And when you were at the shipper or a customer's facility but not driving, how would you log your time?

MR. KONECKY: Objection. Overbroad. Vague and ambiguous.

BY MR. KRAMER:

Q. You can answer.

A. It would be on time.

Q. It would be on-duty time?

A. On-duty time, yes.

Q. Do you see where it says below that, "All time inspecting (Pre-Trip/Post-Trip Inspections), servicing (fueling), or conditioning a...motor vehicle."

Is it your understanding that that time needed to be logged in as on duty, not driving?

A. It would be logged in as pre-trip or post-trip.

Q. So you would make a note in your logs indicating that you were performing either a pre-trip or a post-trip?

A. Yes. It would be beginning pre-trip or start pre-trip, something to that effect.

Q. So while you were doing that, you had to be

misunderstood his testimony before. And when you just restated it now, you know, we'll all look back at it, but I think you misstated it.

MR. KRAMER: Okay. Well, I think the record will speak for itself.

MR. KONECKY: Yes.

MR. KRAMER: I understand.

Q. Mr. Higginson, I just ask, what caused you to make that clarification now?

A. Just due to the questioning and the variances on it, just to clarify a timeframe.

Q. So I'm going to refer back to Exhibit 3 which I'm sharing on the screen right now.

Can you see the text okay?

A. Yes.

Q. Okay. And so we have been discussing this highlighted bullet here. I highlighted it just with my cursor where it says, "All time inspecting (Pre-Trip and Post-Trip Inspections), servicing (fueling) or conditioning a commercial motor vehicle."

So before the break, we were talking about pre- and post-trip inspections.

Did you also log time spent fueling on duty?

A. Yes.

Q. And how long do you estimate it took to fuel the

Q. You mentioned it could vary depending on, I think you mentioned, the strength of the pump; is that right?
A. That could be it, yes.
Q. Are there other -- What other factors could impact how long would it take to fuel the truck?
A. I would not know what other factors. That would be speculation.
Q. Do you see below the bullet point we were just discussing where it says, "All time repairing, obtaining assistance, or remaining in attendance of a disabled CMV"?
A. Yes, I see it.
Q. And do you understand CMV to be short for commercial motor vehicle?
A. Yes, I do.
Q. And is that also what a truck/tractor-trailer is referred to as?
A. Correct.
Q. Did you log time spent attending to the truck if it was ever broken down as on duty in your hours of service logs?
MR. KONECKY: Vague and ambiguous.
BY MR. KRAMER:
Q. You can answer.
A. Yes. It would be on duty.

Q. Okay. And do you see below that where it says, "All time loading" -- I'm sorry. I'm directing your attention to the second-to-the-last bullet point on the page here where it says, "All time loading or unloading as commercial motor vehicle, supervising or assisting in the loading or unloading, attending a commercial motor vehicle being loaded or unloaded, remaining in readiness to operate a commercial motor vehicle, or in giving or receiving receipts for shipments loaded or unloaded. Performing any work for motor carrier, or any compensated worked for a non-motor carrier."

I understand you testified you never had to actually load or unload the freight yourself because it was no-touch freight, but was it your understanding that all the time that is described in this paragraph here is required to be logged as on duty, not driving?

A. Correct.

MR. KONECKY: Objection. Vague and ambiguous. Compound.

BY MR. KRAMER:

Q. You can answer, Mr. Higginson.

A. That was my understanding.

Q. As part of delivering loads, would you sometimes need to weigh the truck on a truck scale?

A. When driving the vehicle, we'd have to go

through truck stops or truck scales, yes.
Q. Can you describe that process briefly for us?
A. While traveling, you have in most cases a signal that will tell you to stop at the weigh station or you can bypass it.
Then you pull into the lanes that are going into the scale and drive at their regulated speed, and going with a greenlight or a red light. If it's green, you continue on, exiting the facility at the required speed and rejoin the highway.
Q. And so unless you are in the sleeper berth when you were scaling the truck, did you have to remain behind the wheel throughout that process?
A. Other than sleeping or in the sleeper berth?
Q. Correct.
A. And I'm driving?
Q. So my question is: If you were the one driving the truck as opposed to being in the sleeper berth --
A. Right.
Q. -- would you have to remain behind the wheel throughout the process that you just described where you weigh the truck on a truck scale?
A. Yes.
Q. Throughout that time would the truck -- I'm sorry.

Throughout that time would your duty status remain logged as on-duty driving?
A. Yes.
Q. And how long would you estimate it took to scale your truck on average?
A. Depending on the line and the amount of vehicles that are waiting in the line.
Q. So it would vary depending on the amount of vehicles that were in the line and how quickly it moved; is that accurate?
A. That is accurate.
Q. Okay. And do you have an estimate for what the low end of how long it would take to scale a truck would be?
A. Just a few minutes if there is very light traffic.
Q. And in your experience, what was the longest that it took to scale the truck?
A. Let me think back. I'd say around 30 minutes, give or take, in traffic before we got to the scale.
Q. And then once you're actually on the scale, approximately how long would it take for the truck to be weighted at that point?
A. Within a minute or so.
Q. I want to show you what I will introduce as

A. I believe so, but I didn't plan on it being off by too much.
Q. I'm going to stop sharing.
So as a team driver, were you familiar with the term, split mileage pay?
A. Yes, I am.
Q. And under split mileage pay, you're paid for each load that you hauled calculated by -- based on your per-mile rate I think you mentioned that earlier today; right?
A. Yes. It's paid by mile, per mile, yes.
Q. And is your understanding of split mileage pay that the amount that you were paid was calculated by multiplying that per-mile rate by half of the miles associated with the load that you delivered?
A. No. It would be calculated by actual miles driven.
Q. Based on your understanding, was that calculated based on the actual number of miles that you personally drove?
A. It would be based on the miles I would drive, and it would be based on the miles my partner would drive, and we'd split.
Q. Okay. So just to make sure I understand. Your understanding was that it would be based on the total

number of miles that you drove, plus your co-driver drove for that particular trip, and then that number would be divided by two?

A. No. It would be done individually. When I'm driving, and I go on duty driving to off duty, that is my time of miles driven, and it's split 50/50.

Q. Okay. So to use a simpler example to make sure I want to make sure I understand this correctly.

A. Uh-huh.

Q. If the total number of miles that the truck was driven was 1,000 miles, and just for as an example, you drove 800 of those miles while your co-driver only drove 200 miles, what is your understanding about the number of miles that you would have been paid for?

A. The miles that we drove would be calculated at the end of that trip, and it would be spent 50/50 between us.

Q. So your understanding was that you each would have been paid based on 500 miles; is that accurate?

A. For the first -- Well, if it was 500 miles, yes, we'd be paid for 500 miles split if that was the trip life, yes.

Q. My question is if the total trip length was 1,000 miles --

A. Right.

Q. -- is your understanding that you would be paid for 500 miles regardless of how many miles each of you drove individually?
A. That would be correct.
Q. Okay. So in other words, your understanding was that if for some reason you drove 800 miles, and your co-driver only drove 200 miles, you would still both be paid based on your per-mile rate multiplied by 500 miles?
A. It would be paid at the total. It would be split in half regardless of which driver drove how many miles.
Q. Okay. Was that your understanding throughout the entire time you worked at CRST?
A. Not only my understanding. That's a fact.
Q. Did you ever -- Did you ever look at how many miles the truck actually drove and compare that to the number of miles that you were ultimately paid for, for that particular trip?
A. Not that I can recall. All I do know is that at the end of that trip, it was broken down, I believe, on the paychecks to address the fact of split pay per miles driven.
Q. We spoke a little earlier about paperwork that you needed to complete for each load that you delivered; right?

driven.
Q. Your understanding that the split mileage pay was based off of a split of the actual number of miles the truck drove, what was that based on?
A. That was based on company policy.
Q. Was that company policy given to you -- how was that company policy given to you from your memory?
A. If I'm paid 25 cents a mile, it's split 50/50 so I get paid 17-and-a-half cents a mile -- or excuse me, 12-and-a-half cents a mile.
Q. My question is: How did you know that the number of miles that was split was based off of the actual number of miles driven as opposed to an estimate of the number of paid miles that was provided to you at the time that you were dispatched on a load?
A. It would be on the paystub.
Q. So your understanding is that the paystub told you that?
A. My understanding because the hours were -- the miles were low because they were cut in half.
(Deposition Exhibit 7 was marked for identification by counsel electronically.)
BY MR. KRAMER:
Q. I'm going to share my screen, what I will introduce as Exhibit 7. I will make this larger for you.

you I checked that before.
A. Sure.
Q. Okay. And so was it your understanding that that was how your pay for each load was calculated that was listed in each of your wage statements?
A. That was -- Yes, that's how my miles were calculated.
Q. Okay. And was it your understanding that you were always paid based off of a split of the total movement miles, regardless of how many miles you personally drove for each load?
A. That is correct.
Q. Your understanding was that total movement miles was equal to the actual number of miles that the truck was driven between you and your co-driver for that trip; is that right?
A. That would be the correct miles, yes, as stated there, which was calculated through Maven.
Q. My question, going back to what we were discussing before, is how did you come to understand that the total movement miles was equal to the total number of miles the truck actually drove as calculated by Maven?
MR. KONECKY: Asked and answered.
THE WITNESS: I don't quite understand. Could you clarify that?

I, Gail E. Kennamer, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: July 24, 2024.



GAIL E. KENNAMER, CSR 4583, CCRR

DELIVERING PROMISES AND DRIVING SUCCESS
CRST
THE TRANSPORTATION SOLUTION

**Job Description:**

- Class A Driver

**Job Summary:**

- Drive a commercial motor vehicle to pick up and deliver freight in safe and timely manner

**Job Responsibilities:**

- Perform all duties in accordance with the company policies and procedures and in compliance with the federal regulations for safe operation of a Commercial Motor Vehicle (CMV).
- Conduct a pre-trip and post-trip inspections of equipment as outlines by the FMCSA.
- Couple, uncouple, and all activities associated with the interchanging of equipment, including raising and lowering landing gear.
- Communicates with Operations personnel in a timely manner regarding dispatch instructions, equipment issues, transit delays and Cargo overages, shortages, and damages.
- Communicates and presents themselves in a professional manner.
- Reports ALL accidents and incidents involving driver or equipment to the accident hotlines and law enforcement agencies immediately once safe.
- Report any violations received by law enforcement of from DOT inspections in a CMV or in personal conveyance immediately to your Driver Manager immediately.
- Properly maintains compliant records of duty status with established regulations from the FMCSA.

**Competencies and Critical Skills:**

- Drives for results with an appropriate level of urgency.
- Commands a professional presence.
- Maximizes relationships, fosters collaboration, and builds trust.
- Communicates effectively, listens, and writes effectively, ability to read and interpret documents such as safety rules, operation instructions, and procedural manuals in the English language. Ability to read and comprehend simple instructions, short correspondence, and memos, and ability to write simple correspondence in the English language in accordance with section 391.11 of the FMCSA regulations.
- With proper training, must be able to operate a combination Class A vehicle safely and correctly in all types of circumstances, including intercity, close confines, highways, secondary roadways, etc.
- With proper training must also operate combination, Class A vehicles in differing and changing
- climates and weather conditions
- With proper training must also operate combination, Class A vehicles in differing and changing climates and weather conditions.
- Ability to read maps, chart routes, and follow routing instructions.
- Ability to add and subtract two-digit numbers and to multiply and divide with 10's and 100's. Ability to perform these operations using units of American money and weight and measurements, volume, and distance.
- Ability to carry out detailed but uninvolved written or oral instructions. Ability to deal with problems involving a few variables and has a basic mechanical aptitude.

**Physical Requirements:**

- Must pass DOT Regulated drug screenings, DOT physicals, and background test.
- Must pass an agility Post Offer/Pre-Placement Test (POET) based on customer requirements.
- Must be able to lift, push, pull, and carry unassisted up to 75 lb. containers, tarps, and cargo as required, including overhead, repeatedly, and for extended periods of time and across distances 75 feet or more.
- While performing the duties of this position, the employee must occasionally load, unload and secure cargo and related duties. Activities expected to be performed as a regular part of the job for a significant portion of an average day: standing, sitting, bending, reaching, stooping, kneeling, seeing, handling, pushing, pulling, and lifting.

- Must be able to perform duties that require the driver to repeatedly bend at the waist, neck, wrist, and shoulder, twist and rotate hands, elbows, and forearms.
- Must have the ability to perform these duties outdoors and in adverse weather and climate conditions. May require working in hot and cold temperature extremes, with exposure to dust, dirt, fumes, moderate noise, and vibration of vehicle
- Have the ability to drive semi-tractors and trailers, Class A vehicles, understand brake operations, and satisfactorily perform all required in cab duties required to safely operate a commercial motor vehicle.
- Must be able to perform all necessary functions to conduct a proper and complete DOT required safety inspection, including but not limited to getting under tractor and trailer to perform such required duties.
- Must be able to climb in and out of commercial vehicles and trailers, 4 feet above the ground, numerous times a day. Ability to grasp and grip repeatedly and operate foot pedal
- Must be able to climb to a height of 4 to 10 feet, balancing and accelerated physical activity in awkward positions.
- Must be able to mount snow chains on tires
- Ability to unload using such devices as a manual floor jack, electrical floor jack, hand dollies, rollers, or other devices as deemed necessary.

**Mental Requirements and Prolonged Activities:**

- Sitting
- Seeing
- Concentrating
- Problem Solving

**Additional Notes:**

- This position does not manage others.

**Qualification Requirements:**

To perform this job successfully, an individual most be able to perform each essential duty satisfactorily. The requirements listed above are representative of the knowledge, skills, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions of the job.

# Exhibit G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,<br>Plaintiff,<br>vs.<br>CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,<br>Defendants. | Case No. 2:21-cv-07766-ODW-PD |

THE VIDEOTAPED DEPOSITION HELD REMOTELY OF KEITH HUCKABY

TAKEN MARCH 7, 2022

REPORTED REMOTELY BY:

MARY (RAINEY) STOCKTON, CSR No. 746

Notary Public

THE VIDEOTAPED DEPOSITION HELD REMOTELY OF KEITH HUCKABY was taken on behalf of the Defendants commencing at 8:02 A.M. (PST) on March 7, 2022, before M. Rainey Stockton, Certified Shorthand Reporter and Notary Public within and for the State of Idaho, in the above-entitled matter.

APPEARANCES:

For the Defendants:

(Present Remotely)

SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
BY: CHARLES ANDREWSCAVAGE
JARED S. KRAMER
30 West Monroe Street
Suite 1600
Chicago, Illinois 60603
candrewscavage@scopelitis.com

For the Plaintiff:

(Present Remotely)

BERENJI LAW FIRM, APC
BY: SHADIE L. BERENJI
8383 Wilshire Boulevard
Suite 708
Beverly Hills, California 90211
berenji@employeejustice.law

ALSO PRESENT REMOTELY: Emily Walter, Videographer

I N D E X


| TESTIMONY OF KEITH HUCKABY | PAGE |
|---|---|
| EXAMINATION BY MR. ANDREWSCAVAGE | 5 |


E X H I B I T S


| | | DESCRIPTION | PAGE |
|---|---|---|---|
| Exh 1 remarked Exh 35 | - | Huckaby Application to CRST, Bate stamped Huckaby 00134-00145 (Exhibit 1 was remarked as Exhibit 35 on Page 37) | 13 37 |
| Exh 36 | - | 11-page CRST 2019 Information Packet, Bate stamped CRSTF000294 to CRSTF000304 | 90 |
| Exh 37 | - | Excel Spreadsheet, Qualcomms, Bate stamped CRSTF000796 | 103 |
| Exh 38 | - | Excel Spreadsheet Export of Log Data, CRSTF000810 | 129 |
| Exh 39 | - | T-Mobile Cell Phone Bill, Bate Stamped 00376-00377 | 144 |
| Exh 40 | - | Disclosure Regarding Background Reports from the PSP Online Service, Bate Stamp 000128-000129 | 153 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 8:02 A.M. on March 7, 2022.

This is the video recorded deposition of Keith Huckaby taken in the matter of Keith Huckaby, individually and on behalf of others similarly situated as Plaintiff versus CRST Expedited, Inc., et al. as Defendants.

Filed in the United States District Court, Central District of California. Case No. 2:21-CV-07766-ODW-PD.

This deposition is being held remotely via Zoom. My name is Emily Walter. I am the videographer. The court reporter is Rainey Stockton. We are from Veritext Legal Solutions.

Will the attorneys please state their appearances and affiliations for the record?

MR. ANDREWSCAVAGE: Chip Andrewscavage from the Scopelitis Law Firm on behalf of CRST Expedited.

And I'm joined by Jared Kramer from the same law firm representing the same Defendant.

MS. BERENJI: Shadie Berenji. Attorney for Plaintiff, Keith Huckaby.

THE VIDEOGRAPHER: I believe the court reporter has something to read on, as well.

THE COURT REPORTER: The attorneys

participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this proceeding remotely.

They further acknowledge that the witness will be sworn in remotely by me and that the testimony will have the same force and effect under the rules as an in-person deposition.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

Also, if there is anyone present in the room with you not on video, please so indicate.

MR. ANDREWSCAVAGE: Chip Andrewscavage on behalf of Defendant. I agree and there is no one else in the room with me.

MS. BERENJI: Shadie Berenji on behalf of Plaintiff. I agree and there's no one else in the room with me.

KEITH HUCKABY,

first duly sworn to tell the truth relating to said cause, testified remotely as follows:

EXAMINATION

QUESTIONS BY MR. ANDREWSCAVAGE:

Q. Good morning, Mr. Huckaby. As you just heard, my name's Chip Andrewscavage. I'm the attorney for CRST in this matter. I just want to say thank you for taking the time today. I know, you know, depositions are a hassle so we really do appreciate you taking the time to help us resolve this case.

Is there anyone else in the room with you today?

A. No, I'm the only one.

Q. If you could please state and spell your name for the record, Mr. Huckaby?

A. Keith Huckaby. K-E-I-T-H, H-U-C-K-A-B-Y.

Q. And, for the record, where are you located today?

A. Las Vegas, Nevada.

Q. Other than there's no one else in the room with you, I just want to make sure: Other than the Zoom that's on your screen and any exhibits we look at today, you don't have any e-mails or chats open; is that correct?

A. No.

Q. Okay. Let's just keep it that way for the rest of the day while we're on the record. Okay?

A. Okay.

Q. That's -- as we've discussed earlier, that's called over-the-road driving?

A. Correct.

Q. Okay. CRST paid you to deliver these loads, correct?

MS. BERENJI: Objection. May call for speculation and a legal conclusion.

Q. (BY MR. ANDREWSCAVAGE) You can answer the question, Mr. Huckaby.

A. Correct.

Q. And they paid you for every load you delivered, correct?

MS. BERENJI: Objection. May call for speculation and a legal conclusion and vague and ambiguous.

Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.

A. Well, I don't know about the load. I was paid for the miles.

Q. Mr. Huckaby, in order to get paid, you had to complete the delivery of the load, correct?

MS. BERENJI: Objection. Calls for speculation. Assumes facts not in evidence and may call for a legal conclusion.

Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr.

Huckaby.
A. Correct.
Q. Mr. Huckaby, I want to discuss some of the things you needed to do to complete the delivery of a load. Okay?
And for these questions, I want to focus on your work at CRST. Okay?
A. Yes.
Q. When delivering the load, you needed to communicate with customers at the pick-up and drop-off location, correct?
A. Correct.
Q. And you needed -- in order to complete the delivery of a load, you needed to get the paperwork from customers, correct?
A. Correct.
Q. This would usually be a Bill of Lading identifying what is in the trailer you were hauling; is that correct?
A. Correct.
Q. Can you deliver the load without getting that paperwork?
A. No.
Q. All right. And often you would need to provide paperwork to customers, correct?

A. Correct.
Q. All right. This was necessary to complete the delivery of a load, correct?
MS. BERENJI: Objection. Vague and ambiguous. Calls for a legal conclusion and an incomplete hypothetical.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
A. Yes.
Q. Can you deliver a load without providing paperwork to customers?
MS. BERENJI: Objection. Incomplete hypothetical.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
A. No.
Q. All right. And in order to complete the delivery of a load, you needed to fill out certain paperwork, correct?
A. Correct.
Q. All right. And this was necessary to deliver loads for CRST, correct?
A. Correct.
Q. Could you deliver a load without filling out the appropriate paperwork?

A. No.
Q. Okay. In order to complete the delivery of a load, you needed to communicate with your dispatcher or your driver manager, correct?
A. Correct.
Q. All right. And did you refer to that individual as a dispatcher or a driver manager when you were working at CRST?
A. Both.
Q. Both. Okay. It's the same person, though, correct?
A. Correct.
Q. All right. And your dispatcher was located in Cedar Rapids, Iowa?
A. As far as I know.
Q. Okay. All right. Could you complete the delivery of a load without communicating with your dispatcher?
A. Yes.
Q. Was it necessary to communicate to your dispatcher in order to deliver loads?
MS. BERENJI: Vague and ambiguous.
THE WITNESS: Can you repeat that?
Q. (BY MR. ANDREWSCAVAGE) Yeah. Let me ask it in a better way.

In order to deliver a load, you need to know what the load is, correct?

A. Say that one more time.

Q. Sure. In order to deliver a load, you need to know what the load is, correct?

A. No.

Q. You need to know where to pick it up?

A. Yes.

Q. Okay. And you need to know where to drop it off, correct?

A. Correct.

Q. All right. And you need to know what time to pick it up, correct?

A. Correct.

Q. And you need to know what time you need to drop it off at the receiver, correct?

A. Correct.

Q. All right. And you couldn't deliver a load without knowing all that information, correct?

A. Correct.

Q. All right. So, you need to communicate your dispatcher -- strike that.

Could you deliver a load without communicating with your dispatcher to get that information?

A. Sometimes.

Q. What do you mean "sometimes"?

A. Because the information was on the E-Logs. So, if it was on the E-Logs; maybe, maybe not.

Q. And when you say "E-Logs," you're talking about the Qualcomm device in the truck?

A. Yes.

Q. All right. And, just for the record, why don't you tell me what the Qualcomm device is.

A. That is how we get information for the loads. Some of the information. And that is where we do our pretrip, post-trip. We get directions on how to get to our receiver and other things as far as, like, dealing with the truck.

Q. Okay. And that information comes from your driver manager or your dispatcher, correct?

A. Correct.

Q. Okay. And so you couldn't deliver a load if you didn't get -- strike that.

When I say "communicate," I'm talking either orally or through the Qualcomm for this question. Do you understand?

A. Yes.

Q. You could not deliver a load if you did not communicate with your dispatcher to receive the information about the load as far as location for

A. I believe that's where you go to fuel.
Q. Okay. And you needed to have fuel in the truck to be able to deliver a load, correct?
A. Correct.
Q. All right. And fueling was part of delivering a load, correct?
A. Correct.
Q. Did you acknowledge that you would accept the load through your Qualcomm?
MS. BERENJI: Objection. Vague and ambiguous.
THE WITNESS: Yes.
Q. (BY MR. ANDREWSCAVAGE) And sometimes you would acknowledge the load, correct? Sometimes -- strike that.
You had a co-driver when you worked for CRST, correct?
A. Correct.
Q. All right. So, sometimes if the dispatch would come in, your co-driver would acknowledge the load, correct?
A. Correct.
Q. And sometimes you would acknowledge the load, correct?
A. Correct.
Q. All right. And you needed to trip plan in

Q. So, you would use 55 miles an hour in determining your trip plans?
A. Yes.
Q. Did you take into account the need for breaks and shift changes?
A. No.
Q. Did you look to determine whether there were weigh stations along the route?
A. Yes.
Q. Because getting the truck weighed at weigh stations is part of the safe way to deliver a load, correct?
A. Yes.
Q. You need to do that in order to be able to deliver a load safely and legally, correct?
A. Yes.
Q. Did you look to see if there were tolls on the roads you were driving on?
A. Yes. Yes, you had to.
Q. Paying for tolls and accounting for tolls is part of safely delivering a load, correct?
A. Correct.
Q. Did you look to see where rest areas were along the route that you could stop?
A. No.

safely delivering a load, correct?
A. Correct.
Q. How long would a pretrip inspection take?
A. Approximately, 30 minutes.
Q. Okay. What would you do during your pretrip inspection?
MS. BERENJI: Vague and ambiguous.
Q. (BY MR. ANDREWSCAVAGE) You can answer.
A. I'd check the lights, check the tires, oil, fluids, brake pressure. Pretty much everything on the truck and trailer.
Q. How would it work? You would be off duty, correct?
A. On duty.
Q. You'd be on duty for the pretrip.
But you'd be off duty before you came on duty, right?
A. Correct.
Q. All right. And your co-driver would have been on duty at that point, correct?
A. Correct.
Q. All right. So, you come on duty, you would go to the Qualcomm and log as on duty.
A. Correct.
Q. All right. And what federal -- what hours of

service status would that be?
A. Driver on duty.
Q. Okay. And you would do your pretrip inspection, correct?
A. Correct.
Q. All right. Would the time it would take to do those inspections vary?
A. Yes.
Q. How much would it vary by?
A. Not by much. 30, 40 minutes.
Q. Would it depend on the weather sometimes how long it would take?
A. Possibly.
MS. BERENJI: Incomplete hypothetical.
Q. (BY MR. ANDREWSCAVAGE) I'm sorry. I'll ask it again, just for the record. I think it was --
Would the weather affect the time it would take to conduct your pretrip inspection?
MS. BERENJI: Incomplete hypothetical.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
A. Possibly.
Q. Was there ever a time you didn't conduct a pretrip inspection?
A. No.

that.

Going back to April of 2019 when you started with CRST, Mr. Huckaby. Did you attend an orientation?

A. Yes.

Q. Where was the orientation?

A. Riverside.

Q. Okay. How long was the orientation?

A. I think it was, approximately, maybe two weeks.

Q. And how many drivers were at that orientation?

A. Just a guess, maybe 20.

Q. For the entirety of the two weeks?

A. Yes.

Q. What broad topics were discussed at the orientation?

A. Mostly safety.

Q. And when you say "safety," what specifically was discussed?

A. What to look out for when you're on the road.

Q. Did they go over the DOT hours of service?

A. Yes.

Q. Did they go over the type of tasks you had to perform in delivering a load?

A. Explain.

Q. Sure. We talked about before sort of the

tasks that were necessary to deliver a load. So, a pretrip inspection, a post-trip inspection, trip planning, all of that, right? We already covered that. Do you recall that testimony?
A. Yes.
Q. Were all those issues discussed at orientation?
A. Yes.
Q. The orientation was focused on the things you needed to do to safely deliver a load for CRST, correct?
A. Correct.
Q. Did anyone discuss compensation at orientation?
A. No, I don't remember that.
Q. Did they discuss logging at orientation?
A. You mean hours?
Q. Yeah. I already asked about the hours of service.
Did they go over how to log your hours on the Qualcomm?
A. Yes.
Q. Did they say you had to use the Qualcomm to log your hours?
A. Yes.
Q. Did they go over how to communicate with your

A. It should be driving. On-duty/driving.
Q. Okay. And why would the time vary? Would it be like how many trucks were at the scale?
A. Yeah, about the only way.
Q. And can you give me a sense of how long it could potentially take to scale the truck at the weigh station?
MS. BERENJI: Objection. Lacks foundation.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
MS. BERENJI: And calls for speculation.
THE WITNESS: Five minutes.
Q. (BY MR. ANDREWSCAVAGE) Five minutes? And you said it would vary. How long could it go up to?
A. Shouldn't be longer than five minutes.
Q. Okay. How frequently did you take breaks when you were driving?
A. Maybe once.
Q. Once how long? Like, over once an hour? Once a day?
A. Shouldn't need but maybe one to two bathroom breaks in a shift.
Q. And would the number of breaks you took during a shift vary from shift to shift?
A. Yeah.

Q. Do you recall this document that was provided to you by CRST before you started working for CRST?
A. Yes.
Q. I want to talk a little bit about compensation. And I want to look first at Point 15 here.
For the record, that's on CRSTF000304.
You see Point 15, it says: When driving as a team, who gets paid for which miles?
A. Yes.
Q. It says: You and your co-driver are paid on split mile method. As part of a team, we want you to work together as a true team; therefore, you'll be paid half of the total miles the truck runs each week. We split the miles; not your pay.
As an example: If you and your co-driver run 6,000 miles a week, you'll be paid 50 percent of the miles or 3,000 miles. Do you see that?
A. Yes.
Q. Okay. And this is referencing split mile pay, correct?
A. Correct.
Q. All right. Under split mile pay, you were paid for half the miles associated with the load, correct?

MS. BERENJI: Objection. The document speaks for itself.
You can answer.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
A. Yes.
Q. And the mileage associated with the load was used to pay you for the work you performed to deliver the load, correct?
MS. BERENJI: Objection. Lacks foundation.
Q. (BY MR. ANDREWSCAVAGE) You can answer, Mr. Huckaby.
A. Yeah, we get paid for however miles that we drive.
Q. And, Mr. Huckaby, do you remember before we talked about you and your co-drivers don't necessarily drive the same amount of miles when delivering a load?
A. Yes.
Q. All right. I want to take an example to talk about that.
So, say there was 1,000 miles -- dispatched miles with a load of 1,000 miles. Okay?
A. Yes.
Q. All right. I believe you previously testified you would use those miles in trip planning, right, to

figure out how long it was going to take to deliver the load, correct?
A. Right.
Q. All right. And under the split mile method, you would get paid for 500 miles and your co-driver would get paid for 500 miles, correct?
A. Correct.
Q. All right. And you would get paid for 500 miles, even if you only drove 400 of those miles, correct?
A. Correct.
Q. All right. And you would get paid for 500 miles, even if you drove 600 of those miles, correct?
A. Correct.
Q. And if, for some unforeseeable reason, you only drove 200 of the miles, you would still get paid for 500, correct?
A. Correct.
Q. All right. And so, at the time of dispatch, you could take your mileage rate and multiply it by half the split miles and understand what your compensation was for the load before you accepted it, correct?
MS. BERENJI: Objection. Incomplete hypothetical.

that.

MS. BERENJI: Okay.

Q. (BY MR. ANDREWSCAVAGE) Let me go ahead and introduce for the record a document that was previously marked as Exhibit 13.

For the record, Exhibit 13 is a one-page document, Bate stamped CRSTF000055. Do you see this, Mr. Huckaby?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's the wages that I was supposed to be paid. It should be 40 cents per mile.

Q. And it's a split mileage rate, correct?

A. Correct.

Q. All right. And did you sign this orientation?

A. I believe it was orientation.

Q. Did anyone explain to you what the split mileage rate was at orientation?

A. Yeah. They said that whatever miles that me and my co-driver drove, that we split the amount.

Q. Did it say anything else?

A. No, that's all I remember.

Q. And you did note the miles associated with the

REPORTER'S CERTIFICATE

I, MARY (RAINEY) STOCKTON, CSR No. 746, Certified Shorthand Reporter, certify: That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 10th day of March, 2022.

Mary Stock

MARY (RAINEY) STOCKTON, CSR

Notary Public

My commission expires February 3, 2024

# Exhibit H

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,

Plaintiff,

Case No. 2:21-cv-07766-ODW-PD

V.

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

*************************************

ZOOM VIDEOTAPED DEPOSITION OF
ANTHONY T. AKINS
Tuesday, January 16, 2024
12:00 p.m. EST

**************************************

TAKEN BY:
ANDREW IRELAND, ESQ.
ATTORNEY FOR DEFENDANT

REPORTED BY:
BELLE VIVIENNE, RPR, CRR, NJ-CRR, WA/CO/NM-CCR
NATIONALLY CERTIFIED REALTIME COURT REPORTER
VERITEXT LEGAL SOLUTIONS
JOB NO. 6380131
866.299.5127

A P P E A R A N C E S

FOR THE PLAINTIFFS:

NATHAN PILLER
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Npiller@schneiderwallace.com

FOR THE DEFENDANTS:

ANDREW IRELAND
SCOPELITIS GARVIN LIGHT HANSON &
FEARY P.C.
10 W. Market Street, Suite 1400
Indianapolis, Indiana 46204
317.637.1777
AIreland@scopelitis.com

VIDEOGRAPHER:

Sean Grant

\- - -

I N D E X

\- - -

Testimony of:

ANTHONY T. AKINS

MR. IRELAND............................. 7

\- - -

E X H I B I T S

\- - -


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Job description document... | 18 |
| Exhibit B | Qualcomm/Log Training: Hours of Service FMCSR Section 395, CRST Safety and Operations Handbook: Page 86-98, Revised 2018... | 62 |
| Exhibit C | CRST Training Guide........ | 90 |
| Exhibit D | Example wage statement - CRSTF396177................ | 118 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Directions to Witness Not to Answer

Page Line

none

133 12

Request for Production of Documents

Page Line

none

Stipulations

Page Line

none

Question Marked

Page Line

none

THE VIDEOGRAPHER: Good afternoon. We are going on the record. The time is 12:01 p.m. and the date is January 16, 2024. Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit number 1 on the video recorded deposition of Anthony T. Akins taken by counsel for Defendant in the matter of Keith Huckaby, et al., versus CRST Expedited Inc. et, al, filed in the United States District Court, Central District of California, Case No. 2:21-cv-07766-ODW-PD.

And it's being conducted remotely using virtual technology. My name is Sean Grant from the firm

Veritext. I'm the videographer. And the court reporter is Belle Vivienne, also from Veritext. I'm not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. IRELAND: Good morning, Andrew Ireland for CRST.

MR. PILLER: Good morning, Nathan Piller for the plaintiffs and representing Mr. Akins.

THE VIDEOGRAPHER: Thank you. Will the certified court reporter please swear in the witness.

ANTHONY T. AKINS,

having been first duly sworn by the Certified Stenographic Realtime Reporter, testified as follows:

EXAMINATION

BY MR. IRELAND:
Q. All right. Well, good morning. I'm going to go ahead and just apologize in the beginning. I'm getting over a little bit of a cold here, so if you hear me sucking on a cough drop or something or coughing a little bit here, it's nothing against you. I'm just trying to get over that a little bit here.
Could you go ahead please and state your name and -- for the record here?
A. It's Anthony Troy Akins, A-K-I-N-S.
Q. Great. Now, have you ever been deposed before, Mr. Akins?
A. Have I ever been --
Q. Have you ever sat for a deposition before?
A. Yes, I have.
Q. And when was that?
A. It was years ago.
Q. And what did that case involve?

at CRST, do you recall?
A. I was a driver, operator.
Q. Okay.
MR. IRELAND: For the court reporter here, I'm going to share a screen on what I'm going to introduce as Exhibit A. And the court reporter, I'll send that in a PDF file to you at the end here.
(Exhibit A, Job description document, marked for identification.)
BY MR. IRELAND:
Q. Now, can you see on your screen, is this sufficiently large for you? I can zoom in if it's helpful.
A. Yeah, I could see it.
Q. Okay.
MR. PILLER: And, Mr. Akins, if at any point it's hard to read, just let us know because he can zoom in. Just make sure you're able to read it before answering questions about it.
THE WITNESS: Okay.
BY MR. IRELAND:
Q. Do you recognize this?

A. I really don't. So what is this? What is it?
Q. We'll get to that and maybe why don't we start by having you read this second section here. It's titled --
(Cross talk.)
BY MR. IRELAND:
Q. Could you -- you don't need to read it out loud, but just to yourself, could you review that second section here that says "Job Summary"?
A. Yes.
Q. Now, is that an accurate description of the job you performed at CRST?
MR. PILLER: Objection, overbroad.
A. I --
BY MR. IRELAND:
Q. You can answer the question.
A. Drive a commercial --
THE COURT REPORTER: Read to yourself, please.
MR. PILLER: Mr. Akins, if you need to read it out loud, that's okay,

if that helps you understand it, it's fine. So go ahead and read it to yourself out loud.

THE COURT REPORTER: If you are going to read it out loud, please read slowly and clearly.

A. "Drive a commercial motor vehicle to pick up a delivery freight in safe and timely manner. Okay. That's what it says on here."

THE VIDEOGRAPHER: Excuse me, this is the videographer, Mr. Akins. I apologize, but in reading documents, you're only halfway in the video so I don't know if you can adjust your laptop. Thank you, sir. I'm sorry, but thank you.

THE WITNESS: Okay.

BY MR. IRELAND:

Q. So to my question here, is that job summary an accurate description of your role at CRST?

MR. PILLER: Objection, overbroad.

(Cross talk.)

A. Yeah, we drove for -- mileage. We drove for miles. We get so many amount of miles and we went across state and -- the states and drove all around.
BY MR. IRELAND:
Q. Okay. Well, maybe let's walk through it piece by piece then.
A. Okay.
Q. Did you drive a commercial vehicle?
A. I drove a commercial vehicle.
Q. All right. Did you pick up and deliver freight?
A. I picked up freight from one state and took it to another state.
Q. Okay. And -- and you were required to do so in both a safe and timely manner, correct?
A. I was required to do so within -- yeah, within the miles that we -- yes.
Q. Sorry. Just to clarify, so you were required to do so in a safe and

timely manner?
MR. PILLER: Objection, asked and answered.
MR. IRELAND: He didn't answer the question, Counsel.
MR. PILLER: Go ahead. You can answer it again.
A. Honestly, I went -- I mean, we was driving. We did it within the miles that they gave us to do it.
BY MR. IRELAND:
Q. That wasn't my question though. My question is whether you were required to do it in a safe and timely manner.
MR. PILLER: Objection, asked and answered, vague and ambiguous. The document speaks for itself.
BY MR. IRELAND:
Q. You can answer -- you can answer the question.
A. I thought I answered it already. I don't know if you want me to say a different way. I don't know what's going on.

Q. Sorry, to clarify, I'm looking for a yes or a no here, whether that is an accurate description.

MR. PILLER: Same objections.

A. It's not accurate. It's not an accurate description.

BY MR. IRELAND:

Q. So you were not required to deliver freight in a safe and timely manner?

A. The way -- the way they did it, they just give us when we get there -- yeah, I would say, I mean -- we have time -- that we have so many amount of miles to get there and so I don't really know that I would say --

Q. We'll talk about miles --

A. -- in a timely manner. That's a whole another different --

Q. Sorry, and I'll -- I'll be sure to let you finish here. I apologize.

But I just want to make a point that we'll talk about miles as we go in here, but, you know, again, I'd ask

that I have a question, we get a straight answer to it, and we'll get to miles here today, too. I can assure you that.

A. I'm going to say no there. My answer to the question is no.

Q. I'm sorry, could you say that again?

A. I said my -- the question -- my answer is no.

Q. Okay. What does it mean to be an over-the-road driver?

MR. PILLER: Objection, vague and ambiguous, calls for speculation.

BY MR. IRELAND:

Q. You can -- you can answer the question.

A. It means to drive from states to state.

Q. So you deliver --

A. -- and get paid by the miles.

Q. So you deliver loads for CRST's customers across the country as an over-the-road driver?

A. Uh-huh.

MR. PILLER: Objection, asked and answered, vague and ambiguous.
BY MR. IRELAND:
Q. You can answer.
A. To make sure everybody's safe. I don't -- I thought I answered it already.
Q. How long would a pretrip inspection take you?
A. It could take from 10, 15 minutes to 20, 25 minutes, 30 minutes --
(Reporter clarification.)
A. I'm sorry. I said it could take from 10 to 15 minutes or 20 to 35 minutes. It's causing the situation of what's going on or what's wrong, if anything's wrong or, you know, something broke or whatever, you smell something, something's leaking.
BY MR. IRELAND:
Q. So it would vary from trip to trip?
A. Yes.
MR. PILLER: Objection, vague.
BY MR. IRELAND:

get my objection out.
Objection, vague and ambiguous.
Go ahead.
A. It's to make sure that everything is safe, the truck is safe, the truck is -- is in good condition to move forward.
BY MR. IRELAND:
Q. And how long would a post-trip inspection take?
A. It could take -- it's a big truck. You got to check everything, you got -- especially if you -- if you was driving the truck and you felt something was wrong, you, you know -- so you have to -- it could take from 10, 15 minutes to 20, 25, 30 minutes, or more, because of how much you know about the truck.
Q. So it would vary from day-to-day?
MR. PILLER: Objection, vague.
(Cross talk.)
A. Say it again. Repeat yourself.
(Reporter clarification.)

cause. It's causing. I don't know if that's a word or not, but the situation of traffic or, how many people they, you know, pull -- because sometimes they will tell you to bring in paperwork. If you have to bring your paperwork, you got to park the truck and take in your paperwork to -- in there and that -- that delays because now they want you to show it. They want to see all the paperwork of the truck and everything.

BY MR. IRELAND:

Q. Uh-huh. So it varied quite a bit?

A. Yes.

Q. Okay. How frequently did you take breaks when you were driving?

MR. PILLER: Objection, vague.

A. I don't know. It's kind of hard to say how frequently. If you have to use the restroom, you have to use the restroom.

BY MR. IRELAND:

Q. Sure. Did you need to go to the restroom once a day, twice a day, ten

shipper, right?
A. Yes.
Q. Have your pick-up time?
A. Possibly, yes.
Q. It also had the name of the company the load was going to be delivered to, right?
A. Yes.
Q. And the address of that receiver?
A. Uh-huh.
THE WITNESS: I mean, yes, ma'am, sorry. Yes
BY MR. IRELAND:
Q. And it had the paid miles that were associated with that trip as well, correct?
MR. PILLER: Objection, vague.
A. Yeah, it had the miles.
BY MS. GARLAND:
Q. Uh-huh. And what are "paid miles"?
MR. PILLER: Objection, vague.
A. It should be the miles that we traveled.

taken.)

THE VIDEOGRAPHER: Back on the record. The time is 2:06 p.m.

BY MR. IRELAND:

Q. All right. I just wanted to pull that last exhibit up again for a minute here. Let me share the dispatch information that you received.

So, again, you understood that the miles that were part of the dispatch that you would receive for a new load were the amount of miles that were being paid to you; is that correct?

A. Repeat that one more time.

Q. Yes. So when you would receive this dispatch, right, for a new load, it would have the number of paid miles that you would receive --

A. Uh-huh.

Q. -- as well?

So you understood that that would be the number of miles you would be paid for that load?

A. I understand that would be the number of miles that it would take

for me to get there, yes, for me to get to the load destination.
Q. Well, I'm asking, did you understand that would be the number of miles you would be paid for that load?
A. Yes, but that's the mileage --
(Reporter clarification.)
A. That's the miles that it's going to take -- it's telling me it's going to take me -- for me to get from point A to point B, which is, okay, that's what they're going to pay.
BY MR. IRELAND:
Q. Uh-huh. And so you recognize, however, that you're receiving that in advance of actually delivering the load, so things like pulling off to take a rest stop that you might choose to do or -- or picking up, you know, food, eating, those sort of things, that it wouldn't be possible to actually add whatever mileage is associated with that in advance for that; is that correct?
MR. PILLER: Objection,

A. Yeah, I'm not sure.
Q. So you're not sure if you would split the miles?
A. Yes, if it's driven unevenly, yes.
Q. So is it your understanding that there would be loads where you would drive more miles and then you would be paid for more miles than your co-driver?
MR. PILLER: Objection, asked and answered. He said he's not sure.
BY MR. IRELAND:
Q. You can answer.
A. I'm not sure.
Q. Okay. Let's move on from this.
Did you get wage statements from CRST each week?
A. You say wage?
(Reporter clarification.)
MR. IRELAND: Wage statements.
A. What is that? What you mean? Can you explain what --
BY MR. IRELAND:
Q. A pay statement. Do you

CERTIFICATION

I, BELLE VIVIENNE, a Nationally Certified Realtime Reporter, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of January 2024.

Belle Vivienne

BELLE VIVIENNE, CRR, CCR, RPR

* * *

# Exhibit I

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public, | ) Case No. 2:21-cv-07766-ODW-PD |
| Plaintiff, | ) |
| v. | ) |
| CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive, | ) |
| Defendants. | ) |

The video recorded deposition of ANTONIO ACOSTA-GARCIA, called for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure of the United States District Courts, taken before Annette Brewer, Certified Shorthand Reporter, in and for the County of Cook and State of Illinois, on March 21, 2024, at 11:00 a.m. CST.

APPEARANCES (via remotely):

SCHNEIDER WALLACE COTTRELL KONECKY
BY: Mr. Joshua Konecky
2000 Powell Street, Suite 1400
Emeryville, CA 94608
jkonecky@schneiderwallace.com
Appeared on behalf of Plaintiff;

BERENJI LAW FIRM
BY: Mr. Shadie L. Berenji
8383 Wilshire Boulevard, Suite 708
Beverly Hills, CA 90211
berenji@employeejustice.law
Appeared on behalf of Defendants CRST Expedited, Inc., an Iowa corporation; CRST International, Inc., an Iowa Corporation;

SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
BY: MR. Jared S. Kramer
30 W. Monroe Street, Suite 1600
Chicago, IL 60603
jskramer@scopelitis.com
Appeared on behalf of Defendant CRST Expedited, Inc.

INDEX


| Witness: | | Page |
|---|---|---|
| ANTONIO ACOSTA-GARCIA | | |
| EXAMINATION BY MR. KRAMER | | 5 |


EXHIBITS


| Exhibit Nos. | | Page |
|---|---|---|
| Exhibit No. 1 | Online application | 20 |
| Exhibit No. 2 | Certification of Knowledge and Understanding | 54 |
| Exhibit No. 3 | CRST Safety and Operations Handbook | 57 |
| Exhibit No. 4 | Driver statement of on duty hours | 73 |
| Exhibit No. 5 | Training guide for the Maven ELD | 89 |
| Exhibit No. 6 | Excerpt from what's called CRST training guide | 109 |
| Exhibit No. 7 | E-Mail chain | 120 |


(Exhibits attached)

THE VIDEOGRAPHER: Good morning. We are going on the record at the 9:05 a.m. on March 21, 2024. Please note that this deposition is being conduct virtually. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video regarding will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Antonio Acosta-Garcia taken by counsel for defendants in the matter of Keith Huckaby versus CRST Expedited, Inc., et al., filed in the United States District Court, Central District of California, Case No. 2:21-cv-07766-ODW-PD. This deposition is being conducted remotely using virtual technology.

My name is Michael Prager representing Veritext and I am the videographer. The court reporter is Annette Brewer from the firm Veritext. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to

proceeding, please state them at the time of your appearance. Counsel and all present including remotely will now state their appearances and affiliation for the record, beginning with the noticing attorney.

MR. KRAMER: Good morning. Jared Kramer on behalf of defendant CRST Expedited, Inc.

MR. KONECKY: Josh Konecky on behalf of the class.

MR. BERENJI: Shadie Berenji on behalf of the class.

(WHEREUPON, the witness was duly sworn.)

ANTONIO ACOSTA-GARCIA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KRAMER:

Q. Good morning, Mr. Acosta-Garcia. Could you please state and spell your name for the record.

A. Antonio Acosta-Garcia.

Q. And can you just spell that for the record as well, please.

A. First name Antonio, A-n-t-o-n-i-o, last

name, Acosta-Garcia, A-c-o-s-t-a, hyphen, G-a-r-c-i-a.

Q. Mr. Acosta-Garcia, as I just stated, my name is Jared Kramer. I am one of the attorneys that's representing CRST Expedited in this lawsuit which as you may know has been brought by another former driver for the company named Keith Huckaby. Just at the beginning I want to thank you for your time today, taking time out of your day to appear for this deposition. I know no one particularly enjoys having to do and I want you to know we appreciate it.

A. Okay.

Q. So the purpose of this deposition is for me to have an opportunity to ask you questions of your experience related to the time you worked as a driver at CRST. It's very important to both sides that we obtain your honest and accurate testimony today. So to help us do that, to get started I am just going to cover a few ground rules that will apply throughout the deposition. Okay?

A. Okay.

Q. So first, the court reporter who is on the screen is taking down everything that you say, everything that I say. And in order for her to be

A. Yes.

Q. So I just want to ask you a few questions about the job description, your understanding of it.

When you applied for a job at CRST back in 2019 and 2020 and again in 2022, did you understand that the job you were applying for was to be an over-the-road truck driver as it says here?

A. Yes.

Q. In the first sentence of the description it says an over-the-road driver must be able to pick up, transport and deliver products in a safe, professional, courteous and timely manner.

Did you understand that that was going to be your job if you are hired at CRST?

A. Yes.

Q. Then it says, the driver is a single direct contact responsible for good public relations with the motoring public and with existing and prospective clients and customers. The driver must be able to communicate orally and in writing with others, including company representatives, fellow drivers and customers. The driver must be able to read, write and do basic math to properly complete bills of lading, trip sheets, logs, accident, and

cargo claims paperwork.
So at the time you applied you understand that picking up and delivering loads would require communicating with customers?
A. Yes.
Q. And it also requires communicating with your co-driver in a team driving environment, right?
A. Yes.
Q. It also required communicating with your dispatcher, right?
A. Yes.
Q. And potentially other company representatives, right?
A. Yes.
Q. At CRST you refer to your dispatcher as your driver manager?
A. Driver manager or DM.
Q. Or DM for short?
A. Yes.
Q. And you also understood that you would have to pick up and complete certain paperwork in order to complete delivery of loads, right?
A. Yes.
Q. And then it says here that includes

things like bills of lading and also trip sheet, right?
A. Yes.
Q. And you have to fill that paperwork out in order to officially complete the delivery of the load, right?
A. Yes.
Q. The paragraph below says the following were my cursor is: The driver must know and understand Department of Transportation rules and regulations pertaining to over-the-road drivers, equipment, and cargo listed in the Federal Motor Carrier Safety regulations. The driver must understand and comply with company policies and procedures.
So to deliver loads needed to understand and follow a lot of different DOT rules and regulations, right?
A. Yes.
Q. And those include what's called the federal hours of service regulations, right?
A. Yes.
Q. You needed to be able to accurately log all your time under the federal hours of service

regulations, right?
A. Right.
Q. The fourth paragraph of this description -- sorry. It says the driver must have a basic mechanical knowledge of a tractor/trailer. The driver must be able to perform DOT equipment inspections, hook/unhook trailers, and enter and exit the tractor and trailer. The driver must be able to shift manual transmission engines, control the steering wheel, operate the brake and accelerator pedals, and be able to back and park a tractor/trailer unit.
So fair to say that in order to safely deliver loads you needed to understand how to use and operate the tractor/trailer in general, right?
A. Correct. Except in my case I didn't have to shift manual transmission engines. I had an automatic restriction on my driver's license.
Q. Got it. Okay.
And you need to know how to conduct what are called pre- and post-trip inspections in order to comply with the federal motor carrier safety regulations, right?

A. Yes.
Q. And those are also required by CRST company policy, right?
A. Yes.
Q. And those inspections are essentially to make sure the truck is operating safely before you begin a trip and after you finish a trip, right?
A. Yes.
MR. KONECKY: Objection as to form.
BY MR. KRAMER:
Q. You also need to be able to drop or unhook and hook trailers to the tractor in order to pick up and drop off loads, right?
A. Yes.
Q. And part of delivering loads you would occasionally take breaks, right?
MR. KONECKY: Objection. Vague, ambiguous.
BY MR. KRAMER:
Q. Do you understand that question, Mr. Acosta-Garcia?
A. Yes. We would take breaks because of the mandatory eight-hour DOT for the state of California as well as DOT regulations.
Q. Those are 30-minute breaks that you would

take under DOT regulations?
MR. KONECKY: Objection. Vague and ambiguous.
BY MR. KRAMER:
Q. You can answer.
A. Yes. It will be a minimum of 30 minutes off duty in order to be considered a 30-minute DOT break.
Q. And you needed to take those in order to complete delivery of loads when you are over the road, right?
A. They wouldn't be necessary to for me to complete the break in order to finish the load. It would be necessary for whatever time I was actually behind the wheel of the truck during my shift.
Q. And, again, that's just to ensure that you are complying with the federal regulations that require those breaks, right?
MR. KONECKY: Objection.
BY THE WITNESS:
A. Yes.
BY MR. KRAMER:
Q. I'm sorry, what was that answer?
MR. KONECKY: Objection. Vague. Are you

asking me or you asking Mr. Garcia?
MR. KRAMER: I was asking for the answer because I think you were objecting at the same time of the answer.
BY MR. KRAMER:
Q. Mr. Acosta-Garcia, sorry. I know you repeated it now twice, but just to make sure the record is clear, what was the answer to the last question?
A. Can you repeat the last question?
Q. I've forgotten the question.
MR. KRAMER: Would you mind reading back the last question, please.
(WHEREUPON, the record was read by the court reporter.)
BY MR. KRAMER:
Q. You can go ahead and answer.
A. Yes.
Q. So I want to go down to the second to last paragraph of the description where it says drivers on occasion must load and unload trailers handling weight such as 75 pounds and be able to mount snow chains on tires, drivers may be required to use loading/unloading devices such as electric

floor jacks and hand dollies.
So did you understand that on occasion you may be required to help load or unload trailers in order to deliver loads?
A. The position I applied for did not require handling of any electronic.
Q. So the loads were all preloaded for you; is that right?
A. It was either a preloaded trailer that I would be picking up or it would be a live load or live unload.
Q. And all of that falls under what's referred to as no-touch freight, right?
A. Yes.
Q. So in other words, you weren't the person that was actually responsible for loading or unloading the trailer?
A. Correct.
Q. And you understood that the part of picking up and delivering loads you may have to sometimes wait while the trailer was loaded or unloaded in order to pick up or drop off a load, right?
A. Yes.

Q. And so let's talk about how when you applied, on each occasion you applied you were applying to work as an over-the-road driver for CRST Expedited, right?

A. Correct. That was the only position that was open. I would try to look for something that was local or even regional but I was always told that you only had OTR positions.

Q. So did you understand that at the time you applied that if you were hired you were going to be paid for the work of an over-the-road truck driver that's described in this job description?

MR. KONECKY: Objection. Vague and ambiguous.

BY MR. KRAMER:

Q. You can answer.

A. Yes. However, I believed the description had been different since I didn't get hired on in 2019. I got hired on in 2022.

Q. Is there anything in particular about the description that you think may have been different?

A. I can't recall at this time. I can barely recall this document as it is. And then, you know, a year from then, it's been a couple of years.

Q. Aside from where you mentioned that you didn't have to drive a manual transmission and that you weren't responsible for actually loading or unloading trailers, is there anything in this job description that is different than the job that you performed when you were hired?
A. I can't recall.
Q. So we talked about several different aspects of being a driver for CRST. You had to communicate with your driver manager, DM, and with customers, you had to pick up the route, submit paperwork, follow DOT regulation, log your time in accordance with those regulations, to operate the tractor/trailer, to drive tractor/trailer, know how to do to inspections, pre-trip and post-trip inspections, drop and hook trailers, fuel the truck, and also take breaks when needed.
All of those are activities that you needed to do in order to safely deliver loads when you were working as a driver for CRST, right?
MR. KONECKY: Objection as to form, compound.
BY MR. KRAMER:
Q. You can answer.
A. Correct, all of those are required to

complete a load.
Q. And you were told that all those tasks were part of the job when you first applied, right?
A. Yes.
Q. Are there any tasks that you had to complete as a driver that you can think of that are not listed in the job description that we just mentioned?
A. Not that I can think of at this time.
Q. As an over-the-road driver for CRST you were hired to deliver loads throughout the country, right?
A. Yes, I was hired to be OTR for 48 contiguous states with my home base being in Riverside, California.
Q. And were you always operating an 18-wheel tractor/trailer while you were driving for CRST?
A. Yes.
Q. Were those 53-foot dry van trailers?
A. Yes, 53-foot dry van trailers.
Q. Are you familiar with the term gross vehicle weight rating?
A. Yes.
Q. And that's also referred to as GVWR for

do to begin your shift?
A. I would start my pre-trip.
Q. Okay. And you said you would log your pre-trips as on duty?
A. Yeah, pre-trips get logged on duty.
Q. What is the pre-trip?
A. A pre-trip is usually an amount of about 15 minutes which we take to go over the truck which would be opening the hood, checking the lights, checking the fluid levels under the hood, reviewing our tires, making sure they are at the proper psi as required by DOT regulations, also checking our tires for any I guess any bulges or any torn tread or rubber from the tire. Just making sure they are in proper condition as well as the undercarriage and suspension of hydraulic. Looking at our airlines, electric lines, our trailer doors, our trailer making sure there's no holes in the side of the trailer, anything like that.
Q. And you said they would typically take about 15 minutes; is that right?
A. Right.
Q. Would that amount of time ever vary?
A. No. It was for the most part around 15

minutes.

Q. And then when you finished driving for the day did you have to complete a post-trip inspection?

A. That's another thing that we didn't do. The way that my mentor was taught was that my pre-trip if he had just finished driving would be considered his post-trip. And so whenever we would be out driving with either my mentor or any of my two other co-drivers their pre-trip was considered my post-trip. So the post-trip was never logged on that for myself. And as well as for them my pre-trip would be considered their post-trip. And that was time that was never logged on duty as well. We never did. I don't think there was ever one instance where we had a post-trip on there.

Q. Between you and your co-driver you would only do one inspection per day?

A. Yes, because that's the way that we were all taught from my mentor so that's the way our mentor had been taught before that.

Q. So that was the way -- when you say that was the way you and your co-driver was taught?

A. Correct.

Q. About how long did it take to scale a load on average?
A. Probably about 15 minutes. And I am including the times that it takes for us to go inside and get the scale ticket.
Q. Did that amount of time ever vary?
A. No, it's usually about 15 minutes.
Q. Did you notate on your logs when you were scaling a load?
A. No, because we'd be under off duty just to save the time whatever time was, you know, those 15 minutes. So we could use our 14-hour clock which didn't count against our driving time and use -- we wouldn't want to use up the time that we had available so we could be on the road driving.
Q. And you understood that technically that time should have been logged on duty?
A. I perfectly understood that it wasn't what the DOT wanted. But again like I said, that's the way that my mentor had been taught and that's the way that he taught me. And basically the understanding was, hey, if you are not making miles you are not earning money, so whatever time you can save anywhere else you have to keep on driving and

multiplied the 5,087 we'd only basically be making 20 cents a mile and not 40 cents.

Q. I am going to try to use a simple example because I get the sense that you are probably better at math than I am. But let's just say for purposes of the example the truck drove 2,000 miles and you drove 1,200 of those miles and your co-driver drove 800 of those miles, was it your understanding that you should have been paid for 1,200 miles or a split of the 2,000 miles which would have been 1,000 miles?

A. No, it was a split. So it didn't matter whether I drove more or less. The miles would get split in half.

Q. So you understood that you were paid based on the split of the miles no matter how many miles you personally drove. You just thought that the split was based on the number of total miles the truck moved. Is that accurate? I just want to make sure I understand.

A. So the reason -- the reason why we were trying to drive as much as we could was --

Q. Mr. Acosta-Garcia --

MR. KONECKY: Hang on, Jared. He is answering the question.

straight to our driver manager. We never used the Maven actually to submit paperwork.

Q. How would you send it to the driver manager?

A. Through text message or e-mail.

Q. Did you know that you could use the Maven to send it?

A. No.

MR. KONECKY: Objection. Assumes facts.

BY THE WITNESS:

A. No. The way that I was instructed to do it was always just text it or e-mail to my driver manager because it was faster. That's the way my mentor had been taught and that's the way he taught me.

BY MR. KRAMER:

Q. When you filled out the paperwork did you have to include the number of miles that the truck drove anywhere on the bill of lading or the trip packet?

A. No, they never, they never required that. There wasn't even a spot for us to put that down.

Q. Was there a spot for the odometer reading to insert for the trip?

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, ANNETTE BREWER, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4121, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I

interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 3rd day of April 2024.



ANNETTE BREWER

CSR License No. 84-4121

**CRST Expedited**
3930 16th Avenue SW
Cedar Rapids, IA 52404
800-553-2778

05-02-2019 11:50:37PM CDT

**IntelliApp**

| Personal Information | |
|---|---|
| Referral Code: **DavidPersaud** | |
| Name | Antonio Acosta-garcia |
| Residence 3 years or longer (If No, previous addresses shown below) | Yes |
| Current Address | 1137 Dogwood Rd |
| Address 2 | Apt 57 |
| City, State/Province Zip/Postal | Heber, CA 92249 |
| Country | United States |
| SSN/SIN | 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 |
| Date of Birth | 10-26-1991 |
| Primary Phone | 760-996-5228 |
| Preferred method of contact | Primary Phone |
| Best time to contact you | Afternoon |
| Email | aag.garcia26@icloud.com |
| Emergency Contact Name: | Alma Aparicio |
| Emergency Contact Phone: | 7602350132 |
| Yes, I want to receive information and communications from CRST Expedited concerning future opportunities or promotions. | Yes |
| Would you like to receive communication from CRST Expedited via text message? By participating, you consent to receive text messages sent by an automatic telephone dialing system, which may contain recruiting/advertising messages. Consent to these terms is not a condition of being hired, contracted, or leased. You may opt out at any time by texting STOP to unsubscribe. You also agree that CRST Expedited's service provider receives in real time and logs your text messages with CRST Expedited. | Yes |



EXHIBIT
Ex. 1

| Company Questions | |
| --- | --- |
| **By my signature at the end of this application, I confirm that I have read the Consumer Reports Disclosure and Authorization Documents.** | Yes |

## OVER-THE-ROAD DRIVER JOB DESCRIPTION

An over-the-road driver must be able to pick up, transport and deliver product in a safe, professional, courteous and timely manner, driving a semi-tractor in the contiguous 48 states, with up to a 53' trailer.

The driver is the single direct contact responsible for good public relations with the motoring public and with existing and prospective clients and customers. The driver must be able to communicate orally and in writing with others including company representatives, fellow drivers, and customers. The driver must be able to read, write and do basic math to properly complete bills of lading, tripsheets, logs, accident, and cargo claims paperwork. The driver must be able to read and understand maps.

The driver must know and understand Department of Transportation rules and regulations pertaining to over-the-road drivers, equipment, and cargo listed in the Federal Motor Carrier Safety Regulations. The driver must understand and comply with company policies and procedures.

The driver must have a basic mechanical knowledge of a tractor/trailer. The driver must be able to perform DOT equipment inspections, hook/unhook trailers, and enter and exit the tractor and trailer. The driver must be able to shift manual transmission engines, control the steering wheel, operate the brake and accelerator pedals, and be able to back and park a tractor-trailer unit.

The driver must have a long history of honesty; display safe behaviors at all times and have the ability to get along with others. Felony convictions involving safety, drugs or crimes against persons will be subject to review and may, based on the circumstances involved, disqualify you for a driving position with CRST.
The driver must meet DOT standards for physical exam, drug test, and commercial drivers' license as well as company standards.

The driver must be able to drive up to a 10 hour shift and up to 70 hours per week. In the coast-to-coast team operation, the driver must work effectively with their co-driver to perform their job responsibilities while working relatively long hours and performing repetitive work in a tractor. This may require the driver to be away from home 21 days or more at a time, work with variable work/rest cycles due to frequent deadlines and meeting delivery schedules, be exposed to environmental extremes, and encounter day-to-day stressful situations.

Drivers on occasion must load and unload trailers handling weights of up to 75 pounds and be able to mount snow chains on tires. Drivers may be required to use loading/unloading devices such as electric floor jacks and hand dollies.

This job description is intended to accurately state the working conditions and the tasks that must be performed for this job. However, the description is not an exhaustive list and the driver may be required to perform other tasks or other work from time to time as assigned to the driver by his supervisor or management.

| | |
|---|---|
| Have you reviewed the job description above? | Yes |
| Do you understand the requirements? | Yes |
| Can you perform the requirements of this job with or without reasonable accommodation? | Yes |

| **General Information** | |
|---|---|
| How did you hear about CRST? | Indeed |
| Were you referred by a CRST Driver? | No |
| Please list the CRST Employee's name, terminal and ID#, if you have it: | |
| If you have spoken with a CRST recruiter, please select his/her name: | |
| PERSONAL REFERENCES | |
| Please provide the name and phone number of two personal references. | |
| First Reference Name (First & Last): | Jesus Murillo |
| First Reference Phone Number: | 7606933809 |
| Second Reference Name (First & Last): | Elena Orozco |
| Second Reference Phone Number: | 7608863416 |
| CRST Position Descriptions<br><br>• **Company Driver:** Student and Experienced Drivers interested in joining CRST.<br>• **Lease Purchase:** Drivers interested in CRST's lease purchase program.<br>• **Owner Operator:** Owner Operators interested in joining CRST. | |
| What type of position are you applying for? | Company Driver |
| Have you recently graduated from a trucking school? If yes, list the school and date of graduation, length of trailer, and transmission type. | |
| Have you ever been known by any other name? | No |
| List all names: | |
| Do you read, write, and speak English? | Yes |
| Can you legally work in the United States? | Yes |
| How many years have you had a valid driver's license? | 8 |
| **License and MVR Information** | |
| Have you ever been refused liability insurance? | No |

| | |
|---|---|
| If you hold a CDL, do you have an automatic restriction? | No |
| If you answered Yes to any of the above questions, please give details; otherwise, enter NONE: | NONE |
| Are you currently an ACTIVE service member in National Guard, Reserve or Active Duty for any branch of the armed services? | No |
| Do you have PREVIOUS military experience? | No |
| Do you have 6 months of Over The Road (OTR) experience within the last year? | No |
| Based on your answer of having OTR experience, are you interested in driving as a Lease Purchase driver? | |

| **Licenses** | |
|---|---|
| Please enter all licenses you have held in the past. | |
| License Number | Y6888620 |
| State/Province | CA |
| Country | United States |
| License Class | |
| License Expiration Date | 10-26-2023 |
| Physical Expiration Date | |
| Current License | Yes |
| Commercial Driver License | No |
| **Endorsements** | None |

| **Employment / Unemployment** | |
|---|---|
| **Unemployment** | |
| Start Date | 08-2015 |
| End Date | 09-2018 |
| Comment | |

| Education | |
|---|---|
| School Name | Imperial Valley College |
| Start Date | 02-2018 |
| End Date | 05-2019 |
| City, State/Province | Imperial, CA |
| Country | United States |
| What did you study? | Business |
| Phone | |
| Graduation Date | |

| FMCSR | |
|---|---|
| Under FMCSR 391.15, are you currently disqualified from driving a commercial motor vehicle? [49 CFR 391.15] | No |
| Has your license, permit or privilege to drive ever been suspended or revoked for any reason? [49 CFR 391.21(b)(9)] | No |
| Have you ever been denied a license, permit, or privilege to operate a motor vehicle?[49 CFR 391.21(b)(9)] | No |
| Within the past two years, have you tested positive, or refused to test, on a pre-employment drug or alcohol test by an employer to whom you applied, but did not obtain, safety-sensitive transportation work covered by DOT agency drug and alcohol testing rules? [49 CFR 40.25(j)] | No |
| In the past three(3) years, have you ever been convicted of any of the following offenses: [49 CFR 391.15]:<br><br>• Driving a commercial motor vehicle with a blood alcohol concentration ("BAC") of .04 percent or more<br>• Driving under the influence of alcohol, as prescribed by state law<br>• Refusal to undergo drug and alcohol testing as required by any jurisdiction for the enforcement of Federal Motor Carrier Safety Act regulations<br>• Driving a commercial motor vehicle under the influence of any 21 C.F.R. 1308.11 Schedule I identified controlled substance, an | No |

| | |
|---|---|
| amphetamine, a narcotic drug, a formulation of an amphetamine, or a derivative of a narcotic drug<br>• Transportation, possession, or unlawful use of a 21 C.F.R. 1308.11 Schedule I identified controlled substance, amphetamines, narcotic drugs, formulations of an amphetamine, or derivatives of narcotic drugs while you were on duty driving for a motor carrier<br>• Leaving the scene of an accident while operating a commercial motor vehicle<br>• Or any other felony involving the use of a commercial motor vehicle | |

| Vehicle Accident Record |
|---|
| Were you involved in any accidents/incidents with any vehicle in the last 5 years (even if not at fault)? |
| No Accidents |

| Traffic Convictions \ Violations |
|---|
| Have you had any moving violations or traffic convictions in the past 3 years? |
| No Violations |

| Signature | |
|---|---|
| Full Name | Antonio Acosta-garcia |
| IP Address | 174.212.2.19 |
| Signature Date/Time | 05-02-2019 11:50 PM |

By signing my application below, I agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature.

This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge.

**Signed Date:** 05-02-2019 11:50 PM

**Signed:**

| Federal FCRA Summary of Rights Acknowledgment | |
|---|---|
| By checking this box, I (a) acknowledge that I have read and understand the federal FCRA Summary of Rights and have been given the opportunity to copy/print the Summary of Rights and (b) agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature. | Yes |

| CALIFORNIA DISCLOSURE REGARDING BACKGROUND CHECKS DOCUMENT | |
|---|---|
| By checking the box, I 1) agree to use an electronic signature to demonstrate my consent, 2) agree that an electronic signature is as legally binding as an ink signature, and 3) acknowledge that I have read and understood this California Disclosure Regarding Background Checks document. | Yes |

| California Consumer Copy Request | |
|---|---|
| If you live or work in California, Minnesota, or Oklahoma, please check this box if you'd like to receive a copy of a consumer report if one is obtained. | Yes |

| PSP Disclosure and Authorization | |
|---|---|
| By checking the box, I (a) acknowledge that I have read and understand the PSP Disclosure and Authorization and also have been given the opportunity to copy/print it, and (b) agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature. | Yes |

| Additional Consent or Certification | |
|---|---|
| By checking the box, I (a) acknowledge that I have read and understand the above and also have been given the opportunity to copy/print it, and (b) agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature. | Yes |

| FCRA Disclosure and Authorization | |
|---|---|
| By checking the box, I (a) acknowledge that I have read and understand the above and also have been given the opportunity to copy/print it, and (b) agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature. | Yes |

| Employment Verification Acknowledgment and Release (DOT Drug and Alcohol) | |
|---|---|
| By checking the box, I (a) acknowledge that I have read and understand the above and also have been given the opportunity to copy/print it, and (b) agree to use an electronic signature to demonstrate my consent. An electronic signature is as legally binding as an ink signature. | Yes |

# Exhibit J

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public,

Plaintiff, Case No.
v. 2:21-cv-07766-ODW-PD

CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 through 30, inclusive,

Defendants.

************************************
ZOOM VIDEOTAPED DEPOSITION OF
VAUGHN LINSON
Wednesday, July 10, 2024
9:00 a.m. EST
*************************************

TAKEN BY:
JIM HANSON, ESQ.
ATTORNEY FOR DEFENDANT

REPORTED BY:
BELLE VIVIENNE, RPR, CRR, NJ-CRR, WA/CO/NM-CCR
NATIONALLY CERTIFIED REALTIME COURT REPORTER
VERITEXT LEGAL SOLUTIONS
JOB NO. 6793879
866.299.5127

A P P E A R A N C E S

FOR THE PLAINTIFFS:

SHADIE BERENJI
SHAWHIN BERENJI
BERENJI LAW FIRM, APC
8383 Wilshire Boulevard, Suite 708
Beverly Hills, Cailifornia 90211
310.855.3270
bereji@employeejustice.law

FOR THE DEFENDANTS:

JAMES HANSON
MEGAN ESCOBOSA
SCOPELITIS GARVIN LIGHT HANSON &
FEARY P.C.
10 W. Market Street, Suite 1400
Indianapolis, Indiana 46204
317.637.1777
Jhanson@scopelitis.com

VIDEOGRAPHER:
Sean Grant

- - -

I N D E X

- - -

Testimony of:

VAUGHN LINSON

MR. HANSON.............................. 7

- - -

E X H I B I T S

- - -


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled Confirmation IntelliApp, 09-16-2022 1:29:20PM CDT... | 20 |
| Exhibit 2 | CRST job description....... | 34 |
| Exhibit 3 | Commercial Driver's License Training and Repayment Agreement ....... | 88 |
| Exhibit 4 | CRST Expedited Entry Classification/Wage Verification (January, 2018), Eduardo Aldana...... | 90 |
| Exhibit 5 | Wage statements............ | 93 |
| Exhibit 6 | IntelliApp - Partial...... | 151 |

THE VIDEOGRAPHER: Good morning. We're going on the record. The time is 9:07 a.m. The date is July 10, 2024. Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Vaughn Linson taken by counsel for defendants in the matter of Keith Huckaby, et al., versus CRST Expedited, Inc., et al, filed in the United States District Court, Central District of California, Case No. 2:21-cv-07766-ODW-PD and it's being conducted remotely using virtual technology.

My name is Sean Grant from the

firm Veritext. I'm the videographer. And the court reporter is Belle Vivienne also from Veritext. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. HANSON: My name is James Hanson. I'm from the law firm Scopelitis Garvin and I represent the defendant in this case, CRST Expedited.

MS. BERENJI: Good morning. I'm counsel for plaintiff and for the amended piece-rate class including Mr. Linson, Shadie Berenji.

THE VIDEOGRAPHER: And with you?

MR. BERENJI: Good morning, Shawhin Berenji representing the

class.

THE VIDEOGRAPHER: Thank you.
Will the certified court reporter
please swear in the witness.

VAUGHN LINSON,

having been first duly sworn by the Certified Stenographic Realtime Reporter, testified as follows:

THE COURT REPORTER: You can
lower your hand.

THE VIDEOGRAPHER: Counsel.

EXAMINATION

BY MR. HANSON:

Q. All right. Mr. Vaughn, my
name is Jim Hanson and I just introduced
myself and I'm the counsel for CRST.

You understand that you are
under oath today?

A. Yes, sir.

Q. All right. Now, have you
had any prior deposition experience?

A. No, sir.

Q. Have you ever been involved
in any lawsuits?

A. No, sir.

Q. Right. But for the most part, you were hauling trailers to deliver loads, correct?
MS. BERENJI: Vague and ambiguous.
A. I was hauling -- hold on. You said I was hauling trailers to deliver loads. I don't understand that question.
BY MR. HANSON:
Q. All right. When you have a load, it's in the trailer, correct?
A. Yes, the load is in the trailer, correct.
Q. And it's connected with the fifth wheel to your tractor, correct?
A. Correct.
Q. And you take that trailer wherever it is supposed to be delivered for the customer, correct?
MS. BERENJI: Incomplete hypothetical, vague and ambiguous.
A. I can't really say that because it's like my job was to drive the actual truck, like I said. So, once

again, it's like -- like I expressed before, it wasn't always trailers, tractors. It was -- sometimes it was bobtail. It was just a variety of different things that I would do in order to get the job done. At the end of the day, the ultimate goal was to get -- get the trailer to a particular destination, but it was other things that -- that came into play with that, if that's what you're asking me.
BY MR. HANSON:
Q. I'm just trying to find a general -- the general idea of what you did as a truck driver.
A. I drove.
Q. You drove.
And it was driving to deliver loads, correct?
MS. BERENJI: Objection, asked --
A. No.
MS. BERENJI: Yeah, asked and answered and vague and ambiguous.
A. No, like I said --

your co-driver -- because you drove in teams at CRST, correct?
A. Correct, I did.
Q. Yeah. And -- and as part of that, to get a load delivered, what are all of the different things you had to do in order to get the load delivered?
MS. BERENJI: Vague and ambiguous.
A. I don't understand exactly what you're asking me because it's --
BY MR. HANSON:
Q. Okay.
A. -- it's a laundry list of things that need to be done --
THE COURT REPORTER: I'm sorry, one at a time. Because...
A. It's a laundry list of things that need to be done.
BY MR. HANSON:
Q. Okay. Let me just kind of give you some examples and tell me if you think those are part of your laundry list.
Your laundry list would

Q. All right. Mr. Linson, we were going through the laundry list and you said driving is one of the things on the laundry list, correct?

MS. BERENJI: Objection, mischaracterizes the testimony.

BY MR. HANSON:

Q. Do you agree with me it's part of the laundry list?

A. I believe that driving is the laundry list, like, ultimately -- ultimately, that's the -- ultimately, driving is the washing machine. So, yeah, so -- so before I do a load of laundry, I got to sort the clothes. After I sort the clothes, I sort my baby clothes. After I sort my baby clothes, I tell the washing machine which washing powder I'm going to use for hers --

THE COURT REPORTER: Slow down, sir, I'm not understanding your words.

THE WITNESS: Oh, I'm sorry.

A. For example, like if I'm -- you're talking about laundry list. So, for example, if I'm doing laundry, I have

Q. Because you split the miles with your co-driver, your trainer, correct?
A. That's not how -- that's not how I ever assumed it was, but, yeah, I guess, uh-huh.
Q. I mean, did you get copies of these wage statements when you were employed?
A. I never got copies of them physically. They had -- they had a site that you would go to and you could look at it. I never got a physical copy, no.
Q. Okay. And you could -- you could look at it and if you had any questions about it, you could call about it, correct?
A. Correct.
Q. And -- and if you wanted to print a copy, you could print a copy, correct?
A. I'm pretty sure I could figure it out.
Q. Okay. So on that -- the trip from Santa Fe Springs to Macon,

it?
A. Yeah, because I drove --
THE COURT REPORTER: Hold on. I think there's a -- your counsel is saying something.
MS. BERENJI: Calls for speculation, lacks foundation, incomplete hypothetical.
A. If you're asking what I got paid, yes, because clearly it says -- if you were going off the document, you said the document says loaded; I'm agreeing with that. It says it was loaded. So it says "Total Movement Miles 2175," and it says current total miles that I drove was 2207 and you said that's what I got paid for, driving the truck that to -- to that destination. You said that yourself.
BY MR. HANSON:
Q. If you had not made that trip to deliver that trailer of goods to the destination in Macon, Georgia, would you have been paid?
A. Yes, sir.
MS. BERENJI: Wait. Vague and

ambiguous, incomplete hypothetical, calls for speculation.

A. Yes, sir. I would have got paid. If I would have got out of the truck and went home and left the truck at -- in Atlanta where we had to do the empty load and went home, they still would have paid me for the miles that I drove. I might have got fired or I might have been on suspension or whatever, but, yes, I still would have got paid absolutely because I drove the miles that I drove.

BY MR. HANSON:

Q. And the miles that you were paid for were associated with that load from Santa Fe Springs to Macon, Georgia, correct?

A. You're asking -- you asked me the same question. So like I say, if I would have got out the truck, I still would have got paid. If I would have quit that day and didn't complete the delivery, I still would have got paid for about 2207 miles. If I would have

didn't -- at that time, it didn't faze me one way or the other, to be honest.

BY MR. HANSON:

Q. Even though you knew that it wasn't for the actual miles driven, correct?

MS. BERENJI: Objection, mischaracterizes the testimony. The question lacks foundation.

A. Honestly, I never gave it no thought because I didn't care. I was -- my brain was, I'm new to this. I know I got to work my way up to get to where I wanted to and I was excited, so I didn't never give it a thought. So if you're asking me if I thought about it, I never even thought about it honestly.

BY MR. HANSON:

Q. But you did get to see this on whatever it was, the app or whatever it was, you looked at your wage statements, correct?

MS. BERENJI: Objection, lacks foundation.

A. I'm -- honestly, when I used

to look at those, I just looked at how much I was getting paid. I didn't really -- I promise you, I didn't even like give it too much -- I didn't -- you know, like I say, I knew that I would have to get my palms sweaty and I would have to, you know, put my sweat equity in to build, so I didn't really look at how much I was making. I just was trying to get it all over with so I could start making, you know, the big bucks, so I thought.

BY MR. HANSON:

Q. Yeah.

And -- and -- but the fact is, you had the information available to you, correct?

MS. BERENJI: Vague and ambiguous, calls for speculation.

(Cross talk.)

A. I do remember seeing those documents on the site, but like I said, I never went through it with a fine-tooth comb, no.

BY MR. HANSON:

after this time of conversation with this recruiter?

A. I paid it off over a period of time.

Q. Okay.

A. I -- I couldn't afford to pay it off all at once. So I paid it off over time.

MS. BERENJI: And I will just state for the record that the last page that we looked at on the share screen was CRSTF397893.

MR. HANSON: I can put it back up if you want. It's one thing that we agree on today.

BY MR. HANSON:

Q. You know, all the things that you did outside of driving for CRST, were those all related to the driving job that you did?

A. I don't understand. Can you -- can you -- can you elaborate on that for me?

Q. We talked about pre-trip and post-trip inspections.

That was related to the driving work, correct?

MS. BERENJI: Vague and ambiguous.

A. Well, based on -- I was trained and taught to be safe, I would take that as, okay, I should do these things to be safe and get -- keep a good driving record. So I would need to do pre-trip, post-trip, check the fifth wheels, check the tires and do all these things to be safe. Could I do it without driving -- I mean, could I do those things and -- could I avoid them? Could I not do those things and still drive? Absolutely I could, but it would be a risk of my life and my safety, or I can get in trouble if anything is wrong. So they're not inextricably bound.

BY MR. HANSON:

Q. Would you agree with me though that doing a pre-trip and a post-trip is required by the DOT in order to drive?

A. They do recommend that you

do it, absolutely, sir.
Q. Do they recommend it or do they require it?
A. They -- yeah, I could say they require it, absolutely.
Q. And we talked about fueling. That's one of the things you have to do in order to drive, correct, especially distances we're talking about?
A. If you run out -- to avoid running out of fuel, yes, I would need to fuel to drive.
Q. In the course of the trips that you drove, you had to do paperwork related to those loads, correct?
MS. BERENJI: Vague and ambiguous, incomplete hypothetical.
A. I had to do paperwork -- paperwork was handled, but I really didn't do much paperwork, just some signatures and log sheets and put them in the Maven system, take pictures through the Maven system.
BY MR. HANSON:
Q. Right. It didn't require

much, but you still had to get it done in order to show that you had made the delivery and get paid for the load, correct?

A. I never got paid for the load, sir. I got paid for driving, but to deliver the load or deliver the trailer, I would have to get documents. I never got paid for the load.

Q. All right. Why -- why do you differentiate between driving and load pay?

A. Because what I did for Red One, like I told you, on the weekends was load pay. When I dropped a load, they say, okay, when you drive, if this load -- if this load doesn't get there, you don't get nothing. But when the load gets there, you get a percentage of this load. When I'm driving for Red One, that's how it was was on the weekends, take -- I drop a load, $1400 -- I mean, $1200, I get $400. That's load.

During the week, I got paid by the hour, with CRST, I got paid for

driving by the mile.

Q. And would you -- you'll agree with me that you were never paid for actual miles driven; were you?

MS. BERENJI: Objection, vague and ambiguous.

(Cross talk.)

A. Whether or not they were the actual miles that I drove or my co-driver drove, I can't say. But I was under the assumption and what was presented to me was that I would be getting paid for the miles driven.

BY MR. HANSON:

Q. But it was not actual miles, correct? That's what you've told me today --

MS. BERENJI: Objection, mischaracterizes the testimony.

Q. -- correct?

MS. BERENJI: Mischaracterizes the testimony, vague and ambiguous.

A. In my experience within itself, I always got -- I always drove more miles than I was paid for.

CERTIFICATION

I, BELLE VIVIENNE, a Nationally Certified Realtime Reporter, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of July 2024.



BELLE VIVIENNE, CRR, CCR, RPR

* * *

# Exhibit K

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH HUCKABY, individually and on behalf of all other persons similarly situated, and on behalf of the general public<br><br>Plaintiff,<br><br>vs.<br><br>CRST EXPEDITED, INC., an Iowa corporation; CRST INTERNATIONAL, INC., an Iowa corporation; and DOES 1 THROUGH 30, inclusive;<br><br>Defendants. | Case No. 2:21-cv-07766-ODW-PD<br><br>Hon. Otis D. Wright, II |

# EXPERT SUPPLEMENTAL REBUTTAL REPORT

**Chen Song, Ph.D., CFA**
**November 6, 2023**

**I. Introduction ........................................................ 1**

I.A. Assignment ........................................................ 1

I.B. My Education, Experience, and Qualifications ........................................................ 3

I.C. Rebuttal Opinions and Calculations ........................................................ 4

**II. Data and Discovery Documents Relied Upon ........................................................ 6**

II.A. Data Produced and Relied Upon ........................................................ 7

*II.A.1. Class List ........................................................ 7*

*II.A.2. Payroll (Payroll Master, Payroll Adjustments) ........................................................ 7*

*II.A.3. Trip Wages Data ........................................................ 8*

*II.A.4. Trip Supplement Data ........................................................ 8*

*II.A.5. Driver Log data ........................................................ 8*

*II.A.6. Qualcomm/Maven GPS Pings Data and Messages data ........................................................ 9*

*II.A.7. DOT Inspection data ........................................................ 10*

*II.A.8. Fuel Tax data ........................................................ 10*

II.B. Discovery Documents Relied Upon ........................................................ 10

*II.B.1. IFTA Records ........................................................ 10*

*II.B.2. Depositions ........................................................ 11*

*II.B.3. Other Discovery Documents ........................................................ 11*

**III. Rebuttal Opinions ........................................................ 11**

III.A. Rebuttal Opinion I – Mr. Chasworth's loss Calculations Remain Unreliable Because They Use Assumptions Not Supported by CRST's Data, and Are Also Inflated If the Court Determines that Workdays and Miles Driven Outside of California Are Not Recoverable ........................................................ 12

*III.A.1. Mr. Chasworth overestimates the number of workdays by: i) including Payroll periods where no work was performed; ii) counting pay periods for trip days and miles driven both inside and outside of California; and iii) extrapolating the inflated workday estimate to a future time period, further exacerbating the inflation. ........................................................ 12*

*III.A.2. Mr. Chasworth provides no basis for using "a weighted average hourly rate" calculated from sick pay transactions as an effective hourly rate. ........................................................ 28*

*III.A.3. Mr. Chasworth overestimates the duration of DOT inspections. ........................................................ 30*

*III.A.4. Mr. Chasworth overestimates the frequency and duration of pre-trip and post-trip inspections. 31*

*III.A.5. Mr. Chasworth overestimates the frequency and duration of refueling. ........................................................ 36*

*III.A.6. Mr. Chasworth errs by not applying the total paid amounts as offsets to wage losses for events of breakdowns, detention delays, and layovers. ........................................................ 39*

*III.A.7. Mr. Chasworth's calculation of an average 9.55 hours per week of "On Duty – Not Driving" time is inflated. ........................................................ 40*

III.B. Rebuttal Opinion II – Liquidated Damages Calculated by Mr. Chasworth Are Unreliable Because They Suffer From the Same Flaws As Those Identified In The Loss Calculations Performed By Him .......... 41

III.C. Rebuttal Opinion III – Mr. Chasworth's "Review of Federal Hours of Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time," is Flawed Because He Does Not Correctly Analyze the Data to Identify the Days that Fit His Criteria and Because he Double Counts Damages for Breakdowns and Layovers Occurring Outside of California. ........................................................ 42

III.D. Rebuttal Opinion IV – Mr. Chasworth's "Review of Wage Statements and Trip Records", Which Derives "Undercounted Miles", Is Incomplete and Incorrect. Additionally, His Calculation of "a Potential Amount of Underpayments" Will Be Inflated If Miles Driven Outside of California Are Not Recoverable According To California Law. ........................................................ 46

*III.D.1. Mr. Chasworth's calculation of "undercounted miles" is incomplete because it ignores Legacy IFTA records Produced to Plaintiff.* ........ *46*
*III.D.2. Mr. Chasworth's analysis of "undercounted miles" is incorrect, resulting in a calculated "underpayment" that is inflated.* ........ *47*
*III.D.3. Chasworth's calculation of miles "underpaid" still is not limited to miles driven in California.* *50*
III.E. Rebuttal Opinion V – Mr. Chasworth Ignores a Substantial Amount of Empirical Data Pertinent to this Litigation. His Backup Production for the Chasworth Supplemental Report Is Deficient. ........ 52
*III.E.1. Mr. Chasworth ignores and does not analyze a substantial amount of empirical data pertinent to this case that CRST has produced to Plaintiff.* ........ *52*
*III.E.2. Mr. Chasworth's production for the Chasworth Supplemental Report does not contain any source codes or logics replied upon by Mr. Chasworth.* ........ *53*
III.F. Rebuttal Opinion VI – Dr. Viscelli's Supplemental Report Does Not Contain Any Empirical Analysis, Therefore His Opinions Are Not Based on Scientific Evidence. ........ 53
III.G. Rebuttal Opinion VII – Dr. Viscelli's Opinion that the Driver Log Data "Are Not Complete Records of Drivers' Work" Is Contradicted by Federal Regulations, CRST Policies, and Driver Testimony ..... 54
III.H. Rebuttal Opinion VIII – Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks" Are Not Supported by CRST's Data and Cannot Be Relied Upon As The Basis For Any Class Loss Calculations ........ 57
*III.H.1. Dr. Viscelli's estimate that each refueling event lasts "at least 30 minutes" is not reliable because the GPS Pings data produced by CRST contradicts it.* ........ *58*
*III.H.2. Dr. Viscelli's estimate that truck inspections last "between 30 and 45 minutes" "at several points through the day" is not supported by Driver Log data produced by CRST and therefore cannot be relied upon.* ........ *58*
*III.H.3. Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks" exceed the amount of on-duty non-driving activities in CRST's data.* ........ *59*

**IV. Conclusions ........ 61**

**Figure 1. Driver Logs Demonstrate that Mr. Chasworth Overestimates Workdays** ........ 20
**Figure 2. Estimates of Percentage of Miles Driven in California Range Between 7.4% and 14.5%** ... 24
**Figure 3. Number of DOT Inspections, by Duration of Inspection** ........ 31
**Figure 4. Location of Mr. Huckaby's Trips, Based on IFTA Records** ........ 51
**Figure 5. Mr. Chasworth Assumes Daily Time for Fueling and Inspections Based on Dr. Viscelli's Estimates, Causing Inflations of Those Time Estimates Compared to CRST's Data on Drivers' Total Daily On-Duty Time** ........ 60

**Table 1. Count of Workweeks without Wages Related to Hauling Loads, and Count of Workweeks Related to Owner-Operators, Aug. 9, 2017 – Apr. 10, 2023** ........ 15
**Table 2. Summary of Miles Driven in GPS Pings data, September 3, 2017 – April 10, 2023** ........ 21
**Table 3. Summary of Miles Driven in Driver Log data, August 9, 2017 – July 22, 2022** ........ 22
**Table 4. Summary of Class LME Fuel Tax Data, Jan. 2, 2020 – Sep. 27, 2022** ........ 23
**Table 5. Pay periods with Trips Outside of California: Driver ID DG42** ........ 26
**Table 6. Pay periods with Trips Outside of California: Driver ID JLRODRI1** ........ 26
**Table 7. Logged Activities in Sequence Consistent with Mr. Chasworth's Assumption** ........ 33
**Table 8. Average and Median Duration of On-Duty Non-Driving Activity** ........ 35
**Table 9. Duration of Truck Fueling, November 2, 2021 – April 10, 2023** ........ 38

**Table 10. Summary of Payments in Legacy Payroll Adjustment Data** .......... 39
**Table 11. Summary of Payments in LME Payroll Adjustment Data** .......... 40
**Table 12. Average Weekly and Daily On-Duty Time, August 9, 2017 to April 10, 2023** .......... 41
**Table 13. Comparison of Fuel Tax and Trip Summary Data, January 1, 2020 - September 27, 2022** 49

**Example 1. Driver Pay Period Consisting of Only Adjustment Code "SB", Sign on Bonus, Using Legacy Payroll and Adjustment Data** .......... 14
**Example 2. Driver – Pay Period without Wages Related to Hauling Loads, where Driver's Pay for the Week Consisted Only of an Advance (deduct_code_id = "ADV"), Using LME Payroll and Deduction Data** .......... 14
**Example 3. Payment for a Load Hauled During One Workweek was Split to Two Payroll Weeks** .... 16
**Example 4. Load Hauled Over Two Workweeks was Paid Out in One Payroll Week** .......... 16
**Example 5. Mr. Chasworth Incorrectly Identifies Trucks as Being Stationary and Outside of California, Including for Driver's First Logged Status** .......... 45
**Example 6. Chasworth Undercounts Paid Miles and Overcounts Tax Miles by Not Matching on Movement ID** .......... 48
**Example 7. Chasworth Incorrectly Averages Only the Highest and Lowest Pay Rates, and Includes Non-Class Member Pay Rates in His Average** .......... 50

# I. INTRODUCTION

## I.A. Assignment

1. I have been retained by Scopelitis, Garvin, Light, Hanson & Feary, P.C. ("Counsel"), Counsel for Defendants CRST EXPEDITED, INC. ("CRST") and CRST INTERNATIONAL, INC., to submit this rebuttal expert report.

2. It is my understanding that Plaintiff Keith Huckaby ("Named Plaintiff"), worked for CRST as a truck driver from approximately April 2019 to August 2020 and resided in California[1], "brings this putative class action seeking relief for alleged violations of the California Labor Code"[2] It is my understanding that the Court has granted class certification of the "Amended Piece-Rate Class" (the "Class") for "Huckaby's first cause of action for failure to pay minimum wages, second cause of action for failure to pay statutory/contractual wages, and ninth cause of action for violation of California's Unfair Competition Law."[3]

3. The Court defined the "Amended Piece-Rate Class" as: "All current and former employees that (sic) had a residential address in California and performed work as a truck driver for CRST ("CA Truck Driver") who were compensated by a piece-rate from August 9, 2017, through April 10, 2023, excluding the participants in the settlement in *Montoya v. CRST Expedited, Inc.*, Case No. 16-cv-10095-PBS (D. Mass.)."[4]

4. On May 1, 2023, I submitted a rebuttal report ("Song Rebuttal Report")[5] in this matter in response to the expert reports of Mr. Sean Chasworth[6] ("Chasworth Report") and Dr. Steve Viscelli[7] ("Viscelli Report"). The empirical analysis I included in the Song Rebuttal Report was limited to the data I understand was produced to Plaintiff as of April 10, 2023, the date when he submitted the Chasworth Report.

---

[1] Dkt. 60, "Order Granting in Part and Denying in Part Motion to Certify Class," dated October 3, 2022 ("Class Certification Order"), page 2.
[2] Class Certification Order, page 1.
[3] Class Certification Order, page 18.
[4] Class Certification Order, page 18; Dkt. 86, "Order Granting in Part and Denying in Part Motion for Reconsideration, dated April 10, 2023, page 8.
[5] Expert Rebuttal Report of Chen Song, Ph.D., CFA, May 1, 2023.
[6] Declaration of Mr. Sean Chasworth, April 10, 2023.
[7] Expert Opinion on the Work of CRST Drivers submitted by Steve Viscelli, Ph.D., April 10, 2023.

5. It is my understanding that CRST made several supplemental data productions after Plaintiff's experts issued their reports. Those supplemental data productions correspond to updated data files of class members, which include the same categories of data files described in Song Rebuttal Report section II.A, but which cover the time period extending to April 10, 2023, and include more class members as a result of the extended time period.

6. Additionally, on May 26, 2023, I produced to Counsel the computer codes which would enable Plaintiff's experts to fully replicate the analyses and findings in the Song Rebuttal Report. I understand that Counsel produced those computer codes to Plaintiff. However, I see nothing in Plaintiff's experts' reports or backup productions that demonstrates they have used my computer codes to test my analysis and findings or to support any criticism in their supplemental report.

7. On October 16, 2023, Plaintiff submitted supplemental expert reports of Mr. Chasworth[8] ("Chasworth Supplemental Report") and Dr. Viscelli[9] ("Viscelli Supplemental Report"). Between October 18 and October 24, I received several rounds of productions from Mr. Chasworth through Counsel, consisting of: (i) Bates numbered supplemental productions from CRST since April 2023, (ii) Excel and CSV data files enumerating records that presumably relate to calculations in the Chasworth Supplemental Report, and (iii) One Stata .do file and another Python program which appear to be intermediate data processing steps or pay period counts. The pay period counts do not directly feed into any numbers in the Chasworth Supplemental Report. To date, I have not received computer codes/scripts that show how Mr. Chasworth processed and analyzed input files, or how the data productions in this case are linked to the numbers in the Chasworth Supplemental Report.

8. It is my understanding that Plaintiff intends to rely on the Chasworth Supplemental Report and the Viscelli Supplemental Report to support class damages for the three surviving class claims. In this context, I have been asked by Counsel for CRST to review and provide supplemental rebuttal opinions to the Chasworth Supplemental Report and the Viscelli Supplemental Report.

---

[8] Supplemental Expert Report of Sean Chasworth, October 16, 2023.
[9] Expert Opinion on the Work of CRST Drivers (Supplemental Report), October 16, 2023.

### I.B. My Education, Experience, and Qualifications

9. I am a Senior Vice President at Cirque Analytics, a consulting firm that specializes in the application of economics, statistics, and data analytics to legal and regulatory issues.

10. I hold a Ph.D. in economics from the University of Chicago, where I specialized in Labor Economics, which is the application of Economics and Statistics to the study of labor markets, and in Econometrics, which is the application of Statistics to the study of Economics. Prior to my graduate study, I obtained a B.A. degree in Mathematics and Economics from Agnes Scott College. Since receiving my Ph.D., I have provided economic and statistical analyses related to damages and liability in class action disputes. I have been qualified as an expert witness in both Federal and State Courts and have testified at arbitration and at trial.

11. As an economist and statistician, I routinely work with payroll, timekeeping, and many other types of databases, including GPS and real-time activity tracking data, to study issues related to class certification and calculating economic damages. My statistical and econometric expertise includes applying econometric modeling tools, such as conducting statistical tests to evaluate differences in data provided by clients and performing regression analyses and drawing statistical inferences based on regression results. My expertise in data analysis focuses on studying the statistical properties of data, making projections, statistical sampling, and the extrapolation of sample estimates to the population.

12. I have also maintained my connections with the academic community. I taught a course on Labor Economics and Human Resources at the University of California, Irvine. I was an Adjunct Assistant Professor at the California State University, Los Angeles, where I taught a course on Financial Institutions. I was an instructor with the Los Angeles Chartered Financial Analyst (CFA) Review program for over a decade, during which time I taught Risk Management and Asset Allocations. A true and correct copy of my curriculum vitae is appended to this declaration as Attachment A.

13. The opinions expressed in this declaration are based on the analyses that I, or Cirque Analytics Staff at my direction and supervision, have conducted. I may supplement or revise this declaration on a later date if additional relevant information becomes available to me. I may respond to any additional reports or opinions by any experts retained by Plaintiff.

**I.C. Rebuttal Opinions and Calculations**

14. I have reviewed the Chasworth Supplemental Report and the Viscelli Supplemental Report, and the data and documents relied upon by Mr. Chasworth and Dr. Viscelli. Based on that review, I reach the following rebuttal opinions:

- **Rebuttal Opinion I** – Loss calculations performed by Mr. Chasworth are unreliable because they use assumptions not supported by CRST's data. Mr. Chasworth overestimates his calculated losses in four ways. First, he overestimates the number of workdays by using payroll records instead of driver logs. Mr. Chasworth's use of payroll records to estimate workdays is unreliable because he (i) included Payroll periods where no work was performed, (ii) counted pay periods for trip days and miles driven both inside and outside of California, and (iii) extrapolated the inflated workday estimate to a future time period, further exacerbating the inflation.

  Second, Mr. Chasworth's loss calculations are inflated due to the wage rate he uses. Instead of applying the California minimum wage rate, Mr. Chasworth uses a weighted average hourly rate of $32.91. This is improper on a minimum wage claim. Separately, Mr. Chasworth's calculation of $32.91 is unreliable because he used sick pay transactions from a tiny fraction of only 88 of 3,962 class members to calculate that rate.

  Third, Mr. Chasworth's loss calculations are overstated because he uses unsupported assumptions regarding the frequency and duration of DOT inspections, pre-trip and post-trip inspections, and refueling. Mr. Chasworth does not perform any empirical data analysis to support his assumptions. My analysis of the data shows that his assumptions on each of these items overstates alleged unpaid time on each of these tasks.

  Finally, Mr. Chasworth's loss calculations include miles driven and workdays spent outside of California. If those times are not recoverable under California law, his loss calculations will be inflated.

- **Rebuttal Opinion II** –Mr. Chasworth's liquidated damages calculations are unreliable because they suffer from the same flaws as those identified in his underlying loss calculations.

- **Rebuttal Opinion III** – Mr. Chasworth's "Review of Federal Hours of Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time"[10] is flawed for two reasons: First, he did not analyze the data to identify the days that fit his criteria. Specifically, the odometer readings from the Qualcomm Driver Log data, which include odometer readings at every recorded change in log status, is occasionally populated with anomalous values, and therefore is not always accurate or valid. Approximately 13.7% of the hours identified by Mr. Chasworth are based on invalid or anomalous odometer values. In addition, approximately 4.7% of hours Mr. Chasworth identifies have missing values in the "state"

[10] Mr. Chasworth does not separately present counts of "Off Duty" events from "Sleeper Berth" events.

field, which Mr. Chasworth ignores and counts as California log segments. Therefore, in those cases, the two criteria Mr. Chasworth relies on for his "Review of Federal Hours of Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time" cannot be discerned and applied. Second, his analysis is flawed because his off-duty time calculation double counts his calculation of damages for breakdowns and layovers.

- **Rebuttal Opinion IV** – Mr. Chasworth's "Review of Wage Statements and Trip Records", which derives "undercounted miles"[11] is inaccurate because he ignores a substantial period of records during the class period, and he did not match fuel tax miles to paid miles. Additionally, his calculation of "a potential amount of underpayments"[12] is inflated if miles driven outside of California are not recoverable according to California law.
- **Rebuttal Opinion V** – The Analysis in the Chasworth Supplemental Report does not consider or utilize a substantial portion of the relevant data, including CRST's updated April/May 2023 data production. Additionally, Mr. Chasworth's backup production for the Chasworth Supplemental Report does not contain any source codes or logics replied upon by Mr. Chasworth. Without his source codes, I am unable to fully replicate the numbers in the Chasworth Supplemental Report.
- **Rebuttal Opinion VI** – Dr. Viscelli's Supplemental Report does not contain any empirical analysis, therefore his opinions are not based on scientific evidence.
- **Rebuttal Opinion VII** – Dr. Viscelli's opinion that the Driver Log data "Are Not Complete Records of Drivers' Work"[13] is contradicted by Federal regulations, CRST policies, and driver testimony.
- **Rebuttal Opinion VIII** – Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks"[14] is not supported by CRST's data and cannot be relied upon as the basis for any class loss calculations. Dr. Viscelli's estimate that each refueling event lasts "at least 30 minutes" is not reliable because the GPS Pings data produced by CRST contradicts it. Dr. Viscelli's estimate that truck inspections last "between 30 and 45 minutes" "at several points through the day" is not supported by Driver Log data produced by CRST and therefore cannot be relied upon. Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks" exceed the amount of on-duty non-driving activities in CRST's data.

---

[11] Chasworth Supplemental Report ¶ 58.
[12] Chasworth Report ¶ 59.
[13] Viscelli Supplemental Report p. 9.
[14] Viscelli Supplemental Report, Item 10.

## II. DATA AND DISCOVERY DOCUMENTS RELIED UPON

15. I understand that CRST produced data to Plaintiff in late 2022 and made supplemental productions of data in April and May of 2023. I reviewed and analyzed this data.[15] The data categories I reviewed are: Class List[16], Payroll Master[17] and Payroll "Adjustment" data[18], Trip Wages data[19], Trip Supplement data[20], Driver Log data[21], GPS Pings data[22], Messages data[23], PDFs of International Fuel Tax Agreement ("IFTA") records[24], and a Fuel Tax dataset.[25]

16. I understand that during the Class Period starting August 9, 2017, CRST used two systems for storing data: the Legacy Payroll and Trip data system, which ended around October 2019, and which was replaced by the LME system starting in July 2019.[26] Similarly, driver log, GPS, and dispatch data systems transitioned over time as well. For all systems, there was a brief period of transitional time when the old and new systems overlapped. For example, based on my review of the produced data, I understand that migrations from the old systems to the new systems occurred at different points of time for different data categories: Qualcomm Messages data migration occurred between April 2021 and January 2022; GPS Ping data migration occurred between April 2021 and September 2022; and Driver Log data migration occurred between April 2022 and July 2022.

17. Finally, it is my understanding that in January 2021, several of CRST Expedited's sister companies statutorily merged into CRST Expedited, and that the former CRST Expedited

---

[15] CRST has made supplemental data productions since Plaintiff's experts have issued their initial reports. The analysis in this report uses the most up-to-date versions of the data made available to Mr. Chasworth as of October 16, 2023. I may supplement or revise this declaration on a later date if additional relevant information becomes available to me. I may also respond to any additional reports or opinions by any experts retained by Plaintiff.
[16] CRSTF390275.
[17] CRSTF330720 and CRSTF331049
[18] CRSTF330715 and CRSTF331048.
[19] CRSTF330717 and CRSTF331050.
[20] CRSTF330718 and CRSTF340363.
[21] CRSTF340362 and CRSTF340361.
[22] CRSTF340364 and CRSTF340366.
[23] CRSTF340365, CRSTF340367, and CRSTF340368.
[24] CRSTF000799, with complete pages produced as Brueck Exhibit 28; and CRSTF340786-CRSTF390273, which are IFTA records covering the Legacy data period.
[25] CRSTF340785 is a dataset of IFTA records covering the LME data period.
[26] My understanding is that the migration of Payroll and "Adjustment" data from the old system to the new system occurred from August 2019 to October 2019, while the migration of the Trip data occurred from July 2019 to August 2019.

operations have continued to do business under the name CRST The Transportation Solution – Expedited Solutions ("Expedited Solutions"). For the time period since January of 2021, it is my understanding that the Expedited Solutions employee drivers are the focus of this litigation.

### II.A. Data Produced and Relied Upon

#### II.A.1. *Class List*

18. I understand that an updated Class List was produced to Plaintiff in August 2023 ("August 2023 Class List").[27] I have verified that the August 2023 Class List consisting of 3,962 class members excludes individuals who opted into the settlement in *Montoya v. CRST Expedited* (the "*Montoya* settlement").[28] The August 2023 Class List has information on driver IDs,[29] driver social security number, legal name, contact information, and hire and termination dates for up to three employment stints.[30]

#### II.A.2. *Payroll (Payroll Master, Payroll Adjustments)*

19. The Payroll database enumerates, for each driver ID and payroll date combination, information on taxable wages, non-taxable wages, deductions, and reimbursements. The Payroll Master[31] table in the Payroll database lists total reimbursements and total deductions amounts, whereas the Payroll Adjustments[32] table in the Payroll data itemizes deductions and reimbursements for every driver and every pay period. The Payroll database includes payments associated with all trips, regardless of whether some or all of the segments are outside of California.

[27] CRSTF390275.
[28] CRSTF001296.
[29] See CRSTF390275. Three columns of driver IDs are provided. There are multiple rows of employees with the same driver ID but different names, which I understand to arise from the occasional recycling of the driver IDs in the Legacy system such that those multiple rows correspond to different employees. Driver IDs in the current LME system are no longer recycled, therefore a unique driver ID maps to a unique employee.
[30] There are distinct employees with the same First and Last Names but are listed as separate individual rows in the August 2023 Class List (*e.g.,* there are two individuals named Maninder Singh). It is not uncommon for people to share the same First and Last Names.
[31] CRSTF330720 and CRSTF331049, covering pay dates from August 10, 2017 to April 10, 2023.
[32] CRSTF330715 (Legacy) and CRSTF331048 (LME).

### II.A.3. *Trip Wages Data*

20. Every row in the Trip Wages data[33] is associated with a unique driver-pay date-trip number[34] combination. Paid trip miles, paid deadhead miles, driver pay rate per mile, and trip wages paid represent the key information in the Trip Wages data. The Trip Wages data itemizes the mileage-based pay associated with each trip for every driver and pay period. The Legacy Trip Wages data also contain a team-driving versus solo-driving indicator and a lead driver status indicator.

### II.A.4. *Trip Supplement Data*

21. Each row of the Trip Supplement data[35] captures a unique trip identified by either a load number (Legacy) or a movement ID (LME), with information for actual departure and arrival (date and time stamps, city, and state), tractor number, and driver1 and driver2 IDs assigned to the trip.[36] When linked to the Driver Log, GPS Pings, and Messages data, the Trip data can be useful to identify trip segments and miles driven outside the planned trips. Both the Legacy and LME Trip data contain an ID field[37] which can be linked to the respective Trip Wages data, thereby allowing us to link pay dates to the days on which class members were in the truck.

### II.A.5. *Driver Log data*

22. The Driver Log data[38] track a driver's activities on any given day with time stamps indicating the start of one of four activities categories: Driving, On-Duty Non-Driving, Off Duty, and Sleeper Berth. Additionally, for each driver-day-activity combination (i.e. each row in the Driver Log data), the Qualcomm Driver Log data provides information on GPS location and

---

[33] CRSTF330717 (Legacy) and CRSTF331050 (LME), covering trips with pay dates from August 10, 2017 to April 21, 2023.

[34] A paid load for a customer is identified by a unique trip sheet number ("trip_sht_nbr", also identified by combinations of "ld_nbr" and "trip_nbr") in CRSTF330717 (Legacy), and by a unique movement ID ("movement_id") in CRSTF331050. (LME).

[35] CRSTF330718 and CRSTF340363.

[36] If a Social Security Number is not tied to a driver ID, then that driver ID is not related to an individual on the class list.

[37] "ld_nbr" and "trip_nbr" in the Legacy Trip Supplement data linked to "ld_nbr" and "trip_nbr" in the Legacy Trip Wages data; and "movement_id" populated in both the LME Trip Supplement data and the LME Trip Wages data.

[38] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 22, 2023. Driver Log data from the Qualcomm system covers the period August 9, 2017 to July 22, 2022, while Driver Log data from the Maven system covers the period July 9, 2022 to April 20, 2023.

the associated odometer reading, duration and start time of the activity, distance in miles driven, tractor ID and trailer ID.[39] The Qualcomm Driver Log data are a key source of information to identify driver activities and trip segments inside versus outside of California.

### II.A.6. *Qualcomm/Maven GPS Pings Data and Messages data*

23. Both the GPS Pings data[40] and the Messages data are real-time information captured by the wireless communication applications (Qualcomm and Maven) the trucks are equipped with. The GPS Pings data are tied to the truck and not to drivers, with pings generated either with changes in drivers' activity status or at regular intervals of approximately every 30 minutes in the legacy system and approximately every 5 minutes in the updated LME system. GPS information is captured by the longitude and latitude of the truck location at each point of time when the ping is sent and includes the proximate city or address. The GPS Pings data include driver IDs, odometer readings, fuel level[41], and tractor number (the same as that in the Qualcomm Driver Log data). Therefore, the GPS Pings data can be linked to other categories of data through those common fields.

24. Similar to the GPS Pings data, the Messages data[42] is also tied to the truck and not to the individual drivers. The messages contain information from dispatch to the users (drivers) regarding their next load assignment, such as the pick-up location, customer delivery location, drop-off time, directions, fuel stops, and deadhead miles and total paid miles associated with the load.[43] Messages are also entered by the users (drivers) and are freeform texts drivers send while enroute, to communicate with CRST on various subjects including reasons for stopping and for reporting issues (for example, switching log designations, requesting route changes,

---

[39] As I discuss in the next section, similar information is available for the Maven system via the Pings data.

[40] CRSTF340364 and CRSTF340366 cover the period from September 3, 2017 to April 10, 2023. CRSTF340364 corresponds to data from the Pre-Maven system: The variable "vehicle" is the tractor number, which can be used together with the Driver ID field to link to Qualcomm Driver Log data. CRSTF340366 corresponds to data from the Maven system: The "driver" variable and timestamp from the "eventtime" variable can be used together to link to the Maven Driver Log data to identify the Driver's location during each log status.

[41] Fuel level is only available after the transition to the updated data system, as reported in CRSTF340366. While CRSTF340366 covers the period from April 22, 2021 – April 10, 2023, fuel levels are not reported until November 2, 2021.

[42] CRSTF340365, CRSTF340367, and CRSTF340368.

[43] Huckaby Depo, 35:23-36:16; 39:6-40:15; 41:18-42:11.

truck repairs).[44] Each message is assigned a unique message ID with the timestamp associated with the message sent time.

### II.A.7. *DOT Inspection data*

25. The DOT Inspection data[45] enumerates for each inspection report number, the driver name and driver ID associated with the inspection; the inspection date and timestamps for the start and end of the inspection; the state where the inspection occurred; whether the inspection occurred at a fixed site or roadside location; the root cause of the inspection (e.g., unsafe driving); and whether the driver passed the inspection, among other details. If the inspection resulted in multiple violations, then each violation will result in a separate data entry describing the type of violation.

### II.A.8. *Fuel Tax data*

26. Each row in the Fuel Tax data table[46] reports either the empty mileage, loaded mileage, or fuel volume by Movement ID, Order ID, and state, with information for tractor ID, trailer ID, and whether the mileage included tolls. When linked to the LME Trip Wages data[47], the Fuel Tax data can be used to determine the total mileage and state-level mileage for Movement IDs driven by class members. I understand that in addition to the Fuel Tax data, which covers the time period during which the LME system was in use, CRST additionally produced IFTA records in PDF format, which cover the pre-LME data period.

## II.B. Discovery Documents Relied Upon

### II.B.1. *IFTA Records*

27. I have received various samples of IFTA data records. For example, CRST has produced a sample IFTA data report for miles associated with truck number 103048 used by Mr. Huckaby.[48] The report covers trips ending in the month of July 2019 and includes a breakdown of miles by state, for each trip number and load number. For each load number, the end date,

---

[44] Brueck Depo, 41:3-9; Huckaby Depo, 104:13-111:9

[45] CRSTF390274, covering the period May 1, 2021 through April 10, 2023.

[46] CRSTF340785 is a dataset of IFTA records covering the LME data period, from January 2, 2020 – April 23, 2023.

[47] CRSTF331050.

[48] CRSTF000799, with complete pages produced as Brueck Exhibit 28. Trucks are labeled as Tractors in the CRST data.

origination, and destination are included. Similar reports were also produced for the months of September 2017 to October 2021, which include trips hauled by class members.[49]

### II.B.2. *Depositions*

28. I have reviewed deposition testimony by CRST and CRST's personnel, including the transcript of the February 15, 2022 Deposition of CRST Expedited, Inc., through its corporate representative Chad Brueck ("Brueck Depo"); the transcript of the May 23, 2023 Deposition of Phil Reges ("Reges Depo"), who is the Vice President of Operations for CRST Expedited.[50]; and the May 25, 2023 Deposition of Scott Nelson ("Nelson Depo"), who is a Driver Manager for employee team drivers at CRST.[51] I have also reviewed the transcript of the March 7, 2022 Deposition of Keith Huckaby ("Huckaby Depo").

### II.B.3. *Other Discovery Documents*

29. I have reviewed CRST manuals and training materials on the company's policies and procedures during the class period. Specifically, CRST produced versions of pre-hire packets describing split mileage pay scales;[52] its Driver Employee Handbooks;[53] Safety and Service Handbooks;[54] and training related to the federal regulations on the Hours of Service.[55] All of these documents include definitions of duty status, consistent with the federal DOT Hours of Service regulations.[56]

## III. REBUTTAL OPINIONS

30. I have reviewed the Chasworth Supplemental Report and the Viscelli Supplemental Report, and the data and documents on which they relied. I have updated the analysis in the Song Report using CRST's supplemental productions to Plaintiff. My opinions in the Song Report remain the same. The following rebuttal opinions reiterate the same findings in the Song

---

[49] The number of trips included in the data production tapers off during the transition to the LME Fuel Tax database. The IFTA records can be linked to Trip Pay data using the truck number and load number.
[50] Reges Depo, 10:18-22.
[51] Nelson Depo, 11:3-13.
[52] Brueck Depo, Exhibits 15 – 22.
[53] Brueck Depo, Exhibits 5 – 8.
[54] Brueck Depo, Exhibits 3 – 4.
[55] Brueck Depo, Exhibits 9 – 11.
[56] § 395.2 Definitions., 49 C.F.R. § 395.2. For example, Brueck Depo, Exhibit 3 p. 87.

Report, as well as address the additional responses from Mr. Chasworth and Dr. Viscelli to the Song Report in their supplemental reports.

### III.A. Rebuttal Opinion I – Mr. Chasworth's loss Calculations Remain Unreliable Because They Use Assumptions Not Supported by CRST's Data, and Are Also Inflated If the Court Determines that Workdays and Miles Driven Outside of California Are Not Recoverable

31. Mr. Chasworth fails to address many of the criticisms brought up in the Song Rebuttal Report. Namely, Mr. Chasworth's Supplemental Report continues to incorporate unsupported assumptions into his flawed calculation method. Despite having access to supplemental data productions and having another opportunity to make corrections to his methodology and calculations, Mr. Chasworth continues to make numerous assumptions that are not supported by the data CRST produced in the litigation.

32. I have updated my analysis of CRST's data to include the supplemental data productions. In this process, I re-assessed the reliability of the loss calculation assumptions Mr. Chasworth used in his Supplemental Report. After doing that, my earlier conclusion remains the same: CRST's data demonstrates that Mr. Chasworth's assumptions are neither accurate nor reliable.

33. In addition, Mr. Chasworth continues to err by not segregating the portion of damages he assessed for time class members spent working in California from time class members spent working outside of California. If the Court concludes that California law does not apply to the time class members spent performing activities outside of California, Mr. Chasworth's calculations will be inflated for that additional reason. In the subsections below, I describe my findings and opinions rebutting the Chasworth Supplemental Report.

#### III.A.1. *Mr. Chasworth overestimates the number of workdays by: i) including Payroll periods where no work was performed; ii) counting pay periods for trip days and miles driven both inside and outside of California; and iii) extrapolating the inflated workday estimate to a future time period, further exacerbating the inflation.*

##### III.A.1.a. *Mr. Chasworth's use of Payroll records inflates the workweek count.*

34. For the period of August 8, 2017 to February 25, 2023, Mr. Chasworth calculates 510,285 workdays for the class.[57] Mr. Chasworth uses CRST's Payroll Master data to reach this conclusion. Specifically, he counts 102,057 workweeks in Payroll Master data. From there,

[57] Chasworth Supplemental Report ¶¶ 12, 18.

Mr. Chasworth assum[es] a 5-day workweek" to reach a total of 510,285 workdays in the period (510,285 = 102,057 x 5).[58] As I explained in the Song Rebuttal Report, the Driver Payroll data is not the best source Mr. Chasworth could use to calculate actual number of days worked; driver logs are. This is because each row or observation in the Driver Payroll data[59] corresponds to a driver pay date[60], and there is no guarantee that each driver actually performed work during the time period covered by each driver pay date. Mr. Chasworth's failure to recognize or account for this reality results in several errors.

35. First, by using Payroll Master file instead of driver logs, Mr. Chasworth inflated his calculated workweeks. Drivers may have an entry in payroll even when the driver did not perform any work during that week.[61] For example, despite not performing work in a week, a driver may still be included in payroll in a given week for many reasons, including because they received reimbursements, or taxable, or non-taxable adjustment payments such as[62] advances, sign-on bonus, or HAS employer match, to name a few. **Examples 1 and 2** provide such an illustration for the Legacy and LME periods[63], respectively. In **Example 1**, the payment to the driver corresponded to a sign-on bonus, when the driver performed no work; Mr. Chasworth counted this payment as representing 5 work-days. In **Example 2**, the payment to the driver corresponded to an advance when the driver performed no work; Mr. Chasworth counted this payment as representing 5 work-days.

---

[58] Chasworth Supplemental Report ¶ 21.
[59] Chasworth Report Exhibit C, CRSTF1276, CRSTF1278.
[60] Almost all the pay dates fell either on a Tuesday or on a Thursday.
[61] Wages related to hauling loads is reported under the "wgs_txbl" field in the Legacy Payroll Master data, and under the "tot_settle_pay" field in the LME Payroll Master data.
[62] My firm produced payroll adjustment and deduction codes (CRSTF330715 and CRSTF330719) and references ("PayrollAdjCodeRef indx (produced 4 13 2023).xlsx" for Legacy, and "deduct_code index (produced 4 13 2023).xlsx" for LME) to Counsel on April 13, 2023, which I understand to have been produced to Plaintiff. Note that there can be multiple payments for the same deduction code on a check date. For example, multiple toll charges, or receiving a lead driver bonus for multiple loads hauled that pay period.
[63] As described in Song Rebuttal Report ¶ 12, during the Class Period starting August 9, 2017, CRST used two systems: the Legacy Payroll and Trip data system, which ended around October 2019, replaced by the LME system starting in July 2019.

**Example 1. Driver Pay Period Consisting of Only Adjustment Code "SB", Sign on Bonus, Using Legacy Payroll and Adjustment Data**[64]

**Payroll Master Data:**
**CRSTF330716_Confidential_Native.csv**

| legalname | ssn | pay_id | payrl_date | wgs_txbl | effective_date |
|---|---|---|---|---|---|
| DEANDRE BROWN | ###-##-7700 | GH86 | 7/31/2018 | $100.00 | 7/30/2018 |

**Payroll Adjustment Data:**
**CRSTF330715_Confidential_Native.csv**

| legalname | ssn | pay_id | payrl_date | adj_cde | adj_amt | effective_date |
|---|---|---|---|---|---|---|
| DEANDRE BROWN | ###-##-7700 | GH86 | 7/31/2018 | SB | $100.00 | 7/30/2018 |

**Example 2. Driver – Pay Period without Wages Related to Hauling Loads, where Driver's Pay for the Week Consisted Only of an Advance (deduct_code_id = "ADV"), Using LME Payroll and Deduction Data**[65]

**Payroll Master Data:**
**CRSTF330720_Confidential_Native.csv**

| legalname | ssn | check_date | other_deduct |
|---|---|---|---|
| HANNAH, LINDA J. | ###-##-4635 | 4/30/2021 | $204.00 |

**Payroll Adjustment Data:**
**CRSTF330719_Confidential_Native.csv**

| legalname | ssn | amount | check_date | deduct_code_id |
|---|---|---|---|---|
| HANNAH, LINDA J. | ###-##-4635 | $204.00 | 4/30/2021 | ADV |

36. In total, I was able to identify 12,301 payroll workweeks where an individual did not receive wages related to hauling a load - meaning she did not perform any work during that week. These are enumerated below in **Table 1**. In short, this means that Mr. Chasworth has included 12,301 payroll workweeks where individuals did not perform any work in the 102,057 "workweek" count in the Chasworth Supplemental Report. By doing so, he inflated the number of workweeks used as the basis for his loss calculations.

37. Mr. Chasworth's analysis also inflates the number of workweeks by including Payroll workweeks that fall outside the class definition. Specifically, Mr. Chasworth has included a

[64] These records represent all payroll records for the driver in the week.
[65] These records represent all payroll records for the driver in the week.

total of 2,675 Payroll workweeks related to when a class member was not employed as a company driver but was instead an owner-operator.[66]

**Table 1. Count of Workweeks without Wages Related to Hauling Loads, and Count of Workweeks Related to Owner-Operators, Aug. 9, 2017 – Apr. 10, 2023[67]**

| Year | Count of Workweeks Related to Owner-Operators | Unique Drivers with Workweeks Related to Owner-Operators | Count of Workweeks without Wages Related to Hauling Loads | Unique Drivers with Workweeks without Wages Related to Hauling Loads |
|---|---|---|---|---|
| 2017 | 52 | 3 | 1,403 | 519 |
| 2018 | 162 | 7 | 4,308 | 1,103 |
| 2019 | 379 | 19 | 3,319 | 1,124 |
| 2020 | 653 | 19 | 836 | 535 |
| 2021 | 671 | 17 | 1,170 | 757 |
| 2022 | 585 | 18 | 1,090 | 640 |
| 2023 | 173 | 15 | 175 | 101 |
| **Total** | **2,675** | **34** | **12,301** | **3,482** |

38. The Payroll Master data is also not the best source for workweeks because weeks when employees got paid do not always correspond to the weeks when employees engaged in load hauling activities. **Example 3** provides such an illustration where payment for a load hauled during one workweek was split to two payroll weeks.

[66] These records are identified by instances in which the "pay_ind" field is equal to "O" in the Legacy Payroll Master data, and instances in which the "payee_type" field is equal to "O" in the LME Payroll master dataset.
[67] Legacy and LME Payroll Master data (CRSTF330720 and CRSTF331049).

## Example 3. Payment for a Load Hauled During One Workweek was Split to Two Payroll Weeks

**Using Legacy Trip Pay (CRSTF330717) and Legacy Trip Supplement Data (CRSTF330718)**
**Load Number 77423257 was Hauled During one Work Week as Defined by Mr. Chasworth[1] from Saturday 7/21/18 to Sunday 7/22/18 and was Paid on both Thursday 7/26/18 and Thursday 8/9/18**

| legalname | ssn | pay_id | payrl_date | trip_sht_nbr | ld_nbr | trip_wages | pickup | delivery | weekbeg | weekend |
|---|---|---|---|---|---|---|---|---|---|---|
| WILLIAM E. FOSTER | ###-##-7794 | CY50 | 7/26/2018 | 77423257 | 77423257 | $45.45 | 7/21/18 16:00 | 7/22/18 1:05 | 7/21/2018 | 7/27/2018 |
| WILLIAM E. FOSTER | ###-##-7794 | CY50 | 8/9/2018 | 77423257A | 77423257 | $161.55 | 7/21/18 16:00 | 7/22/18 1:05 | 7/21/2018 | 7/27/2018 |

**Using LME Trip Pay (CRSTF331050) and LME Trip Supplement Data (CRSTF340363)**
**Movement ID 2752256 was Hauled During one Work Week as Defined by Mr. Chasworth[1] from Tuesday 11/30/21 through Thursday 12/2/21 and was Paid on Both Friday 12/10/21 and Thursday 12/23/22**

| legalname | ssn | movement_id | pay_date[2] | total_pay | actual_departure | actual_arrival | weekbeg | weekend |
|---|---|---|---|---|---|---|---|---|
| NORTON, JOHN L. | ###-##-0982 | 2752256 | 12/10/2021 | $564.25 | 11/30/21 20:03 | 12/2/21 7:37 | 11/27/2021 | 12/3/2021 |
| NORTON, JOHN L. | ###-##-0982 | 2752256 | 12/23/2021 | $641.42 | 11/30/21 20:03 | 12/2/21 7:37 | 11/27/2021 | 12/3/2021 |

[1] Mr. Chasworth defines workweeks as Saturdays through Fridays
[2] Driver did not receive trip pay for any other load on 12/23/2021.

39. **Example 4** provides an example of the inverse situation where CRST paid in a single work week for a load hauled over two workweeks. These examples demonstrate that Mr. Chasworth's statement that "Accordingly, the total number of pay periods and workweeks for a class member are calculated by examining the number of pay periods in the Payroll data, where a given class member is paid", is inaccurate.[68]

## Example 4. Load Hauled Over Two Workweeks was Paid Out in One Payroll Week

**Using Legacy Trip Pay (CRSTF330717) and Legacy Trip Supplement Data (CRSTF330718)**
**Load Number 78091113 was Hauled from Thursday 11/15/18 to Monday 11/19/18, which Straddles 2 workweeks Defined by Mr. Chasworth as Starting Saturday through Friday**

| legalname | ssn | pay_id | payrl_date[1] | trip_sht_nbr | ld_nbr | trip_wages | pickup | delivery | weekbeg | weekend |
|---|---|---|---|---|---|---|---|---|---|---|
| LAMAR FENNER | ###-##-3307 | FM98 | 11/27/2018 | 78091113 | 78091113 | $40.69 | 11/15/18 21:14 | 11/19/18 21:00 | 11/10/2018 | 11/16/2018 |
| LAMAR FENNER | ###-##-3307 | FM98 | 11/27/2018 | 78091113A | 78091113 | $281.76 | 11/15/18 21:14 | 11/19/18 21:00 | 11/10/2018 | 11/16/2018 |

**Using LME Trip Pay (CRSTF331050) and LME Trip Supplement Data (CRSTF340363)**
**Movement ID 93472 was Hauled from Friday 8/2/19 to Saturday 8/3/19, which Straddles Two Workweeks Defined by Mr. Chasworth as Starting Saturday through Friday**

| legalname | ssn | movement_id | pay_date[1] | total_pay | actual_departure | actual_arrival | weekbeg | weekend |
|---|---|---|---|---|---|---|---|---|
| MANUEL TAMAYO-TORRES JR | ###-##-6083 | 93472 | 8/9/2019 | $2,138.50 | 8/2/19 6:00 | 8/3/19 19:23 | 7/27/2019 | 8/2/2019 |
| MANUEL TAMAYO-TORRES JR | ###-##-6083 | 93472 | 8/9/2019 | $1,069.25 | 8/2/19 6:00 | 8/3/19 19:23 | 7/27/2019 | 8/2/2019 |

[1] Driver did not receive trip pay for any other load on 8/9/2019.

[68] Chasworth Supplemental Report ¶ 18.

**III.A.1.b. *Mr. Chasworth should have used driver logs to identify workdays.***

40. As I explained in the Song Rebuttal Report[69], the best information for the workday count is the Driver Log data because it logs *daily* driver activities for CRST, therefore the information is recorded at a more granular (*i.e.* daily) level than the Payroll data (*i.e.* weekly). In contrast, the Payroll data are organized by pay dates which do not provide the granular level of daily information on work performed. Mr. Chasworth's decision to use blunt data – weeks in which the driver was paid – required him to estimate the number of workdays, even though that number can be directly obtained from the Driver Log data.

41. Mr. Chasworth attempts to justify his use of the Payroll data as the "the best source of total workweeks from the class", by claiming that he "found 977 drivers with Social Security Numbers who were not contained in the Driver Logs, but who are on the class list . . . [and where] . . . [e]ach of these drivers was located with at least one transaction in the Payroll data."[70]

42. I have investigated Mr. Chasworth's claim that he identified 977 class members with no corresponding Driver Logs. Mr. Chasworth's analysis is incorrect because it does not account for any of the supplemental Qualcomm log data CRST produced. Specifically, in his Supplemental Report, Mr. Chasworth identifies only the following log data[71]: (i) the 2022 production of the Driver Logs "CRSTF001272…txt" and "CRSTF001274...txt", and (ii) the 2023 supplemental production "CRSTF340361...csv" ("Maven Driver Logs"). However, Mr. Chasworth fails to identify or include CRST's supplemental production of QHOS Driver Logs "CRSTF340362...csv" ("QHOS Driver Logs"). If he did, he would have observed that these QHOS Driver Logs contains records for 3,416 class members. This is a major error.

43. The combined Maven and QHOS Driver Logs produced to Plaintiff cover the period of 8/9/2017 to 4/10/2023, with records for 3,718 class members. There are 244 class members in the class list (this is only 6.2% of 3,962 class members)[72] who are not contained in the combined Maven and QHOS Driver logs.[73] And while these individuals are in the Payroll

[69] Song Rebuttal Report ¶ 28.
[70] Chasworth Supplemental Report ¶ 19.
[71] Chasworth Supplemental Report ¶ 14.
[72] CRSTF390275.
[73] 4 were hired after 7/10/2022 and 4 where terminated before 5/12/2019, therefore 8 of the 244 were outside of the period that Chasworth cited.

Master data, all but one of those 244 class members are also in the Trip Pay Data.[74] Given that, it would have been more accurate for Mr. Chasworth to use the Trip Pay data to extrapolate days worked for the 244 individuals who do not have driver logs. This is because the Trip Pay Data has the exact pickup and delivery dates for each load, giving a more accurate view of days when drivers would have performed work.

44. Mr. Chasworth calculates the number of workdays by assuming a 5-day workweek to convert his count of the number of workweeks to the number of workdays.[75] In his Supplemental Report, Mr. Chasworth defends this assumption by studying a subset of the driver log data (as mentioned previously, he does not use the updated production of the QHOS driver log data):

> "From the 1272 and 1274 files, a total of 25,340 weeks were evaluated in this study. In all, the average number of days with "Driving" and/or "On Duty-Not Driving" time was 4.69 days per week, with 63.13% of the weeks having 5 or more days with "Driving" and/or "On Duty – Not Driving" time. Repeating this analysis on the 340361 file, I found that the average days per week was 4.453, with 57.9% of the weeks having 5 or more days."[76]

The computer scripts from Mr. Chasworth do not show how he calculated the 4.69 days per week or the 4.453 days per week, and therefore I am unable to replicate his results.

45. Using the Driver Log data produced with daily driver log information available from August 9, 2017 to April 10, 2023, I calculate the number days worked by the class members (*i.e.*, days with driving time and/or on-duty non-driving activities) to be 476,669 employee-workdays.[77] For the 244 class members who are not contained in the Driver Log data, I calculate 2,029 driver-workweeks using the pickup and delivery dates for movements in the Trip Pay and Trip Supplement data.[78] Then, I estimate 10,145 workdays for those 244 class members by applying Mr. Chasworth's 5-day workweek assumption (5 x 2,029), which results in a total calculation of 486,814 workdays (476,669 + 10,145). My calculation of the 486,814 workdays between August 9, 2017 and April 10, 2023 is 32,763 workdays fewer than the 519,577 workdays

[74] CRSTF331050 (LME Trip Pay Data), and CRSTF330717 (Legacy Trip Pay Data).
[75] Chasworth Supplemental Report ¶ 21.
[76] Chasworth Supplemental Report ¶ 22.
[77] The produced Driver Logs have data for non-class members. My analysis of the Driver Logs is limited to those drivers on the class list. While Driver Log data has been produced through April 23, 2023, I have limited the workday analysis to correspond to the class period.
[78] CRSTF331050 (LME Trip Pay Data), and CRSTF330717 (Legacy Trip Pay Data), which is combined with CRSTF330718 (Legacy Trip Supplement Data) to identify pickup and delivery dates.

estimated by Mr. Chasworth for the same period.[79] This comparison demonstrates that Mr. Chasworth's use of the Payroll data instead of the Driver Logs to calculate the number of workdays leads to a significant overestimation of the number of workdays for the class as a whole. Therefore, his calculation of 519,577 workdays is incorrect and cannot be relied upon.

**III.A.1.c.** ***Mr. Chasworth erred by not segregating workdays or pay periods for trip days and miles driven outside of California.***

46. As pointed out in the Song Rebuttal Report and reiterated in this report, Mr. Chasworth does not use data available to him to exclude workdays or pay periods where no miles were driven in California. Both the Driver Log data and the GPS Pings data contain location information (city, state, longitude and latitude). I understand that there is a dispute as to whether California law applies to work performed by class members outside of California. If the Court concludes that California law does not apply to the time class members spent performing activities outside of California, Mr. Chasworth's calculation of workdays will be further inflated.

47. I have performed an updated analysis of workdays with any driving and/or on-duty non-driving time in California. I used the updated production of Driver Log Data to perform this analysis.[80] Since the Maven Driver Logs do not include location information, I analyzed the Qualcomm Driver Logs to calculate the share of driver-workdays in California. I then used that calculation to estimate total driver-workdays in California. Based on the Qualcomm Driver Logs, I calculate a total of 409,149 driver-workdays with either driving time or on-duty non-driving time, regardless of where the work was performed. Of these workdays, only 106,656 are *associated with California*.[81] Therefore, the percentage of workdays with either driving time or on-duty non-driving time associated with California locations is approximately 26%

---

[79] Chasworth Supplemental Report ¶ 23. Mr. Chasworth calculates 510,285 workdays through March 3, 2023, and extrapolates an additional 9,292 workdays through April 10, 2023, giving a total of 519,577 workdays.

[80] The Qualcomm system covers the period August 9, 2017 to July 22, 2022, while Driver Log data from the Maven system covers the period July 9, 2022 to April 20, 2023.

[81] I used the "location" field to identify a driver's current State at the start of a driving or on-duty non driving time activity. I count workdays with time associated with California locations to include both a) driving or on-duty non driving time that started in California, and b) if the driving segment starts outside of California but the subsequent driver log activity is off-duty or sleeper berth with a location in California, which captures driving activity that starts in another state but ends in California. For Example, if a driving segment starts in PHOENIX, AZ and the next activity (off-duty or sleeper berth) starts in LOS ANGELES, CA, the driving activity starting in Arizona is counted towards a California workday.

(106,656 out of 409,149 workdays) of workdays with all on-duty or non-driving time associated with other states.

48. Based on the calculated 26% of driver-workdays associated with driving and/or on-duty non-driving time in California, I estimate that of the 486,814 total driver-workdays from August 9, 2017 to April 10, 2023, there are 126,902 (486,814 x 106,656 / 409,149) workdays where any time was logged as driving or on-duty non-driving time workdays in California. This calculation demonstrates that Mr. Chasworth inflated the number of relevant work days, potentially up to 74%, by including workdays outside California.

**Figure 1. Driver Logs Demonstrate that Mr. Chasworth Overestimates Workdays**




49. I evaluated the extent of the inflation that Mr. Chasworth's failure to consider whether Plaintiff's claims apply to work performed outside of California caused to his calculations by comparing the percentage of miles driven inside versus outside of California. I have evaluated multiple benchmarks of drivers' percentage of miles driven in California.

50. First, using the GPS Pings data from September 3, 2017 to April 10, 2023,[82] I calculate that approximately 7.4% of all class member miles were driven in California during this period.

**Table 2. Summary of Miles Driven in GPS Pings data, September 3, 2017 – April 10, 2023[83]**

| Statistic | Percent of Total Miles Driven[1] |
|---|---|
| Miles Driven in California | 7.4% |
| Miles Driven in All Other States | 92.6% |

51. Alternatively, using the Driver Log data[84], I calculate that between **11%** and **14.5%** of miles were driven in California during this period,[85] as shown in the table below.

[82] CRSTF340364 and CRSTF340366.
[83] CRSTF340364 and CRSTF340366. Note: [1] My analysis of the GPS Pings calculates the miles driven based on the change in odometer readings for trucks driven by class members (identified by SSN). Specifically, mileage for each state is calculated by taking the difference in odometer readings between the first and last ping occurring in succession within a state, on a given day. I then exclude anomalous odometer readings, including those that imply a speed of over 100 mph (calculated using time stamps and distance) or negative odometer changes. I have excluded time gaps over 3 days, to account for the possibility of missing data, or periods during which a non-class member may have driven the truck (thus skewing the change in odometer readings).
[84] CRSTF340362 (Qualcomm Log Data) covering the period from August 9, 2017 to July 22, 2022.
[85] I used the "location" field to identify a driver's current state at the start of a driving activity. For the lower bound percentage value, I only count towards miles driven in California if the location State at the start of the driving segment is California, without considering any adjacent driving activities with locations outside of California even though part of the associated trip segments might have been in California. For the upper bound percentage value, if the state at the start of the driving segment or the state for the next driving segment is California, then all miles in the "DistanceDriven" field are counted as California miles. As an example of the method used for the upper bound percentage value, if a driving segment starts in PHOENIX, AZ and the next driving segment starts in LOS ANGELES, CA, the entire mileage for the trip segment starting in Arizona is counted towards California miles. For the purpose of determining what is the subsequent trip segment, records are grouped by data fields "ssn" and "Tractoid" and sorted by the "StartTime" field. This method is conservative because it overcounts miles driven in California.

**Table 3. Summary of Miles Driven in Driver Log data, August 9, 2017 – July 22, 2022**[86]

| Statistic | Percent of Total Miles Driven[1] |
|---|---|
| Within California (high percentage range)[2] | 14.5% |
| Within California (low percentage range)[3] | 11.0% |

52. Driver Logs only report location information when a driver changes duty status. In comparison, the GPS Pings data[87] track the trucks' exact location by longitude and latitude coordinates, with pings generated either with changes in drivers' activity status or at regular intervals of every approximately 30 minutes.[88] Therefore, the percentage estimate of miles driven in California obtained from the GPS Pings data is more accurate than that calculated using the Driver Log data. Even though Mr. Chasworth received the GPS Pings Data[89], he did not analyze them.

53. In the Song Rebuttal Report[90], I analyzed IFTA records for trips completed by Mr. Huckaby between April 11, 2019 and July 22, 2019 and found that Mr. Huckaby's fuel tax miles in California accounted for **11.0%** of fuel tax miles across all states, and that 43.0% of the trips Mr. Huckaby drove during this period did not have miles in California. I repeated the same analysis with the updated production of LME Fuel Tax data, which Mr. Chasworth used with the class list to identify 53,482 Order IDs related to Orders that are at least partially driven by class members.[91] As demonstrated in **Table 4,** I find that fuel tax miles in California accounted for **10.6%** of fuel tax miles across all states between January 2, 2020 and September 27, 2022.[92]

---

86 CRSTF340362 (Qualcomm Log Data). The Qualcomm system covers the period August 9, 2017 to July 22, 2022. Notes: [1] Analysis excludes values less than or equal to zero, and instances in which the tractor ID or location is missing. [2] If the state at the start of the driving segment or the state for the next driving segment is California, then all miles in the "DistanceDriven" field are counted as California miles. [3] Counts miles driven in California if the location State at the start of the driving segment is California.
87 CRSTF340366.
88 As previously described, the updated GPS Pings data system generally tracks the truck's location in 5-minute intervals.
89 Chasworth Supplemental Report, Exhibit C.
90 Song Rebuttal Report, ¶ 37.
91 Chasworth Supplemental Report, ¶¶ 54 and 56. Mr. Chasworth's analysis uses an incomplete version of LME Trip Pay Data (CRSTF001279), which has since been supplemented by CRSTF331050.
92 I have limited the analysis to the same period analyzed by Mr. Chasworth. See Chasworth Supplemental Report ¶ 56.

**Table 4. Summary of Class LME Fuel Tax Data, Jan. 2, 2020 – Sep. 27, 2022**[93]

| | Count | Percent |
|---|---|---|
| California Miles | 12,100,795 | 10.6% |
| Non-California Miles | 102,484,181 | 89.4% |
| All Miles | 114,584,977 | |
| Unique SSN-Movement IDs with all California Miles | 18,933 | 15.6% |
| Unique SSN-Movement IDs with no California Miles | 61,913 | 51.0% |
| Total SSN-Movement IDs | 121,356 | |

Sources: CRSTF340785, CRSTF331050, and CRSTF390275.
Note: CRSTF340785 contains trip detail for 2,246 putative class members.

54. As **Figure 2** demonstrates, each of these data points indicate that Mr. Chasworth's inclusion of activities and miles driven outside of California significantly inflates loss calculations should the Court conclude that Plaintiff's claims do not apply to that work. This is in addition to the inflation on the number of workdays estimated by Mr. Chasworth, where I have shown in **Figure 1,** by using the Driver Log data, that the number of workdays including those with activities and miles driven outside of California, is 486,814 workdays instead of 519,577 workdays estimated by Mr. Chasworth.

[93] CRSTF340785. Class Member trips are identified by linking on Movement ID to LME Trip Pay data (CRSTF331050).

**Figure 2. Estimates of Percentage of Miles Driven in California Range Between 7.4% and 14.5%**




55. Similarly, as stated in the Song Rebuttal Report, Mr. Chasworth's loss calculations associated with the following events are unreliable should the Court conclude that Plaintiff's claims do not apply to work performed outside of California: i) Inspections by the DOT and other Law Enforcement ("DB" adjustment code); ii) Breakdowns ("BK" adjustment code); iii) Detention Delays ("2F" adjustment code); iv) Scaling ("SC" code"); and v) Layovers ("LO" adjustment code).

56. Mr. Chasworth calculated losses from those categories of events in several steps. First, he used his count of 102,057 total workweeks between 8/8/2017 to 2/25/2023 (including workweeks with no workdays and/or miles driven in California) from the Payroll data[94] as the starting point.[95] Then Mr. Chasworth applied an average frequency of the event per workweek obtained

[94] Chasworth Supplemental Report ¶ 12, citing to CRSTF330716 and CRSTF330720.
[95] Chasworth Supplemental Report ¶¶ 18, 26, 31, 32, 34 38.

from adjustment codes in the Payroll data ("DB", "BK", "2F", "SC", "LO")[96], multiplied by the assumed duration of each of the five events, and by "a weighted average hourly rate of $32.91 per hour,"[97] as formulated below:

**Losses from ("DB", "BK", "2F", "SC", "LO") = 102,057 workweeks x Average number of times per workweek event occurred (Brueck Deposition Exhibit 26) x Average assumed duration (in hours) of event x $32.91 per hour**

57. However, Mr. Chasworth's count of 102,057 workweeks from the Payroll data is for all trips[98], regardless of whether some or all of the trip segments are outside of California. If the Court concludes that California law does not apply to the time class members spent performing activities outside of California, Mr. Chasworth's calculations will be inflated. By way of example, the following tables show numerous pay periods in the Payroll data mapped to trips outside of California, for just two drivers, with driver IDs DG42 and FI73.

[96] CRSTF330715 and CRSTF330719. Note that CRSTF331048 is a more complete version of CRSTF330719, which Mr. Chasworth does not incorporate in his analysis. Mr. Chasworth cites to Brueck Deposition Exhibit 26 for the meaning of each of these codes. "DB" is taxable earnings from DOT Inspec Bonus; "BK" is taxable earnings from Breakdown; "2F" is taxable earnings from Detention; "SC" is reimbursement for Scale; and "LO" is taxable earnings for Layover.

[97] Chasworth Supplemental Report ¶¶ 24, 26 (Refueling), 29 (DOT Inspections and other Law Enforcement), 31 (Breakdowns), 32 (Detention Delays), 34 (Scaling), 36 (Pre-trip and Post-Trip Inspections), and 38 (Layovers). In paragraphs 31, 32, 34, and 36 of the Chasworth Supplemental Report, the weighted average rate is referenced as $31.92. Based on my review of Mr. Chasworth's backup materials, it appears that he intends to refer to a calculation of $32.91 per hour, and reference to $31.92 is a typo.

[98] I have closely replicated this workweek count in the Chasworth Report using CRSTF001276 and CRSTF001278.

## Table 5. Pay periods with Trips Outside of California: Driver ID DG42

Trip Data for Driver DG42
8/10/2017 - 10/5/2017

| id | trip | orig_city | orig_state | pickup_dt | dest_city | dest_state | delivery_dt | tractor_id | driver1 | driver2 | pay_date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 75410299 | 1 | HUNTINGTON | IN | 8/4/2017 9:25 | ATHENS | TX | 8/5/2017 6:24 | 101943 | DI01 | DG42 | 8/10/2017 |
| 75351920 | 1 | IRVING | TX | 8/5/2017 14:30 | PHOENIX | AZ | 8/6/2017 13:12 | 101943 | DI01 | DG42 | 8/10/2017 |
| 75401800 | 1 | PHOENIX | AZ | 8/6/2017 15:15 | AURORA | CO | 8/7/2017 11:20 | 101943 | DI01 | DG42 | 8/10/2017 |
| 75566937 | 1 | DALLAS | TX | 9/1/2017 0:01 | DALLAS | TX | 9/4/2017 19:30 | 101943 | DI01 | DG42 | 9/8/2017 |
| 75566973 | 1 | DALLAS | TX | 9/4/2017 22:56 | COLUMBUS | OH | 9/5/2017 22:00 | 101943 | DI01 | DG42 | 9/12/2017 |
| 75610948 | 1 | CEDAR RAPIDS | IA | 9/10/2017 13:25 | PHILADELPHIA | PA | 9/13/2017 1:30 | 101943 | DG42 | C713 | 9/19/2017 |
| 75610962 | 1 | PHILADELPHIA | PA | 9/13/2017 1:45 | COLUMBUS | OH | 9/13/2017 11:00 | 101943 | DG42 | C713 | 9/19/2017 |
| 75617699 | 1 | REYNOLDSBURG | OH | 9/13/2017 17:15 | DES MOINES | IA | 9/14/2017 9:30 | 101943 | DG42 | C713 | 9/19/2017 |
| 75643370 | 1 | NORTH LIBERTY | IA | 9/14/2017 16:30 | OLIVE BRANCH | MS | 9/15/2017 16:20 | 101943 | DG42 | | 9/19/2017 |
| 75633904 | 3 | MEMPHIS | TN | 9/15/2017 16:40 | COLUMBUS | OH | 9/16/2017 18:30 | 101943 | DG42 | | 9/21/2017 |
| 75610960 | 2 | COLUMBUS | OH | 9/16/2017 18:35 | CEDAR RAPIDS | IA | 9/17/2017 8:00 | 101943 | DG42 | | 9/21/2017 |
| 75679835 | 1 | TUNNEL HILL | GA | 9/26/2017 20:45 | CORAOPOLIS | PA | 9/27/2017 11:26 | 101943 | DG42 | CP61 | 10/3/2017 |
| 75581489 | 1 | RICHFIELD | OH | 9/27/2017 22:30 | ORLANDO | FL | 9/28/2017 20:56 | 101943 | DG42 | CP61 | 10/3/2017 |
| 75690732 | 3 | MIAMI | FL | 9/28/2017 9:05 | JACKSONVILLE | FL | 10/2/2017 21:48 | 101943 | DG42 | | 10/5/2017 |
| 75754822 | 1 | JACKSONVILLE | FL | 10/1/2017 22:00 | GARDEN CITY | GA | 10/3/2017 16:05 | 101943 | DG42 | | 10/5/2017 |

Sources: CRSTF001280

Payroll Data for Driver DG42
8/10/2017 = 10/5/2017

| payrl_name | pay_id | drvr_id | payrl_date | rcvr_name |
|---|---|---|---|---|
| CRST EXPEDITED, 2ND | DG42 | DG42 | 8/10/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 2ND | DG42 | DG42 | 9/8/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 1ST | DG42 | DG42 | 9/12/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 1ST | DG42 | DG42 | 9/19/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 2ND | DG42 | DG42 | 9/21/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 1ST | DG42 | DG42 | 10/3/2017 | DESMARAIS, CHARLES J |
| CRST EXPEDITED, 2ND | DG42 | DG42 | 10/5/2017 | DESMARAIS, CHARLES J |

Sources: CRSTF001276

## Table 6. Pay periods with Trips Outside of California: Driver ID JLRODRI1

Trip Data for Driver JLRODRI1
4/23/2021-5/14/2021

| id | trip | orig_city | orig_state | pickup_dt | dest_city | dest_state | delivery_dt | tractor_id | driver1 | driver2 | pay_date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2042807 | 0 | GRAPEVINE | TX | 4/14/2021 14:19 | FORT WORTH | TX | 4/14/2021 16:00 | 148472 | DATROMP | JLRODRI1 | 4/23/2021 |
| 2052526 | 0 | GROVE CITY | OH | 4/16/2021 14:00 | GROVEPORT | OH | 4/16/2021 14:00 | 148472 | DATROMP | JLRODRI1 | 4/23/2021 |
| 2005901 | 0 | FORTH WORTH | TX | 4/14/2021 20:23 | ELLENWOOD | GA | 4/15/2021 23:07 | 148472 | DATROMP | JLRODRI1 | 4/23/2021 |
| 1940765 | 0 | LITCHFIELD PARK | AZ | 4/13/2021 19:00 | GRAPEVINE | TX | 4/14/2021 13:31 | 148472 | DATROMP | JLRODRI1 | 4/23/2021 |
| 2006051 | 0 | ELLENWOOD | GA | 4/16/2021 6:00 | GROVE CITY | OH | 4/16/2021 14:00 | 148472 | DATROMP | JLRODRI1 | 4/23/2021 |
| 2017555 | 0 | FORTH WORTH | TX | 4/22/2021 1:08 | ELLENWOOD | GA | 4/22/2021 23:05 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 1968976 | 0 | LITCHFIELD PARK | AZ | 4/20/2021 16:54 | GRAPEVINE | TX | 4/21/2021 12:44 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2076762 | 0 | GROVE CITY | OH | 4/23/2021 14:30 | GROVEPORT | OH | 4/23/2021 15:30 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2022619 | 0 | ELLENWOOD | GA | 4/23/2021 2:11 | GROVE CITY | OH | 4/23/2021 14:05 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2005811 | 0 | GROVEPORT | OH | 4/17/2021 7:49 | PHOENIX | AZ | 4/18/2021 16:30 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2065881 | 0 | GRAPEVINE | TX | 4/21/2021 14:10 | FORT WORTH | TX | 4/21/2021 17:00 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2053808 | 0 | PHOENIX | AZ | 4/18/2021 16:50 | LITCHFIELD PARK | AZ | 4/20/2021 14:00 | 148472 | DATROMP | JLRODRI1 | 4/30/2021 |
| 2032549 | 0 | GROVEPORT | OH | 4/23/2021 15:30 | PHOENIX | AZ | 4/25/2021 23:00 | 148472 | DATROMP | JLRODRI1 | 5/7/2021 |
| 2110461 | 0 | PHOENIX | AZ | 4/25/2021 23:00 | LITCHFIELD PARK | AZ | 5/4/2021 15:55 | 148472 | DATROMP | JLRODRI1 | 5/14/2021 |

Sources: CRSTF001280

Payroll Data for Driver JLRODRI1
4/23/2021-5/14/2021

| company_id | payee_id | legal_name | payperiod_start | payperiod_end | check_date |
|---|---|---|---|---|---|
| TMS | JLRODRI1 | RODRIGUEZ, JOSE L. | 4/11/2021 | 4/17/2021 | 4/23/2021 |
| TMS | JLRODRI1 | RODRIGUEZ, JOSE L. | 4/18/2021 | 4/24/2021 | 4/30/2021 |
| TMS | JLRODRI1 | RODRIGUEZ, JOSE L. | 4/25/2021 | 5/1/20221 | 5/7/2021 |
| TMS | JLRODRI1 | RODRIGUEZ, JOSE L. | 5/2/2021 | 5/8/2021 | 5/14/2021 |

Sources: CRSTF001278 and CRSTF001279

58. Using the Trip data,[99] I identify 23.3% of driver-pay periods (out of 119,873 total driver-pay periods), which encompass trips completed outside of California, and only 6.4% of driver-pay periods encompassing trips completed inside of California.

59. Therefore, if Plaintiff's claims do not apply to work performed outside of California, Mr. Chasworth's 102,057 workweek count, which includes pay periods for payments of trips outside of California, is inflated on that basis alone, and cannot be used as the base input for calculating losses under tasks associated with adjustment codes "DB"[100], "BK", "2F", "SC", and "LO."

**III.A.1.d.** ***Mr. Chasworth extrapolates the inflated workday estimate to the remainder of the class period, further inflating the loss calculations.***

60. Mr. Chasworth extrapolates his inflated calculation of the number of workdays associated with the class to the period of March 4, 2023 to April 10, 2023, by "calculating an average 'employees per calendar day' of 510,285/2032=251.12" and by "multiplying these rates by 37 days in the extrapolation period from 3/4/2023 through 4/10/2023, giving an additional 9,292 additional days."[101] Because the 510,285 number is overestimated by 6.3%, Mr. Chasworth's extrapolated estimate of 9,292 additional days is overestimated by 6.3% as well.

**III.A.1.e.** ***Flawed assumptions made by Mr. Chasworth that inflate the workday count impact many of his remaining calculations and therefore render his report unreliable.***

61. Mr. Chasworth's errors in the workday count are particularly problematic because, as discussed in the next subsection, the estimated number of workdays impacts many of the

[99] CRSTF001277; and Trip Wages data (CRSTF001279-80).
[100] In any event, as stated in Chasworth Report ¶¶ 18 and 19, drivers were already paid a bonus for DOT inspections (adjustment code "DB").
[101] Chasworth Supplemental Report ¶ 23.

subsequent calculations in the Chasworth Supplemental Report, including where he estimates damages associated with time spent refueling, conducting pre-trip and post-trip inspections, undergoing inspections by the DOT and other law enforcement, during breakdowns, detention delays, scaling, and on layovers. Mr. Chasworth's flawed approach to calculating the number of workdays alone renders the calculations in the Chasworth Report unreliable.

**III.A.2.** ***Mr. Chasworth provides no basis for using "a weighted average hourly rate" calculated from sick pay transactions as an effective hourly rate.***

62. Mr. Chasworth provided no basis for why "a weighted average hourly rate" calculated from sick pay can be uniformly applied to hours associated with activities (refueling, inspections, and scaling) and events (breakdowns, detention delays, and layovers) he chose to focus on. As an initial matter, my understanding is that the class claims seeking damages for alleged unpaid non-driving tasks is a statutory minimum wage claim.[102] Nothing in the Plaintiff's claims stated that the class is owed payment at a weighted average hourly rate. Mr. Chasworth calculates "a time-weighted average minimum wage of $12.944 per hour."[103] Mr. Chasworth's use of the $32.91 "weighted average hourly rate," as opposed to the value he calculated as the average minimum wage per hour during the relevant time period, alone inflates the loss calculations by 2.645 times (=$32.91/$12.44). Further, a more accurate calculation of the minimum wage claim would use the actual minimum wage during each driver-workweek, not a "time-weighted average minimum wage" for the whole class period. Use of a "time-weighted average minimum wage" assumes that driver-workweeks are evenly distributed over the class period, and therefore may overstate the minimum wage owed. For instance, if a driver only worked from August 9, 2017 to December 31, 2019, then the minimum wage would be below $12.944 for her entire employment, and Mr. Chasworth's calculation would overstate the minimum wage owed. Since Mr. Chasworth did not control for variation in employee workweeks over time, his minimum wage calculations are incorrect, and therefore unreliable.

63. Finally, even if it were appropriate to use a weighted average hourly rate for the purpose of calculating alleged damages, the method which Mr. Chasworth used to do so is flawed. In his original report, Mr. Chasworth calculated an average per hour rate of $20.7435 per hour.[104]

---

[102] Class Certification Order, page 18.
[103] Chasworth Supplemental Report ¶ 41.
[104] Chasworth Report ¶ 15.

There, he used "Sick Pay" transactions from the CRSTF001278 Payroll data and divided the total sick pay of $28,211.20 by 1,360 units or hours. A review of the backup production of the Chasworth Report reveals that the $20.7435 per hour rate was calculated from "Sick Pay" transactions of only 48 employees.[105] In the Chasworth Supplemental Report, Chasworth increases his calculated average hourly rate from the class to $32.91. Despite the substantial increase, Chasworth did not change his methodology. He again uses "Sick Pay" transactions from the CRSTF330719 Payroll data and divides the total sick pay of $63,942 by 1,943 units or hours.[106] However, a review of the backup production associated with the Chasworth Supplemental Report reveals that the $32.91 per hour is calculated from only 88 out of the total of t 3,962 class members (2.2% of the class).[107]

64. It is not surprising that Mr. Chasworth flawed calculation method results in an increase of 59% in the "weighted average hourly rate" from $20.7435 to $32.91 between the Chasworth Report and the Chasworth Supplemental Report, which in turn increases his loss calculation by 59% (holding hours constant). The fact that adding just 40 more class members (from 48 in the Chasworth Report to 88 in the Chasworth Supplemental Report) increased his result by 59% demonstrates the wide variation in compensation rates over time and across class members. The variation in compensation rates is unsurprising and reflects changes to CRST's driver pay scale during the class period[108] and the wide range of pay based on among drivers' length of service. For example, the starting split mileage pay rate for CRST drivers increased by 20% between January 2019 and December 2021 ($0.36 per mile / $0.30 per mile), while the maximum split mileage pay rate increased by 46.5% during the same period ($0.85 per mile / $0.58 per mile).[109] The base split mileage rate increases from $0.36 for a driver with zero months of experience to $0.45 for a driver with one to two months of experience, and then

[105] See Chasworth_00000323.xlsx, tab "Sick Pay Calculation" produced on 10/18/2023.
[106] Chasworth Supplemental Report ¶ 24.
[107] In CRST330715, sick pay is denoted by deduct_cde "SCK." In CRST330719, sick pay is denoted by deduct_cde "KS." Mr. Chasworth uses CRST330719 for the $32.91/hour rate calculation.
[108] For example, see the pay scale effective January 16, 2019 (Brueck Depo Exhibit 12), pay scale effective December 9, 2021 (Brueck Depo Exhibit 14),
[109] Brueck Depo Exhibits 12 and 14. The maximum pay rates include additional pay for being a lead driver or mentor.

continues to increase with additional months of experience until it caps at $0.65.[110] Mr. Chasworth provided no basis on which to conclude that he could reliably extrapolate data from 2.2% of the class to arrive at an accurate hourly rate of pay that is representative of the entire class.

### III.A.3. *Mr. Chasworth overestimates the duration of DOT inspections.*

65. Mr. Chasworth also measures alleged damages for time related to inspections by the DOT and other law enforcement. His analysis assumes that "an inspection of this type takes 45 minutes, or 0.75 hour."[111] This results in an overestimate. It is my understanding that CRST provided Plaintiff with DOT inspection data showing the start and end times for each DOT inspection class members underwent from May 2021 through April 2023.[112] Mr. Chasworth did not consider that data in his analysis. Contrary to Mr. Chasworth's assumption that DOT inspections take 45 minutes to complete, my empirical analysis of the data demonstrates that the average DOT inspection duration is 33.52 minutes and that 50% of the DOT inspections lasted less than 30 minutes. The full distribution of DOT inspection minutes is plotted in **Figure 3** below.

66. Mr. Chasworth counts 1,251 DOT inspections based on his analysis of payroll data. From that, he calculates losses associated with inspections as follows: "1,251 inspections x 0.75 hour/inspection" "x $32.91/hour = $30,877 of unpaid wages to the class." If instead, the average DOT inspection of 33.52 minutes and "a time-weighted average minimum wage of $12.944 per hour" are used, the $30,877 figure he calculates would have been reduced to $8,694 (=1,251 x 33.52/60 x $12.44); a 72% reduction.

---

[110] Brueck Depo Exhibits 14. Drivers have the ability to earn an additional $0.20 per mile for mentor pay, resulting in a maximum split mileage rate of $0.85. The same experience-rate profile can be observed in Brueck Depo Exhibits 12 as well.
[111] Chasworth Report ¶ 18 and Chasworth Supplemental Report ¶ 29.
[112] CRSTF390274 listed in Exhibit C of the Chasworth Supplemental Report.

**Figure 3. Number of DOT Inspections, by Duration of Inspection**[113]




**III.A.4.** ***Mr. Chasworth overestimates the frequency and duration of pre-trip and post-trip inspections.***

67. In both the Chasworth Report and the Chasworth Supplemental Report, he states that "[a] driver is required to perform pre-trip and post-trip inspections of their vehicles on a daily basis. As drivers normally have two driving sessions per workday (before and after a DOT mandated stop), each of which requiring (sic) a separate pre-trip and post-trip inspection, we assume that ***four such inspections occur each day***."[114] Then, based on Dr. Viscelli's estimate of 30 minutes per inspection, Mr. Chasworth assumes 120 minutes of inspection time per driver per day.[115] Mr. Chasworth's assumption amounts to a total of four hours (or 240 minutes) spent on inspections by driver teams, which would leave only 20 hours for two drivers to drive and

[113] DOT Inspections from May 2021 to April 2023 (CRSTF390274).
[114] Chasworth Report ¶ 23, (emphasis added).
[115] Chasworth Report ¶ 23 and Chasworth Supplemental Report ¶ 35.

perform other on-duty non-driving activities. Given that it is possible for both drivers to reach their 11-hour driving limit in a day, there is no logical basis for assuming that four hours of inspections occur each day. I pointed out in the Song Rebuttal Report that Mr. Chasworth performed no analysis of the data to support or check the validity of his assumptions. Instead of making an unsupported assumption about the number of inspections per workday or their duration, Mr. Chasworth should have analyzed the Driver Log data. In the Chasworth Supplemental Report, he continues to make the unsupported assumption of 120 minutes of inspection time per driver per day.[116]

68. Indeed, my analysis in the Song Rebuttal Report of the Driver Log data demonstrates that there is no empirical basis for Mr. Chasworth's assumption of 120 minutes of inspection time per driver per day. This conclusion holds using the updated data productions.

**III.A.4.a.** ***Mr. Chasworth overestimates the frequency of pre-trip and post-trip inspections.***

69. It is my understanding that according to federal Hours of Service regulations, "on-duty" time includes "[a]ll time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work."[117] The regulations specifically include "[a]ll time inspecting … any commercial motor vehicle at any time" as an example of "on-duty time."[118] CRST instructs its drivers that all time performing inspections should be recorded as "on-duty, not driving."[119] Mr. Huckaby confirmed he logged his time performing pre-trip and post-trip inspections consistent with that instruction.[120] Accordingly, time logged in the Driver Log Data as on-duty, not driving before or after driving sessions may reflect time spent performing pre-trip and post-trip inspections, respectively.

70. For illustrative purposes, I analyze the Driver Log data[121] to investigate two configurations that are consistent with Mr. Chasworth's assumption of four pre-trip and post-trip inspections. As illustrated in the table below, instances in which drivers stopped to take a break (as identified

[116] Chasworth Supplemental Report ¶ 36.
[117] Brueck Depo, Exhibit 10 slide 6.
[118] 49 C.F.R. § 395.2.
[119] Brueck Depo, Exhibit 10 slide 7.
[120] Huckaby Depo, 77:6-78:4.
[121] CRSTF001272-1275, covering the period from May 9, 2019 to December 11, 2022.

by time logged as "Sleeper" or "Off-Duty") in between two driving sessions and logged on-duty before and after the break rarely occurred, at less than 3% of the time.

**Table 7. Logged Activities in Sequence Consistent with Mr. Chasworth's Assumption**[122]

| Sequence | Count | Percent of Driver Workdays with Sequence |
|---|---|---|
| "Driving", "On-Duty Non-Driving", "Sleeper", "On-Duty Non-Driving", "Driving" | 1,479 | 1.39% |
| "Driving", "On-Duty Non-Driving", "Off-Duty", "On-Duty Non-Driving", "Driving" | 1,240 | 1.16% |
| CA Driver Workdays[1] | 106,656 | |

Sources: CRSTF340362 (Qualcomm Log Data)
[1] CA Driver workdays include days with activity logged as "Driving" or "OnDuty." with a location of "CA" Drivers are identified by SSN.

71. Therefore, the frequency with which drivers logged on-duty non-driving time before or after those driving sessions indicates that Mr. Chasworth's calculations inflate the number of pre-trip and post-trip inspections. Even for the activity sequence presented in **Table 7**, it is impossible to know whether drivers were performing an inspection or performing other on-duty non-driving tasks.

**III.A.4.b. *Mr. Chasworth overestimates the duration of pre-trip and post-trip inspections.***

72. Mr. Chasworth "understand[s] that Dr. Viscelli estimates that a minimum full inspection takes between 30 and 45 minutes, in light of CRST's expectations as detailed in the Driver Handbook (Bates Number 000501 – 00505)."[123] He states that "[a]ccordingly, ***we have been asked to assume that each inspection is 30 minutes in length, resulting in 120 minutes of unpaid time***

[122] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 22, 2023. Notes: [1] Driver workdays include days with activity logged as "Driving" or "OnDuty." Drivers are identified by SSN.

[123] Chasworth Supplemental Report ¶ 37. Dr. Viscelli's estimate of 30-45 minutes is based on a citation to CRST's Handbook containing a checklist for a proper pre-trip and post-trip inspection (Viscelli Report, Page 11 citing to CRSTF000506-10). While CRST's handbook states that a 10-minute inspection is too short, it does not provide an estimate for the expected amount of time a driver should spend inspecting their vehicle ("If you see a 10-minute inspection on the driver's logbooks, you know that driver is cutting corners" CRST000502).

***[for each driver] for each workday***."[124] Mr. Chasworth could have analyzed the Driver Log data to study the duration of on-duty non-driving time immediately preceding a driving session to estimate the duration of pre-trip inspections. And he could have analyzed the duration of on-duty non-driving time immediately succeeding a driving session to estimate the duration of post-trip inspections. Doing so would have allowed Mr. Chasworth to test the validity of Dr. Viscelli's assumption that inspections lasted for 30 to 45 minutes. Additionally, such an analysis would conservatively estimate the duration of pre-trip and post-trip inspections because the Driver Log Data does not indicate whether drivers are performing an inspection during the entirety of the time period during which they log their status as on-duty before or after a driving session. Since the Driver Log data does not specify the tasks performed while logged as on-duty, the only way to know whether those log entries reflect time spent performing inspections would be to ask each individual class member.

73. As demonstrated in the table below, by analyzing the updated production of the Driver Log data[125], I have determined that the average and median number of minutes drivers logged on-duty not-driving immediately preceding or following a driving session are 16 minutes and 12 minutes, respectively. Similarly, when limited to activities associated with California locations, the average and median durations are 17 minutes and 12 minutes, respectively. Because these durations of on-duty non-driving time are not specific to any particular task and can encompass multiple tasks (*e.g.,* fueling), they provide a conservative estimate of the time

[124] Chasworth Report ¶ 23; Chasworth Supplemental Report ¶ 36.
[125] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 10, 2023

drivers spent performing inspections. Therefore, the 30 minutes that Mr. Chasworth assumes for each inspection is inflated.

**Table 8. Average and Median Duration of On-Duty Non-Driving Activity Using Driver Log data between August 9, 2017 and April 10, 2023[126]**

| | Minutes | | | |
|---|---|---|---|---|
| | "OnDuty" Either Immediately Preceding or Following "Driving" Status | | Any "OnDuty" Status | |
| **Statistic** | **Limited to California** | **All** | **Limited to California** | **All** |
| Average[1] | 17 | 16 | 23 | 18 |
| Median | 12 | 12 | 12 | 13 |

Sources: CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data).

[1] The average excludes outliers by dropping observations below the 1st percentile and above the 99th percentile.

74. Mr. Huckaby testified that it would take him approximately 30 minutes to perform a pre-trip and post-trip inspection,[127] that there was never a time that he didn't conduct a pre-trip inspection,[128] and that he would record this time as on-duty non-driving.[129] However, an analysis of Mr. Huckaby's driver logs indicates that he spent much less than 30 minutes immediately preceding or following a driving session performing pre-trip and post-trip inspections. Specifically, Mr. Huckaby's Driver Logs[130] indicate that the average and median number of minutes for on-duty not-driving immediately preceding or following a driving session are 12 minutes and 9 minutes, respectively.[131]

75. To summarize, Mr. Chasworth's assumption of 120 minutes of pre-trip and post-trip inspections, per driver per day, is overestimated and unsupported by the Driver Log data for

---

[126] CRSTF340362 and. Notes: [1] The average excludes outliers defined by on-duty, not driving activities with durations below the 1st percentile and above the 99th percentile in the duration distribution.
[127] Huckaby Depo, 50:22-52:10; 58:10-59:8.
[128] Huckaby Depo, 52:23-25.
[129] Huckaby Depo, 76:15-78:21.
[130] Huckaby Depo, Exhibit 38, covering the period from April 12th, 2019 and August 12th, 2020.
[131] The average excludes outliers by dropping observations below the 1st percentile and above the 99th percentile. Similarly, Mr. Huckaby's driver logs indicate an average and median number of minutes for any on-duty status (not just those immediately preceding or following a driving activity) are 9 minutes and 12 minutes, respectively.

either Mr. Huckaby or the Class. Therefore, there is no factual or statistical basis for Mr. Chasworth's suggestion that his assumption of four inspections per driver per day may be underestimated, or that the class could potentially be unpaid for an additional (fifth) 30-minute inspection.[132]

76. As I later demonstrate in Section III.E.3, the average and median daily on-duty not-driving time (which also encompasses other activities) is much lower than the 120 minutes of daily time that Mr. Chasworth calculates *just* for pre-trip and post-trip inspections.

### III.A.5. *Mr. Chasworth overestimates the frequency and duration of refueling.*

77. Mr. Chasworth states that "CRST's Safety and Operations Handbook provides that vehicles should be refueled after 900 miles…the class members here work in tandem, enabling the vehicle to be driven far in excess of 900 miles per workday. Accordingly, ***I have been asked to assume that the vehicle is refueled once per workday.***"[133] Mr. Chasworth then states "Nonetheless, ***I assume 30 minutes of unpaid time per workday per driver to refuel.***"[134] But assuming that the truck is refueled once "per workday per driver" in a team driving environment, where there are two drivers in the truck, equates to an assumption that the truck is refueled twice per workday. Mr. Chasworth's assumption of 30 minutes of unpaid fueling time "per workday per driver" directly contradicts his own assumption that each truck was refueled once per workday.

78. Additionally, there is no empirical basis for Mr. Chasworth to assume one refuel per workday per driver. And while he didn't do anything to test the validity of that assumption, Mr. Chasworth could have analyzed the GPS Pings data, which reports truck fuel levels, to count the number of times a truck refuels per workday.[135]

79. I have analyzed the updated production of the GPS Pings data[136] to evaluate the validity of Mr. Chasworth's assumptions related to fueling. In doing so, I inferred that fueling sessions

[132] Chasworth Report ¶ 24 and Chasworth Supplemental Report ¶ 37.
[133] Chasworth Report ¶ 17 and Chasworth Supplemental Report ¶ 26 (emphasis added).
[134] Chasworth Report ¶ 17 and Chasworth Supplemental Report ¶ 26 (emphasis added).
[135] CRSTF340366 (Maven GPS Pings).
[136] Fuel level is only available after the transition to the updated data system, as reported in CRSTF340366. While CRSTF340366 covers the period from April 22, 2021 – April 10, 2023, fuel levels are not reported until November 2, 2021.

occurred when the trucks' fuel level (denoted in the "fuellevel" column of the GPS Pings data, which captures the percentage of fuel level indicated by the truck's fuel gauge measurement) reports an increase over the prior ping. In addition to allowing me to determine the frequency of refueling events for specific tractors, the "fuellevel" field allows me to determine the duration of each refueling event by comparing the timestamp between when the fuel level was at its lowest level and when the fuel level increase stabilized to a much higher level. For example, if the fuel level is .24 (indicating that the fuel tank is 24% full) at 18:33, then rose to .996 (indicating the fuel tank is almost 100% full) at the next ping 20 minutes later, it is reasonable to infer that the truck took approximately 20 minutes to refuel. This method of calculating the duration of refueling is conservative because, for example, drivers could be taking time to take a rest break and get food at truck stops prior to or after refueling. If no ping occurred during that time, this method would result in additional time being computed as refueling time.

80. I calculate 48,945 fueling sessions between November 2, 2021 and April 10, 2023 when fuel level is available in the GPS Pings data, or an average of 0.729 refuels per truck per day.[137] The table below shows the distribution of the frequency and duration of refueling during this period. My analysis demonstrates that Mr. Chasworth's assumption of 30 minutes of refueling per workday per driver inflates the frequency of fueling that actually occurs for multiple reasons. First, the correct method to track fueling is by truck, not by driver. As discussed earlier, although Mr. Chasworth states that he has "been asked to assume that the vehicle is refueled once per workday" he contradicts himself by assuming "30 minutes of unpaid time per workday per driver to refuel."[138] Therefore, Mr. Chasworth at least doubles the necessary frequency of fueling using his assumptions. Second, as the table below shows, CRST's GPS Pings data establish that trucks were not refueled every workday, but instead were refueled on average every 1.37 days. The average and the median duration of fueling are 16 minutes and 13 minutes, respectively, and are much lower than the 30 minutes estimated by Dr. Viscelli,

[137] Truck days are defined as any day in which trucks were driven (determined based on an odometer change, speed observed, or change in coordinates.) Due to potential imprecision in fuel gauge measurement, I only consider increases of at least 0.10 (10%) in the fuel level as a fueling session. For instance, the fuel gauge sometimes fluctuates up and then back down by a few percentage points in-between pings. Such small fluctuations do not appear to reflect actual fueling activity.

[138] Chasworth Report ¶ 17.

who did nothing to confirm or verify his 30-minute estimate, which was used by Mr. Chasworth as the basis for his calculations.

**Table 9. Duration of Truck Fueling, November 2, 2021 – April 10, 2023[139]**

| Statistic | | Minutes |
|---|---|---|
| Average | | 16 |
| 1st Percentile | | 5 |
| 5th Percentile | | 5 |
| 10th Percentile | | 7 |
| 25th Percentile | | 10 |
| 50th Percentile | | 13 |
| 75th Percentile | | 19 |
| 90th Percentile | | 28 |
| 95th Percentile | | 36 |
| 99th Percentile | | 60 |
| Minimum | | 5 |
| Maximum | | 90 |
| Number of Refuels | [1] | 48,945 |
| Number of Truck Days with Driving | [2] | 67,129 |
| Refuels per Truck Day | [3] = [1]/[2] | 0.729 |
| Average Days per Refuel | [4] = [2]/[1] | 1.372 |

81. It is my understanding that according to the Hours of Service regulations and consistent with CRST's company policy[140], fueling time is supposed to be logged as on-duty not-driving.[141] Therefore, to the extent that my finding in Section III.A.3 on the average and median number of minutes drivers logged on-duty not-driving either immediately preceding or following a driving session (16 minutes and 12 minutes, respectively) could apply to identify fueling events, my finding in Section III.A.3 provides alternative empirical evidence debunking Dr.

[139] CRSTF340366 (Maven GPS Pings).

[140] Brueck Depo, Exhibit 3 at CRSTF000552 ("All time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work, that is not actually driving, is On-Duty time." This includes, "All time inspecting (Pre-Trip/Post-Trip Inspections), servicing (fueling), or conditioning a commercial motor vehicle". The Employee Handbook further explains that "[w]aiting to get to the fuel island is drive time until you actually park the vehicle, and begin the fueling process").

[141] Mr. Huckaby testified that he logged fueling as on-duty, and that the time it took to fuel a truck varied. See Huckaby Depo, 86:2-86:21.

Viscelli's assumption that it takes 30 minutes to refuel, which Mr. Chasworth relied on in his calculations.

**III.A.6.** ***Mr. Chasworth errs by not applying the total paid amounts as offsets to wage losses for events of breakdowns, detention delays, and layovers.***

82. Mr. Brueck testified that both layovers and breakdowns are off-duty or sleeper berth events.[142] Mr. Brueck testified that layovers and breakdowns over 48 hours are compensated at a rate of $100 per 24 hours after the initial 48-hour period[143], and that drivers are paid a detention pay at 30 percent of the amount CRST bills to its customers.[144] Mr. Chasworth also acknowledges that CRST provides detention pay, breakdown pay if breakdown lasts over 48 hours, and layover pay if layover lasts over 48 hours.[145]

83. **Tables 10 and 11** below enumerate the total numbers and amounts of breakdown, detention, and layover pay the class of paid drivers received during the relevant data period of 8/9/2017 to 4/10/2023. Mr. Chasworth should have applied the total paid amounts as an offset for his loss calculation, which he does not do.

**Table 10. Summary of Payments in Legacy Payroll Adjustment Data[146]**

| Adjustment Code | Code Description | Number of Payments | Total Adjustment Amount | First Check Date | Last Check Date |
|---|---|---|---|---|---|
| 2F | DETENTION | 272 | $11,466 | 8/15/2017 | 7/30/2019 |
| BK | BREAKDOWN | 1,677 | $309,213 | 8/15/2017 | 7/30/2019 |
| DB | DOT INSP BONUS | 681 | $17,325 | 8/10/2017 | 7/25/2019 |
| LO | LAYOVER | 4,086 | $609,477 | 8/10/2017 | 7/30/2019 |
| SC | SCALE | 7,163 | $85,089 | 8/10/2017 | 7/30/2019 |

[142] Brueck Depo, 36:24-37:9.
[143] Brueck Depo, 22:7-23:6.
[144] Brueck Depo, 21:9-20, specifically, detention pay is negotiated by CRST with its customers "where if a driver is either being loaded or unloaded with freight in and out of their trailer for an excessive period of time they are paid a rate based on that additional time that the customer holds the driver at the dock."
[145] Chasworth Supplemental Report ¶¶ 31, 32, and 38.
[146] CRSTF330715. Excludes records in which drivers are owner-operators, as indicated by values of the "pay_ind" field equal to "O".

**Table 11. Summary of Payments in LME Payroll Adjustment Data**[147]

| Deduction Code | Code Description | Number of Payments | Total Deduction Amount | First Check Date | Last Check Date |
|---|---|---|---|---|---|
| BRK | BREAKDOWN | 1,716 | $437,908 | 8/1/2019 | 3/2/2023 |
| DET | DETENTION PAY | 859 | $32,161 | 8/15/2019 | 3/2/2023 |
| DOT | DOT INSPEC BONUS | 545 | $21,460 | 8/15/2019 | 3/2/2023 |
| LAY | LAYOVER | 2,864 | $533,140 | 8/1/2019 | 3/2/2023 |
| SCA | SCALE | 5,936 | $82,652 | 8/1/2019 | 3/2/2023 |

**Notes:**

[1] Deduction code "DET" has multiple descriptions as either "DETENTION PAY" or "DETENTION SHIPPER", both descriptions are counted under deduction code "DET".

[2] Deduction code "SCA" has multiple code types as either "E" or "R". Both code types are counted under deduction code "SCA"

**III.A.7.** ***Mr. Chasworth's calculation of an average 9.55 hours per week of "On Duty – Not Driving" time is inflated.***

84. Mr. Chasworth's calculation of an average 9.55 hours per week of "On-Duty – Not Driving" time is inflated. My calculation using the updated production of the Driver Log data from 8/9/2017 to 4/10/2023 shows a median and average daily on-duty non-driving time of 3.25 and 4.83 hours, respectively.

[147] CRSTF331048. Excludes records in which drivers are owner-operators, as indicated by values of the "payee_type" field equal to "O", and unpaid or voided payroll records, as indicated by values of the "is_paid" field equal to "N" or values of the "is_void" field equal to "Y".

**Table 12. Average Weekly and Daily On-Duty Time, August 9, 2017 to April 10, 2023**[148]

| Year | Mean Weekly On-Duty Minutes | Median Weekly On-Duty Minutes | Mean Daily On-Duty Minutes | Median Daily On-Duty Minutes |
|---|---|---|---|---|
| 2017 | 275.42 | 204.00 | 61.28 | 38.00 |
| 2018 | 274.01 | 199.00 | 59.84 | 37.00 |
| 2019 | 265.94 | 190.00 | 60.20 | 36.00 |
| 2020 | 249.04 | 186.00 | 54.47 | 34.00 |
| 2021 | 261.36 | 188.00 | 58.57 | 36.00 |
| 2022 | 404.00 | 206.90 | 96.60 | 42.00 |
| 2023 | 509.27 | 254.17 | 120.73 | 52.95 |
| **Total** | **289.56** | **195.00** | **64.91** | **37.00** |
| **Total In Hours** | **4.83** | **3.25** | **1.08** | **0.62** |

85. The $32,071,997 of alleged uncompensated "On-Duty, Non-Driving" time using the formula "9.55 hours/week x 102,057 weeks x $32.91/hour"[149], is the product of two inflated numbers: (1) 9.55 hours/week, and (2) an erroneous measure of "weighted average hourly rate of $32.91". Reliance on these values causes the $32 million figure calculated by Mr. Chasworth to be incorrect and inflated. If instead, the average weekly on-duty hours of 4.83 and "a time-weighted average minimum wage of $12.944 per hour" are used, the $32 million figure Mr. Chasworth calculates would have been reduced to $6,132,115 (=4.83 hours/week x 102,057 weeks x $12.44), an 80% reduction.

### III.B. Rebuttal Opinion II – Liquidated Damages Calculated by Mr. Chasworth Are Unreliable Because They Suffer From the Same Flaws As Those Identified In The Loss Calculations Performed By Him.

86. Mr. Chasworth separately calculates liquidated damages. Liquidated damages are "equal to the unpaid wages valued at minimum wage."[150] The liquidated damages calculations suffer from

[148] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 10, 2023. The average excludes outliers (on-duty, not driving time duration below the 1st percentile and above the 99th percentile in the distribution). I also exclude a small number of duplicative observations, or approximately 1% of the records, relating to simultaneous logged activities (e.g., records where driver's activity status are logged as both on-duty and off-duty, starting at the same timestamp and for the same duration). This analysis includes on-duty, not driving activities in all of the states. Only employee days with logged on-duty not driving time are included in this analysis.
[149] Chasworth Supplemental Report between ¶ 53 and ¶ 54.
[150] Chasworth Supplemental Report ¶ 43.

all the same flaws described in my Rebuttal Opinion I, which shows that Mr. Chasworth's calculation of unpaid wages are not reliable.

**III.C. Rebuttal Opinion III – Mr. Chasworth's "Review of Federal Hours of Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time,"[151] is Flawed Because He Does Not Correctly Analyze the Data to Identify the Days that Fit His Criteria and Because he Double Counts Damages for Breakdowns and Layovers Occurring Outside of California.**

87. Mr. Chasworth calculates "466,076 hours of events where drivers were out of state, but either in a DOT "off-duty" or "sleeper berth" designation, while the truck was stationary."[152] He further states: "I did not review time inside of California, to reflect residency of the class members, and CRST's argument that drivers might go home during this time, even though it is possible that some of those records may fit the other criteria of compensable time." His analysis is purportedly measuring "off-duty" or "sleeper berth" activities where drivers were out of home state, for example, were delayed and not getting paid.

88. As an initial matter, Mr. Chasworth does not show how he or anyone else can know if the drivers were in fact performing work during this time or, if they were, which of the two team drivers were performing work for CRST. That is particularly true based on my understanding that under federal law and CRST company policy, drivers can only be logged as off-duty when not performing work outside the sleeper berth, and they can only be logged as in the sleeper berth when they are in fact resting (and not working) inside of the sleeper berth of the truck. None of the counts or amounts Mr. Chasworth calculates under this review are included in Chasworth Report Exhibit D Summary of Losses. Therefore, it is unclear what Mr. Chasworth seeks to achieve with this review.

89. Additionally, I understand that there is a dispute as to whether California law applies to Plaintiff and class members' work performed outside of California. If the Court concludes that California law does not apply to class members' work activities outside of California, Mr. Chasworth's review will be irrelevant. Even if there exists a legal basis for Mr. Chasworth's review of off-duty and sleeper berth time, my investigation reveals that he does not perform the analysis correctly as explained below.

---

[151] Mr. Chasworth does not separately present counts of "Off Duty" events from "Sleeper Berth" events.
[152] Chasworth Supplemental Report ¶ 7.

90. To calculate losses he associates with off-duty or sleeper berth time outside of California, Mr. Chasworth applied several criteria to his review of the Driver Log data between August 1, 2019 and July 8, 2022:[153] "First, the truck had to be stationary, as noted by the odometer reading of the specific truck remaining unchanged between records. Second, the driver had a 'status' of either 'Off Duty' or 'Sleeper'." Finally, Mr. Chasworth "did not review time inside of California, to reflect the residency of the class members, even though it is possible that some of those records may fit the other criteria of compensable time."[154] Mr. Chasworth relied on the odometer reading of the specific truck to determine whether the truck was stationary. Mr. Chasworth used the date range in the Chasworth Report and does not update his counts using the updated production of the Driver Log data.[155]

91. I have studied Mr. Chasworth's analysis and have determined that his analysis is flawed because he does not correctly analyze the data to identify the days that fit his criteria. Specifically, the odometer reading from the Qualcomm Driver Log data[156], which include odometer reading at every recorded change in log status, is occasionally populated with anomalous values, and therefore is not always accurate or valid. My review of the odometer reading for log segments on 8/9/17 or later reveals that approximately 5.5% of log segments are associated with a "-1" value in the odometer field, almost all of which correspond to "Off Duty" or "Sleeper Berth" activities. Odometer readings with a "-1" value account for approximately 13.7% of the 466,076 hours identified by Mr. Chasworth.[157] In addition, approximately 4.7% of the 466,076 hours identified by Mr. Chasworth have missing values in the "state" field, which Mr. Chasworth relies on to determine California log segments.[158] Therefore, in those cases, the two criteria in Mr. Chasworth's "Review of Federal Hours of

---

[153] Chasworth Supplemental Report ¶ 44.
[154] Chasworth Supplemental Report ¶ 44.
[155] Mr. Chasworth relies on Qualcomm Log data (CRSTF001272-1275) that has since been supplemented by CRSTF340362.
[156] CRSTF001272-1275, which include odometer reading at every recorded change in log status.
[157] See "Data" tab of Chasworth's Backup Production File named "CRST 1272 – 74 Off Duty-Sleeper 20231016.xlsx". Using his analysis, I filter the data to sum his calculation of layover time over one hour ("LayoverAdj") for records with "-1" odometer values.
[158] If the state field is blank, then Mr. Chasworth classifies it as occurring outside of California. See "Data" tab of Chasworth's Backup Production File named "CRST 1272 – 74 Off Duty-Sleeper 20231016.xlsx". Using his analysis, I filter the data to sum his calculation of layover time over one hour ("LayoverAdj") for records with "0" or blank values for "State".

Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time" cannot be discerned and applied.

92. Based on Mr. Chasworth's identification of a total of 466,076 hours logged as off-duty or in the sleeper berth outside of the state of California, multiplied by an average pay rate of $32.91 per hour, he calculates $15,338108 of unpaid wages.[159] As an illustration of the impact of Mr. Chasworth's errors on his calculation of unpaid amounts, if instead, "a time-weighted average minimum wage of $12.944 per hour" is used, the $15 million figure Mr. Chasworth calculates would have been reduced to $4,768,489 (=466,076 hours x [1-13.7%] x [1-4.7%] x $12.44), a more than two-thirds reduction.

93. **Example 5** demonstrates the flaws in Mr. Chasworth's methodology. First, instead of excluding those cases from his analysis, Mr. Chasworth errs by considering repeat odometer readings equal to "-1" as indicative of a stationary truck. Second, he classifies records with blank values in the state field to be outside of California, even if the "location" field indicates it is in California. Third, it is common for drivers to be logged as "Off Duty" or "Sleeper Berth" for their first record in the driver log data, and weeks can pass before a recorded update in their log status. Since the class consists of California drivers, it is unlikely that the first driver log entry would represent an "off duty" or "sleeper" activity outside of California. However, Mr. Chasworth categorically counts all such first records for the class members for this calculation.

---

[159] Chasworth Supplemental Report ¶ 51.

### Example 5. Mr. Chasworth Incorrectly Identifies Trucks as Being Stationary and Outside of California, Including for Driver's First Logged Status[160]

**Two Examples Demonstrating Three Errors In Mr. Chasworth's Analysis**
**1. Mr. Chasworth Includes a Driver's first driver log record, which was logged as "OffDuty", as a "delay" event**
**2. Mr. Chasworth Considers a Driver to Be Stationary When there are Repeat Anomalous Odometer Readings Equal to -1**
**3. Mr. Chasworth Considers Records with blank values in the State field to be Outside of California, Even if the Location Field Indicates its in California**

| drivername | activity | driverid | duration | location | logid | odometer | starttime | state |
|---|---|---|---|---|---|---|---|---|
| ABDULLE, ABDIMALIK A. | 1 | AAABDULL | 25595 | | 123543891 | -1 | 3/25/21 19:00 | |
| ABDULLE, ABDIMALIK A. | 2 | AAABDULL | 1209 | 5 mi N of Riverside, CA | 123564278 | -1 | 4/12/21 13:35 | CA |

| drivername | activity | driverid | duration | location | logid | odometer | starttime | state |
|---|---|---|---|---|---|---|---|---|
| SUMMEY, LEONTE | 1 | LSUMMEY | 53458 | 3 mi WSW of Grand Terrace, CA | 115156261 | -1 | 5/5/2020 19:00 | |
| SUMMEY, LEONTE | 1 | LSUMMEY | 228 | 3 mi WSW of Grand Terrace, CA | 115156276 | -1 | 6/11/2020 21:58 | |
| SUMMEY, LEONTE | 3 | LSUMMEY | 269 | Cudahy, CA | 115168411 | 1958841 | 6/12/2020 16:06 | CA |

94. Mr. Chasworth states that "[a] small number of records indicated delay events of over one week (168 hours), and for purposes of any total hours calculation, those times were trimmed to 168 hours."[161] However, the 168-hour threshold is arbitrary and Mr. Chasworth does not explain how he decides to cap the total hours at 168, instead of, for example at 24 hours.

95. Finally, Mr. Chasworth's analysis of "Unpaid DOT Off-Duty and Sleeper Berth Time" outside of California is duplicative of the damages he calculates for breakdowns and layovers described elsewhere in his report.[162] Mr. Brueck testified that both layovers and breakdowns are off-duty or sleeper berth events.[163] Mr. Chasworth's calculations of "Unpaid DOT Off-Duty and Sleeper Berth Time" are unreliable because they result in double-counting of breakdowns and layovers class members logged as off-duty or sleeper berth time while their trucks were stationary outside of California.

[160] Activity = 1 is "OffDuty", 2 is "Sleeper", 3 is "Driving", and 4 is "OnDuty". The "duration" field is in minutes, and represents the time between changes in log status, as reported in the "starttime" field. I have reviewed Mr. Chasworth's backup production to confirm that these types of errors, and specifically these log entries, are included in his calculation of potential unpaid wages for 466,076 hours of DOT "off-duty" or "sleeper berth" designation when the truck was stationary. See "Data" tab of Chasworth's Backup Production File named "CRST 1272 – 74 Off Duty-Sleeper 20231016.xlsx", at lines 13498 and 281179.
[161] Chasworth Supplemental Report ¶ 47.
[162] Chasworth Supplemental Report ¶¶ 31 and 38.
[163] Brueck Depo, 36:24-37:9.

**III.D. Rebuttal Opinion IV – Mr. Chasworth's "Review of Wage Statements and Trip Records", Which Derives "Undercounted Miles"[164], Is Incomplete and Incorrect. Additionally, His Calculation of "a Potential Amount of Underpayments"[165] Will Be Inflated If Miles Driven Outside of California Are Not Recoverable According To California Law.**

96. Mr. Chasworth compares the miles in the LME Fuel Tax data[166], with paid miles in LME Trip Wages data.[167] He linked the two files by the common field order ID and compared the miles between the two by summing total fuel tax miles for an order ID and comparing that to the "maximum miles from the trip summary data for any record with that order ID."[168]. If miles recorded in LME Fuel Tax records exceed paid miles recorded in LME Trip Wages, he "multiplied the undercounted miles by the pay rate (in pennies per mile) in the trip summary information"; if there were multiple pay rates for a given order number, he multiplied the undercounted miles by the average of the highest and lowest pay rates.[169] He then took the "median underpayment" of $29.50 per order ID, multiplied by 2.44 orders per week and by 102,057 workweeks to reach a "total underpayments to the class" of $7,336,170.[170]

**III.D.1. *Mr. Chasworth's calculation of "undercounted miles"[171] is incomplete because it ignores Legacy IFTA records Produced to Plaintiff.***

97. Since the initial exchange of expert reports in April 2023, Mr. Chasworth was provided with IFTA Records during the relevant period. IFTA records for the Legacy period consist of PDF files.[172] IFTA records for the LME period are contained in one excel file "CRSTF340785" (IFTA LME in Excel format). Mr. Chasworth only relies on the IFTA records for the LME period. He does not acknowledge receipt of the IFTA records for the legacy period, nor does he analyze the Legacy IFTA records in his "Review of Wage Statements and Trip Records"[173], even though his backup production shows that he did receive them. Mr. Chasworth's analysis

[164] Chasworth Supplemental Report ¶ 58.
[165] Chasworth Supplemental Report ¶ 59.
[166] CRSTF340785 is a dataset of IFTA records covering the LME data period, from January 2, 2020 – April 23, 2023.
[167] CRSFT001279_Confidential-Subject to Protective Order.xlsx.
[168] Chasworth Supplemental Report ¶ 55.
[169] Chasworth Supplemental Report ¶ 58.
[170] Chasworth Supplemental Report ¶ 59.
[171] Chasworth Supplemental Report ¶ 58.
[172] CRSTF340786 to CRSTF390273.
[173] Last section of the Chasworth Supplemental Report ¶¶ 54 to 59.

of the LME data period is also incomplete because he does not utilize the most complete data for LME Trip Wages, which was produced as CRSTF331050.

**III.D.2.** ***Mr. Chasworth's analysis of "undercounted miles"[174] is incorrect, resulting in a calculated "underpayment" that is inflated.***

98. Mr. Chasworth's approach to analyzing "undercounted" miles is flawed because he does not perform a proper comparison of fuel tax mileage to paid mileage by linking to movement ID. The Trip Wages data reports paid mileage by Movement ID and Order ID, where Order IDs (or loads) can consist of multiple segments (movement IDs), and a driver or driver team may only haul one portion of a multi-segment load before relaying the load to another driver. Because the Trip Wages data does not necessarily include all segments of a load – for instance, if a non-class member or driver for a different CRST division hauled a segment – and because the Fuel Tax data includes all segments of a load, the proper comparison is to match fuel tax miles to paid miles by movement ID, *not* by Order ID, as Mr. Chasworth does. By matching based on order ID instead of movement ID, Mr. Chasworth's analysis includes *all* fuel tax miles for an order ID, regardless of whether each movement is also found in the Trip Wages data for class members, thereby overcounting fuel tax miles. Additionally, because Mr. Chasworth only counts the maximum paid miles for an Order ID, he undercounts paid miles by not summing paid miles across Movement IDs.[175]

99. The following table illustrates the egregious errors made by Mr. Chasworth, by comparing his results to the results of a proper analysis using Order ID 10068486. Under Mr. Chasworth's approach, he calculates a total of 1,748.6 "unpaid" miles, which is the difference between 1,994.6 fuel tax miles, and 246 paid miles.[176] However, only 2 of the 3 movement IDs are

[174] Chasworth Supplemental Report ¶ 58.
[175] Paid miles are unique to Movement ID. Therefore, if a team of drivers haul the same movement, both drivers will have the same paid mileage. This accounts for Mr. Chasworth's observation of the "frequent duplication of information for multiple drivers" (Chasworth Supplemental Report ¶ 55). If Mr. Chasworth had instead used the maximum paid miles for a Movement ID instead of for an Order ID, he would have properly counted miles.
[176] See Mr. Chasworth's backup production, at line 20 from tab "Unpaid miles and wages" of the file "Fuel Tax and Trip Data comparison 20231011.xlsx".

included in both the Fuel Tax data and Trip Wages data.[177] If Mr. Chasworth would have limited the comparison to just those movement IDs, then he would have only calculated a total of 19.8 "unpaid" miles, which is only 1.1% of the total "unpaid" miles he calculates.

### Example 6. Chasworth Undercounts Paid Miles and Overcounts Tax Miles by Not Matching on Movement ID

Example Calculation Using Order ID 10068486

| Order ID | Movement ID | Total Fuel Tax Miles for the Movement ID (CRSTF340785) | Trip Pay Data for Movements included in the Data File Analyzed by Chasworth (CRSTF001279): Driver ID | Driver Name | Paid Miles | Pay Rate (Cents per Mile) | Order Pay | Difference between Fuel Tax Miles and Paid Miles | Correction to Chasworth's Calculation of Alleged Underpayment |
|---|---|---|---|---|---|---|---|---|---|
| 10068486 | 564884 | 252.3 | RRCERRIL | RICARDO R. CERRILLO | 246.0 | $0.20 | $49.20 | 6.3 | $1.26 |
| 10068486 | 564884 | 252.3 | MAENDRES | MARK A. ENDRES | 246.0 | $0.10 | $24.60 | 6.3 | $0.63 |
| 10068486 | 576399 | 31.6 | RRCERRIL | RICARDO R. CERRILLO | 28.0 | $0.20 | $5.60 | 3.6 | $0.72 |
| 10068486 | 576399 | 31.6 | MAENDRES | MARK A. ENDRES | 28.0 | $0.10 | $2.80 | 3.6 | $0.36 |
| **Total for Movement IDs included in both the Fuel Tax Data and the Trip Pay** | | **283.9** | | | **274.0** | | **$82.20** | **19.8** | **$2.97** |
| 10068486 | 533047 | 1,710.7 | <--- Movement 533047 is not included in the Trip Pay Data file Analyzed by Chasworth (CRSTF001279) | | | | | | |

| Chasworth's Calculation of Alleged Underpayment | | |
|---|---|---|
| Total Fuel Tax Miles for Order ID | 1,994.6 | = 283.9 + 1,710.7 |
| Maximum of Paid Miles for Order ID | 246.0 | <--- Chasworth Only Counts the Maximum Paid Miles, Instead of Properly Summing Paid Miles Across Movement IDs. |
| Chasworth's Calculation of Unpaid Miles | 1,748.6 | = 1,994.6 - 246.0 |
| Chasworth's Average Pay Rate | $0.15 | = Average of $0.20 and $0.10 |
| Chasworth's "Average Driver Loss" | $262.29 | = 1,748.6 miles x $0.15. |

100. **Table 13** corrects Mr. Chasworth's analysis by matching fuel tax miles to paid miles by movement ID, *not* by Order ID, as Mr. Chasworth does. This correction reduces the average and the median "undercounted miles"[178] from 410.15 miles[179] that Mr. Chasworth calculates, to 48.25 miles or a reduction of 88%. My analysis also shows that for 16.29% of the movements, drivers were paid more miles than the fuel tax miles, or an overpayment instead of an underpayment.

[177] Mr. Chasworth's analysis uses an incomplete version of LME Trip Pay Data (CRSTF001279), which has since been supplemented by CRSTF331050. In CRSTF331050, data relating to Mark. A. Endres is also not included since he is not on the updated class list. This example includes records relating to Mark A. Endres for the sole purpose of demonstrating all of the data inputs into Mr. Chasworth's calculation.
[178] Chasworth Supplemental Report ¶ 58.
[179] Chasworth Supplemental Report ¶ 57.

**Table 13. Comparison of Fuel Tax and Trip Summary Data, January 1, 2020 - September 27, 2022**[180]

| Statistic | | Value |
|---|---|---|
| Number of Class Member Movement IDs in Both Datasets | [1] | 121,356 |
| Number of Class Members with Movement IDs in Both Datasets | [2] | 2,246 |
| Total Distance in Fuel Tax Data | [3] | 114,584,977 |
| Total Distance in Trip Summary Data | [4] | 108,729,884 |
| **Average "Undercounted Miles" in Trip Summary** | **[5A]** | **48.25** |
| **Median "Undercounted Miles" in Trip Summary** | **[5B]** | **21.85** |
| Number of Trips where Trips Summary Miles Exceed Fuel Tax Miles | [6] | 19,769 |
| **Percentage of Movement IDs where Trips Summary Miles Exceed Fuel Tax Miles** | **[7] = [6]/[1]** | **16.29%** |
| Number of Movement IDs where Fuel Tax Miles Exceed Trip Summary Miles | [8] | 101,210 |
| Percentage of Movement IDs where Fuel Tax Miles Exceed Trip Summary Miles | [9] = [8]/[1] | 83.40% |
| | | |
| Number of Class Members with No IFTA Miles in CA | [10] | 34 |
| Percentage of Class Members with no IFTA miles in CA | [11] = [10]/[2] | 1.51% |
| Percentage of Movement IDs Only Outside CA for Class Members | [12] | 51.02% |
| Percentage of Movement IDs Partially Outside CA for Class Members | [13] | 33.38% |
| Percentage of Total Fuel Tax Miles Driven in CA for Class Members | [14] | 10.72% |

101. In addition to improperly comparing miles, Mr. Chasworth's calculation is further flawed due to the averaging of driver pay rates. As explained by Mr. Chasworth, "if there were multiple pay rates for a given order number, I multiplied the undercounted miles by the average of the highest and lowest pay rates. This gives the underpayment amount for a single driver."[181] Mr. Chasworth method of only including the highest and lowest pay rates is flawed because it does not include every driver's pay, particularly for multi-segment orders with more than one driver team or a mix of team drivers and solo drivers.[182] Mr. Chasworth's calculation is also flawed because he includes pay rates for non-class members in approximately 20% (10,464) of the 53,482 Order IDs he analyzed.[183] As demonstrated in the following example for Order ID 10067672, Mr. Chasworth calculates an average pay rate that is inflated by approximately 44%

[180] CRSTF340785 (LME Fuel tax data) and CRSTF331050 (LME Trip Wages). Although data is available beyond September 27, 2022, I have limited the analysis to this time period, consistent with Mr. Chasworth's analysis.
[181] Chasworth Supplemental Report ¶ 58.
[182] Approximately 2.2% of orders have more than 2 class members drivers.
[183] Chasworth Supplemental Report ¶ 56. See Mr. Chasworth's backup production, at tab "Unpaid miles and wages" of the file "Fuel Tax and Trip Data comparison 20231011.xlsx". In columns J and M, Mr. Chasworth identifies whether the driver SSN is included in the class list. Those who are not on the class list are marked as "Not Found" by Chasworth. Each of the records on this tab are used in his calculation of average driver loss per order ID. Of the 10,464 Order IDs with non-class member pay rates, there are 5,749 (or 10.75% = 5,749/53,482) with a minimum and maximum pay rate that differ, which implies that the non-class member pay rate impacts 10.75% of Order IDs analyzed by Mr. Chasworth.

($0.238 / $0.165) by erroneously including the pay rate for a solo-driver who is not on the class list.[184] Even if all three drivers were class members, it would still be incorrect to calculate the drivers loss using an average of just the lowest and highest rates for the order, or even the average of all three drivers' rates, because it assumes an equal split of miles across the multiple movements.[185] Mr. Chasworth's method of averaging pay rates is flawed and unnecessary given the availability of data for each driver and movement.

**Example 7. Chasworth Incorrectly Averages Only the Highest and Lowest Pay Rates, and Includes Non-Class Member Pay Rates in His Average**

Example of Chasworth's Average Mileage Rate Calculation Using Order ID 10067672

| Order ID | Movement ID | Driver ID | Driver Name | Pay Rate (Cents per Mile) | Driver on Class List ? |
|---|---|---|---|---|---|
| 10067672 | 530615 | WROSEBU | WILLIE ROSEBUD JR | $0.310 | No |
| 10067672 | 599046 | DASTON2 | DAVID A. STONE | $0.165 | Yes |
| 10067672 | 599046 | RWMALDO | RICKY W. MALDONAD | $0.165 | Yes |

| | |
|---|---|
| Chasworth's Average Pay Rate is calculated as the "average of highest and lowest pay rates" | $0.238 |
| Average Pay Rate for Class Members | $0.165 |

102. These examples demonstrate that Mr. Chasworth's analysis of "unpaid" miles is incorrect, unreliable, and results in an "underpayment" calculation that is inflated.

**III.D.3. *Chasworth's calculation of miles "underpaid"[186] still is not limited to miles driven in California.***

103. In the Song Rebuttal Report[187], I pointed out that Mr. Chasworth's calculation of 1,593 potential unpaid miles is not limited to miles driven in California. There, using Mr. Huckaby's IFTA Records[188], I calculated that Mr. Huckaby and his codriver drove a combined 9,567 miles

[184] See Mr. Chasworth's backup production, at line 18 from tab "Unpaid miles and wages" of the file "Fuel Tax and Trip Data comparison 20231011.xlsx".
[185] For example, Mr. Chasworth's calculation will be inflated in certain instances where the driver with the highest pay rate hauls a segment with the least number of miles.
[186] Chasworth Supplemental Report ¶ 54.
[187] Song Rebuttal Report ¶ 70.
[188] Brueck Depo, Exhibit 28.

in California, or 11% of the 87,279 total miles driven by Mr. Huckaby and his codriver between April 1, 2019 and July 22, 2019. For the 107 trips Mr. Huckaby and his codriver drove during this period, 46 (or 43% of all) trips corresponded to trips outside of California, while 32 (or 29.9% of all) trips corresponded to trips within California. Therefore, I concluded in the Song Rebuttal Report that Mr. Chasworth's determination that CRST potentially underpaid Mr. Huckaby for 1,593 miles will be inflated if miles driven outside of California are not recoverable according to California law.

**Figure 4. Location of Mr. Huckaby's Trips, Based on IFTA Records**

**April 1, 2019 – July 22, 2019**




104. In his supplemental report Mr. Chasworth reviews the period of 1/1/2020 and 9/27/2022 using Fuel Tax Record data for the LME period.[189] I have reviewed the same Fuel Tax Record data "CRSTF340785_Native.xlsx" and have identified 2,218 class members'126,093 trips using the trip summary data and the fuel tax data. As demonstrated above in **Table 4,** 51% of class members' trips from the LME IFTA records were outside of California, and that total miles driven in California represented only 10.6% of all miles driven.

[189] Chasworth Supplemental Report ¶¶ 54 and 56.

**III.E. Rebuttal Opinion V – Mr. Chasworth Ignores a Substantial Amount of Empirical Data Pertinent to this Litigation. His Backup Production for the Chasworth Supplemental Report Is Deficient.**

**III.E.1.** ***Mr. Chasworth ignores and does not analyze a substantial amount of empirical data pertinent to this case that CRST has produced to Plaintiff.***

105. Since the initial exchange of expert reports in April 2023, Mr. Chasworth was provided with one more round of supplemental data which I understand that CRST produced to Plaintiff. All rounds of supplemental data production subsequent to April 10, 2023 correspond to updated data files of class members, which include the same categories of data files described in Song Rebuttal Report section II, but extend the time period covered by the data to April 2023, and include more class members (those who did not opt into the Montoya settlement) as a result of the extended period of coverage.

106. Despite the updated and relevant data and information available to him, Mr. Chasworth relied on an incomplete subset of that data to reach the conclusions included in his supplemental report. In **Appendix A**, I enumerate relevant data and information which Chasworth either did not consider (not in Chasworth Supplemental Report Exhibit C) or listed in Exhibit C but did not use in his analysis in the Chasworth Supplemental Report.

107. Specifically, Mr. Chasworth ignores three main categories of data in his analysis. First, he ignores the QHOS driver log data[190] in the updated production, and only uses the Maven driver log data.[191] Second, even though CRST produced DOT inspections data[192] which can be used to calculate the average and median duration of DOT inspections, Mr. Chasworth ignores this data and instead "assume[s] that an inspection of this type takes 45 minutes, or 0.75 hours."[193] Third, in his "Review of Wage Statements and Trip Records"[194], Mr. Chasworth only analyzes the LME IFTA records and ignores the Legacy IFTA records produced to Plaintiff, which cover a significant portion of the class period.

---

190 CRSTF340362. Mr. Chasworth instead relies on prior productions of QHOS driver log data, which is incomplete.
191 Chasworth Supplemental Report, ¶¶ 22, 27.
192 CRSTF390274, covering DOT inspections from May 2021 to April 2023. Those records show start and end times for each inspection.
193 Chasworth Supplemental Report, ¶ 29.
194 Chasworth Supplemental Report, ¶¶ 54-59.

**III.E.2.** ***Mr. Chasworth's production for the Chasworth Supplemental Report does not contain any source codes or logics replied upon by Mr. Chasworth.***

108. On October 23, one week after the Plaintiff's supplemental expert reports were filed, I received Mr. Chasworth's work products consisting of nine Excel files and one CSV file. Those files enumerate records, but none contains any source codes or logics relied upon by Mr. Chasworth (for example how the enumerated records are obtained by merging of data files or by applying any filtering criteria).[195]

109. On October 24, I received two additional files: One Stata .do file and another Python program with no descriptions or stated purposes of what those files are used for. The Stata and Python codes appear to be intermediate data processing steps or pay period counts although the pay period counts do not directly feed into any numbers in the Chasworth Supplemental Report.[196]

110. Mr. Chasworth's production for the Chasworth Supplemental Report does not include all scripts, cell links, and formula he used. The production does not map out from original data sources, all intermediate calculations that led to the final output reflecting the results in the Chasworth Supplemental Report.[197] This is problematic because without his source codes, I am unable to fully replicate the numbers in the Chasworth Supplemental Report. In **Appendix B**, I enumerate errors in Mr. Chasworth's calculations, including instances in which a calculation appears to not be provided in his production.

**III.F. Rebuttal Opinion VI – Dr. Viscelli's Supplemental Report Does Not Contain Any Empirical Analysis, Therefore His Opinions Are Not Based on Scientific Evidence.**

111. Neither the Viscelli Report nor the Viscelli Supplemental Report present *any* analysis using CRST's produced data. As described in Section II.A, CRST produced Payroll Master and Payroll Adjustment data, Driver Logs, Trip Wages and Trip Supplement data, GPS pings and messages, fuel tax records, and DOT inspections data, for the Class from August 2017 to April

[195] Occasionally it appears that a pivot table was constructed prior to being replaced by actual values populating the pivot table, thereby removing the link to the source data.

[196] The python program imports "CRSTF340361_CONFIDENTIAL_Native.csv", coverts the status start to datetime format, and then removes duplicates by SSN, status start, and status code. The Stata .do file uses CRSTF330716 and CRSTF330720 to count the name of pay periods, however no calculation from this .do file appears to backup any values in the Chasworth Supplemental Report.

[197] In numerous instances the counts and figures in the Chasworth Supplemental Report do not match exactly to the counts in the production files due to typos.

2023. Dr. Viscelli chose not to analyze *any* produced data, despite their relevance to his assumptions.

112. Instead, the cited bases for Dr. Viscelli's opinions are: CRST Safety and Operations Handbook (CRSTF000455-CRSTF000633), a document titled "Getting Started with CRST!" (CRSTF000248-CRSTF000258), a document titled "CRST Expedited Driver Wage Sheet" (CRSTF000060), Bruek Deposition, Reges Deposition and Nelson Deposition (added citations in the Viscelli Supplemental Report). Those documents are a small selection of the evidence produced in this litigation and do not include any empirical data applicable to the class. Dr. Viscelli has not performed any analysis of actual wages paid, miles driven, driver activities, communications with dispatch, and GPS location tracking of the trucks – all of which I understand CRST produced in this litigation – in order to support any of his opinions.

113. Dr. Viscelli states that "[o]ver the course of my research and policy and expert work I have encountered and interviewed a number of former CRST drivers and have been familiar with operations because of these for several years."[198] I have not been provided with any work product from any such interviews, and I am not aware that Dr. Viscelli has produced any. Dr. Viscelli does not discuss any issue of bias arising from his interview with former CRST drivers. He does not disclose the number of interviewees and how those interviewees can be representative of the class of drivers in their experience with CRST.

114. The Viscelli Report and the Viscelli Supplemental Report are not scientifically reliable because they ignore the various categories of empirical data, which contradict Dr. Viscelli's estimates.

### III.G. Rebuttal Opinion VII – Dr. Viscelli's Opinion that the Driver Log Data "Are Not Complete Records of Drivers' Work"[199] Is Contradicted by Federal Regulations, CRST Policies, and Driver Testimony

115. In his supplemental report, Dr. Viscelli criticizes my "[a]ssumptions . . . regarding driver activities, and how they may or may not be reflected on Department of Transportation Safety Logs."[200]

[198] Viscelli Supplemental Report, p. 5.
[199] Viscelli Supplemental Report p. 9.
[200] Viscelli Supplemental Report p. 3.

116. Specifically, Dr. Viscelli criticizes my analysis for "incorrectly assum[ing] that drivers would record all work they did for CRST in these logs accurately"[201] and specifically casts doubt on whether drivers properly log pre-trip and post-trip inspections.[202] By this, he implies that drivers regularly falsify their logs, and log work time as off duty, in violation of federal law. But Dr. Viscelli identifies no empirical data or evidence supporting his analysis. Dr. Viscelli also argues that CRST's "policies and practicalities often result in an underreporting of work hours on DOT Driver Logs."[203] Specifically, Dr. Viscelli claims that certain driving time, including the "the slowest driving into and out of docks, fuel islands, or parking spots may not be logged" because driving time is only automatically recorded "when certain conditions are met, such as the truck moving at a certain speed for a certain amount of time (Regis (sic) Deposition, p. 117-9)."[204] First, this is not true for the Maven devices which CRST drivers have used since August 2021.[205] For those devices, drive time is not automatically switched to off duty status whenever the truck goes below a certain speed. The Maven training reference guide[206] provided to drivers states that if the system does automatically switch out of "driving" based on the speed of the truck, it switches back to "on-duty, not driving" and even then, the system does so only when the truck has been stopped for a specified period of time.[207] Because the ELD automatically switches to on-duty not-driving, it could lead to over-reporting of on-duty time in certain instances.

117. Even assuming that time spent driving below a certain speed isn't automatically captured as on duty driving time, Dr. Viscelli's assumption is still unsupported. Federal law still requires that drivers log "all time spent at the driving controls of a commercial motor vehicle in operation" as driving time.[208] CRST also instructs its drivers that driving time includes "waiting

[201] Viscelli Supplemental Report p. 10.
[202] Viscelli Supplemental Report p. 17.
[203] Viscelli Supplemental Report p. 9.
[204] Viscelli Supplemental Report p. 9.
[205]https://www.prnewswire.com/news-releases/crst-selects-maven-as-all-in-one-driver--fleet-management-platform-and-telematics-partner-301365647.html
[206] REV0127194, CRSTF268236-268268.
[207] See bottom of p. 10 (CRSTF268245) of the Maven training reference guide given to drivers.
[208] § 395.2 Definitions., 49 C.F.R. § 395.2.

in traffic", "[h]aving to slow down for conditions", and "[w]aiting to get to the fuel island… until you actually park the vehicle, and begin the fueling process."[209]

118. Dr. Viscelli argues that because "non-driving on-duty must be manually entered" there is an "under-reporting of such activities." But Dr. Viscelli's assertions ignore that the federal regulations defining "On-duty time" explicitly require drivers to record "all time from the time the driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work."[210] Further, materials I reviewed reflect that CRST regularly instructs drivers to properly and accurately log time in accordance with federal regulations[211], and driver testimony indicates that those policies and regulations were adhered to.[212] In short, Dr. Viscelli has identified no evidence demonstrating that CRST's drivers regularly violated federal law and CRST policy by logging time spent performing work as off-duty or in the sleeper berth. For each of those reasons, I understand that time recorded as on duty is, indeed, an accurate record of when drivers spend time performing any work for CRST.

119. Dr. Viscelli also asserts Driver Log Data is inaccurate because "non-driving on-duty must be manually entered into the electronic logging device or paper logs by drivers, and CRST has policies and expectations that result in the under-reporting of such activities.[213] But this is not true, and his assertion ignores the fact that when a driver is logged as driving and then stops the truck, the ELD automatically switches to on-duty, not driving; not off duty. That could, and very well likely does, lead to over-reporting of on duty time in certain instances.[214]

120. Finally, Dr. Viscelli argues that there are "long periods of waiting time" and "even days, when drivers are likely to not record their time" as on duty.[215] I understand that Plaintiff disputes what tasks are considered compensable work time and therefore, the duration of work time that has purportedly gone uncompensated. Even setting that dispute aside, Dr. Viscelli offers

---

[209] Brueck Deposition Exhibit 10 slide 5.
[210] § 395.2 Definitions., 49 C.F.R. § 395.2.
[211] For example, see Brueck Depo, Exhibit 9 ("Your logs must be accurate to the last change of duty status."); CRSTF000455-CRSTF000633 at CRSTF000562 ("You will have no reason to falsify your logs at CRST. False logs will lead to discipline up to and including termination of your employment or lease").
[212] Huckaby Depo, 76:15-78:21.
[213] Viscelli Supplemental Report p. 9.
[214] See bottom of p. 10 (CRSTF268245) of the Maven training reference guide given to drivers.
[215] Viscelli Supplemental Report p. 12.

opinions on estimates of time required for various "uncompensated tasks" (e.g., fueling, scaling, and inspections), which would all be recorded as "on-duty" in the driver logs. Therefore, my analysis of on-duty time in the driver log data is a reasonable basis for demonstrating the unreliability of his estimates for those tasks.

### III.H. Rebuttal Opinion VIII – Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks"[216] Are Not Supported by CRST's Data and Cannot Be Relied Upon As The Basis For Any Class Loss Calculations

121. Mr. Chasworth relies on the opinions from Dr. Viscelli to form assumptions for loss calculations presented in Chasworth Report Exhibit D. Specifically, Mr. Chasworth adopts Dr. Viscelli's assumptions for the lengths of various work-related non-driving tasks, including: "30 minutes of unpaid time per work day per driver to refuel"[217], "an inspection of this type [by DOT and other Law Enforcement] takes 45 minutes"[218], "20-30 minutes for routine scalings"[219], and 30-45 minutes for each pre-trip and post-trip inspection.[220]

122. Under item 9 of the Viscelli Report, Dr. Viscelli estimates "a number of regular tasks … that can take substantial amounts of time," specifically: Fueling, Scaling, Breakdowns, Truck Inspections, and DOT inspections. In all categories, Dr. Viscelli offers his estimates based on his professional research and observations without citing to any specific studies or empirical analysis that ties his general observations to the specific circumstances of this case. Even though CRST has produced Driver Log, GPS Pings, and Messages data, Dr. Viscelli does not vet the reliability of his estimates against the data. My analyses in the previous sections addressing the duration of various work-related non-driving tasks (in Sections III.A. 3-7) refute the validity of Dr. Viscelli's opinions.

---

[216] Viscelli Supplemental Report, Item 10.
[217] Chasworth Supplemental Report ¶ 26.
[218] Chasworth Supplemental Report ¶ 29.
[219] Chasworth Supplemental Report ¶ 34.
[220] Chasworth Supplemental Report ¶ 35.

**III.H.1.** ***Dr. Viscelli's estimate that each refueling event lasts "at least 30 minutes"[221] is not reliable because the GPS Pings data produced by CRST contradicts it.***

123. Dr. Viscelli solely bases his fueling estimates on his "professional research and observations that fueling can take as much as an hour."[222] He cites to CRST's Driver Handbook,[223] where it suggests that drivers should expect fueling to take at least 30 minutes and bases his estimate on refueling "every 900 miles and top of (sic) before trips begin."

124. As described in Section III.A.3, I have analyzed the GPS Pings data to identify instances in which a truck refueled. Contrary to Dr. Viscelli's assumption of one refuel every workday, the data shows that refueling was far less frequent. Additionally, based on the time stamps in the GPS Pings data, I am able to estimate the duration of fueling time, which is calculated as the difference in time from when the truck stopped to begin refueling and when the truck resumed driving. Again, this approach is inherently conservative as it may include time when the drivers were not actually refueling. My analysis in Section III.A.4 demonstrates that the average and the median duration for fueling time are 17 minutes and 14 minutes, respectively, both of which are less than the 30 minutes estimated by Dr. Viscelli.

**III.H.2.** ***Dr. Viscelli's estimate that truck inspections last "between 30 and 45 minutes" "at several points through the day"[224] is not supported by Driver Log data produced by CRST and therefore cannot be relied upon.***

125. Dr. Viscelli opines that "[i]nspecting the truck is required at several points through the day."[225] He then estimates, "based upon [his] professional research and observations that an inspection which complies with CRST stated expectations, as detailed in the Driver Handbook (CRSTF000506-10), should take, at a minimum, between 30 and 45 minutes."[226]

126. Dr. Viscelli's estimate of 30-45 minutes is based on a citation to CRST's Handbook containing a checklist for a proper pre-trip and post-trip inspections.[227] While CRST's Driver Handbook states that a 10-minute inspection is too short, it does not provide an estimate of the expected

---

221 Viscelli Supplemental Report, Item 10.
222 Viscelli Supplemental Report, Item 10.
223 CRSTF000472. Dr. Viscelli cites to the Trip planning section of the Handbook, which states to estimate a fuel stop for every 900 miles and a minimum of 30 minutes per fuel stop.
224 Viscelli Supplemental Report, Item 10.
225 Viscelli Supplemental Report, Item 10.
226 Viscelli Supplemental Report, Item 10.
227 Viscelli Supplemental Report, Page 16 citing to CRSTF000506-10)

amount of time a driver should spend inspecting its vehicle[228], and does not necessarily reflect the actual work performed by its drivers. Aside from relying on unspecified "professional research and observations," Dr. Viscelli made no effort to validate his assumptions to determine whether they are consistent with the available data.

127. As previously discussed in Section III.A.3, my analysis of Driver Log data refutes Dr. Viscelli's statement that each inspection lasts between 30 and 45 minutes.

### III.H.3. *Dr. Viscelli's "Estimates of Time Required for Frequent Uncompensated Tasks"*[229] *exceed the amount of on-duty non-driving activities in CRST's data.*

128. Based on Dr. Viscelli's estimates for fueling time and pre-trip and post-trip inspections, Mr. Chasworth calculates a total of 150 minutes of time per driver per workday associated with fueling and pre-trip and post-trip inspections alone.[230] It is my understanding that according to the Hours of Service regulations and consistent with CRST's company policy, both fueling and pre-trip and post-trip inspections should be logged as "on-duty" time in the Driver Log.[231] Indeed, Mr. Huckaby testified that he logged all such time as "on-duty."[232] To test Dr. Viscelli's estimates, I therefore compared them to the total on-duty non-driving time that drivers log in a day, as reported in the Driver Log data.[233]

129. As demonstrated in the following chart, I find that the average and median number of minutes of logged on-duty non-driving time per driver per day are 65 minutes and 37 minutes, respectively. Furthermore, Mr. Huckaby's Driver Logs indicate that he spent substantially less time per day performing on-duty tasks, with an average and median of 20 minutes and 14 minutes, respectively. This analysis demonstrates that drivers spent far less time per day

---

[228] CRST000502.
[229] Viscelli Supplemental Report, Item 10.
[230] As explained above, Mr. Chasworth assumes four pre-trip and post-trip inspections per day (each at 30 minutes), and 30 minutes of time per driver per workday for fueling. See Chasworth Supplemental Report ¶¶ 26 and 36.
[231] Brueck Depo, Exhibit 3 at CRSTF000552 ("All time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work, that is not actually driving, is On-Duty time." This includes, "All time inspecting (Pre-Trip/Post-Trip Inspections), servicing (fueling), or conditioning a commercial motor vehicle". The Employee Handbook further explains that "[w]aiting to get to the fuel island is drive time until you actually park the vehicle, and begin the fueling process").
[232] Huckaby Depo, 73:13-78:18.
[233] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 10, 2023.

performing *all* tasks they logged as on duty, not driving than the amount of time Mr. Chasworth estimated drivers spend performing inspections alone.[234] My analysis of class members' Driver Log data demonstrates that there is no empirical support for Mr. Chasworth's calculations regarding the amount of time drivers spent on various non-driving tasks that Mr. Huckaby claims to be uncompensated.

**Figure 5. Mr. Chasworth Assumes Daily Time for Fueling and Inspections Based on Dr. Viscelli's Estimates, Causing Inflations of Those Time Estimates Compared to CRST's Data on Drivers' Total Daily On-Duty Time[235]**




[234] Similarly, there is no support for Mr. Chasworth's suggestion that the "number of inspections required and performed by drivers may be underestimated", or his calculation relating to a fifth inspection, also 30 minutes in length. See Chasworth Supplemental Report ¶ 37.

[235] CRSTF340362 (Qualcomm Log Data) and CRSTF340361 (Maven Log Data), covering the period August 9, 2017 to April 10, 2023. The average excludes outliers (on-duty, not driving time duration below the 1st percentile and above the 99th percentile in the distribution). I also exclude a small number of duplicative observations, or approximately 1% of the records, relating to simultaneous logged activities (e.g., records where driver's activity status are logged as both on-duty and off-duty, starting at the same timestamp and for the same duration). This analysis includes on-duty, not driving activities in all of the states.

## IV. CONCLUSIONS

130. The Chasworth Supplemental Report Exhibit D presents "Summary of Losses Based on Employee Pay Rate" and "Summary of Losses Based on Minimum Wage and Liquidated Damages." Exhibit D additionally presents "Unit Calculations for Unpaid Amounts" previously not included in the Chasworth Report. Based on my updated analysis of CRST's data, my review of relevant case documents, and my evaluation of the additional responses to the Song Rebuttal Report from Mr. Chasworth and Dr. Viscelli, it is my opinion that *every* category of loss calculations in Exhibit D is based on incorrect assumptions not supported by CRST's data and is flawed because the underlying calculation method inflates the "unpaid amounts."

131. Because the "unpaid amounts" are incorrect, the "interest"[236] from "unpaid amounts" presented in Exhibit D are incorrect. Similarly, the "[Labor] Code Section 1194.2 Liquidated Damages," which are "equal to the unpaid wages valued at minimum wage"[237] are incorrect. As such, the "Total" loss amounts calculated by Mr. Chasworth are incorrect, and are therefore unreliable. Finally, because the "base rate of pay" which is equivalent to "unpaid amounts" plus interest", and "minutes per day" are inflated, the "Loss Per Unpaid Minute" calculations added to Exhibit D of the Chasworth Supplemental Rebuttal are incorrect, and are therefore unreliable.

---

[236] Again, my understanding of the Plaintiff's claims is that "Huckaby's first cause of action for failure to pay minimum wages, second cause of action for failure to pay statutory/contractual wages" (Class Certification Order, page 18.) Nothing in the Plaintiff's claims stated that the class is owed interest payment at the weighted average hourly rate.

[237] Chasworth Supplemental Report ¶ 41.

**Executed this 6th day of November 2023 in Los Angeles, California.**




**Chen Song, Ph.D., CFA**

**CHEN SONG, Ph.D., CFA**

Cirque Analytics
Jackson Hole, WY; Washington, D.C.; Los Angeles, CA; Irvine, CA
www.CirqueAnalytics.com

(310) 691-4476 chen.song@CirqueAnalytics.com

Dr. Song is an economist, CFA charter holder, and expert witness. Since receiving her Ph.D. in economics from the University of Chicago, she has provided consulting and expert testimony in single-plaintiff, multiple-plaintiff, and class action discrimination disputes. Dr. Song has studied labor market definition and has applied techniques in statistics and econometrics to examine companies' employment practices: hiring, pay, promotion, termination, reduction in force, executive compensation, and pension benefits. Additionally, she has conducted pay equity studies to assist companies with identifying potential gender or minority pay gaps. Dr. Song routinely works with large databases and various types of HR, time reporting, and large-scale transactional databases to help counsel with wage and hour class actions concerning unpaid wages, meal and rest break violations, and employee misclassification. In California wage and hour class actions, she has applied data and statistical analyses to study issues related to class certification, and to calculate potential exposure to assist with mediation.

Dr. Song has been qualified as an expert witness in both Federal and State Courts, and has testified at arbitration and at trial. For over four years, Dr. Song was appointed by the United States District Court as a neutral Technical Advisor, to assist the Court and the Special Master with a complex employment class action, which resulted in a successful settlement that ended more than a decade of litigation.

Dr. Song's statistical and econometric expertise, which she frequently applies to study issues related to class certification and economic damages, includes applying econometric modeling tools, such as conducting statistical tests, performing regression analysis, and drawing statistical inferences based on robust empirical data analyses. Dr. Song's expertise in data analysis focuses on studying the statistical properties of data, making projections, statistical sampling, and the extrapolation of sample estimates to the population. Related to survey data analysis, Dr. Song has offered rebuttal opinions on a proposed choice-based conjoint (CBC) survey in a consumer class action.

Other areas of Dr. Song's expertise include applying complex financial modeling tools, for example stock option valuation, Monte Carlo simulation, event-study, and stress testing in connection with alleged trade secrets misappropriation, accounting fraud, and breach of contract damages calculations.

Dr. Song maintains a strong affiliation with the academic community. She taught courses on labor economics at the University of California, Irvine, and on financial institutions at California State University, Los Angeles. She currently teaches review courses on risk management for the Chartered Financial Analyst (CFA) program.

## EDUCATION

Ph.D. (Economics) (2000), University of Chicago
M.A. (Economics) (1995), University of Chicago
B.A. (Mathematics and Economics) (1993), Agnes Scott College

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2021 April | Senior Vice President of Cirque Analytics |
| 2011 - 2021 | Nathan Associates, Inc. |
| | Senior Vice President: 2016 - 2021 April |
| | Vice President: 2013 - 2016 |
| | Principal Economist: 2011 - 2013 |
| 2006 - 2010 | Navigant Consulting, Inc. |
| | Director: 2008 - 2010 |
| | Associate Director: 2006 - 2008 |
| 2000 - 2005 | Resolution Economics, LLC |
| | Senior Economist: 2003 - 2005 |
| | Economist: 2000 - 2003 |
| 2008 - 2021 | Instructor, CFALA Review Program, Level III Risk Management |
| 2007 - 2008 | Adjunct Assistant Professor, California State University, Los Angeles |
| 2000 - 2006 | Senior Investigator, Center for Population Economics, University of Chicago |
| 2004 Fall | Lecturer, University of California Irvine |
| 1992 - 1993 | Intern, Federal Reserve Bank of Atlanta |

## EXPERT REPORTS, TESTIMONY, DECLARATIONS AND PROCEEDINGS (2019 May – Current)

- *Wade Pyun, Complainant, vs. U.S. Bank National Association, Respondent*, OALJ Case No. 2020-SOX-00023 & OSHA Case No. 9-3290-18-660, related to loss of earnings calculation. Expert report filed on March 9, 2023. Trial testimony provided on September 28 and 29, 2023.
- *The State of California, ex rel. Gregory Duncan and Gary Hulbert, v. Sutter Health, et al.*, Case No. RG17846895, related to statistical sampling in connection with fraudulent medical billing claims. Declarations filed on October 10, 2022, October 21, 2022, December 19, 2022, April 13, 2023, and April 24, 2023. Expert report filed on June 20, 2023. Deposition testimony provided on July 26, 2023.
- *Angel Lujan v. Dover Pump Solutions Group, et al.*, Case No. 20STCV09522, related to economic loss calculation for a wrongful termination claim. Deposition testimony provided on July 18, 2023.
- *Michael Cash v. County of Los Angeles*, Case No. BC718190, related to rebuttal damages calculation under California Fair Employment and Housing Act (FEHA) claims. Deposition testimony provided on June 10, 2021. Trial testimony provided on June 13, 2023.

- *Male Excel Medical, P.A., and Male Excel, Inc.* v. *Signia Marketing, LTD.*, Case No. A-20-816167-C, related to damages calculations in connection with allegations of fraud. Expert report filed on December 17, 2021. Trial testimony provided on May 30, 2023.
- *Keith Huckaby, et al., v. CRST Expedited, Inc. and CRST International, Inc.*, Case No. 2:21-cv-07766-ODW-PD, related to rebuttal damages analysis in a wage and hour class action. Rebuttal expert report filed on May 1, 2023.
- *Maria Martinez v. Pharmavite, LLC*, Case No. BC671153, related to loss of earnings calculation for a wrongful termination claim. Deposition testimony provided on January 8, 2021. Updated rebuttal analysis provided on February 21, 2023. Trial testimony provided on March 28, 2023.
- *Michele Lewana Evans and Melody Sprouse, et al., v. Downtown Women's Center*, Case No. 22STCV06578, related to data analysis in a wage and hour class action. Rebuttal expert declaration filed on March 20, 2023.
- *Maria Torres v. Southern California Permanente Medical Group, Kaiser Foundation Health Plan, Inc., and Kaiser Foundation Hospitals*, Case No. 19STCV42476, related to rebuttal damages calculation under disability discrimination claims. Rebuttal expert report filed on November 10, 2022.
- *Eric Pierce v. County of Los Angeles, et al.*, Case No. BC675062, related to rebuttal damages calculation under race discrimination claims. Deposition testimony provided on November 1, 2022.
- *Truinject Corp. v. Galderma, S.A., Galderma Laboratories, L.P., Nestlé Skin Health, Inc.*, Case No. 19-00592-VAC-JLH, providing rebuttal opinions to expert survey analysis in connection with allegations of breach of contract, patent infringement, and trade secret misappropriation claims. Rebuttal expert report co-authored with Nancy Mathiowetz, Ph.D., and filed on September 14, 2022.
- *Judy Garcia, Fidel Barrios, and Elyse Allahar, individually, and on behalf of all others similarly situated, v. Cardinal Health, Inc., and Cardinal Health 200, LLC.*, Case No. 37-2019-00068269-CU-OE-CTL, related to data analysis in a wage and hour class action. Expert declaration filed on September 8, 2022.
- *Arthur J. Gallagher & Co., v. Tarantino, et al.*, Case No. 20-cv-05505-EMC, providing rebuttal financial analysis in connection with allegations of breach of contract and misappropriation of trade secrets. Rebuttal expert report filed on April 28, 2022. Deposition testimony provided on August 3, 2022.
- *William M. Dorfman, D.D.S., dba Century City Aesthetic Dentistry v. Patti Cantor, Michael Kosdon, D.D.S., dba Kosdon Cosmetic Dentistry*, Case No. BC602388, related to trade secrets misappropriation and breach of contract claims. Deposition testimonies provided on March 6, 2020 and on April 16, 2022. Trial testimony provided on May 10, 2022 and June 1st, 2022.
- *Margarita Ramirez v. World Oil Corp*, Case No. 20STCV22351, related to rebuttal damages calculation under disability discrimination claims. Deposition testimony provided on January 24, 2022. Trial testimony provided on April 18 and April 19, 2022.
- *Jeremy Gilmore, et al., v. Vansh, Inc. et al.*, Case No. HG18930348, related to data analysis in a wage and hour class action. Expert declaration filed on December 6, 2021.
- *United States, v. Nancy Zak, Claud Clark III, EcoVest Capital, Inc., Alan N. Solon, Robert M. McCullough, and Ralph R. Teal Jr.*, Case No. 1:18-cv-05774-AT, providing rebuttal financial

analysis in connection with allegations of violations of the internal revenue laws related to the donation of conservation easements and deductions claimed related to those easements. Rebuttal expert report filed on November 10, 2021. Deposition testimony provided on January 13, 2022.

- *Jennifer Garcia, et al., v. Central Coast Restaurants, Inc. et al.*, Case No. 3:18-cv-02370-RS, related to data analysis in a wage and hour class action. Rebuttal expert report filed on October 29, 2021.
- *Monica Barnett v. Costco Wholesale Corporation*, Case No. 2:20-cv-04896-ODW-JEMx, related to rebuttal damages calculation in discrimination claims. Rebuttal expert report filed on October 4, 2021.
- *Lauryn Latravia Vargas v. Kaiser Foundation Health Plan, Inc.*, Case No. RIC1906237, related to rebuttal damages calculation in discrimination claims. Deposition testimony provided on July 28, 2021. Trial testimony provided September 8, 2021.
- *Department of Fair Employment and Housing (DFEH) v. Pathways Community Services, LLC, and Pathways Health and Community Support, LLC*, Case No. 30-2018-01039657-CU-CRCJC), related to rebuttal damages calculation in discrimination claims. Deposition testimony provided on July 16, 2021.
- *In RE: MacBook Keyboard Litigation*, Case No. 5:18-cv-02813-EJD-VKD, related to rebuttal opinions on proposed choice-based conjoint and repair rate analyses. Rebuttal expert report filed on May 13, 2021. Deposition testimony provided on May 25, 2021.
- *An Engineering Design Corporation v. Former CEO/Board Member*, AAA, related to damages calculation under claims of fraud and breach of fiduciary duty. Expert report filed on September 28, 2020. Deposition testimony provided on October 28, 2020. Arbitration testimony provided on April 20, 2021.
- *A California Real Estate Management Firm v. Global Real Estate Investment Company*, JAMS, related to wage and hour matter in connection with an indemnification claim. Arbitration hearing expert witness rebuttal report filed on October 12, 2020. Arbitration hearing testimony provided on November 30, 2020.
- *Paulette Fauceglia v. University of Southern California, et al.*, Case No. 2:19-vcv-04738-FMO-JEM, related to loss of earnings calculation for a wrongful termination claim. Expert report filed on August 10, 2020. Deposition testimony provided on October 2, 2020. Supplemental report filed on October 7, 2020.
- *Elizabeth Cuevas, et al., v. ConAm Management Corporation*, Case No. 3:18-cv-01189-GPC-LL, related to damages calculations on bonus overtime compensation in connection with an FLSA collective action. Expert report filed on August 3, 2020.
- *Juan Carlos Montoya, et al., v. CRST Expedited, Inc. and CRST International, Inc.*, Case No. 1:16-cv-10095-PBS, related to class-wide loss calculations in connection with a consumer frauds class action. Expert report filed on July 22, 2020. Deposition testimony provided on August 14, 2020. Rebuttal report related to FLSA collective and Iowa Wage Class claims, and consumer frauds class action, filed on August 21, 2020. Second deposition testimony provided on September 2, 2020.
- *Peter Kleinberg v. Landmark Dividend, LLC., et al.*, Case No. BC675252, related to breach of contract and wrongful constructive discharge damages. Deposition testimony provided on July 23, 2019. Trial testimony provided on November 21, 22, and 25, 2019.

- *Former Employee v. A Power and Renewable Energy Company*, JAMS, related to rebuttal damages calculation for a wrongful termination claim. Rebuttal summary of opinions provided on August 28, 2019. Deposition testimony provided on September 11, 2019. Arbitration testimony provided on November 20, 2019.
- *Yelter Cruz, et al., v. Gelson's Markets*, Case No. BC670061, related to data analysis in a wage and hour class action. Declaration filed on September 17, 2019. Deposition testimony provided on October 8, 2019.
- *Edward Jordan and De'Wana Hubbard v. City of Los Angeles*, Case No. BC575699, related to rebuttal damages calculation for a wrongful termination claim. Deposition testimony provided on September 9, 2019.
- *Berta Sosa v. Comerica Bank, et al.*, Case No. YC071851, related to rebuttal damages calculation for a wrongful termination claim. Deposition testimony provided on August 2, 2019.

## SELECT EXPERT WITNESS AND CONSULTING EXPERIENCE

### LABOR EMPLOYMENT

Representative assignments in labor employment matters:

- Expert witness services for defendant (a grocery store chain) in a California wage and hour class action alleging meal and rest breaks and rounding claims. Services included rebuttal analysis to plaintiffs' expert's statistical sampling method and calculations.
- Expert witness services for defendant (a trucking company) in an FLSA collective action. Services included rebuttal analysis to damages calculations related to unpaid wage claims.
- Expert witness services for defendant (a university and its affiliated physician practice plan) in a gender discrimination class action. Services included statistical and econometric modeling to assist counsel with opposition to class certification.
- On-going consulting for a large company (a restaurant chain) to audit gender pay equity. Services included statistical and econometric modeling of compensation, and auditing periodic pay adjustments in order to ensure that the company complies with the California Fair Pay Act.
- Expert witness services for defendant (a construction company) in a case involving meal break violations. Services included submitting a declaration explaining statistical sampling, and rebutting plaintiffs' expert's analysis to assist counsel with opposition to class certification.
- Expert witness services for defendant (a health club) in a case involving meal break violations for non-managerial hourly employees. Services included analyzing electronic time clock and payroll records, and rebutting plaintiffs' expert's analysis to assist counsel with opposition to class certification.
- Consulting services for defendant (a lumber company) in a case involving meal break violations and unpaid overtime. Services included designing and supervising data entry of punch records to reliably capture all relevant information, analyzing punch records and

payroll data, and preparing a summary of risk assessment to assist counsel with mediation.
- Consulting services for defendant (a home healthcare agency) in a case involving unpaid overtime claims. Services included analyzing a sample of time-keeping records and payroll data to assist counsel with mediation.
- Consulting services for defendant (a large grower of herbs) in a case involving meal break violations. Services included reviewing and analyzing time-keeping and payroll files from various time-keeping and payroll systems, in order to assist counsel with mediation.
- Expert witness services for defendant (a restaurant chain) in a class action discrimination case. Services included constructing analytical databases from human resources and payroll data, modeling the promotional process, performing statistical analyses to examine plaintiffs' claim of discrimination in promotion and pay, and assisting counsel with class certification defense.
- Expert witness services for defendant (a hospital) in a single-plaintiff discrimination claim. Services included rebutting opposing expert's lost earnings analysis and estimating economic damages.
- Consulting services for defendant (a pharmaceutical company) in a single-plaintiff wrongful termination claim. Services included rebutting opposing expert's calculation of lost employee stock options awards.
- Consulting services for defendant (a restaurant chain) in a case alleging unpaid time related to the donning and doffing of uniforms. Services included culling over 200 store manager declarations to build an analytical database, summarizing ranges of the donning and doffing time by uniform types, studying variations in the donning and doffing time by store and by shift, and performing statistical analysis to identify factors potentially impacting the donning and doffing time.
- Consulting services for defendant (a regional social services provider) in a case involving meal and rest break violations. Services included designing an observational/time-in-motion study to evaluate plaintiffs' claims that service professionals were not provided opportunities for break during their work days.
- Consulting and expert witness services for defendant (a global defense, security, and aerospace systems company) in a wrongful termination matter alleging race discrimination. Services included evaluating the economic impact of the plaintiff's termination from his employer.
- Consulting and expert witness services for defendant (a restaurant chain) in a case involving meal and rest violations. Services included analyzing large time clock and transactional databases, designing statistical tests to assess the merit of the plaintiffs' claim of a company-wide policy for meal and rest violations, and filing a rebuttal report to assist counsel with a motion opposing class certification.
- Consulting services in connection with reduction in force (RIF). Services included performing adverse impact analysis on gender, race, and age, and critiquing the statistical analysis conducted by an EEOC expert.
- Consulting services in connection with an age discrimination claim brought forth by a sales rep at an investment bank. Services included analyzing compensation, sales and performance rating information for liability assessment, calculating lost earnings, and rebutting opposing expert's damage models.

- Consulting services for defendant in a case involving breach of contract allegation by a high-level executive in the gaming and high-tech industry. Services included estimating damages using information from analyst reports issued by major investment banks, and studying academic peer-reviewed journal articles that formed the basis of opinions on executive compensations in the high-tech industry.
- Consulting services for defendant's counsel in a wage and hours matter alleging uncompensated overtime and missed meal periods for a prospective class of hourly employees at a large transportation company. Services included designing and developing a daily punch-in/punch-out database and hours worked from a large number of electronic records, performing workweek calculation, estimating exposure, penalties, the value of per hour regular pay, per hour overtime pay and per hourly double-time pay, and assisting counsel with mediation.
- Consulting services in connection with research on gender discrimination in pay and promotion at a university. Services included estimating the difference in pay and merit increases by gender, identifying inputs into the compensation and academic award structure, and presenting findings to the faculty.
- Consulting services for the board of trustees in a university system in response to a labor union allegation of gender and racial discrimination in the faculty award policy. Services included statistical analyses of award records.
- Consulting services in several wrongful termination matters. Services included using detailed census and other data to estimate labor market availabilities by geographic location, evaluating job search efforts and mitigation opportunities, constructing financial models to compute economic damages under a variety of scenarios, rebutting opposing expert's analysis, and assisting counsel with cross-examination.
- Consulting and expert witness services for defendant (a large institution for national security) in a case involving an EEOC investigation of gender discrimination in pay and promotion. Services included creating analytical databases from human resource files, employee job application and performance review paper documents, performing statistical tests and regression analyses to study the relationship between productivity-related variables, pay, and gender, and filing declarations to assist counsel with liability assessment.
- Consulting and expert witness services for defendant (a healthcare provider) in a case involving time-shaving, meal, and rest violations. Services included studying daily activity patterns of four types of healthcare workers, designing statistical tests to assess the merit of the plaintiffs' claims that the defendant had adopted a company-wide policy to systematically prune overtime entitled by its employees.
- Consulting services for defendant in connection with an allegation of age discrimination in promotion in a large biotech company. Services included processing large job history data and conducting statistical analyses of employment records.

**COMMERCIAL AND CONTRACT DISPUTES**

Representative assignments in commercial litigation and breach of contract matters:

- Appointed as the neutral technical advisor by the U.S. District of Kansas in a contract dispute brought by over 30,000 employees at a telecommunications company. Services included assisting the Court with understanding plaintiffs' and defendant's experts' big data analyses and damages calculations.
- Consulting services for plaintiff (a public company specializing in virtualization, cloud computing, and enterprise solutions) in a trade secrets and contract dispute matter. Services included calculating lost profits and unjust enrichment in connection with the alleged unlawful and unfair solicitation, raiding of employees, and theft of trade secrets.
- Expert witness services for plaintiff (an independent insurance agency) in an insurance payment dispute. Services included reviewing and rebutting opposing expert's sampling analysis and damages extrapolation.
- Expert witness services for plaintiff (a large home builder) in a legal malpractice claim related to class certification. Services included statistical sampling and damages calculations.
- Consulting services for plaintiff in a construction defects claim against a builder. Services included estimating, using a hazard model, the life span of pipes installed in certain residential neighborhoods during the class period.
- Consulting services in connection with FINRA (formerly NASD) arbitration in a breach of contract claim from a portfolio manager. Services included evaluating returns to portfolios and calculating lost earnings.
- Consulting services for defendant (a large bank) in a consumer class action. Plaintiffs in the prospective class alleged that the bank's practice of processing debit card transactions from highest to lowest dollar amount resulted in a higher number of overdraft fees assessed on customers' accounts than if debit card transactions were posted in the chronological order that they occurred. Services included critiquing Plaintiffs' expert's data and damage analyses, running alternative but-for scenarios for sampled customers' accounts, and calculating damages.

**SECURITIES CLASS ACTION AND FINANCIAL MODELING**

Representative assignments in securities class action and financial modeling:

- Consulting services for enforcement in an accounting investigation. Services included supporting an academic affiliate in preparing a rebuttal report on the topic of delisting risk and its potential costs to investors.
- Consulting services for defendant (a large broker-dealer company) in connection with a derivative class action suit in which the plaintiffs alleged Section 10b-5 and other violations. Services included employing econometric approach to estimate a range of potential damages per share by taking into account the timing of information releases to the capital markets, and developing a multi-trader model to estimate the number of shares potentially damaged. The multi-trader model was used to account for shareholders' varying propensities to trade, correct for trading volume overstatements caused by market maker and specialist activities, and adjust shares outstanding for short interest, company insiders' beneficial ownership positions, and institutional shares not traded during the alleged fraud period.

- Consulting services for defendant (a high-tech company) in connection with an SEC investigation of options backdating practices. Services included conducting a series of statistical tests on the company stock option grant dates to identify those dates where the short-term return was unusually favorable.
- Consulting services for defendant (a state security entity) in a lawsuit brought forth by a securities trading company alleging $500 million loss due to reduction in business capacity as a result of the 1993 bombing of the World Trade Center. Services included performing time-series regression models to address the issue of loss causation, calculating damages during the alleged business interruption period, and testing the sensitivity of model outcome by studying various time-to-maturity segments of the traded fixed income securities.
- Consulting services for defendant (an entertainment software company) in a breach of contract case brought by former managers. Services included stock options valuation using a modified version of the Black-Scholes Option Pricing Framework. The modification incorporates a marketability discount arising from sales restrictions and separation risk.

## STATISTICAL ANALYSIS AND ECONOMETRIC MODELING

Representative assignments in statistical analysis and econometric modeling:

- Consulting services to determine patent family sample size for essentiality studies.
- Expert witness services on statistical sampling and damages calculations in a malpractice claim in connection with class certification.
- Consulting services for enforcement in an accounting investigation. Services included supporting an academic affiliate in preparing a rebuttal report on the topic of delisting risk and its potential costs to investors.
- Applied multi-variate regression analysis using panel data in class action pay discrimination matters. Models controlled for neutral seniority and productivity measures, and accounted for clustering effects.
- Performed one-sample binomial test with Mantel-Haenszel aggregation in class action promotion discrimination matters.
- Identified abnormal stock returns using regression analysis, controlling for market and industry-specific factors, in the context of an event study in securities class actions.
- Designed statistical sampling method and performed damages extrapolation with calculations of confidence interval and error rate.
- Performed regression analysis to project but-for sales, accounting for market condition, time trend, and seasonality.
- Performed regression analysis in the context of a wage and hour class action to identify statistical significance of store-specific characteristics on work-related issues at dispute.
- Applied hazard model in a construction defects claim to estimate the life span of pipes installed in certain residential neighborhoods during the class period.
- Conducted T-test and KS-test to evaluate any difference between two populations, in the context of class actions (for example, comparing relevant characteristics of the deponents with the class members not deposed).

- Conducted Chi-squared test to study any correlation between two variables, in the context of class actions (for example, comparing relevant characteristics of the sampled class members with the rest of the class not sampled).
- Performed adverse impact statistical analysis in class actions alleging discrimination in hiring or in termination.
- Evaluated EEOC experts' statistical and econometric analysis in Reduction-in-Force (RIF) investigations.

## HONORS AND RESEARCH GRANTS

Phi Beta Kappa, Elected to Membership 1993

Far East Funding, 1994 - 97

National Institute on Aging, Program Project Grant (Award # P01 AG10120), "Early Indicators of Later Work Levels, Disease and Death", Robert W. Fogel, Principal Investigator. Senior investigator (September 2001 to August 2006)

## PROFESSIONAL MEMBERSHIPS

American Economic Association

American Bar Association

Los Angeles Bar Association

Los Angeles Society of Chartered Financial Analysts

Orange County Bar Association

## COMMUNITY ACTIVITIES

Former Governor, Los Angeles Society of Chartered Financial Analysts

Former Board Member (2011 July - 2018 June), Board of Directors of the Los Angeles Center for Law and Justice, a legal-aid organization which provides education and direct representation in housing and family law for low-income communities in East Los Angeles

Former Board Member (2014 - 2016), The State Bar of California, Legal Services Trust Fund Commission, a program responsible for administration of revenue for the benefit of nonprofit legal aid organizations in California

# Attachment B

## Materials Relied Upon

***Legal Documents***

- Order Granting in Part and Denying in Part Motion to Certify Class, October 3, 2022
- Order Granting in Part and Denying in Part Motion for Reconsideration, April 10, 2023
- Dkt. 60, Order Granting in Part and Denying in Part Motion to Certify Class, October 3, 2022

***Depositions***

- Deposition of Chad Brueck and Exhibits, February 15, 2022
- Deposition of Keith Huckaby and Exhibits, March 7, 2022
- Deposition of Phil Reges and Exhibits, May 23, 2023
- Deposition of Scott Nelson and Exhibits, May 25, 2023

***Expert Reports and Backup Material***

- Expert Opinion on the Work of CRST Drivers by Dr. Steve Viscelli, Ph.D., April 20, 2023
- Declaration of Mr. Sean Chasworth with Exhibits and Production Material, April 10, 2023
- Supplemental Expert Report by Sean Chasworth with Exhibits and Production Material, October 16, 2023
- Expert Opinion on the Work of CRST Drivers (Supplemental Report) by Dr. Steve Viscelli, Ph.D., October 16, 2023
- Expert Rebuttal Report by Dr. Chen Song, Ph.D., CFA, May 1, 2023

***Bates Documents***

- CRSTF000060 - 61
- CRSTF000248 - 258
- CRSTF000455 - 633
- CRSTF000799
- CRSTF001272 - 001301
- CRSTF268236 - 268
- CRSTF330715 - 330720
- CRSTF330722 - 330731
- CRSTF331048 - 331050
- CRSTF340361 - 340369
- CRSTF340785 - 390275

# Appendix A
## Data and Information which Mr. Chasworth Did Not Consider or Did Not Use in His Analysis

| Starting Bates | Ending Bates | Description | Listed on Chasworth Exhibit C? | Used in Mr. Chasworth's Supplemental Analysis? |
|---|---|---|---|---|
| CRSTF330717 | CRSTF330717 | Legacy Trip Wages | Listed on Exhibit C | No |
| CRSTF330718 | CRSTF330718 | Legacy Trip Supplement | Listed on Exhibit C | No |
| CRSTF331048 | CRSTF331048 | LME Payroll Adjustments | Not listed on Exhibit C | No. Chasworth uses a version with less data CRSTF330719 |
| CRSTF331049 | CRSTF331049 | LME Payroll Master | Not listed on Exhibit C | No. Chasworth uses a version with less data CRSTF330720 |
| CRSTF331050 | CRSTF331050 | LME Trip Wages | Listed on Exhibit C | No. Chasworth uses a version with less data CRSTF001279 |
| CRSTF340362 | CRSTF340362 | QHOS Driver Logs | Listed on Exhibit C | No. Chasworth uses a version with less data CRSTF001272-1275 |
| CRSTF340363 | CRSTF340363 | LME Trip Supplement | Listed on Exhibit C | No |
| CRSTF340364 | CRSTF340364 | Qualcomm Pings | Listed on Exhibit C | No |
| CRSTF340365 | CRSTF340365 | Maven Messages | Listed on Exhibit C | No |
| CRSTF340366 | CRSTF340366 | Maven Pings | Listed on Exhibit C | No |
| CRSTF340367 | CRSTF340367 | Qualcomm Messages | Listed on Exhibit C | No |
| CRSTF340368 | CRSTF340369 | Qualcomm Messages | Not listed on Exhibit C | No |
| CRSTF340786 | CRSTF390273 | Legacy IFTA Records | Listed on Exhibit C | No |
| CRSTF390274 | CRSTF390274 | DOT Inspection Data | Listed on Exhibit C | No |

# Appendix B
## Summary of Errors in Mr. Chasworth's October 16, 2023 Report

| Chasworth Production Relating to 10/16/23 Report | | | Chasworth 10/16/23 Report | | | | |
|---|---|---|---|---|---|---|---|
| File Name | Tab | Column/Cell | Number | Paragraph | Description | Type of Error | Notes |
| CRST 1272 - 74 Off Duty-Sleeper 20231016.xlsx | "Summary by Day" | Y8 | 466,076 | 7 | Hours of events where drivers are out of state in "off-duty" or "sleeper berth" | Methodological | Mr. Chasworth caps sleeper/off duty time at 1 week (168 hours) of consecutive time. Arbitrary assumption. |
| CRST 1272 - 74 Off Duty-Sleeper 20231016.xlsx | "Summary by Day" | AE8 | $15,338,108 | 7 | Potential unpaid wages in time period covered by data using $32.91 wage | Methodological | Mr. Chasworth hardcoded the average wage in this file, and it differs slightly from the value in the file which it is calculated in causing rounding issues. |
| On duty Only 1272 - 1274.xlsx | "72-74 On Duty Time" | D2 | 10 | 9 | Amount of "On Duty-Not Driving" time per week | Typo | 9.55 not in backup. Presumably, the value he meant to use is 9.34 which he also uses in paragraph 53. |
| CRSTF330715_Confidential_Native.csv & CRSTF330719_Confidential_Native.csv | | B2 | $3,959 | 13 | Number of distinct SSNs | Calculation | 3,960 unique ssn between these two files. |
| | | | 246,543 | 16 | Number of records in CRSTF001279 | Not in production | File not included in production material from Chasworth. Number of records matches our internal file. |
| | | | 50.22 | 23 | Average 'employees per work week' | Methodological | Mr. Chasworth divides the 102,057 employee-workweeks by the 2,032 days to get the average 'employees per work week'. The correct method would be to divide the 102,057 employee-workweeks by the 290 (2,032 days/7) workweeks in the period to get 352 average 'employees per workweek'. |
| Events Calculation 20231016.xlsx | "Sick Pay Calculation" | D1 | $63,941.24 | 24 | Total sick pay | Methodological | Only 131 sick pay records for 88 ssns, not an accurate measure of the hourly rate. There are other, more extensive datasets to get a more applicable hourly rate. |
| Events Calculation 20231016.xlsx | "Sick Pay Calculation" | D2 | 1,943 | 24 | Number of sick pay hours | Methodological | Only 131 sick pay records for 88 ssns, not an accurate measure of the hourly rate. There are other, more extensive datasets to get a more applicable hourly rate. |
| Events Calculation 20231016.xlsx | "Sick Pay Calculation" | D3 | $32.91 | 24 | Weighted average hourly rate per hour | Methodological | Only 131 sick pay records for 88 ssns, not an accurate measure of the hourly rate. There are other, more extensive datasets to get a more applicable hourly rate. |
| On duty and Driving 340361.xlsx | "Drive and DriveOnDuty" | C2 | 4.45 | 27 | Days per week with driving activity in 340361 file | Mistake | Mr. Chasworth cites his calculation of average days either On Duty or Driving (4.45) instead of the average driving days (4.32) that he described in the report. |
| | | | 55,015 | 27 | Workweeks in payroll master covered in the date range covered by 1272 and 1274 | Not in backup production | |
| | | | 8,849 | 27 | Workweeks in 340361 | Not in backup production | |
| | | N/A | 5 | 27 | Weighted average of driving days per workweek | Mistake | Calculated as =((8,849 x 4.45) + (55,015 x 4.61))/(55,015+8,849), using the incorrect 4.45 from above. Using the correct 4.32 average the resulting weighted average is 4.57. |
| | | | $2,976,268 | 28 | Interest on unpaid refueling wages to class | Not in backup production | |

# Appendix B
## Summary of Errors in Mr. Chasworth's October 16, 2023 Report

| Chasworth Production Relating to 10/16/23 Report | | | Chasworth 10/16/23 Report | | | | |
|---|---|---|---|---|---|---|---|
| File Name | Tab | Column/Cell | Number | Paragraph | Description | Type of Error | Notes |
| | | | 158,889 | 28 | Extrapolated unpaid refueling wages to class | Not in backup production | |
| | | | $8,246 | 28 | Extrapolated interest on unpaid refueling wages to class | Not in backup production | |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F21 | $32.91 | 29 | Average wage | Methodological | Only 131 sick pay records for 88 ssns. |
| Events Calculation 20231016.xlsx | "EE-Week Lists" | U5 | $220 | 31 | Average pay for breakdown | Typo | Value in backup is 219.9765 which rounded would be 219.98. |
| Events Calculation 20231016.xlsx | "EE-Week Lists" | U6 | 341,693 | 31 | Number of hours work by class for breakdown | Calculation | The report says "100.79 x 3,390 = 341,693", however, 100.79 x 3,390 = 341,460. The backup document calculates 341,693 = (1,713 events x $254.82 average pay in file 330719) + (1,677 events x $50.5 average pay in file 330715). |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F33 | $31.92 | 31 | Average wage | Typo | Above shows the average is $32.91, backup calculation also relies on $32.91. |
| Events Calculation 20231016.xlsx | | N/A | 7 | 32 | Hours per detention | | Calculation computed differently in backup than described in the report. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F46 | 7,508 | 32 | Hours of time worked by class | Calculation | The report says "1,142 detentions x 6.57 hours/detention= 7,508 hours", however, 1,142 x 6.57 = 7503. The backup document calculates 7,508 = (867 events x 6.097 hours/detention in file 330719) + (275 events x 8.08 hours/detention in file 330715). |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F47 | $31.92 | 32 | Average wage | Typo | Above shows the average is 32.91, backup calculation uses 32.91. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F50 | $200,162 | 32 | Unpaid detention wages to class | Typo | Resulting total is correct, however, sentence has a typo and subtracts $42,926 instead of $46,926. Also calculated using wrong wage, inflating value. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F61 | $31.92 | 34 | Average wage | Typo | Above shows the average is 32.91, backup calculation uses 32.91. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | N/A | 120 | 36 | Minutes of unpaid work time each day | | Calculation computed differently in backup than described in the report. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F73 | $31.92 | 36 | Average wage | Typo | Above shows the average is 32.91, backup calculation uses 32.91. |
| | | | $11,801,281 | 37 | Unpaid wages plus interest on additional inspection | Not in backup production | |
| Events Calculation 20231016.xlsx | "List of claims (table)" | N/A | $41.09 | 38 | Average pay for layover event | Typo | In backup as $164.30. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | N/A | 6.944 | 38 | Number of layovers in payroll data | Typo | In backup as 6,944. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | N/A | 87 | 38 | Hours per layover event | | Calculation computed differently in backup than described in the report. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | F85 | $32.91 | 38 | Average wage | | Weighted average for sick pay should not be relied upon. |
| Events Calculation 20231016.xlsx | "List of claims (table)" | P38 | $26,390,095 | 38 | Extrapolation through 9/19/2023 | Typo | In report listed as "total over the entire period (through 9/19/2023)" however in Exhibit D the estimation is through 4/10/2023. |
| Events Calculation 20231016.xlsx | "Average Minimum Wage" | | $12.94 | 41 | Time-weighted average minimum wage in Exhibit D | Typo | In the backup the minimum wage is listed as $12.858. |

# Appendix B
## Summary of Errors in Mr. Chasworth's October 16, 2023 Report

| Chasworth Production Relating to 10/16/23 Report | | | Chasworth 10/16/23 Report | | | | |
|---|---|---|---|---|---|---|---|
| File Name | Tab | Column/Cell | Number | Paragraph | Description | Type of Error | Notes |
| CRST 1272-74 Off Duty-Sleeper 20231016.xlsx | "Summary by Date" | X14 | 121,584 | 46 | Total days | | No consideration if the duration of off-duty or sleeper time crosses into the next day. |
| CRST 1272-74 Off Duty-Sleeper 20231016.xlsx | "Summary by Date" | AF6 | $24,376,041 | 49 | Estimation through 9/19/2023 hours>=1 | Typo | In the report the estimation is "through a valuation date of 9/19/2023" but the backup shows the estimation accounts for a period through 4/10/2023. |
| CRST 1272-74 Off Duty-Sleeper 20231016.xlsx | "Summary by Date" | AF7 | $18,751,119 | 49 | Estimation through 9/19/2023 hours>=10 | Typo | In the report the estimation is "through a valuation date of 9/19/2023" but the backup shows the estimation accounts for a period through 4/10/2023. |
| CRST 1272-74 Off Duty-Sleeper 20231016.xlsx | "Summary by Date" | Y9 | 446,130 | 50 | Hours >=20 min | Typo | In report as "446.130". |
| | | | 55,015 | 53 | Workweeks in "1272" & "1274" for "On Duty, Not Driving" | Not in backup production | See p. 27. |
| | | | 8,849 | 53 | Workweeks in "340361" for "ON_DUTY_NOT_DRIVING" & "ON_DUTY_YARD_MOVE" | Not in backup production | See p. 27. |
| Fuel Tax and Trip Data comparison 20231011.xlsx | "matching" | J1 | 55,269 | 56 | Number of order ids common between files 1279 and 0785 | No backup | No codes or formulas to supplement this calculation. |
| Fuel Tax and Trip Data comparison 20231011.xlsx | "Order per workweek - losss" | H8 | 102,057 | 59 | Number of workweeks for drivers in class period | No backup | Number is hardcoded, no codes or formulas to supplement this calculation. |

# Exhibit L

# Expert Opinion on the Work of CRST Drivers

Submitted by:

Dr. Steve Viscelli, Ph.D.
President
Freight Research Inc.

Date: 4.10.23

Table of Contents

*1. Purpose of the Opinion* **3**

*2. Expertise of the Author* **3**

*3. Case Documents Reviewed for this Opinion* **4**

*4. Summary of the Opinion* **5**

*5. This Opinion is Not Intended as Legal Analysis* **6**

*6. Expedited Truckload Work* **6**

*7. CRST's Policy of Paying Drivers by the Mile Shifts the Risk of Inefficiencies and Disruptions onto Drivers* **8**

*8. Non-Driving Tasks That May Not be Compensated* **9**

*9. Estimates of Time Required for Frequent Uncompensated Tasks* **10**

## 1. Purpose of the Opinion

I was asked by class counsel to review documents, testimony, and data associated with this case and offer an assessment of:

1. The tasks required of CRST drivers and the nature of their work;
2. How the compensation system of CRST relates to the tasks performed by drivers and the amount of time required of them;
3. How often and under what circumstances CRST drivers are likely to be completely relieved of responsibility and restrictions to pursue their own activities, even when not driving.

## 2. Expertise of the Author

I am an economic sociologist with approximately 17 years of experience researching the trucking industry and its labor and employment practices. I have extensive training in both qualitative and quantitative methods and use both in my research. I received training in qualitative methods of ethnographic observation and interviewing at Syracuse University (M.A. 2002). I received further training in both qualitative and quantitative methods at Indiana University (Ph.D. 2010).

At Indiana University I completed a dissertation on work and employment relations in the long-haul trucking industry. My dissertation used a wide range of quantitative and qualitative data analysis. After completing my dissertation in 2010, I was awarded a two-year National Science Foundation post-doctoral fellowship to study the effects of the Great Recession on the work and employment opportunities of long-haul truckers. During my post-doctoral fellowship, I became a senior associate at the Center on Wisconsin Strategy (COWS), a think-tank and policy research center. In that capacity over roughly 6 years, I worked with and advised a range of stakeholders in the trucking industry and government on issues of regulation and efficiency in the industry. In particular, I served as an expert for the State Smart Transportation Initiative (a group of state DOT Secretaries interested in "best practices" for state transportation agencies) on issues related to the work of truckers and trucking operations.

Since 2011 I have worked to develop and evaluate public policy related to truck efficiency and job quality. I have presented my research in this area to numerous organizations, government agencies and more than one dozen State Transportation Secretaries. I have advised public agencies and elected officials on trucking issues, including the White House Council of Economic Advisors, US Department of Transportation, US Consumer Financial Protection Bureau, Federal Motor Carrier Safety Administration, US Department of Labor, US Department of Agriculture, Chicago Metropolitan Agency for Planning, the National Science Foundation, California Department of Labor, California Department of Transportation, California Department of Motor Vehicles, California Department of Agriculture, the State of California's Future of Work Commission, the US Government Accountability Office, and US Senators of both major parties.

Currently I am an Associate Professor of Practice in the School of Arts and Sciences and a Faculty Fellow at the Kleinman Center for Energy Policy at the University of Pennsylvania. In my work for the Kleinman Center I serve as an expert on the trucking industry for the Center in its work on energy efficiency. I have also worked for Penn's Wharton School of Business and Penn's Engineering School to develop research programs, conferences on trucking technology and innovation management.

My recent research examines the employment and environmental impacts of self-driving trucks. In recent years I have served as a consultant to state and federal policymakers, Silicon Valley technology firms and investors on use scenarios for self-driving trucks.

In terms of the specific task of assessing the hours worked and work responsibilities of long-haul truck drivers, I am uniquely qualified. In April of 2016, I published a book, entitled "The Big Rig: Trucking and the Decline of the American Dream" with the University of California Press, which explains the changing patterns of work in long-haul trucking since deregulation of the industry in the late 1970s and the development of the current labor practices of the industry. I am currently conducting research on truckers' work and labor market conditions for the state of California.

I have attached a c.v. with my publications and expert testimony to this opinion.

I am being compensated at an hourly rate of $600/hour for my review of the file and analysis.

## 3. Case Documents Reviewed for this Opinion

Case specific documents I have reviewed include:

Dkt 37. Stipulated Protective Order
Dkt 40-1. First Amended Class Action Complaint for Damages
Dkt 41-1. Memorandum of Points and Auth. ISO Motion for Class Cert
Dkt 41-2. Declaration of Keith Huckaby ISO Class Cert
Dkt 41-4. Compendium of Exhibits ISO Plaintiff's Motion for Class Cert. (Vol. I of IV)
Dkt 41-5. Exhibit A_ Compendium of Exhibits ISO Plaintiff's Motion for Class Cert. (Vol. II of IV)
Dkt 41-6. Exhibit A_Compendium of Exhibits ISO Plaintiff's Motion for Class Cert. (Vol. III of IV)
Dkt 41-7. Exhibit B_Compendium of Exhibits ISO Plaintiff's Motion for Class Cert. (Vol. IV of IV)
Dkt 47. CRST's Opp to Class Cert Mtn
Dkt. 60. Order Partially Granting Motion to Certify Class1
5084431_Exhibit_28_ChadBrueck
CRSTF001297 Huckaby Legacy Messages 112019 to 7312019
Deposition of Chad Brueck February 15, 2022
Deposition of Keith Huckaby
CRSTF000205

CRSTF000796-8
CRSTF000807-8
CRSTF001272
CRSTF001279-1301

## 4. Summary of the Opinion

CRST is in the expedited freight business, which involves transporting freight quickly over long distances. Expedited freight hauling is a game of "wait and hurry-up." CRST drivers work in teams; one driver drives while the other remains in the passenger seat or sleeper berth. (The sleeper berth is a compartment in the cab behind the driver and passenger seats that is approximately 5ft by 8ft.).

As CRST policies and instructions to drivers demonstrate, drivers are required to perform non-driving work and wait for potentially long stretches unpaid in preparation for driving. What this means is that CRST drivers are likely to spend significant time performing unpaid non-driving work in comparison to the miles that they drive. This non-driving work includes DOT inspections, other pre- and post-driving inspections, time spent fueling, time at weigh stations, time at customer sites, layover time, breakdowns, and weather delays, among other things. This is not an aberration but the result of the way CRST structures its freight service and compensation.

In addition to driving, there are numerous non-driving tasks team drivers must perform from inspecting and fueling the truck to communicating with managers, assisting their co-driver as they drive and often long stretches of time waiting as their truck is loaded or unloaded, or awaiting dispatch. Such tasks can require many hours of drivers in a typical week. Much of this time will be logged by drivers as off-duty or sleeper berth for the purposes of federal Hours of Service,[1] the safety rules that restrict the driving time of truckers. CRST does not compensate drivers for work performed, wait time or other restricted time spent in these statuses.

CRST shifts the cost of delays and a lack of freight to drivers by only paying based on mileage. CRST's trucks are available to work almost continually, 24 hours a day. While one driver is driving, the other is in the passenger seat or sleeper berth compartment. Drivers are reliant on the truck for transportation and just for a place to be as they are on route across the country. Drivers thus face significant restrictions to pursuing activities of their own choosing. In all but unusual circumstances, CRST's operations and policies mean that drivers are continually on the job once they leave home.

---

[1] Hours of Service is a regulatory scheme under the authority of the Department of Transportation to ensure that drivers get adequate rest and promote safety. The term "off-duty" is not intended in this report to imply one way or the other how such off-duty periods should be understood relative to any particular wage law.

## 5. This Opinion is Not Intended as Legal Analysis

I have studied the work and employment of truck drivers since 2005. Over that time, I have performed extensive comparisons of truckers in different arrangements and segments of the industry on their work and compensation, using data ranging from in-depth interviews and firsthand observations to surveys to industry-level statistics. How workers are paid, how they log their work hours, what non-driving duties and work they perform, and how they are restricted when on route for their employer, have important legal and regulatory influences and consequences. These influences and consequences have necessarily been fundamental considerations in my research. However, no statement in this opinion should be understood as intended to make any assertion about the legality of the practices at issue. I have no formal training in the law and the analysis contained in this opinion is intended only to assist the reader in understanding the economics and organization of work of truck drivers, not to assert how any practice should be understood relative to the requirements of any particular law or regulation.

## 6. Expedited Truckload Work

CRST specializes in freight that needs to move quickly over long distances. This is referred to as expedited freight. For drivers this means lots of work time spent before, after, and in between driving shifts. It includes inspecting and preparing the vehicle, preparing for the route, fueling, time at weigh stations, time spent inspecting the truck when it is stopped in route, time spent during DOT inspections while in route, layovers, breakdowns, waiting time during weather and other delays, waiting or assisting during the loading and unloading of freight, and waiting for loads to become available.

Once freight is ready to move, drivers are under strict time requirements. As the Driver Handbook states:

> "CRST strives for 100% on-time pickup and delivery. To meet customer expectations, transit extends upwards of 50mph."(CRSTF000472)

Transit speeds of over 50 mph are extremely fast during these periods. Drivers work in teams; one driver drives while the other attempts to rest. Drivers will be working and preparing to work continually with the exception of taking care of bodily needs, as the Driver Manual makes clear:

> Team planning requires no shut down periods, except driver swaps, fueling, and breaks. (CRSTF000472)

Customers pay a premium for this fast service and the consequences of being late can be significant, as the Driver Handbook states:

> "If you are late, you run the risk of shutting down a production line or upsetting the customer's schedule. (CRSTF000470)

Truckers like to say: if the wheels aren't turning, you aren't earning. One aspect of expedited freight is that it typically travels very long distances. Long-haul trucking companies or motor carriers refer to the average distance their freight travels as their average length of haul. In recent year, average length of haul for truckload carriers has been less then 500 miles. CRST claims to have the industry's longest average length of haul at 1400-1500 miles CRSTF000250. As CRST Driver Handbook states:

> "We offer the industry's longest average length of haul - 1,400 to 1,500 miles! - This means fewer stops and greater pay for you" CRSTF000250.

While drivers may have fewer stops when working in an expedited operation, they can have lots of waiting time to get loads. This is in contrast to truck drivers working less time-sensitive routes, who often can be pre-assigned a sequence of loads that may keep them busy for several days or longer with little downtime beyond their DOT rest breaks.[2] But this freight service is typically much cheaper for customers than the expedited service performed by CRST drivers.

Expedited drivers, like those at CRST, can wait long stretches for the time-sensitive freight that customers are willing to pay a premium for CRST to move. While this may drive CRST's profits, CRST does not appear to pay its drivers for the waiting its drivers must do to provide this service to CRST's customers. For example, CRST drivers can sit without a load for up to 48 hours before they get paid for waiting, and even then, the wait time is capped at $100 per 24-hour period (Brueck, p.10:10-14). At other truckload firms the norm is if drivers sit without a load for 24 hours, they will be paid layover pay. Similarly, CRST's breakdown pay does not start until after drivers have been unpaid for 48 hours, and again appears to be capped at $100 per 24-hour period after that (Brueck, p.20:20-25).

Drivers still awaiting their first load are not covered by these policies. Mr. Brueck states that such drivers waiting at company terminals are not compensated for that time:

> A. There certainly are times where a driver may be at a company terminal waiting to be dispatched.
> Q. Okay. And are the drivers compensated for that time waiting?
> A. No. Assuming they're out of the truck, they would be logging that as off duty. If they're in the truck they're probably in the sleeper berth. If they're in between loads that falls under our layover policy. (Brueck p.51:2-11).

Additional long waiting could occur if drivers miss an appointment, as the Driver Handbook states:

[2] This report is not intended to offer an opinion as to whether these DOT rest periods are compensable under wage laws.

> Loads that need to be rescheduled could mean that drivers have to wait a day or two while it is rescheduled. (CRSTF000470)

Such long unpaid wait periods for missed appointments would be more rare occurrences at other truckload operations.

## 7. CRST's Policy of Paying Drivers by the Mile Shifts the Risk of Inefficiencies and Disruptions onto Drivers

Employee drivers in long-haul are paid by the mile at CRST.

The fact that CRST pays by the mile is evidenced by the extensive discussion of the mileage pay in CRST's records , such as the document entitled "CRST Expedited Driver Wage Sheet" which drivers are required to sign and consists entirely of a table of mileage pay rates. (CRSTF000060).

In the document titled "Frequently Asked Questions for Company Drivers," the first question is:

> **How many miles can I run?**
> Our average length of haul is approximately 1,400 to 1,500 miles - the longest in the industry! This means more time working and less time waiting. Our commitment to the long-haul market provides you with consistent mileage all year long. Our teams can currently average over 5,000 miles/week. CRSTF000256

The reason this is the first question is because drivers are paid for the miles they run.

CRST drivers may not actually get paid for all of the miles because they split the miles 50/50 with their partner. Their partner gets the other 50%. As the "Frequently Asked Questions for Company Drivers," states:

> **When driving as a team, who gets paid for which miles?**
> You and your co-driver are paid based on the "split mile" method. As part of a team we want you to work together as a true team. Therefore, you will be paid half of the total miles the truck runs each week. We split the miles, not your pay. As an example, if you and your co-driver "run" 6000 miles in a week., you will be paid for 50% of the miles or 3000 miles. CRSTF000258.

The policy of paying by the mile is a legacy of when truckers were hard to monitor. Unable to know what truckers were doing, carriers incentivized them by paying for the miles they drove. Today, of course, drivers like those at CRST, are constantly monitored by sophisticated technology that allows employers to know exactly where they are and whether they are driving. Mileage pay persists, however, because it allows carriers to shift the risk of inefficiencies and disruptions onto drivers, by not paying them for extra

work required because of inefficiencies such as breakdowns, traffic, weather and customer delays.

**8. Non-Driving Tasks That May Not be Compensated**

For a CRST driver, the activities and other work required to perform safely and competently include (among others certainly):

- Waiting to be assigned a load or for an assigned load to be available
- Waiting for information required to complete an assigned load
- Attending while a truck is loaded or unloaded.
- Attending a truck and trailer to ensure security of load and truck
- Waiting to enter a dock or facility
- Communicating with shipper and consignees' employees
- Qualcomm (or similar device) and/or phone communications with carrier (e.g. driver manager)
- Logging Hours of Service
- Completing and mailing shipment paperwork
- Unloading or assisting in the unloading of a trailer (e.g. counting freight)
- Hiring and managing labor to unload a trailer
- Cleaning a trailer
- Loading or unloading equipment (e.g. pallets)
- Scaling loads
- Placarding loads containing hazardous materials
- Travel route planning
- Work schedule planning
- Finding parking using guides, cb radio, internet or other means
- Mandatory pre-trip inspections of truck and trailer
- Completing trailer inspection forms
- Less frequent inspections of tractor and trailer in the course of work
- Post-trip inspections
- Fueling the truck
- Checking engine oil
- Washing windows and mirrors
- Monitoring and securing of freight
- Making minor repairs to the truck (e.g. blown lights)
- Taking the truck in for repairs and maintenance (e.g. new tires, oil changes, etc.)
- Filling out reimbursement paperwork
- Washing, cleaning and organizing the truck
- Purchasing supplies
- Record keeping
- Updating and coordinating with co-driver
- Dealing with damage or missing claim for freight
- Updating and coordinating with co-driver
- Attending safety and other meetings
- Submitting to drug, alcohol and other forms of testing

- Observing unloading
- Counting freight
- Inspecting freight
- Dealing with missing or damage freight claims
- Trailer tasks (e.g. opening, closing and securing doors; choking tires)

**9. Estimates of Time Required for Frequent Uncompensated Tasks**

There are a number of regular tasks beyond the waiting discussed above that can take substantial amounts of time:

- Fueling – CRST recommends that drivers plan to fuel every 900 miles and top of before trips begin (CRSTF000472). As the Driver Handbook suggests, drivers should expect this to take at least 30 minutes (CRSTF000472). When drivers have to wait to enter the fuel island and need to deal with dirty windows and mirrors and need to add fuels or take care of other tasks and find parking, I estimate based on my professional research and observations that fueling can take as much as an hour.
- Scaling – Drivers are responsible for ensuring the overall weight of the truck and distribution of the weight on the axles meet legal requirements. We can think of this process as having a set of steps that may need to be repeated. First, a driver has to get to a scale. If there as one available at the customer location, it will tend to be quicker than if they need to go to elsewhere. Either way, once they have the results of the scaling, they may need to adjust the trailers tandem wheels and/or fifth wheel (the plate on the tractor that attaches to the front of the trailer). Once adjustments are completed, they need to reweigh the truck to see if it is now legal. If not, the process needs to be repeated. Often scales are not available on customer locations and drivers may need to do a significant amount of driving to get to one. Unfortunately, more problematic scalings can happen. In some cases, trailer tandems may be stuck and require maintenance. Or, equally time-consuming, the problem may ultimately be the result of the way that the trailer was loaded and can't be fixed by sliding the tandems or fifth wheel. In that case, the driver must return to the shipper and have the freight rearranged. This process can take hours. I estimate based on my professional research and observations that it would be reasonable to expect more routine scalings to require 20-30 minutes, and more time-consuming ones to take longer.
- Breakdowns – while CRST states that it compensates for breakdowns after drivers are unable to drive for 48 hours, drivers are also required to deal with smaller and more frequent maintenance and breakdown issues. These can include preventive maintenance that may take just a few hours and common roadside issues, like blown tires. In such cases, drivers may have to route through a company terminal for work that could take hours or most of a day. In the case of roadside service, drivers need to safely park the truck, communicate with CRST and service providers, deploy safety triangles and waiting while the truck is serviced. Tire replacement, the most common roadside service can take several hours.

- Inspecting the truck is required at several points through the day (CRSTF000502). I estimate based upon my professional research and observations that an inspection which complies with CRST's stated expectations, as detailed in the Driver Handbook (CRSTF000506-10), should take, at a minimum, between 30 and 45 minutes.
- In addition to the inspections described in the foregoing, truck drivers, including those at CRST, will need to undergo inspections by DOT personnel. The CRST Driver Handbook states that these inspections typically take between 30 and 60 minutes. (CRSTF000505). I concur with this estimation.

April 2023

Steve Viscelli

Presidents
Freight Research Inc.

Physical Address:
140 Forest Trail
Old Forge, NY 13420

Mailing Address:
P.O. Box 72
Old Forge, NY 13420

steveviscelli1@gmail.com
www.steveviscelli.com
cell: 215-275-6499

## Academic Appointments

| | |
|---|---|
| 2022-Present | University of Pennsylvania<br>*Associate Professor of Practice,* Department of Sociology<br>*Faculty Fellow*, Kleinman Center for Energy Policy |
| 2016-2022 | University of Pennsylvania<br>*Lecturer*, Department of Sociology<br>*Faculty Fellow*, Kleinman Center for Energy Policy |
| 2012-2016 | Swarthmore College<br>*Visiting Assistant Professor* |
| 2010-2012 | University of Wisconsin – Madison<br>*National Science Foundation/American Sociological Association Postdoctoral Fellow in Economic Sociology* |

## Education

| | |
|---|---|
| Ph.D. | Department of Sociology, Indiana University, 2010 |
| M.A. | Department of Anthropology, Syracuse University, 2002 |
| B.A. | Colgate University, cum laude, with honors in Philosophy, 1996 |

## Books

*The Big Rig: Trucking and the Decline of the American Dream.* Berkeley: UC Press, 2016.

- *Richard A. Lester Book Award for the Outstanding Book in Labor Relations and Labor Economics* from Princeton University's Industrial Relations Section (2017)
- *Distinguished Scholarly Book Award* from the American Sociological Association's Section on Labor and Labor Movements, co-winner (2017)
- *Max Weber Award for Outstanding Book of the Year* from the American Sociological Association's Section on Organizations, Occupations and Work (2017)
- *Outstanding Book Award* from the American Sociological Association's Section on Inequality, Poverty and Mobility (2017)

Media coverage in: *The Wall Street Journal, The Washington Post, The New York Times, The Atlantic, BusinessWeek, Money, BBC Newshour, Time, Forbes, NPR Radio Times, The Economist, NPR's Planet Money, Transport Topics, Supply Chain Digest, FleetOwner, Arkansas Democrat Gazette, Long Beach Press Telegram, The Pennsylvania Gazette, Trucks.com, Landline, Industry Watch, Truckers News, Sociological Images, Heartland Politics, In the Workplace, Knowledge at Wharton, Thinking Aloud, Road Dog Radio, Penn Current, The Ringer, PBS Newshour, Frontline, CBS 60 Minutes, In These Times.*

Reviews in: *Work and Occupations, American Journal of Sociology, Contemporary Sociology, Labor Notes, Men and Masculinities, Labor, Journal of American Culture, Journal of Working Class Studies.*

*Driverless: Autonomous Trucks and the Future of the American Trucker.* Book manuscript in progress.

## Articles and Chapters

"Assessing the Impacts of Self-Driving Trucks on Truckers." *Industrial and Labor Relations Review.* August, 2022.

"Policy, Worker Power and the Future of the American Trucker." *American Behavioral Scientist.* November, 2021.

"Will Robotic Trucks be 'Sweatshops on Wheels.'" *Issues in Science and Technology.* Fall 2020.

"The Trouble with Trucking." In *Shifting to the High Road: Improving Job Quality in Low-wage Industries.* Edited by Paul Osterman. Cambridge, MA: MIT Press. 2019.

"Truck Stop: How One of America's Steadiest Jobs Turned into One of Its Most Grueling." *The Atlantic*. May, 2016.

## Reports, Briefs, and Public Comments

*Sustainable Transportation* in *Putting California on the High Road: A Jobs and Climate Action Plan for 2030.* UC Berkeley. With Richard France and Carol Zabin. September, 2020.

*Comment to the Federal Motor Carrier Safety Administration on Suggested Changes to Hours of Service Regulations*. October 9th, 2018.

*Brief of Amicus Curiae in New Prime v Oliveira,* submitted to the Supreme Court of the United States, Steve Viscelli, et. al. 2018.

*Driverless? Autonomous Trucks and the Future of the American Trucker*. Labor Center, UC Berkeley and Working Partnerships USA. 2018.

*Effect of Automated Trucks on the Truck Driver Workforce.* National Science Foundation. Authors: Jeffery Hickman; Levy, Frank; Burks, Stephen; Viscelli, Steve; Lee, John. 2018.

*Mobility 21: Strategic Investments for Transportation Infrastructure and Technology.* Computing Community Consortium. Contributing Author. 2017.

*Stalled: Make Big Trucks More Fuel Efficient with Smarter Infrastructure Investments*. Kleinman Center for Energy Policy. 2017.

*A Road Map to Wisconsin's Climate and Energy Future.* Wisconsin Academy of Sciences, Arts and, and Letters. Contributing Author. 2014.

*Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis.* Center on Wisconsin Strategy. 2012.

**Film and TV**

*The Last Mile*. Full-length Film. Appearance and Producer. In development

*CNN+*. Segment on Truck Driver Shortage. In production

*NBC Nightly News with Lester Holt.* Segment on Truck Driver Training. In production.

*Last Week Tonight with John Oliver*. Appearance and Consulting. 2022

*Chain Reaction: Why Global Supply Chains May Never Be the Same.* Wall Street Journal. Full-length Documentary. Appearance and consulting. 2022

*The Age of AI,* PBS Frontline, Full-length Documentary. Appearance and consulting. 2019

*King of the Road.* CBS 60 Minutes. Segment. Appearance and consulting. 2019

*PBS Newshour.* Appearance. December 6th, 2018.

**Grants**

National Science Foundation, *The Future of Trucking: Pathways to Positive Societal Outcomes,* 2022-2025, $108,000.

State of California (Various Agencies), *Agricultural Truck Driver Shortage Survey,* 2021-2023, $350,000

Washington Center for Equitable Growth, *Labor Markets for Last-mile Delivery,* 2020-2022, $58,000

Washington Center for Equitable Growth, *Last-mile Delivery in the COVID-19 Crisis,* 2020, $6,000

Sloan Foundation, *Technology and Outsourcing in Last-mile Delivery,* 2020-2022, $223,545

Environmental Defense Fund, *Carbon Emissions and the Future of Freight*, 2019-2020, $38,000

Ford Foundation, *The Platform Economy and the Future of the City,* 2018-9, $10,000

Heinz Foundation, *Future of Work in Freight Transportation,* 2018-21, $40,000

UC Center for Labor Research and Education, *Labor Impacts in Transportation of California's Climate Plan*, 2018 $28,000

UC Center for Labor Research and Education, *Autonomous Truck Employment Impacts Project,* 2017-8, $30,500

Working Partnerships USA, *Autonomous Vehicle Research Project,* 2017-8, $45,000

Mellon Environmental Studies, *Curriculum Grant,* Swarthmore College, 2013, $5,000

Lang Center Civic & Social Responsibility, *Curriculum Grant*, Swarthmore College, 2012-2013, $5,000

W.E. Upjohn Institute for Employment Research, *Mini-Grant*, 2011. $4,500

**Awards and Fellowships**

NSF/ASA *Postdoctoral Fellowship in Economic Sociology*, U. of Wisconsin, 2010-2012

Department of Sociology, *Advanced Departmental Fellowship*, Indiana University, 2005-2006

Department of Sociology, *Ph.D. Qualifying Exam Pass with Honors*, Indiana University, 2004

Maxwell School of Citizenship and Public Affairs, *Recipient, Goekjian Summer Research Grant,* Syracuse University, 2001

Department of Anthropology, *Ph.D. Qualifying Exam Pass with Distinction in Theory*, Syracuse University, 2000

Colgate University, *Donald C. Cerri Memorial Scholarship*, 1992-1996

Colgate University, *Patriot League Scholar Athlete Award*, 1993-1995

**Editorials**

"We Need Ethnography of Labor Markets More Than Ever." *Inequality, Poverty, Mobility Newsletter*. Summer, 2018.

"The Real Injustice of the ELD Mandate." *Trucks.com*. December 6th, 2017.

"Truckers Fleeing the Road Due to Missed Holidays and Low-Pay." *Trucks.com.* June 30th, 2017.

**Book Symposia and Reviews**

"AI and the Study of Work." *Industrial and Labor Relations Review.* May 2020.

Review of *When Good Jobs Go Bad: Globalization, De-unionization, and Declining Job Quality in the North American Auto Industry*, by Jeffrey S. Rothstein. *Work and Occupations*. Forthcoming.

Review of *Negotiating Work, Family, and Identity among Long-haul Christian Truckers: What would Jesus Haul?* by Rebecca Upton. *Contemporary Sociology*. 47(4):502-503. July, 2018.

**Invited Talks/Panels**

* "The Past, Present and Future of the Trucker Shortage." Uber, Freight Fest, April 2022.
* "Where did the Trucker Shortage Come From." George Washington University, March 2022.
* "Technology Innovation and the American Trucker." Teamsters Illinois Joint Council, February 2022.
* "Technology Innovation and the American Trucker." UPS Advanced Technology Group, January 2022
* "Technology Innovation and the American Trucker." Volvo EdgeTalk Series, October, 2021.
* "Autonomous Vehicles: Freight." Self-Driving Car Summit Series. Princeton University, May 2021.
* "Worker Voice and Technology." Washington Center for Equitable Growth, April, 2021.
* "Building Forward Better in Transportation." Keystone Research Center, March 2021.
* "How will Robot Trucks Change American Life?" Zocalo, January 2021.
* "Freight Transportation in the Public Interest" Webinar. Solutionary Rail. June 2020.
* "Future of Transportation" Panel, California Future of Workers Summit. Sacramento, CA February 11, 2020.
* "The Environmental Impacts of Autonomous Trucks." BlueGreen Alliance, Washington, DC, October 29, 2019.
* "The Quality and Future of Freight Jobs." California Future of Work Commission, Palo Alto, CA. October 10th, 2019.
* "The Quality of Supply Chain Jobs." Labor Research Action Network. Cleveland, OH. June 13th, 2019.

* "Economic Impacts of Autonomous Trucks." Consortium for Science, Policy & Outcomes. Washington, DC. February 14th, 2019.
* "The Future of Goods Movement." Delaware Valley Regional Planning Commission. December 10th, 2018.
* "A Laboratory of Democracy in a Land of Predation." Cornell ILR/Rutgers Symposium on Federalism in US Work Regulation. School of Management and Labor Relations, Rutgers University. November 8th, 2018.
* "Goods Movement and the Climate." Architecture League. New York, New York. November 3th, 2018.
* "Energy in Transportation." Wharton Energy Conference. Philadelphia PA. October 26th, 2018.
* "Towards a Workers' Agenda for New Technology: Research, Policy, and Organizing." EARNCon, Chicago October 5th, 2018.
* "Automation and Impacts on Low and Moderate Wage Workers." Federal Reserve Bank Reinventing our Communities Conference. Baltimore, MD. October 3rd, 2018.
* "Cargo and Logistics." Labor in Climate Transition. UC Labor Center. Berkeley, CA. September 12th, 2018.
* "Driverless? Autonomous Trucks and the Future of the American Trucker." Heinz Foundation's Future of Work Project Advisory Meeting. Pittsburgh. August 9th, 2018.
* "Driverless? Autonomous Trucks and the Future of the American Trucker." International Brotherhood of Teamsters' National Legislative Conference. Washington, DC. July 17th, 2018.
* "Driverless? Autonomous Trucks and the Future of the American Trucker." Virginia Tech National Science Foundation Autonomous Truck Workshop. Alexandria, VA, June 29th, 2018.
* "Driverless? Autonomous Trucks and the Future of the American Trucker." International Brotherhood of Teamsters' Joint Council 7 Annual Seminar. Lake Tahoe, CA. June 12th 2018.
* "Driverless and Door-to-Door: Autonomous Trucks, Ecommerce and the Future of the American Trucker." MIT, Institute for Work and Employment Research. May 8th, 2018.
* "Predatory Employers, Vulnerable Workers: How Unrestrained Employer Power Increases Inequality." University of Texas – Austin, Inequality Working Group, March 29th, 2018.
* "Autonomous Vehicles and Labor: Where is the common ground?" Uber. December 19th, 2017.
* "Predatory Employers, Vulnerable Workers." UMass Amherst, Department of Sociology. September 13th, 2017.
* "Independents: Past, Present and Future." Uber Freight. March 30th, 2017.
* "Over-the-Road Truckload: The Good, the Bad and the Ugly and What Self-Driving Trucks Could Do About Them." Otto. March 30th, 2017.
* "The Role of Ethnography in Understanding Worker Misclassification." Labor Relations, Law, & History/International & Comparative Labor Research Seminar, ILR, Cornell University. March 21st, 2017.
* "The Big Rig: Studying Class Power in the Field." Institute for the Study of Societal Issues and the Labor Center. UC Berkeley. September 21st, 2016.
* "Build It and They Will Come: Lessons from CBL Project-based Classes." The Third Annual Community Based Learning Lecture at Johns Hopkins University. Baltimore, MD. April, 2015.
* "Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis." State Smart Transportation Initiative Meeting, Salt Lake City, Utah. October, 2014.
* "Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis." North American Council on Freight Efficiency Meetings. Indianapolis, IN May, 2012.

- "Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis." State Smart Transportation Initiative Meeting, Seattle, WA. February, 2011.

**Conference Organizing**

Co-organizer, *The Platform Economy and the Future of the City,* Annenberg School of Communication. University of Pennsylvania, March, 2019.

Co-organizer, *Moving America Forward: The Next Generation of Truck Freight Transport*. Mobility21, University Transportation Center and the Kleinman Center for Energy Policy, University of Pennsylvania, October, 2018.

Co-organizer, *Connected Vehicles Conference;* Wharton School of Business, Program on Vehicle Mobility and Innovation, Mack Institute for Innovation Management, June, 2017.

**Conference Presentations**

- "AI, Automation and Equity in Goods Movement." ASA Annual Meetings, August 7th, 2021.
- "Building Back Better in Trucking." Industry Studies Association, June 3rd, 2021.
- "Driverless? Autonomous Trucks and the Future of the American Trucker." ASA Annual Meetings, August 5th, 2020.
- "Driverless? Autonomous Trucks and the Future of the American Trucker." Industry Studies Association, June 5th, 2020.
- "Driverless? Autonomous Trucks and the Future of the American Trucker." Labor Employment Relations Association, Cleveland, OH. June 14, 2019.
- "Driverless? Autonomous Trucks and the Future of the American Trucker." Moving American Forward Conference. University of Pennsylvania. October 24th, 2018.
- "Making Time to Talk: Working with Reporters." ASA Annual Meeting. Philadelphia, PA. August 2018.
- "The Big Rig: Class Power in Deregulated Labor Markets." Presidential Panel on Ethnography, ASA Annual Meeting. San Francisco, CA. August, 2014.
- "The Socioeconomic Mobility of Jewish Immigrants in the 20th Century." ASA Annual Meeting. San Francisco, CA. August, 2014. With Rachel Ellis, Kristin Geraty, and Melissa Wilde.
- "The Socioeconomic Mobility of Jewish Immigrants in the 20th Century." 2013 annual meeting of the *Society for the Scientific Study of Religion*, Boston, MA. With Rachel Ellis, Kristin Geraty, and Melissa Wilde.
- "Shifting Risk in the Great Recession." ASA Annual Meeting. Denver, CO. August 2013.
- "Constructing the Small Business Owner: The Role of Symbolic Boundaries in Shifting Employment Relations." Junior Theorists Symposium, Las Vegas, NV. August, 2011.
- "Self-Employed in the New World of Work: Independent Contracting and Worker Control in Trucking." ASA Annual Meeting, Las Vegas, NV. August, 2011.
- "Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis." Industry Studies Association Meetings, Pittsburgh, PA. June, 2011.
- "Why do Long-Haul Truckers become Owner-Operators?" Culture, Politics and Economy Workshop, University of Wisconsin. December, 2010.

- "Getting It from Here to There: Urban Truck Ports and the Coming Freight Crisis." Center on Wisconsin Strategy, University of Wisconsin. November, 2010.
- "Ready to Call Your Own Shots? Taxes, Class, and Symbolic Boundaries in Long-Haul Trucking." ASA Annual Meeting. August, 2010.
- "Buying It: Class, Culture, and the Making of Owner-Operators in Long-Haul Trucking." Culture and Interaction Workshop, University of Pennsylvania. May, 2010
- "More Ways to Skin a Cat: How Tax Laws Affect Competition and Workers in Long-Haul Trucking." Social Science History Association Meeting. November, 2009
- "A Computer Won't Breathe Down Your Neck: Dignity and Surveillance in the Long-haul Trucking Industry." ASA Annual Meeting. August, 2008
- "Strange Bedfellows: Coalition Formation, Organizational Characteristics and Strategic Advantage." ASA Annual Meeting. August, 2005.
- "Strange Bedfellows: Coalition Formation, Organizational Characteristics and Strategic Advantage." Political, Economic and Cultural Sociology Workshop, Indiana University. May, 2004

**<u>Service</u>**

Reviewer for:

University of California Press
UC Davis Transportation Center
Sociological Compass
Work and Occupations
Contemporary Sociology
Industrial and Labor Relations Review
American Journal of Sociology
Journal of Artificial Intelligence Research

**<u>Consulting and Policy Work</u>**

*Consulting*, various and on-going. Providing advice to a wide range of policymakers and organizations on labor, energy efficiency and automation in the freight industry. Including: Pennsylvania Department of Transportation, California Departments of Labor, Agriculture, and Transportation, US Department of Transportation, Federal Consumer Protection Bureau, US Department of Labor, US Government Accountability Office, Federal Motor Carrier Safety Administration, New York State Attorney General, California Attorney General, Senator Marco Rubio, Senator Chuck Schumer's Office, White House Council of Economic Advisors.

*Expert Witness,* Providing expertise in lawsuits and arbitrations regarding truck drivers. Producing expert reports and testimony to assist courts and arbitrators in understanding the work and labor market behavior, work hours, and compensation of truck drivers.

*Blakley v. Celadon Group, Inc.,* 1:16-cv-00351 -LJM-TAB (U.S. Dist. Ct, S.D. Ind.)

*Blodgett v. FAF, Inc.,* 2:18-cv-00015-DCLC-DCP (U.S. Dist. Ct, E.D. Tenn.)

*Browne v. P.A.M. Transport, Inc.,* 5:16-cv-5366 (U.S. Dist. Ct, W.D. Ark.)

*CTA v. Becerra,* Case No. 3:18-cv-02458-BEN-BLM (U.S. Dist. Ct, S.D. Ca.)

*Ayala v. U.S. Xpress Inc.,* 5:16-cv-00137 (U.S. Dist. Ct, C.D. Cal.)

*Cilluffo v. Central Refrigerated Services Inc.,* 5:12-cv-00886 (U.S. Dist. Ct, C.D. Cal.)

*New Prime v. Oliveira*, 17–340 (U.S. Supreme Court)

*Canava v. RDS Inc.,* Case No. 5:19-cv-00401-JGB (KKx)

*Roberts et. al v. TransAm Trucking Inc.,* Case 2:21-cv-02073-JWB-GEB

Chicago Metropolitan Agency for Planning, *Expert Consultant*. 2017. Provided expertise and information on new technologies for freight transportation, including autonomous vehicles, to develop a regional transportation plan for the Chicago region (GOTO 2050).

Driftless Region Food and Freight Project, *Steering Committee Member,* 2015-2016. Provided expertise on freight logistics. Project funded by U.S. Department of Agriculture with goal of bringing together stakeholders to create more efficient and sustainable supply chains for local and regional produce in the Upper Midwest, particularly Chicago.

Center on Wisconsin Strategy, *Senior Associate*, 2012-2016. Provided expertise on the trucking industry to public and private stakeholders, including the State Smart Transportation Initiative, a working group of state DOT executives.

**Previous Research and Work Experience**

Center for Urban Ethnography, UC Berkeley, *Research Assistant*, 2001-2002
Assisted Professor Martin Sanchez-Jankowski in research on gangs, urban poverty, and health risks of urban poverty in Northern and Southern California.

Forest Communities Project, *Director,* Oakland, CA, 1998-1999
Designed and directed campaign under the fiscal sponsorship of Rainforest Action Network to develop US market support for local sustainable forestry initiative in the Slocan Valley of British Columbia. Directed all aspects of campaign including developing strategy for consumer education and media, acquiring funding, writing literature, and corporate and media relations.

BC Wild, *Project Consultant*, Vancouver and Atlin, British Columbia, Fall 1998
Worked with NGO in Vancouver and Tlingit First Nation in Atlin on a campaign to protect local native salmon fisheries in British Columbia, Yukon Territories and Alaska from pollution by international mining operations. Provided guidance on designing international efforts to support grassroots campaign.

Natural Resources Defense Council, *Researcher,* Washington, DC, 1997-8

Worked with Rainforest Action Network and Greenpeace on successful campaign for the protection of six million acres of ancient temperate rainforest in British Columbia and NRDC's Forest for Tomorrow Initiative and represented NRDC at conferences, meetings and other public forums. Wrote briefs and developed strategy for consideration by senior staff, including Robert Kennedy, Jr., on topics including: international market trends, the Forest Stewardship Council, US trade policy, corporate profiles, and consumer and media campaign strategies.

American Rivers, *Hydropower Reform Coalition Assistant*, Washington, DC, Fall 1996
Researched successful legal appeal of Federal Energy Regulatory Commission (FERC) ruling of non-jurisdiction pertaining to four hydropower dams in an effort to protect the American eel fishery in Maine. Developed guidance literature on model legal language for use by grassroots organizations in settlement agreements with FERC.

## **<u>Teaching</u>**

Current Courses:

- *Classical Sociological Theory* – Introductory course to sociological theory until the 1970s
- *Field Methods* – Advanced undergraduate and graduate methods course covering research design, participant observation, interviewing and qualitative data analysis

Past Courses:

- *Rich and Poor* – Introductory course on work, economic inequality and policy in the US
- *Social Stratification* – Undergraduate course on the Sociology of Race, Class, and Gender
- *Sociology of the US Labor Movement* – Advanced undergraduate course covering theories of the US labor movement
- *Social Problems and Public Policy: Educational Inequality in Philadelphia* – Introductory course about educational inequality in Philadelphia, includes substantial community-based learning with partner elementary school
- *Social Problems and Public Policy: The Underclass* – Introductory course about sociological conceptions of the "underclass" from the Moynihan report to the present
- *Social Problems and Public Policy: The War on Drugs* – Introductory course about the public policy of the war on drugs and mass incarceration

Pueblo of Tesuque Headstart, Teacher's Assistant. Fall 1995.

# Exhibit M

I, Sean Chasworth, declare as follows:

1. This is a report pursuant to FRCP 26 written by Sean Chasworth in support of class certification in the matter of *Huckaby vs. CRST Expedited, Inc.,* Case No. 2:21-cv-07766-ODW-PD, United States District Court, Central District of California. I am over the age of 18 and a citizen of the United States. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness could and would testify truthfully and competently to those facts.

2. I am a data analyst with Phillips, Fractor & Company, LLC ("PFC"), which offers consulting services to companies, government agencies, and other organizations as well as expert witness and consulting services in support of litigation, primarily in the areas of statistics, economics, finance, and survey/questionnaire related research. I have worked with PFC (and its predecessor firms) for over fifteen years, during which time I have performed database management, statistical reporting, and analysis on over one hundred databases.

3. I have given deposition testimony, testified in Federal District court, various administrative courts, and in arbitrations, and submitted numerous declarations for state and federal court actions regarding my opinions and methodology. I have a Bachelor of Arts degree in mathematics from the University of Redlands and have passed numerous professional examinations. Prior to my tenure at PFC, I was a mathematics teacher in California public schools, a pension analyst (for which I passed numerous actuarial examinations), and a financial analyst (for which I passed examinations toward the Chartered Financial Analyst credential from the CFA Institute). My current CV and a list of recent testimony is attached at Exhibit A.

4. PFC (and its predecessor firms) has provided consulting and expert services on numerous litigation matters, including California wage and hour class action matters, and has been retained by both plaintiffs and defendants. In many of these cases, I have consulted on data collection and analysis issues to assist with the quantitative assessment of potential liability and class-wide economic losses.

5. We have been engaged by counsel for plaintiffs in this matter. PFC is not engaged on a contingency basis for this case, and my compensation is not dependent on the outcome of this litigation. My hourly rate for this engagement is $350 per hour for both analysis and testimony. The

engagement letter and recent invoices on this matter is attached as Exhibit B.

**Summary of Opinions**

6. An analysis of various claims of unpaid time, including employee payroll information, based on employee pay rates, resulted in a calculation of up to $50,748,909 of unpaid wages directly from the data, and $9,532,774 of estimated unpaid wages for the time period up through 9/19/2023, for a total of $60,281,683. Interest on these amounts through 9/19/2023 is an additional $18,425,975, for a total of $78,707,658.

7. A review of driver log data found up to 469,274 hours of events where drivers were out of state, but either in a DOT "off-duty" or "sleeper berth" designation, while the truck was stationary. If this time is considered compensable under applicable wage laws, then based on employee pay rates, the potential unpaid wages would be $9,734,385 from the period of time covered by the data, or $20,267,862 if extrapolated to the entire class period through 9/19/2023.

8. A review of wage statements and trip records from one driver revealed differences in the miles actually driven compared to the miles paid as documented in their pay stubs, resulting in $22.76 per pay period of unpaid earnings.

**Description of Data**

9. We were provided a file labeled "CRSTF001276", which contains employee pay information, in the form of "Payroll Master" and "Adjustments" data. The "Payroll Master" information contains 189,257 records, with one record likely representing a single check issued to an employee. The "Adjustments" information contains 714,897 records, each of which contains one "adjustment" to an employee payroll period. These two data sources contain 2,813 employees, as identified by unique "pay_id". Of those, 489 were identified as a member of the *Montoya v. CRST Expedited, Inc.*, Case No. 16-cv-10095-PBS (D. Mass.) ("*Montoya*") class, with 2,324 other employees used for subsequent analysis. The "paryl_date" of this data ranges from 9/6/2006 to 8/1/2019 (and a single record dated 10/29/2019).

10. Additional pay stub data was provided in a file labeled "CRSTF001278", containing "Payroll Master" and "Adjustments" information. The "Payroll Master" information contains 60,783

records, and 3,726 unique "payee_id" values. The "Adjustments" information contains 151,928 records, each of which contains one "adjustment" to one of 2,499 employees, as identified by unique "driver_id". Of those, 578 were identified as a member of the *Montoya* class, with 3,148 other employees used for subsequent analysis. The "paryl_date" of this data ranges from 8/2/2019 through 9/30/2022.

11. Driver log data was provided in four files, labels CRSTF001272 through CRSTF001275. The files have different fields of information, ranging from 250 different fields in the '1272' file to 35, 36, and 32 fields in the '1273', '1274', and '1275 files, respectively. Each record in each of these files contains a single log entry for a single driver, including a status code (usually "Driving", "On Duty", "Off Duty", or "Sleeper Berth") and the timestamp when the driver began that status activity, and the duration the driver remained at that status code. Some of the files contain location information, truck odometer information, and other information relating to a driver's daily activities.

12. A list of documents reviewed for the preparation of this report has been attached as Exhibit C.

**Analysis of Data**

13. Loss amounts for the various claims are often calculated using a number of times per work week a given event occurred. Accordingly, the total number of pay periods and work weeks for a class member are calculated by examining the number of pay periods in the payroll data, where a given class member is paid. In order to calculate the loss from claims which occurred on a daily basis, we estimated a number of employee days worked by the class, assuming a 5-day workweek. Payroll information from pay periods ended 8/8/2017 to the extent of the payroll data (9/30/2022), covering employees who were identified on the class list, were considered for this calculation. In all, we calculated a total of 90,322 work weeks, and 451,610 work days for the class as a whole, from the data. Note that calculations of these amounts may appear slightly different due to rounding.

14. To account for time worked after the end of the payroll data period, up through a valuation

date of 9/19/2023[1], I estimated by dividing the total days identified above, by the average number of driver days over the payroll data period (8/9/2017 to 9/30/2022, or 1,878 days), calculating an average 'employees per calendar day' of 451,610 / 1878 = 240.47, and 'employees per work week' of 48.09. I then estimated post-data employee workdays and workweeks by multiplying these rates by 353 days in the extrapolation period from 10/1/2022 through 9/19/2023, giving an additional 84,887 additional days, and 16,977 additional weeks, for a total of 536,497.29 days, and 107,299,46 work weeks.

15. Average hourly wages were determined from "Sick Pay" transactions from the CRSTF001278 payroll data. A total of $28,211.20 of sick pay, representing 1360 hours (as found in the "units" field), give a weighted average hourly rate of $20.7435 per hour.

16. Interest on any form of unpaid wages is calculated at 10 percent simple interest. Interest is calculated assuming that the rate of unpaid wages accrues evenly over the class period, and therefore is estimated using the midpoint of the applicable date range for each calculation, to a valuation date of 9/19/2023.

17. Refueling. CRST's Safety and Operations Handbook provides that vehicles should be refueled after 900 miles (CRSTF 000472). Further, the class members here work in tandem, enabling the vehicle to be driven for in excess of 900 miles per workday. Accordingly, I have been asked to assume that the vehicle is refueled once per work day. The CRST Safety and Operations Handbook (CRSTF000472) further states that a refueling stop has a "minimum time per stop equals a minimum of 30 minutes" (sic). As Dr. Viscelli explains in his industry report, the fueling process can in fact take as much as an hour when considering wait time to enter the fuel island and other tasks that may need to be taken care of there. Nonetheless, I assume 30 minutes of unpaid time per work day per driver to refuel. In total, from the data provided by CRST, there are 451,610 days x 0.5 hours/day = 225,805 hours of unpaid time worked by the class, for a total of 225,805 hours x $20.7435/hour = $4,683,993 of unpaid wages to the class, and additional interest of $1,658,153, for a total of $6,342,145. This

[1] 9/19/2023 is the trial date in this case. After completing the calculations for this report I was informed that the court issued an order 4/10/2023 amending the class period so that it would run through 4/10/2023 rather than 4/10/2023. I anticipate modifying my calculations accordingly.

figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional amounts after the end of the data period are $880,431, with interest of $42,545, for a total over the entire period (through 9/19/2023) of $7,265,121.

18. Inspections by the DOT and other Law Enforcement. From the Adjustments information in the payroll data, we find that bonus pay for a passed inspection (as indicated by a "DB" code, as shown in the file named "5084431_Exhibit_26_ChadBrueck", and the earlier) occurs an average of 0.0239 times per work week in the CRSTF0001276 data, or a total of 90,322 x 0.0239 = 2,160 passed inspections. CRST's Safety and Operations Handbook states that these inspections "will take between 30 and 60 minutes to complete." (CRSTF000505). Accordingly, I have been asked to assume that an inspection of this type takes 45 minutes, or 0.75 hours. In total, from the data provided by CRST, there are 2,160 inspections x 0.75 hours/inspection = 1,620 hours of unpaid time worked by the class, for a total of 1,620 hours x $20.7435/hour = $33,608 of unpaid wages to the class, and additional interest of $11,897, for a total of $45,505. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional amounts after the end of the data period are $6,317, with interest of $305, for a total over the entire period (through 9/19/2023) of $52,127. Note that these amounts are likely underestimated, as the payroll data does not include other delays of this type that do not result in a documented passed inspection.

19. We have calculated an amount of $17,075 in bonus payments for passed inspections from the payroll data. I have not been informed whether or not these payments are considered a discretionary or non-discretionary bonus.

20. Breakdowns. From the Adjustments information in the payroll data, we find that a "BK" code, as shown in "5084431_Exhibit_26_ChadBrueck", occurs an average of 0.0592 times per work week in the CRSTF0001276 data, or a total of 90,322 x 0.0592 = 5,345 events. The average pay for these events is $145.39. The deposition of Chad Breuck, pg. 22, lines 10-14, state that these breakdown adjustments are paid at the rate of $100 per day, for delays over 48 hours. This gives an average time per breakdown of 145.39/100 x 24 hours = 34.8932 hours, plus 48 hours minimum delay, totalling 82.8932 hours per breakdown event. In total, there are 5,345 breakdowns x 82.8932

hours/breakdown = 443,077 hours of time worked by the class. The amount of earnings for this time is calculated as 443,077 hours x $20.7435/hour = $9,190,971. The amount paid already for breakdowns is estimated as $145.39 x 5,345 events = $777,122, leaving $9,190,971 - $777,122 = $8,413,849 as unpaid wages to the class, and additional interest of $2,978,537, for a total of $11,392,386. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional unpaid amounts after the end of the data period are $1,575,226, with interest of $76,120, for a total over the entire period (through 9/19/2023) of $13,043,732. Note that this amount is potentially underestimated, as the payroll data does not include other delays of this type that are under 48 hours in length.

21. Detention Delays. From the Adjustments information in the payroll data, we find that a "2F" code, as shown in "5084431_Exhibit_26_ChadBrueck") occurs an average of 0.0096 times per work week in the CRSTF0001276 data, or a total of 90,322 x 0.0096 = 863 events. The average pay for these events is $36.72. Comparing the amounts paid to the hours amounts noted in the "adj_memo" field of that payroll data gives a rate paid $6.25 per hour for these adjustments. This gives an average time per detention of 36.72/$6.25 x 24 hours = 5.8754 hours per detention event. In total, I calculated 863 detentions x 5.8754 hours/detention = 5,073 hours of time worked by the class. The amount of earnings for this time is calculated as 5,073 hours x $20.7435/hour = $105,234. The amount already paid for these events is estimated as 863 events x 5.8754 hours/event x $6.25/hour = $32,041, leaving $105,234 - $32,040 = $73,194 as unpaid wages to the class, and additional interest of $25,911, for a total of $99,104. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional unpaid amounts after the end of the data period are $13,758, with interest of $665, for a total over the entire period of $113,527.

22. Scaling. From the Adjustments information in the payroll data, we find that a "SC" code, as shown in "5084431_Exhibit_26_ChadBrueck"), representing a reimbursement for scaling occurs 0.2466 times per week in the CRSTF0001276 data, or a total of 90,322 x 0.2466 = 22,269 events. I understand that Dr. Viscelli's industry report estimates 20-30 minutes for routine scalings, and longer for the more problematic ones. Nonetheless, we have been asked to assume that this activity takes an

average of 20 minutes, or 0.3333 hours. In total, from the data provided by CRST, there are 22,269 scaling events x 0.3333 hours/event = 7,423 hours of unpaid time worked by the class, for a total of 7,423 hours x $20.7435/hour = $153,981.70 of unpaid wages to the class, and additional interest of $54,510, for a total of $208,492. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional unpaid amounts after the end of the data period are $28,943, with interest of $1,399, for a total over the entire period (through 9/19/2023) of $238,834.

23. Pre-trip and Post-trip Inspections. A driver is required to perform pre- and post- trip inspections of their vehicles on a daily basis. As drivers normally have two driving sessions per work day (before and after a DOT mandated stop), each of which requiring a separate pre- and post- trip inspection, we assume that four such inspections occur each day. I understand that Dr. Viscelli estimates that a minimum full inspection takes between 30 and 45 minutes, in light of CRST's expectations as detailed in the Driver Handbook. In addition, the CRST Safety and Operations Handbook's section on Safety Department Policies, states: "If you see a 10-minute inspection on a driver's log book, that is evidence of cutting corners" (Bates Number 000502). Accordingly, we have been asked to assume that each inspection is 30 minutes in length, resulting in 120 minutes of unpaid time for each work day. In total, from the data provided by CRST, there are 451,610 days x 120 minutes/day x 1 hour/60 minutes = 903,220 hours of unpaid time worked by the class, for a total of 903,220 hours x $20.7435/hour = $18,735,971 of unpaid wages to the class, and additional interest of $6,632,611 for a total of $25,368,581. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional unpaid amounts after the end of the data period are $3,521,724, with interest of $170,181, for a total over the entire period (through 9/19/2023) of $29,060,486.

24. In addition, the policy states that a driver must inspect their truck and cargo "Within the first 50 miles of a trip, whenever the driver changes duty status, and when he drives more than three hours or 150 miles" (CRSTF000502). This suggests that the number of inspections required and performed by drivers may be underestimated. If there were one additional inspection per day, of 30 minutes in length, the amount of unpaid wages to the class would be an additional one-quarter the

amounts listed above, or $7,265,121 of unpaid wages and interest to the class, over the entire class period.

25. Layovers. From the Adjustments information in the payroll data, we find that a "LO" code (as shown in "5084431_Exhibit_26_ChadBrueck"), representing pay for layovers occurs an average of 0.1424 times per work weeks, or a total of 90,322 x 0.1424 = 12,866 events. The average pay as documented in the payroll data for these events is $116.075. The deposition of Chad Breuck, pg. 22, lines 10-14, states that these layover adjustments are paid at the rate of $100 per day, for layovers over 48 hours. Using this rate gives an average paid time per layover of 116.075/100 x 24 hours = 27.8580 hours, plus 48 hours minimum delay, totalling 75.8580 hours per layover event. In total, there are 12,866 layovers x 75.8580 hours/layover = 976,014 hours of time worked by the class. The amount of earnings for this time is calculated as 976,014 hours x $20.7435/hour = $20,245,965. The amount paid already is estimated as $116.075 x 12,866 events = $1,591,652, leaving $20,245,965 - $1,591,652 = $18,654,313 as unpaid wages to the class, and additional interest of $6,603,704 for a total of $25,258,017. This figure represents damages through the end of the payroll data provided by CRST (9/30/2022). Additional unpaid amounts after the end of the data period are $3,506,375, with interest of $169,439, for a total over the entire period (through 9/19/2023) of $28,933,831.

26. Note that this amount is potentially underestimated, as the payroll data does not include layovers that are under 48 hours in length.

27. A summary of the above calculations is attached in Exhibit D.

28. Liquidated Damages and calculations at Minimum Wage Rate. I have been asked to calculate an amount of liquidated damages payable to the class for the failure to pay the minimum wage for time spent performing work duties. Accordingly, in Exhibit D, I have presented calculations of these unpaid wage amounts, valued at a time-weighted average minimum wage of $12.8576 per hour, with interest. The liquidated damage amount is equal to the unpaid wages valued at minimum wage.

29. I reserve the right to adjust any of the calculations in unpaid wages, or in this report if the trier-of-fact determines that there are any differences of the above amounts of time for the above

claims, or the frequency of any events that might represent unpaid time.

**Review of Federal Hours of Service Logs for Unpaid DOT Off-Duty and Sleeper Berth Time**

30. I was asked to do a general review of the driver logs to locate time during which a truck is stationary, and therefore the drivers were not getting paid, even though they may have been performing work duties or otherwise entitled to compensation.

31. Accordingly, I filtered the records in the driver logs files, locating records which identified three criteria. First, the truck had to be stationary, as noted by the odometer reading of the specific truck remaining unchanged between records. Second, the driver had a 'status' of either 'Off Duty' or 'Sleeper'. Finally, I did not review time inside of California, to reflect the residency of the class members, even though it is possible that some of those records may fit the other criteria of compensable time. The resulting events had dates ranging from 8/1/2019 through 7/8/2022. Note that calculations of these amounts may appear slightly different due to rounding.

32. The time period covered by the data covers a range of 1,072 days, from 8/1/2019 through 7/8/2022. The entire class period, from 8/9/2017 up through the trial date of 9/19/2023, is a period of 2,232 days. Assuming that these events occurred at the same rates throughout the class period, we can estimate the amount of unpaid wages from these events over the entire class period by multiplying the amounts from the data by a factor of 2232/1072 = approximately 2.0821.

33. In all, I identified 433,210 total events which met the three criteria. The median length of time of these events was 20 minutes, meaning that approximately half of these events were 20 minutes or shorter, while half of the events were 20 minutes or longer.

34. These records that met the above criteria occurred on 122,354 distinct employee-days with employees identified as on the class list. On 16,055 of these days, the total time spent in these events were at least 10 hours. On 1,399 days, the total time from these events totalled over 34 hours.

35. A small number of records indicated delay events of over one week (168 hours), and for purposes of any total hours calculation, those times were trimmed to 168 hours.

36. From the driver log information and class list, I located a total of 386,261 hours from events from that are at least one hour in length, and 297,052 hours from events that are at least ten hours in length. At an average pay rate of $20.7435 per hour, this represents $8,012,403 of unpaid amounts for events at least one hour in length, and $6,161,899 of unpaid amounts event at least ten hours in length.

37. Assuming that these events occur at the same frequency throughout the class period through a valuation date of 9/19/2023 (as mentioned above), I estimate the total unpaid amounts for events at least one hour in length as $8,012,403 x 2232/1072 = $16,682,540, and the total unpaid events at least ten hours in length as $6,161,899 x 2232/1072 = $12,829,625.

38. Looking at all delay events from the driver log information and class list of at least one minute, I located a total of 469,274 hours. Approximately 49.8% of this time comes from log records with a status of "Sleeper", while 50.2% comes from log records with a status of "OffDuty". At an average pay rate of $20.7435 per hour, this represents $9,734,385 of unpaid amounts of at least one minute from the data, and $9,734,385 x 2232/1072 = $20,267,862 for the entire class period.

39. Looking at all delay events from the driver log information and class list of at least twenty minutes, I located a total of 449,232 hours. Approximately 51.6% of this time comes from log records with a status of "Sleeper", while 48.4% comes from log records with a status of "OffDuty". At an average pay rate of $20.7435 per hour, this represents $9,317,078 unpaid amounts of at least twenty minutes from the data, and $9,318,644 x 2232/1072 = $19,402,251 for the entire class period.

**Review of Wage Statements and Trip Records**

40. I was provided with two files, named "5084431_Exhibit_26_ChadBrueck, CRSTF000718-795" and "Trip Records By Unit" ("5084431_Exhibit_28_ChadBrueck," CRSTF000799-806). The wage statements contain information about Keith Huckaby's pay for individual trips for the company, which I have been informed are based on pre-determined numbers of miles for given origin and destination points. The "Trip Records by Unit" contain amounts of actual miles driven for the route, which may differ from the pre-determined miles used for pay. To the extent that the miles actually driven are more than the miles used for pay purposes, the drivers are underpaid.

41. Accordingly, I compared the records in the two files. I located 14 pay periods where there was information contained in both files, between 4/18/2019 and 7/23/2019. The pay periods contained a total of 19 distinct trips. In one trip, the miles information was the same in both payroll and trip files. In each of the other 18 trips, the miles information in the trip files was higher, indicating potential underpayment. In total, there were 1593 potential unpaid miles during the 14 pay periods. At a rate of 40 cents per mile, as shown in Huckaby's wage statements, this would indicate unpaid earnings of $637.20, or $45.51 per twice-weekly pay periods. If this amount was shared by two tandem drivers, the amount would be $22.757 per pay period.

42. Assuming that the drivers in the entire class were impacted at the same rate, this would represent a total loss to the class of $22.757/pay period x 2 pay periods/week x 90,322 weeks = $4,110,941. I have been informed that Plaintiffs have requested this information, but it has not yet been provided. If provided with this data, I reserve the right to perform additional calculations for the entirety of the class and class period.

I declare, to the best of my knowledge and ability that the foregoing is true and correct.

Executed this 10th day of April, 2023, at Pasadena, California.

[signature]

# Exhibit

# A

PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# SEAN C. CHASWORTH

December 2019

## Current Position

Statistical, Database, and Pension Benefits consulting

## Education

| | |
|---|---|
| B.A. 1991 | Mathematics, University of Redlands |
| 1992 | University of Redlands<br>California Preliminary Single Subject Teaching Credential |

## Professional Examinations Passed

Administered by the CFA Institute
- Level I Examination, Passed June 2009

Administered by the American Society of Pension Actuaries
- Administrative and Qualification Issues of Retirement Plans: C-1
- Administrative Issues of Defined Benefit Plans: C-2(DB)
- Administrative Issues of Defined Contribution Plans C-2(DC)
- Met examination requirements for the Qualified Pension Administrator (QPA) designation.

Administered by the Society of Actuaries and the Casualty Actuary Society
- Probability and Statistics (Course 110)
- Calculus and Linear Algebra (Course 100)

Administered by the Joint Board for the Enrollment of Actuaries
- Mathematics of Compound Interest and Life Contingencies (Course 141/EA-1A)

Professional Certification – Microsoft Office User Specialist

PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

## Personal Data

Born in Los Angeles, California
Email address: schasworth@rule26.com

## Experience

2003 - present: Consultant and Analyst
Phillips, Fractor & Company, LLC, Pasadena (formerly Phillips Fractor Gorman)

2003 - 2006: Consultant and Analyst
Findlay, Phillips and Associates

1998 - 2003: Actuarial Analyst and Pension Administrator
Kravitz, Inc., Encino, California

1992 - 1997: Teacher, Hillside Junior High School, Simi Valley, California
Newbury Park High School, Newbury Park, California
Substitute Teacher for up to seven Ventura County school districts.

1995 - 1997: Instructor, Sylvan Learning Center, Thousand Oaks, California

1989 - 2005: Private Mathematics Instructor

## Memberships

American Statistical Association
American Association for Public Opinion Research

## Courses Taught

Mathematics: Algebra, Geometry, Trigonometry, Calculus, Matrix Algebra, Statistics
Computer Applications: Microsoft Excel, Microsoft Word
Science: Earth Science, Physics, Chemistry

PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

## Awards and Honors

University of Redlands Mathematics Department - Departmental Excellence Award, 1991
1987 Los Angeles County Academic Decathlon: County Division Champion, 6 individual subject medals

## Presentations at Professional Meetings

Panelist
"Careers for Math Majors", Mathematical Association of America, March 2000

# Sean Chasworth – Testimony List

## Deposition Testimony:

| | |
|---|---|
| 06/04/2019 | William Jacobo vs. Ecolab Inc.<br>American Arbitration Association 01-18-003-2797 |
| 06/11/2019 | Cindy Castillo, et al vs. Bank of America National Association<br>United States District Court Central District of California 8:17-cv-00580 |
| 07/11/2019 | Robert Bankwitz vs. Ecolab Inc.<br>American Arbitration Association 01-18-0003-2812 |
| 11/04/2019 | Stephen Craig vs. Ecolab Inc.<br>American Arbitration Association 01-19-0000-1058 |
| 11/06/2019 | David Bojorquez vs. Ecolab, Inc.<br>American Arbitration Association 01-18-0004-4660 |
| 12/12/2019 | Mark Brewer vs. Ecolab Inc.<br>American Arbitration Association 01-19-0000-1056 |
| 04/01/2021 | Karen Hartstein vs. Hyatt Corporation<br>United States District Court Central District of California 2:20-cv-4874 |
| 04/16/2021 | Luke Davis, et al vs. Laboratory Corporation of America Holdings<br>United States District Court Central District of California 2:20-cv-00893 |
| 08/19/2021 | Pamela Stewart and Zulekha Abdul vs. Quest Diagnostics Clinical Lab. Inc.<br>United States District Court Central District of California 3:19-cv-02043 |
| 09/28/2022 | Desmond Augustine, et al vs. United Parcel Service, Inc.<br>Superior Court of the State of California County of Los Angeles BC636468 |
| 02/24/2023 | Boris Klarin, et al vs. Westoil Machine Services, Inc., et al<br>Superior Court of the State of California County of Los Angeles 19STCV46852 |

## Arbitration and Other Testimony:

| | |
|---|---|
| 06/13/2019 | William Jacobo vs. Ecolab Inc.<br>American Arbitration Association 01-18-0003-2797 |

# Sean Chasworth – Testimony List

| | |
|---|---|
| 07/25/2019 | Robert Bankwitz vs. Ecolab Inc.<br>American Arbitration Association 01-18-0003-2812 |
| 11/13/2019 | David Bojorquez vs. Ecolab, Inc.<br>American Arbitration Association 01-18-0004-4660 |
| 01/07/2020 | Mark Brewer vs. Ecolab Inc.<br>American Arbitration Association 01-19-0000-1056 |
| 06/17/2020 | Blakeley vs. Ecolab Inc.<br>American Arbitration Association |
| 07/28/2020 | Anderson vs. Ecolab Inc.<br>American Arbitration Association |

# Exhibit

# B

G. Michael Phillips, Ph.D.
David T. Fractor, Ph.D.

Robert K. Neff, CPA, ABV
William Ingersoll, Ph.D.
Sean Chasworth
George Arzumanyan, CFA, MAFF®, CVA®
M. Christine Phillips, Ph.D.

PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

*Of Counsel*

William W. Roberts, Ph.D.
Karina Cordova, Ph.D.
H. Drew Fountaine, CPA, Ed.D.
Dennis Halcoussis, Ph.D.
Craig Kerr, Ph.D.
A. Lynn Matthews, Ph.D.

Berenji Law Firm
8383 Wilshire Blvd, Ste 708
Beverly Hills, CA 90211-2442

RE: Keith Huckaby vs. CRST Expedited, Inc., et al
USDC Central District of Calif. case no. 2:21-cv-07766

Dear Counsel,

This Agreement confirms that Phillips, Fractor & Company, LLC ("PFC" or "We" and "Our") will provide the services of William W. Roberts, Ph.D.; Sean Chasworth; Karina Cordova, Ph.D. (the "Experts"), and other professional staff, as needed, to Berenji Law Firm ("Law Firm" or "Firm" or "You" and "Your") as consultant(s) in connection with the case referenced above (the "Litigation"), and on the terms and conditions herein. The Firm represents Keith Huckaby and other Plaintiffs ("Client") in the Litigation.

1. **Scope of Work:** You have asked PFC to provide statistical analysis and financial computations including work PFC determines to be necessary and advisable to accomplish these tasks, with deposition and/or trial testimony upon request (collectively, the "Engagement"). From time to time, the Engagement may be modified and/or expanded in writing, and any such modification will be subject to the terms and conditions of this Agreement.

2. **Fees and Expenses:** It is Our intention to perform this Engagement as efficiently and affordably as possible, recognizing potential budgetary constraints. PFC's services, however, take a reasonable amount of time to render. Our fees are billed on an hourly basis. Mr. Chasworth's rate is $350 per hour, Dr. Roberts' rate is $450 per hour, and Dr. Cordova's rate is $400 per hour. Rates are subject to change on 30 days' notice. Other personnel may be used in this Engagement, as appropriate, and typically rates for those persons may range between $300 to $795 per hour. We will assign the appropriate personnel at PFC to render the service that comports with the level of expertise needed for this Engagement. You acknowledge that PFC has made no promises or representations about the total amount of fees to be incurred by You under this agreement.

3. **Payment:** Payment for Our services is in no way contingent on the outcome of the Litigation, on the reaching of any particular result in Our work, on any opinion or testimony We may render, or on the nature of any of Our findings. Accordingly, it is important that Our fees be paid promptly. PFC will bill the Firm for its work on this Engagement on a monthly basis and fees are due on the date of the invoice. Expenses reasonably incurred by PFC in this Engagement will be billed at Our cost and included on invoices. Invoices shall be paid in full within 30 days. Amounts over 60 days past due are subject to interest charges of 1.5 percent per month. Please note, in the event the examining party fails to pay Our fees and costs for depositions, You agree to guarantee payment which will be included on Your invoice.

PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

You agree that You will review PFC's invoices upon receipt and will advise PFC of any objection to, or dispute with, the invoice or any time entry or item of work therein within 30 days of the invoice date. Any such objection or dispute not made in writing to PFC within 30 days of the invoice date is waived, and the fees and costs in the invoice are deemed to be accurate, correct and approved by the Firm. In the event You dispute a portion of an invoice, the undisputed portion shall still be paid in accordance with this paragraph.

A retainer of $7,500 must be paid prior to the commencement of any services (check payable to Phillips, Fractor & Company, LLC). The retainer includes a fee of $1,000 which is not refundable. In Our sole discretion, We may hold the retainer until the end of the engagement, or apply it (or portions of it) to one or more invoices in the course of the Engagement. If all or any part of the retainer is so applied, You agree to replenish the retainer to the full original amount within 30 days of Our request to do so. Upon completion or termination of the Engagement, any amount of the retainer remaining after deduction of any fees and other charges which then remain unpaid will be promptly returned to You.

In addition, should it become necessary for us to expand the scope of our services, We may require an additional retainer payment. We may also require an additional retainer in advance of a major activity such as lengthy trial preparation or testimony or other matter that is likely to generate substantial work in a compressed period of time.

*PLEASE NOTE: All outstanding billings must be paid in full prior to the delivery of reports, declarations, or testimony (deposition and/or trial).* It is understood and agreed that timely payment for Our services and expenses will be solely the responsibility of the Firm. It is understood and agreed that You will pay all out-of-pocket expenses in connection with this matter.

4. **Termination of Work by PFC:** Without liability, PFC reserves the right, in its sole discretion, to suspend all work on this Engagement, including providing testimony, preparing reports or data (as well as withholding the provision thereof) and all other work, if amounts due for this Engagement are not paid within 30 days. In the event that We continue to provide services notwithstanding the existence of fees outstanding for more than 30 days, We do not thereby waive Our right to stop providing service at a later date in accordance with this paragraph.

   PFC also reserves the right to terminate its work on this Engagement, without liability, if We believe that the Firm is requesting that PFC take actions or positions that We believe to be improper, or if the Firm is not reasonably cooperating with PFC, including, but not limited to, the failure to provide information relevant to Our work in the Engagement. Prior to termination pursuant to this paragraph, PFC shall provide written notice of its concern and intent to terminate in an effort to resolve the

problem. Termination of work under this Section 4 shall not relieve the Firm of its responsibility to pay all outstanding fees and costs incurred to the date of termination.

5. **Retention of Documents:** Upon termination of this Engagement, and unless otherwise instructed by You, or unless otherwise required by law or court order, PFC will discard, at its discretion, all non-original copies of paper documents provided to PFC by You, Client or anyone else in connection with this Engagement, and will retain original copies for a period of two (2) years, after which such documents may also be discarded. PFC will retain electronic copies of documents for a period of four (4) years from the termination of the Engagement.

6. **Conflict Check:** Prior to beginning work on this matter, PFC will have undertaken a reasonable review of its records to determine PFC's relationships, if any, with persons or entities identified by You as parties to the Litigation or otherwise having a pecuniary interest in the Litigation, and will have concluded that no conflict exists that would, in PFC's professional opinion, prevent it from accepting and performing this Engagement, or would otherwise present a conflict of interest to PFC. In the event such a conflict exists, PFC will work with You to obtain any necessary waiver of the conflict or otherwise resolve the conflict of interest, if practicable. In the event such a conflict arises during the course of this Engagement and no waiver or other resolution can be had, PFC reserves the right, without liability, to terminate this Engagement.

7. **Limitation of Liability:** With exception for a claim for a breach of this Agreement, Client and the Firm agree that they shall not hold PFC or any of the Experts liable or responsible for any claims, liabilities, losses, damages or expenses incurred or allegedly incurred by either Client or Firm or both arising out of, or relating to, the Engagment or this Agreement, except to the extent such claim, liability, loss, damage or expense results solely from the negligence or bad faith conduct of PFC or the Experts. In no event shall PFC be liable for any consequential, incidental, indirect, special or punitive damages, losses or expenses, and in no event shall the liability of PFC or any of the Experts, individually or collectively, whether in tort, contract, or otherwise exceed the amounts actually paid to PFC for the services rendered by PFC and/or any of the Experts pursuant to this Agreement.

   In the event Our work on this Engagement requires PFC to rely on any data or other information provided to PFC by You or the Client, whether in writing, electronic form or otherwise, all such information (the "Client Information") will be presumed by PFC to be accurate, correct, true, current, valid and reliable unless it is clear on the face of such information not to be so, or unless You or Client inform PFC in writing otherwise. In the event Our work on this Engagement requires PFC to rely on any data or other information provided to PFC by any third party, including without limitation, other consultants, experts, vendors and the like, whether engaged by You or by PFC, and whether in writing, electronic form or otherwise, which We reasonably believe in good faith to be accurate, correct, true, current, valid and reliable, all such information (the "Third Party Information") is presumed by the

Parties to be so. PFC assumes no responsibility, and shall not be held liable, for any claims, damages, costs, charges or expenses of any kind, brought or incurred by You and/or the Client arising from, caused by, related to, or otherwise in connection with the inaccuracy, falsity, invalidity, non-currency, or unreliability of either the Client Information or the Third Party Information.

8. **Force Majeur:** PFC shall not be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, acts of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9. **Governing Law:** This Agreement shall be interpreted and controlled by the laws of the State of California.

10. **Arbitration:** In the event any dispute between You and PFC, or between Client and PFC, arising from or relating to this Engagement cannot be resolved informally, You, Client and PFC agree to forego the right to trial by jury and to resolve any and all such disputes between and/or among us, including the Experts or any other PFC employees or independent contractors who may have worked on the Engagement, and including but not limited to disputes over fees and charges or a breach of this Agreement, exclusively through private and confidential binding arbitration in Los Angeles, California, before a sole arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules, or, in the event neither the disputed claims or counterclaims respectively exceed $250,000, not including interest or attorneys' fees, then pursuant to the JAMS Streamlined Arbitration Rules. Judgment on the award may be entered in any court having jurisdiction.

11. **Attorney's Fees:** In any arbitration or other action arising out of, or related to this Agreement or the services provided under this Agreement, the prevailing party shall receive, in addition to any and all other damages and relief, reimbursement for its litigation expenses, including attorneys' fees, expert fees, collection fees, and other expenses, actually and reasonably incurred.

12. **Authority to Bind:** Each Party represents and warrants to the other Party that the person signing the Agreement on its behalf has the authority to do so, and that the signature that appears below binds it to the terms of the Agreement. The Firm further represents and warrants that it has the authority to bind Client to the terms and conditions of this Agreement insofar as any such term or condition affects the rights and/or obligations of Client, including, without limitation, the provisions of Section 7, Section 10, and Section 11 herein.

13. **Entire Agreement:** This Agreement constitutes the entire agreement between the Parties with respect to its subject matter, and any prior oral or written statements concerning its subject are merged herein for all purposes and are of no further force and effect.

PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

14. **Deemed Acceptance Upon Commencement of Work:** If PFC agrees to commence work on this Engagement at Your request prior to the execution of this Agreement, the beginning of such work shall be deemed acceptance of the Agreement and each and every term herein, whether or not the Agreement is ever actually executed.

15. **Survival:** All provisions herein which, by their nature, are intended to survive performance of this Engagement shall survive such performance and termination of the Agreement.

If the foregoing comports with Your understanding of our agreement, please sign and date this Agreement and return it to Our office. After We receive Your signed letter and retainer payment, We will be able to commence work on this matter. By signing below, You acknowledge that You, the attorney, are responsible for the payment of services rendered by Phillips, Fractor & Company, LLC in compliance with the requirement expressed above. We look forward to working with You.

RE: Keith Huckaby vs. CRST Expedited, Inc., et al

PHILLIPS, FRACTOR & COMPANY, LLC

By: Jeannie Wong
Jeannie Wong, Case Coordinator

November 23, 2022
If not signed by You/Client and received by PFC, this letter expires in 30 days from the above date.

Tax ID: 45-5551955

AGREED:

By: [signature]

Name (print) Shadie Berenji

Date: November 28, 2022

PHILLIPS. FRACTOR. & COMPANY

Invoice #: 2301-BL1222

# Invoice

1/3/2023

Berenji Law Firm
2030 Main Street
Suite 1300
Irvine, CA 92614

**For consulting services rendered on:** Huckaby v. CRST

| | | Description of Hours Worked | Hours | Rate | Total |
|---|---|---|---|---|---|
| 11/23/2022 | Mr. Lange | Process documents | 0.50 | 150.00 | 75.00 |
| 12/1/2022 | Dr. Cordova | Confer with Mr. Chasworth and attorney; data review | 0.50 | 400.00 | 200.00 |
| 12/1/2022 | Mr. Chasworth | Review employee data; confer with counsel | 2.00 | 350.00 | 700.00 |
| 12/19/2022 | Mr. Chasworth | Review employee data | 3.00 | 350.00 | 1,050.00 |
| 12/20/2022 | Mr. Chasworth | Review employee data | 6.00 | 350.00 | 2,100.00 |
| 12/26/2022 | Mr. Chasworth | Review employee data | 4.00 | 350.00 | 1,400.00 |
| 12/28/2022 | Mr. Chasworth | Review employee data | 6.00 | 350.00 | 2,100.00 |
| 12/29/2022 | Mr. Chasworth | Review employee data | 6.00 | 350.00 | 2,100.00 |
| 12/31/2022 | Mr. Chasworth | Courtesy adjustment | -13.50 | 350.00 | -4,725.00 |

Terms: Due upon receipt

Please remit checks payable to: Phillips, Fractor & Company, LLC
Tax ID Number: 45-5551955

| | |
|---|---|
| **Total** | **$5,000.00** |
| **Payments/Credits** | **-$5,000.00** |
| **Balance Due** | **$0.00** |

It is customary to pay for professional services when rendered. If not paid within thirty (30) days, a 1.5% monthly fee will be charged on all past due amounts. In the event it becomes necessary to employ a collection agency or attorney to collect past due accounts or initiate court proceedings, you will be responsible for all fees and court costs.

PHILLIPS. FRACTOR. & COMPANY

**Invoice #:** 2302-BL1222

2/1/2023

# Invoice

Berenji Law Firm
2030 Main Street
Suite 1300
Irvine, CA 92614

**For consulting services rendered on:** Huckaby v. CRST

| | | Description of Hours Worked | Hours | Rate | Total |
|---|---|---|---|---|---|
| 1/11/2023 | Mr. Chasworth | Review employee data | 2.50 | 350.00 | 875.00 |
| 1/13/2023 | Mr. Chasworth | Review employee data | 1.00 | 350.00 | 350.00 |
| 1/16/2023 | Dr. C. Phillips | Review employee data | 3.25 | 400.00 | 1,300.00 |
| 1/17/2023 | Dr. C. Phillips | Review employee data | 3.25 | 400.00 | 1,300.00 |
| 1/17/2023 | Dr. Cordova | Data analysis | 1.00 | 400.00 | 400.00 |
| 1/18/2023 | Dr. Cordova | Data analysis | 1.00 | 400.00 | 400.00 |
| 1/20/2023 | Dr. Cordova | Confer with Mr. Chasworth and lawyer; data analysis | 2.00 | 400.00 | 800.00 |
| 1/20/2023 | Mr. Chasworth | Review employee data | 2.00 | 350.00 | 700.00 |
| 1/23/2023 | Dr. Cordova | Data analysis | 1.00 | 400.00 | 400.00 |
| 1/25/2023 | Dr. Cordova | Data analysis | 2.00 | 400.00 | 800.00 |
| 1/25/2023 | Mr. Chasworth | Review employee data | 1.00 | 350.00 | 350.00 |
| 1/26/2023 | Dr. Cordova | Data analysis | 1.50 | 400.00 | 600.00 |
| 1/30/2023 | Dr. Cordova | Confer with Mr. Chasworth and attorneys; data analysis | 2.50 | 400.00 | 1,000.00 |
| 1/30/2023 | Mr. Chasworth | Review employee data | 3.00 | 350.00 | 1,050.00 |
| 1/31/2023 | Dr. Cordova | Data analysis | 2.00 | 400.00 | 800.00 |

Terms: Due upon receipt

Please remit checks payable to: Phillips, Fractor & Company, LLC
Tax ID Number: 45-5551955

| | |
|---|---|
| **Total** | **$11,125.00** |
| **Payments/Credits** | **-$2,500.00** |
| **Balance Due** | **$8,625.00** |

It is customary to pay for professional services when rendered. If not paid within thirty (30) days, a 1.5% monthly fee will be charged on all past due amounts. In the event it becomes necessary to employ a collection agency or attorney to collect past due accounts or initiate court proceedings, you will be responsible for all fees and court costs.

PHILLIPS. FRACTOR. & COMPANY

**Invoice #:** 2303-BL1222

# Invoice

3/1/2023

Berenji Law Firm
2030 Main Street
Suite 1300
Irvine, CA 92614

**For consulting services rendered on:** Huckaby v. CRST

| | | Description of Hours Worked | Hours | Rate | Total |
|---|---|---|---|---|---|
| 2/1/2023 | Dr. Cordova | Data analysis | 3.00 | 400.00 | 1,200.00 |
| 2/2/2023 | Mr. Chasworth | Review employee data | 1.50 | 350.00 | 525.00 |
| 2/3/2023 | Dr. Cordova | Confer with Mr. Chasworth and attorneys | 1.00 | 400.00 | 400.00 |
| 2/3/2023 | Mr. Chasworth | Review employee data | 3.00 | 350.00 | 1,050.00 |
| 2/6/2023 | Mr. Chasworth | Review employee data | 2.50 | 350.00 | 875.00 |

Terms: Due upon receipt

Please remit checks payable to: Phillips, Fractor & Company, LLC
Tax ID Number: 45-5551955

| | |
|---|---|
| **Total** | **$4,050.00** |
| **Payments/Credits** | **$0.00** |
| **Balance Due** | **$4,050.00** |

It is customary to pay for professional services when rendered. If not paid within thirty (30) days, a 1.5% monthly fee will be charged on all past due amounts. In the event it becomes necessary to employ a collection agency or attorney to collect past due accounts or initiate court proceedings, you will be responsible for all fees and court costs.

PHILLIPS. FRACTOR. & COMPANY

Invoice #: 2304-BL1222

4/3/2023

# Invoice

Berenji Law Firm
2030 Main Street
Suite 1300
Irvine, CA 92614

**For consulting services rendered on:** Huckaby v. CRST

| | | Description of Hours Worked | Hours | Rate | Total |
|---|---|---|---|---|---|
| 3/14/2023 | Mr. Tim Sargent | Verify and format received data | 0.50 | 300.00 | 150.00 |
| 3/16/2023 | Mr. Tim Sargent | Verify and format received data | 6.25 | 300.00 | 1,875.00 |
| 3/16/2023 | Dr. C. Phillips | Confer with Mr. T.D. Sargent, Mr. Chasworth | 0.25 | 400.00 | 100.00 |
| 3/16/2023 | Mr. Chasworth | Review employee data | 1.00 | 350.00 | 350.00 |
| 3/17/2023 | Dr. C. Phillips | Review employee data | 3.50 | 400.00 | 1,400.00 |
| 3/20/2023 | Dr. C. Phillips | Review employee data | 1.25 | 400.00 | 500.00 |
| 3/20/2023 | Dr. Cordova | Confer with Mr. Chasworth, attorneys; data analysis | 1.00 | 400.00 | 400.00 |
| 3/21/2023 | Ms. Wong | Case administration | 0.60 | 125.00 | 75.00 |
| 3/22/2023 | Mr. Chasworth | Review employee data | 1.50 | 350.00 | 525.00 |
| 3/24/2023 | Mr. Chasworth | Review employee data; draft declaration | 2.50 | 350.00 | 875.00 |
| 3/27/2023 | Mr. Chasworth | Review employee data; draft declaration | 1.50 | 350.00 | 525.00 |
| 3/28/2023 | Dr. Cordova | Confer with Mr. Chasworth, lawyers; data analysis | 2.00 | 400.00 | 800.00 |
| 3/28/2023 | Mr. Chasworth | Review employee data | 2.50 | 350.00 | 875.00 |
| 3/29/2023 | Dr. Cordova | Data analysis | 1.00 | 400.00 | 400.00 |
| 3/30/2023 | Dr. Cordova | Data analysis | 1.50 | 400.00 | 600.00 |
| 3/31/2023 | Dr. Cordova | Data analysis | 1.50 | 400.00 | 600.00 |

Terms: Due upon receipt

Please remit checks payable to: Phillips, Fractor & Company, LLC
Tax ID Number: 45-5551955

| | |
|---|---|
| **Total** | **$10,050.00** |
| **Payments/Credits** | **$0.00** |
| **Balance Due** | **$10,050.00** |

It is customary to pay for professional services when rendered. If not paid within thirty (30) days, a 1.5% monthly fee will be charged on all past due amounts. In the event it becomes necessary to employ a collection agency or attorney to collect past due accounts or initiate court proceedings, you will be responsible for all fees and court costs.

# Exhibit

# C

**Exhibit C**

List of Documents and Data Reviewed
Huckaby v. CRST

Driver Log Data: CRSTF001272 - 1275

Driver Payroll Data: CRSTF1276, CRSTF1278

Deposition of Chad Brueck, page 22, and exhibits 26 and 28

CRST Safety and Operations Handbook (pages CRSTF000501-516, 472)

Dkt 44. First Amended Class Action Complaint for Damages

# Exhibit

# D

Summary of Losses Based on Employee Pay Rate

| | Unpaid Amounts | Interest | Total |
|---|---|---|---|
| Refueling | | | |
| Directly from Data | $ 4,683,992.66 | $ 1,658,152.64 | $ 6,342,145.30 |
| Additional estimated to 9/19/2023 | $ 880,430.99 | $ 42,545.13 | $ 922,976.12 |
| **Total** | **$ 5,564,423.65** | **$ 1,700,697.76** | **$ 7,265,121.42** |
| DOT and other Law Enforcement Inspections | | | |
| Directly from Data | $ 33,607.64 | $ 11,897.24 | $ 45,504.88 |
| Additional estimated to 9/19/2023 | $ 6,317.09 | $ 305.26 | $ 6,622.35 |
| **Total** | **$ 39,924.73** | **$ 12,202.50** | **$ 52,127.23** |
| Breakdowns | | | |
| Directly from Data | $ 8,413,849.28 | $ 2,978,537.20 | $ 11,392,386.48 |
| Additional estimated to 9/19/2023 | $ 1,575,225.99 | $ 76,119.75 | $ 1,651,345.74 |
| **Total** | **$ 9,989,075.27** | **$ 3,054,656.95** | **$ 13,043,732.22** |
| Detention delays | | | |
| Directly from Data | $ 73,193.62 | $ 25,910.84 | $ 99,104.46 |
| Additional estimated to 9/19/2023 | $ 13,757.91 | $ 664.82 | $ 14,422.73 |
| **Total** | **$ 86,951.52** | **$ 26,575.66** | **$ 113,527.19** |
| Scaling events | | | |
| Directly from Data | $ 153,981.70 | $ 54,510.15 | $ 208,491.85 |
| Additional estimated to 9/19/2023 | $ 28,943.31 | $ 1,398.63 | $ 30,341.94 |
| **Total** | **$ 182,925.01** | **$ 55,908.78** | **$ 238,833.79** |
| Pre- and Post-trip inspections | | | |
| Directly from Data | $ 18,735,970.64 | $ 6,632,610.55 | $ 25,368,581.18 |
| Additional estimated to 9/19/2023 | $ 3,521,723.98 | $ 170,180.50 | $ 3,691,904.48 |
| **Total** | **$ 22,257,694.62** | **$ 6,802,791.05** | **$ 29,060,485.67** |
| Layovers | | | |
| Directly from Data | $ 18,654,313.30 | $ 6,603,703.52 | $ 25,258,016.82 |
| Additional estimated to 9/19/2023 | $ 3,506,375.18 | $ 169,438.80 | $ 3,675,813.99 |
| **Total** | **$ 22,160,688.49** | **$ 6,773,142.32** | **$ 28,933,830.81** |
| **Totals** | | | |
| **Directly from Data** | **$ 50,748,908.83** | **$ 17,965,322.14** | **$ 68,714,230.97** |
| **Additional estimated to 9/19/2023** | **$ 9,532,774.45** | **$ 460,652.89** | **$ 9,993,427.35** |
| **Total** | **$ 60,281,683.28** | **$ 18,425,975.03** | **$ 78,707,658.32** |

Summary of Losses Based on Minimum Wage and Liquidated Damages

| | Unpaid Amounts | Interest | Code Section 1194.2 Liquidated Damages* | Total |
|---|---|---|---|---|
| Refueling | | | | |
| Directly from Data | $ 2,903,319.93 | $ 1,027,787.18 | $ 2,147,901.30 | $ 6,079,008.41 |
| Additional estimated to 9/19/2023 | $ 545,725.21 | $ 26,371.12 | $ 545,725.21 | $ 1,117,821.53 |
| **Total** | **$ 3,449,045.14** | **$ 1,054,158.29** | **$ 2,693,626.51** | **$ 7,196,829.94** |
| DOT and other Law Enforcement Inspections | | | | |
| Directly from Data | $ 20,831.31 | $ 7,374.37 | $ 15,411.19 | $ 43,616.87 |
| Additional estimated to 9/19/2023 | $ 3,915.58 | $ 189.21 | $ 3,915.58 | $ 8,020.37 |
| **Total** | **$ 24,746.89** | **$ 7,563.58** | **$ 19,326.76** | **$ 51,637.24** |
| Breakdowns | | | | |
| Directly from Data | $ 4,919,797.79 | $ 1,741,628.62 | $ 3,639,709.13 | $ 10,301,135.54 |
| Additional estimated to 9/19/2023 | $ 918,463.38 | $ 44,382.97 | $ 918,463.38 | $ 1,881,309.72 |
| **Total** | **$ 5,838,261.17** | **$ 1,786,011.59** | **$ 4,558,172.51** | **$ 12,182,445.26** |
| Detention delays | | | | |
| Directly from Data | $ 33,187.68 | $ 11,748.57 | $ 24,552.53 | $ 69,488.79 |
| Additional estimated to 9/19/2023 | $ 6,238.15 | $ 301.45 | $ 6,238.15 | $ 12,777.75 |
| **Total** | **$ 39,425.83** | **$ 12,050.02** | **$ 30,790.69** | **$ 82,266.54** |
| Scaling events | | | | |
| Directly from Data | $ 95,443.82 | $ 33,787.50 | $ 70,610.16 | $ 199,841.48 |
| Additional estimated to 9/19/2023 | $ 17,940.18 | $ 866.92 | $ 17,940.18 | $ 36,747.29 |
| **Total** | **$ 113,384.00** | **$ 34,654.43** | **$ 88,550.35** | **$ 236,588.78** |
| Pre- and Post-trip inspections | | | | |
| Directly from Data | $ 11,613,279.73 | $ 4,111,148.72 | $ 8,591,605.20 | $ 24,316,033.65 |
| Additional estimated to 9/19/2023 | $ 2,182,900.82 | $ 105,484.46 | $ 2,182,900.82 | $ 4,471,286.11 |
| **Total** | **$ 13,796,180.55** | **$ 4,216,633.18** | **$ 10,774,506.02** | **$ 28,787,319.75** |
| Layovers | | | | |
| Directly from Data | $ 10,957,580.85 | $ 3,879,028.62 | $ 8,106,513.47 | $ 22,943,122.95 |
| Additional estimated to 9/19/2023 | $ 2,059,651.78 | $ 99,528.69 | $ 2,059,651.78 | $ 4,218,832.25 |
| **Total** | **$ 13,017,232.63** | **$ 3,978,557.31** | **$ 10,166,165.25** | **$ 27,161,955.19** |
| **Totals** | | | | |
| **Directly from Data** | **$ 30,543,441.11** | **$ 10,812,503.59** | **$ 22,596,302.99** | **$ 63,952,247.69** |
| **Additional estimated to 9/19/2023** | **$ 5,734,835.10** | **$ 277,124.82** | **$ 5,734,835.10** | **$ 11,746,795.02** |
| **Total** | **$ 36,278,276.21** | **$ 11,089,628.41** | **$ 28,331,138.09** | **$ 75,699,042.70** |

* Based on pay periods beginning 8/8/2018.